# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | |
|---|---|
| Aatrix Software, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Green Shades Software, Inc. <br><br> Defendant. | **DECLARATION OF JOHN B. LUNSETH II IN OPPOSITION TO DEFENDANT'S MOTION FOR STAY** <br><br> Civil Action No. 3:15-cv-00164-HES-MCR |

I, John B. Lunseth II, hereby declare:

1.  I am counsel for Plaintiff Aatrix Software, Inc., in the above-entitled matter and am personally familiar with the files, records and proceedings.

2.  As a result of some videos posted by Defendant Green Shades Software, Inc. ("Green Shades") on the Internet, Plaintiff became concerned that Green Shades was infringing the '615 Patent.

3.  I purchased a copy of Green Shades' publicly available software in August 2014 and engaged an outside technology expert for the purpose of reviewing the software to determine if infringement existed.

4.  During our review of the software we reviewed the End User Licensing Agreement ("EULA"), and I became concerned that the EULA purported to prohibit any in depth examination of the software. After reviewing the EULA I caused the review work to stop, and on or about September 25, 2014, I sent a letter to Defendant Green

7216882v1

Shades advising that Plaintiff was concerned that Green Shades was infringing Plaintiff's '615 Patent and requesting that Green Shades consent to an inspection and analysis of the software. A copy of the letter is attached as Ex. 1 hereto. Having received no response, a second letter was sent on or about October 10, 2014, a copy of which is attached as Ex. 2 hereto.

5. On October 16, 2014 I received an email from Green Shades' present defense counsel, Timothy Gillis, who requested a telephone conference. See Ex. 3 hereto. Counsel for the parties spoke by phone on October 17. Defendant's counsel described why they thought their client's software did not infringe. They agreed to send an email by October 20 or 21 confirming what they had said over the phone. I requested that Green Shades allow us to inspect and analyze Defendant's software subject to a Confidentiality Agreement that would provide for protection of Green Shades' proprietary information. It was agreed that I would draft a Confidentiality Agreement and that the Agreement would provide for a "standstill," that is, Aatrix would agree not commence litigation for 30 days (to December 31, 2014). The standstill was later extended until January 31, 2015 at my suggestion.

6. Green Shades' counsel sent a short, confirming email on October 21, a copy of which is attached as Ex. 4 hereto. That day I sent a draft of a Confidentiality Agreement to Mr. Gillis which is Ex. 5 hereto. I sent a redraft the next day, October 22, 2014, and a copy of the emails concerning the redraft are attached as Ex.'s 6, 7 & 8 hereto.

7.    Green Shades agreed to provide us with a detailed analysis as to why it believed its software did not infringe (herein referred to as the "Noninfringement Letter") by November 7, 2014 (see Ex. 6).

8.    Defendant raised a number of issues concerning the exchange of information and the Confidentiality Agreement in an email of November 5, 2014, a copy of which is attached hereto as Ex. 9. We immediately responded and among other things agreed that we would, after inspecting the software and reviewing the Noninfringement Letter, provide Green Shades with a detailed response. A copy of our email response is attached hereto as Ex. 10.

9.    On November 5 Green Shades' counsel requested additional time to draft their Noninfringement Letter, and I agreed. A copy of our email exchange to that effect is attached as Ex. 11 hereto. I sent opposing counsel a redraft of the Confidentiality Agreement on November 11, 2014, incorporating the changes we had discussed, and a copy of the email is attached as Ex. 12.

10.    On November 17, 2014, Green Shades sent its Noninfringement Letter. The letter has been designated as confidential by Defendant's counsel, and Plaintiff has filed a Motion to File Under Seal dated August 20, 2015. The letter makes no mention of any interpretation of the '615 Patent as covering or being directed to "designing, creating, calculating, and importing data into, an electronic form on a generic computer connected to a generic network that replicates a paper form and is viewable, editable, and able to be printed or electronically transmitted by a user of that generic computer," which is the primary abstract idea the patent is said to cover in Defendant's Motion to Dismiss

and Motion to Stay. On the contrary, the letter spends 4 pages walking through the recited structures of Claim 1 of the Patent, attempting to show that Defendant's software does not meet three of the four elements of the Claim. Those elements are denominated in the letter as the "'Form file' element," "'Form file creation program' element," and "'Form viewer program' element."

11.  The Confidentiality Agreement was signed on December 1, 2014. A copy is attached as Ex. 13. With the assistance of our outside expert, we proceeded with inspection and analysis of the Green Shades software.

12.  In discussions with Mr. Gillis and in an effort to simplify the work the parties were doing, I had identified Claim 1 of the '615 as the primary claim of interest. Green Shades' Noninfringement Letter went through each of the recited structures of Claim 1 of the '615 Patent, namely the form file, the form file creation program, the data file, and the form viewer program, and also addressed the remaining claims.

13.  We completed our analysis of Green Shades' software, and on February 12, 2015, sent a letter ("Infringement Letter") to Defendant setting forth our reasons why in our opinion Green Shades infringed the '615 Patent. Defendant's counsel has requested that the letter be filed under seal, and Plaintiff has filed a Motion to File Under Seal dated August 20, 2015. The inspection of software and the Infringement Letter addressed Green Shades' stated positions in the Noninfringement Letter point by point, following the recited structures of the Claim 1 of the '615 Patent, namely the form file element, the form file creation program element, the data file element, and the form viewer program element.

14. Having found definitive evidence of infringement, we also filed a Complaint with this Court but did not immediately serve the Complaint. We sent Defendant a courtesy copy of the Complaint, and we advised that a second patent, the '393 patent, had been allowed and would shortly issue. These matters are referred to in the Infringement Letter.

15. Green Shades requested a telephone conference on February 13, 2015, and a copy of Mr. Gillis's email to that effect is attached as Ex. 14 hereto.

16. At that point, Plaintiff had incurred $3,296 paid to Green Shades to acquire the software, had incurred over $33,000 in expert costs to inspect and analyze the software, and had expended over $130,000 in legal fees related to the inspection, analysis, and communications with Green Shades' counsel.

17. On February 13, Green Shades' counsel advised that even if their client's software infringed the '615 Patent, they believed the damages were small and that an attempt should be made to settle the matter before litigation.

18. Mr. Gillis said that they had engaged a damages expert to analyze the damages, and that they would provide a report from their expert. They further proposed that, upon receipt of that report by Plaintiff, the parties should attempt to settle, and if we could not settle between us, that we ought to agree to a mediation.

19. I responded that under Rule 4(m) of the Federal Rules of Civil Procedure, the Plaintiff would be able to hold off on service of process for 120 days. We told Defendant's counsel that if they wished to settle in that period of time, we were willing to try, but that settlement efforts would need to move quickly.

20. Mr. Gillis also advised that his office believed a new Confidentiality Agreement would be needed to cover the exchange of financial information that would need to take place, and said that he would draft one (the first Agreement only covered technical information).

21. Although at that point we had no information from Green Shades with which to evaluate or calculate damages, in view of the short amount of time available, we immediately engaged a damage expert and began to prepare her to assist us to receive, review and respond to the damage report from Defendant, and to quickly help us determine what additional information we might need from Defendant in order to respond. We identified our damage expert to Mr. Gillis on February 13, 2015 and a copy of the emails to that effect are attached as Ex.'s 15 & 16 hereto.

22. We set up a status call with opposing counsel for March 10, so that they could report to us on the status of their expert's work. A call was held on March 10, at which time we were advised simply that the expert had not completed her work, nor had Defendant drafted the proposed Protective Order, and that Defendant needed more time.

23. We sent Defendant's counsel a short request for information our expert thought would be needed on March 12, 2015 and a copy is attached as Ex. 17 hereto. The requested information was never provided.

24. We set up and held another status call on March 18, and again were told that the report had not been completed, that the expert was working on it, the Protective Order was not drafted, and that they would need more time.

7216882v1

25. We did not hear again from Defendant's counsel until April 29, 2015, when they sent a draft of a proposed Protective Order more than two months after it had been promised. We advised them that too much time had passed and that we thought at that point the best thing for us to do was serve the Complaint and get the lawsuit started, but that we would continue to discuss settlement with them if they wished. A copy of Mr. Gillis's email to me of April 29, and my reply of May 6, 2015, is attached as Ex. 18.

26. The Protective Order draft prepared by Defendant's counsel was not limited to a pre-suit exchange of information, rather, it was a Protective Order to be entered in the litigation that would cover all discovery. I felt that for that purpose the draft failed to address a number of issues. I therefore wrote a new Protective Order and forwarded it to Defendant on May 13, 2015, and a copy of my email is attached as Ex. 19 hereto. There were several discussions about the Protective Order, a satisfactory Order was eventually worked out, and it was filed with the Court on June 8, 2015 and entered. Dkt. 17.

27. However, as of the end of May no expert report had been produced by Defendant, nor any other documentation or analysis of damages. The 120 day deadline for service of process was approaching expiration and we had no indication from Defendant what, if anything, they wanted to do to further the settlement discussions they had proposed. We therefore caused the Amended Complaint to be served on May 26, 2015. Dkt. 9. The amendment to the Complaint was made to include a claim of infringement of US Patent No. 8,984,393 that had issued on March 17, 2015, notice of which we had previously given to Green Shades.

7216882v1

28. At no time during any of the parties' work prior to service of the Amended Complaint had Defendant advanced a view that the '615 Patent was directed to "designing, creating, calculating, and importing data into, an electronic form on a generic computer connected to a generic network that replicates a paper form and is viewable, editable, and able to be printed or electronically transmitted by a user of that generic computer." On the contrary, they had consistently interpreted Claim 1 of the Patent was directed to the elements recited in the Claim, namely, the form file, the form file creation program, the data file, and the form viewer program, as those terms are used in the Claim.

29. In early June, 2015, Mr. Gillis contacted me requesting an extension of time to submit an Answer to the Amended Complaint or otherwise plead. My response is attached hereto as Ex. 20. I advised Mr. Gillis that I was fine with the requested extension provided the filing of any Rule 12 Motion would not delay discovery.

30. I received a draft Consent Motion from Mr. Gillis's office on June 8, 2015 and a copy of the email is attached as Ex. 21. The draft purported to document the agreement Mr. Gillis and I had made, but the language was not specific enough in my view. Accordingly, I sent Mr. Gillis an email on June 11, 2015 requesting changes in the text of the Unopposed Motion, and Mr. Gillis responded saying he would make the changes and file the Motion. A copy of my email of June 11 and Mr. Gillis's response is attached as Ex. 22. My requested change was to state in the Motion:

> The parties respectfully request that neither this extension of time nor the filing of any pleading or Rule 12 or other motion concerning the pleadings, shall delay or extend any other deadlines applicable to this case, including the deadlines set forth in Local Rule 3.05(c)(2)(B) or Rule 26, Federal Rules of Civil Procedure, nor shall they delay the commencement or conduct of discovery or the filing of Initial Disclosures.

This language was incorporated in the Unopposed Motion filed with the Court, Dkt. 18, and an Endorsed Order was entered, Dkt. 19.

31.   I began practicing law in October 1977 and have done so continuously since then. My practice has been almost entirely as a litigator. When I last looked about five years ago, I had been lead counsel in over 100 matters in various Federal District Courts around the United States. I have been lead counsel in at least that many cases in the state courts. My practice over the last roughly 20 years has been in Intellectual Property litigation. Most of my patent litigations have been in representing Defendants, although I have handled some Plaintiff's patent cases, including the present case.

32.   I have been involved in a small number of cases where stays have been entered, it is not a common occurrence in my experience. In the past decade it appears to have become a strategy of choice in defending patent cases. My experience with stays is that they are costly, prejudicial, and virtually never accomplish the objective for which the stay is granted.

33.   In my experience, the first effect of a stay is that momentum is lost in tangible ways that increase the cost for all the parties. Within the law firms, lawyers are assigned to staff the case at the beginning of a case. Meetings are held (and have been held by me, with my staff, at my law firm, in this case) concerning the new matter. A considerable amount of time is spent getting the staff educated as to the patent, the technology, the products of the client and the infringer, and the damage aspects of the case, among others. When a stay is issued, we need to reassign the lawyers who were assigned to that case, so that they have work to do. When, some unknown amount of

time later, the stay is lifted, we generally find that some or all of that staff is no longer available, they have been moved to other cases. We need to assign new staff and begin the process of familiarizing the new lawyers all over again.

34.   Essentially the same thing happens to the lawyers and experts that remain with the case. They put down their files when a stay is issued, move on to other matters, and need to spend quite a bit of time re-familiarizing themselves when the stay is lifted.

35.   These issues are not theoretical. In the present case, these things will happen to me, to the staff lawyers I have assigned to the case, and to the experts I have engaged and paid to date to work on the matter. When the stay is lifted all of us will need to repeat work we have already done, at substantial cost to the client. I estimate the "stop and start" cost to the client in this case will be a minimum of $50,000.

36.   Work already done between the counsel for the respective parties will need to be repeated. In this case the parties have worked out and submitted a Case Management Report which is fairly detailed, and Initial Disclosures are being exchanged on August 21, 2015. If a stay is entered and later lifted, meeting and agreeing on a Case Management Report will need to be done over as will Initial Disclosures.

37.   There have been, as reflected earlier in my Declaration, months of discussions between me and my office, on behalf of Plaintiff, and Defendant's counsel, toward the end of resolving this matter by settlement. Those discussions will come to a complete halt. It is my experience that stays never help settle a case. Whether this matter can be settled remains to be seen, but if a stay is entered the chances of that occurring go down to practically nothing. In my experience parties rarely if ever settle when a stay is

pending. A major reason is that without discovery and depositions, and without interpretation of the claims of the patent, neither party has sufficient information to evaluate the case for settlement purposes.

38. Yet another issue with stays in my experience is that they are never as brief or well managed as the parties or the Court believed they would be at the outset of the stay. I was involved as lead counsel in a case in Federal District Court for the District of Minnesota a few years ago (*Card Technology Corp. v. Datacard, Inc.*, Case #: 0:05-cv-02546), where a stay was entered pending reexamination of patents of both parties by the United States Patent and Trademark Office. At the outset, as I recall, the statistics on reexams were that they were completed in about 18 months, and that was the length of time that was given to the Court in support of the first stay request (not by me). In reality, the stay lasted for 4 years and the litigation itself was pending for 6 ½ years. Although Court's sometimes feel that they can effectively manage a stay to avoid such protracted prejudice, it is my experience that once a stay is entered that does not happen. Since the litigation is no longer moving forward, it falls off the radar for everyone including the Court, and effective management of the case ceases.

39. Further, in my experience, life events occur during the pendency of stays that cannot be predicted by anyone in advance, but that have a major impact. I have had one case where the key witness passed away during a postponement of discovery (not a formal stay). I had another case (the aforementioned District of Minnesota case) where the CEO of an opposing party, who was a key witness, was fired, and where one of the key witnesses for our client received a job promotion to a station in the Far East, making

7216882v1

it extremely difficult to communicate with him or to bring him to Minnesota for depositions when the stay was lifted. Life events happen even when cases are proceeding, of course. But the problem is that when a case is ongoing the lawyers are in constant touch with the parties and learn beforehand about most life changes, or at the worst, very shortly after the change, at times when something can still be done to accommodate the change, as for example by taking the deposition of a witness to preserve the testimony. When a stay is in place the lawyers are no longer in regular contact with their clients, life events happen, and when the stay is lifted, key witnesses have become inaccessible and sometimes documents have been destroyed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of August, 2015.

John Lunseth

7216882v1