**In the Matter of:**

*AATRIX SOFTWARE, INC.*

*vs*

*GREEN SHADES SOFTWARE, INC.*

---

*HEARING*

*February 27, 2019*

---

Cornerstone Litigation Services, LLC
301 West Bay St., Suite 1400
Jacksonville, FL 32202
Phone: (904) 647-4723
www.clsjax.com



```
 1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
 2                JACKSONVILLE DIVISION

 3
    AATRIX SOFTWARE, INC.,          Jacksonville, Florida
 4
    vs.                            Case No.
 5                                 3:15-cv-164-J-20MCR
    GREEN SHADES SOFTWARE, INC.,
 6                                 February 27th, 2019
              Defendant.
 7                                 1:27 p.m.

 8                                 Courtroom No. 10C

 9  _____

10              PROCEEDINGS BEFORE THE
             HONORABLE HARVEY SCHLESINGER
11       SENIOR UNITED STATES DISTRICT JUDGE

12  PLAINTIFF'S COUNSEL:

13          JOHN LUNSETH, Esquire
            JOANNE O'CONNOR, Esquire
14          Briggs and Morgan
            80 South 8th Street
15          Minneapolis, Minnesota  55402

16  DEFENDANT'S COUNSEL:

17          JOSEPH BAIN, Esquire
            HAROLD GILLIS, Esquire
18          Shutts & Bowen, LLP
            525 Okeechobee Boulevard, Suite 1100
19          West Palm Beach, Florida  33401

20  COURT REPORTER:

21          Stephanie Lachowicz, RPR, FPR
            Cornerstone Litigation Services, LLC
22          301 West Bay Street, Suite 1420
            Jacksonville, Florida  32202
23
    ALSO PRESENT:  Marsha Grant
24                 Matt Kane
                   Steven Lunseth
25
```

```
 1                    E X H I B I T S

 2   RECEIVED IN EVIDENCE:

 3   DEFENDANT'S 1    ISO 5087............................ 110

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          THE COURT:  So someone raised a question about did
 3    we have to stand at the lectern.  Did we --
 4          COURTROOM DEPUTY:  That was me.
 5          THE COURT:  You did.  So I don't know.  Whichever is
 6    the easiest for you to do.  If it's easier to sit down at
 7    the table and plug your things in there, feel free.  The
 8    jury isn't here.  We don't have to worry about standing,
 9    and I --
10          MR. LUNSETH:  We had some technical problems of
11    getting the lectern, but they've been solved, so probably
12    we can stand.
13          THE COURT:  Okay.  You got a long cord?
14          MR. LUNSETH:  Yeah.
15          THE COURT:  I figured that's what it would take.
16          MR. LUNSETH:  It was an adapter.
17          THE COURT:  Now, so that you understand -- of course
18    I'm not supposed to criticize other courts.  I think that
19    the federal circuit en banc opinion hit it on the head.
20    These people need to earn their money and do something.
21          So I have the original circuit opinion -- en banc
22    circuit opinion, the orders that I issued recently about
23    how we're going to do this, a copy of the updated docket
24    sheet, and my law clerk prepared for me a nice little
25    booklet that says docket entry number 124.  I have the
```

1   joint claims construction chart.  I have docket entry

2   number 110, which is the plaintiff's opening claims

3   construction.  I have docket number 112, which is the

4   declaration of Mr. Rosenblatt.  I know there was another

5   declaration.  That's Mr. -- is it Lunseth?  Is that how

6   it's pronounced?

7        MR. LUNSETH:  Yes, Your Honor.

8        THE COURT:  Okay.  That would be docket number 111.

9   I have the vitae of Rosenblatt, and I have docket number

10  115, which is Defendant's opening claim construction

11  brief; 114, which are the declarations of Mr. Bain and

12  all the exhibits.  I think there are like 20-something

13  exhibits attached to that.

14       I also have docket number 117, which is the response

15  to the claims construction filed by the plaintiff.  Then

16  I have a second declaration of Mr. Rosenblatt and another

17  declaration from Mr. Lunseth, and I have a defendant's

18  response -- defendant's responsive claims construction,

19  which is 112.

20       I have 121, which is another declaration from a

21  Dr. Rosenberg; and number 122, which is Plaintiff's

22  motion for leave to file a reply, which I think I denied.

23  And then the opposition for that motion and then, as I

24  said, I have a copy of the order, which would be docket

25  number 128 on February 8th entering the order denying.

1          So it would be helpful to you, you just tell me

2    where you're speaking about or what you're highlighting.

3    I know you can't between two sides go through every page

4    in three hours, so we'll go in the order that I entered,

5    docket entry number 129 earlier this month, on how we

6    should do this.  But if you could tell me where you are,

7    if you're speaking about one of those documents, just

8    point it out, and that way I can flip to that document

9    and get to the page so I can make my notes in that book.

10   And if not, I've got my yellow pad and a pen.  I'll write

11   it on here.

12         So I thought you were going to come back and say to

13   me, oh, we decided we're going to form a joint venture

14   and make a million dollars a day selling this thing.  I

15   guess not, though.

16         Okay.  So if you -- if you did -- if you wanted to

17   do it sitting down, we can do that if you'd be more

18   comfortable than having to stand up here for hours.

19         MR. LUNSETH:  I sat all day.

20         THE COURT:  I won't tell your client they shouldn't

21   pay the hourly rate you're charging because you sat down

22   instead of having to stand up.

23         MR. LUNSETH:  I sat all night on an airplane, so

24   standing might be good.

25         THE COURT:  I was going to say you've had some

1    pretty bad weather.

2         MR. LUNSETH:  Yeah.  It wasn't weather.  We -- the

3    airplane we got on in Minneapolis was broken, so they

4    took us off it and --

5         THE COURT:  You were flying Southwest?

6         MR. LUNSETH:  No.  Delta.

7         THE COURT:  Delta?

8         MR. LUNSETH:  Yeah.  And so we missed our connection

9    in Atlanta, so we got into Jacksonville and hit the hay

10   at 12:49 for me, but --

11        THE COURT:  I can't help you with that.

12        MR. LUNSETH:  I know.

13        THE COURT:  So now --

14        MR. LUNSETH:  So I'm going to stand.

15        THE COURT:  Now having gone through all of that,

16   when you go to work in the morning, do you have to

17   actually go outside or you walk through the bridges?

18        MR. LUNSETH:  I go outside for ten feet.

19        THE COURT:  That's about it.

20        MR. LUNSETH:  From my back door to my garage.

21        THE COURT:  There was a magistrate judge in

22   Minneapolis.  He was on re-call from Florence, South

23   Carolina.  His name was Skip Swearingen, and he was up

24   there for maybe three or four years.  I know the first

25   fall that he was there his wife went out and got him a

1   full length heavy wool coat which sat in his closet the

2   whole time he was there because he had an apartment

3   downtown, and I did the route with him one time.  He was

4   explaining how he would walk through some of these

5   department stores and get to the courthouse, and he never

6   went outside in the wintertime.

7          MR. LUNSETH:  You don't have to.

8          THE COURT:  I know.  Pretty clever.  Pretty clever.

9          I have a neighbor who's from Winnipeg, Canada, a

10  surgeon, and when he was in medical school his wife was

11  pregnant.  And all of the buildings in that university he

12  went to were covered with an underground tunnel, so when

13  she's getting ready to deliver they're in the student

14  apartments on one end of the campus, and the hospital was

15  all the way on the other side.  Had to make the big

16  circle.  Said he was going to try to teach them to move

17  them a little bit closer, but no.  I think whoever

18  designed Minneapolis knew what they were doing.

19         MR. LUNSETH:  I hope so.

20         Mr. Bain and I have talked about how to do this

21  presentation.  We elected not to bring in actual

22  witnesses because it takes forever.  We'd be here for two

23  or three days.  What we have agreed is that I'll give you

24  a tutorial on programming and the technology for -- it

25  will run a half hour, 40 minutes with my PowerPoint.

1      He has an opportunity to respond to that, and then

2    we'll go through claim term by claim term one lawyer

3    getting up and presenting their position, the other

4    getting up and presenting their position.

5      I'm going to use a PowerPoint.  I found in all the

6    journeys in the airplane that didn't work that the

7    PowerPoint that I have on my screen was not quite the one

8    I printed out.  I told that to Mr. Bain.  I gave him a

9    copy.  You're welcome to have this.  Most of what you'll

10   see on there is -- on the screen is in this PowerPoint.

11   I can print you out a final copy and send it after the

12   hearing is over if you'd like.

13      THE COURT:  Well, if you have an extra copy, then I

14   can make notes right on that.

15      MR. LUNSETH:  Yeah.  That's what I'm suggesting.

16      THE COURT:  That will help.  Okay.

17      MR. LUNSETH:  I'm just saying you might find some

18   things changed or missing.

19      THE COURT:  That's okay.

20      MR. LUNSETH:  That's the reason for it.

21      THE COURT:  So we'll just consider this a draft.

22      MR. LUNSETH:  Yep.

23      THE COURT:  And I took an oath to do the best that I

24   can.  I'll tell you right off the bat I'm no engineer.  I

25   told my wife if I was good in engineering, I wouldn't

```
 1   have gone to law school.  But some of this stuff when you

 2   read the circuit about how it says you should do this --

 3   these Markman hearings, a lot of stuff was actual -- I

 4   don't want to call the word gibberish, but I am not what

 5   you would say computer literate the way probably a good

 6   engineer would be, so if you can enlighten me, I'll be

 7   happy to.

 8        MR. LUNSETH:  Okay.  What I'm seeing is different

 9   than what you're seeing, and I wasn't sure what the heck

10   that was but --

11        COURTROOM DEPUTY:  I didn't want to publish.

12        MR. LUNSETH:  Thank you.

13        THE COURT:  Wait a minute.

14        MR. LUNSETH:  You should have it on the screen in

15   front of you, Your Honor.

16        THE COURT:  Yes, and unfortunately I don't.  There

17   we go.  Okay.  Got it.  That's the first page that's on

18   here.  I'm with you now.  Are there a lot of changes that

19   you're going to have to make on the final between the

20   PowerPoint?

21        MR. LUNSETH:  Pardon me?

22        THE COURT:  Are there going to be a lot of changes

23   on the draft you gave me?  I mean, if it's like a word in

24   every ten pages, maybe if you just told me which one, I

25   can hand change it here and then you won't have to go
```

1   through.

2        MR. LUNSETH:  There are a couple of extra slides and

3   there are a few words changed in there and I will try to

4   highlight it for you.  It will certainly pop out to you,

5   but the substance of it has not changed.  I could --

6   there was no way to print it out at the hotel today.  I'm

7   sorry.

8        THE COURT:  Well, if you were in a hotel, they would

9   charge you $1,000 to print it anyway.

10       MR. LUNSETH:  I know.  So at the start of the 1967

11  season Vince Lombardi held up the football and said, this

12  is a football.  He was famous for going to fundamentals,

13  and what I want to do today, although I'm not a

14  programmer, is to try to give you an understanding of

15  programming and then an understanding of how the Aatrix

16  technology works, which is the subject of the patents,

17  and then a little bit on basic claim construction law and

18  then we'll get into the claims.

19       So there are two types of programming languages, two

20  major classes.  One is machine code.  And machine code is

21  binary instructions that run on a computer, and I'm going

22  to show you some in a minute so you'll have a concrete

23  example.

24       Then there's programming code or instructions, and

25  as a general rule machine code can't be read by humans.

 1   It can be read by some humans, but it's very difficult.

 2   Programming code is what programmers use to write a

 3   program, and there's several types of programming code.

 4        There's assembly language, which is a system of

 5   pneumonics, and it's mainly used to assemble the pieces

 6   and parts of the computer so that they talk to each

 7   other.

 8        And there is compiled language, and compiled

 9   language is much more powerful than assembly language,

10   and it requires some sophisticated -- sophisticated

11   processing to convert it to machine code so the computer

12   can understand it.  And that's called running it through

13   a compiler, and I'll have a slide -- a couple slides on

14   that.

15        And then the third type of programming language is

16   called interpreted language, and this is a little unique.

17   So the code that the programmer writes is sent directly

18   to a computer that has on board an interpreter, and it

19   does not convert that code directly to machine code.

20   Rather it understands how to execute the code, and it

21   directs the machine in executing the code.

22        There are at least 54 different programming

23   languages.  I pulled a list up on Wikipedia.  It didn't

24   make any sense to me, so I don't think I'll give you the

25   whole list.

1           But the point of this is that all of them -- all of
2    them are programming languages, languages in which
3    programmers write programs for computers, and the
4    programmer can pick this language or pick that language
5    or this format of language.  There are many choices to
6    make, but they're all programming languages.  And all of
7    them have to either be assembled with an assembler,
8    compiled with a compiler, or run through an interpreter
9    to make the machine work.
10          So this is binary code, and I don't know what Your
11   Honor understands about computers.  To put it simply, a
12   computer is a set of transistors that you can switch on
13   and off.  And by switching those transistors on and off,
14   they're set up in logic circuits, you can cause the
15   computer to run work.  And you do that by sending
16   electronic pulses, either no pulse for off or a pulse for
17   on.
18          So the way machine code is written is this example
19   that you see right here, zero for off and a one for on,
20   and that's mathematics.  It's what we call a base two, so
21   you only get two digits.  You get zero and one, and so if
22   you wanted to count, it would be zero, one, one zero.
23   One one would be three and so on and so forth.  That's
24   machine code.
25          The machine code is arranged in bits, so a single

1  digit -- that zero right there is a bit.  And bytes --

2  and a byte is a character of eight digits, and some

3  people think 16 as a byte today, but that's not very

4  important.

5       Data to the computer is basically any information,

6  any bit and byte that runs through the computer

7  represented in binary code, and you need to understand

8  that this is a word that has a contextual meaning to

9  programmers and to those in the computer arts.

10 99 percent of the time that we use that word data, we

11 aren't referring to all the zeros and ones that run

12 through a computer.

13      So let's say you do a scientific study on people's

14 toothbrushing habits and you document how many times they

15 brush in the morning and how many times they brush at

16 night and how many times they floss and on and on.  You

17 get a whole base of this data, a set of numbers that has

18 nothing to do with a computer, and we would call that

19 data.

20      Well, there's a meaning of data in computer

21 technology that is the same as -- as that, and that

22 meaning is that the information that a computer operates

23 on as opposed to the commands or instructions that a

24 computer -- that make a computer operate.  So we can

25 either tell a computer add these two numbers, that's an

1   instruction, or we can give the computer two and two plus

2   the instruction.  And the two and the two are data, and

3   the plus is an instruction.

4        So for most of this presentation when we use the

5   term data, that's what we're referring to.  We're

6   referring to the information that comes into a computer

7   that it operates on, a set of numbers or something like

8   that that we want the computer to crunch.

9        THE COURT:  And then the instruction would tell them

10  what to do with --

11       MR. LUNSETH:  You got it.

12       THE COURT:  -- the number.

13       MR. LUNSETH:  That's exactly it.  But what I'm

14  trying to get at is that in the pure scientific sense of

15  the word sometimes data is used to cover it all because

16  to a computer zeros are zeros and ones are ones and

17  that's all they see.

18       This is a form of code, not very important again,

19  called hexadecimal notation.  It's another way of writing

20  binary code.  We give you 16 digits, so each two-digit

21  set represents an entire byte in binary.

22       And this is a piece of code.  What I'm showing you

23  here is a sample of code in a compiled language.

24  Remember we have assembled, compiled, and interpreted, so

25  this is what code would look like if it's in a compiled

 1  language.

 2      Over here is this squiggle bracket that says a code

 3  starts now.  This means integer, and that just means I'm

 4  going to declare a variable.  The name of the variable is

 5  wages, and I'm giving it a value, two.

 6      The next one is the same thing.  Declare a variable

 7  tips, and the value of that is three and declare another

 8  variable total.  We're not going to assign a value to

 9  that right now, and then we're going to -- so this is

10  data up here.  Wages is tips.  Wages is two, tips is

11  three, and declaration of variables and then this is a

12  formula.  It's an instruction to the computer.  Sum up

13  wages plus tips and give me the total.

14      In order to run this on the machine, it has to be

15  put through compiler software, and the compiler software

16  automatically puts out machine code.  In this case it's

17  reflected as hexadecimal code.  That's what the computer

18  understands and what it can operate on.

19      But you can write code in more than one language, so

20  this is a sample of code in an interpreted language.  The

21  last one was compiled language called C.  This is an

22  interpreted language called Perl.  And you have the same

23  code just with different symbols, so this is -- the

24  dollar symbol means scaler.  It means there's just going

25  to be one item of data here.  We're going to declare a

1   variable.  That's wages, and the value is two and so on

2   and so forth.  We've written the same code.

3       But what happens here is that there's an interpreter

4   sitting in the computer.  Rather than converting the

5   code, the -- the compilable code into machine code and

6   running it through the computer that way, we send it to

7   the interpreter.  The interpreter knows what to do with

8   it, and the interpreter itself decides how to run the

9   instructions on the machine.

10      I was trying to think of an easy way to get this

11  across, and let's say you have a -- maybe I have this on

12  a slide.  No.  Let's say you have --

13      THE COURT:  Go back.  Okay.  That's where I wanted

14  to be.  Okay.  So where you have that information above

15  where it's written interpreter, there are 54 different

16  ways to do that?

17      MR. LUNSETH:  Yes.  And there -- there are two basic

18  types of languages -- three, but we're only going to talk

19  about two today.  You can have an interpreted language,

20  and you can have a compiled language.  Let's do -- let's

21  do it this way.  Let's take a command, draw line, 7.23,

22  which means draw me a line in the screen that's

23  7.23 inches long.  You can write that in a compilable

24  language and convert it to machine code, and the machine

25  code will get processed through the machine and you get a

1    line.

2         The interpreter would do something different.  The

3    interpreter, if you will, knows how to draw a line.  You

4    draw a line by illuminating pixels all the way across the

5    screen.  So it gets the code draw line, 7.23, and it

6    converts that into all the code that is necessary to

7    illuminate all the pixels.  And in other words, the

8    interpreter makes the decision about how to operate the

9    machine.  The machine code, that's direct, but they will

10   both do the same thing.

11        So here's another issue that you'll hear about later

12   on in claim construction.  Programs or programming

13   consists of both code and data, and this is an example.

14   This is the same code we spoke about before, integer,

15   wages equals two, tips equals three, total.  And you run

16   it through a compiler, and the compiler splits it out

17   into two sections of machine code.  But what you actually

18   have here are things like this formula which is an

19   instruction and this two, which is an item of data.

20        You can put data in programs or you can write

21   programs with a separate data set and a separate

22   instruction set.  It's up to the programmer.  If you're

23   going to write a code let's say for a form and the form's

24   going to be the same this year and again next year and

25   the command is just draw a line, 7.23, why would you set

1  up a separate file and write a data file and -- and have

2  it separate from the commands?  It's just as easy to do

3  it the way I said.  It's a choice.  It's a choice the

4  programmers make.

5      All right.  Forms, fields, and form files.  So this

6  is a very abbreviated Florida tax -- tax form, and

7  pretend this is a piece of paper.  And what you have on

8  this piece of paper obviously is the state seal and the

9  caption Florida Tax Form, and wages is labeled.  And then

10  you have a block, and the block is a user input field.

11  You would write something.  If you're working in paper,

12  you would write something in that field, $10,000 or $2 or

13  whatever it is.

14      This is a calculated field.  You'd sit down with

15  your calculator, and you would do the addition.  And then

16  this is another calculated field that has a formula or a

17  rule condition in it.  In this field you would have to

18  decide if it's over $50,000, then my tax is just a flat

19  5,000.  If it's under $50,000, then it's 10 percent of

20  whatever that amount is.

21      So how do we do this in a computer system?  And this

22  is the beginning of the Aatrix technology.  The problem

23  is to convert that form which is on paper -- the computer

24  can't do anything with it, it's just an image -- into

25  something that the computer can actually use.  And to do

1    that you take the original form, and you would capture an

2    image of it by some means.  How you do it is not

3    important, and then you would overwrite three layers.

4        The first layer is going to be the background layer,

5    so on this layer you are overwriting all the graphics and

6    texts that appear on the form in order to try to

7    re-create the form as precisely as you can.  And there's

8    lots of -- I don't know if you've played even with a word

9    processer, but there are lots of tools that you can do --

10   use to drop boxes and put in text and that kind of stuff.

11       The difference is when you're doing it in the

12   computer, what you're going to capture is code.  It's not

13   an image of something.  It is computer code that will

14   tell another computer how to re-create that graphics and

15   text.

16       The second layer is fields.  So the way a computer

17   works is when you declare a variable and assign it a

18   value, you have to tell the computer where to put it in

19   memory.  Usually it's random -- called random access

20   memory.  It could be on a disk.  Could be in a process of

21   some place, but you have to give the computer an address

22   and say, here, store this information here.

23       And you want to assign to that data field certain

24   characteristics.  For example, you want it to display in

25   dollars and cents as opposed to text or just a pure

1    value.  So that gets stored in the computer's memory.

2         And then the third layer is a programming layer.

3    It's programming for calculations and rule conditions.

4    Programming -- I think you probably grasp it already

5    because we talked about total equals wages plus tips.

6    Rules conditions are a little more complicated, and they

7    can do just about anything, so it's basically an if then

8    else statement.  If something is true, then do this.  If

9    it's not, do this.

10        One implementation of it would be, okay, you filled

11   out your Florida tax form, and at the bottom there's an

12   amount due.  You could code that field with an if then

13   else statement that would say, if there's an amount in

14   the bottom line, display Schedule B.  Schedule B is the

15   payment voucher, so that instructs the computer to bring

16   up a payment voucher that the user would fill out in

17   order to actually pay their tax.  If then else.

18        If then else has a lot of uses, but those are the

19   three layers.  And what's important here is this original

20   image, the piece of paper that we started with, a paper

21   Florida tax form, it's gone.  It's not in the computer.

22   It's not used by the computer other than to create a

23   computerized form, and that computerized form is what is

24   then passed around from one computer to another and

25   actually used.  The image form is gone.  Computers don't

 1   know how to use image forms.

 2         So this is actually -- we looked at a -- sort of a

 3   3-D or layered version of the Aatrix technology.  This is

 4   actually a screen where a form is being created in what's

 5   called the form file creation program of the Aatrix

 6   patents.  You'll see several things up here.  There's a

 7   lot of material in red.  All this material in red is text

 8   that's been typed in or boxes.  This is a lot of graphics

 9   that will ultimately appear on the form that gets printed

10   up.

11         And then remember that we also have to have fields,

12   which aren't the box.  They're a memory address where

13   you're going to store data so the computer can work on

14   the data.

15         So if you look -- we'll just pick one here.  If you

16   look at that box, you'll see there's an outline in red.

17   That's the graphic.  And then there's an outline in

18   black.  The black tells the person who's doing the form

19   design work you have set up a data field into which data

20   can go so it is put into the computer's memory someplace.

21         These data boxes are the data boxes where data from

22   business accounting software, for example, will get

23   brought over and will get filled in on the form or the

24   user can type into the form.

25         You'll also see boxes that are in blue.  So there's

 1   a red outline.  That's the graphics.  And then there's

 2   the blue box, and the blue box is for rules conditions

 3   and formulas programming.

 4       So in this example there is a box here with a data

 5   field.  Data would be put into the data field.  It needs

 6   to be multiplied by -- I think it's .124 percent.  So in

 7   this blue box this data field over here would be a

 8   formula, a little program for doing the multiplication

 9   and displaying the results of the multiplication.  Data

10   programming.

11       Now, this is all done by hand.  Not quite by hand.

12   It's done with the assistance of a computer.  In other

13   words, a person, which is called a form designer, sits on

14   a computer and underneath the screen is an original, and

15   they manually create graphics over the original.  And

16   this is a video.  It's real short, but if you watch, I

17   had one of the form designers at Aatrix create a box with

18   a cursor and then create a data field in that box and

19   then create a text box and then type in some text.

20       So that's a simple example, but that has to be done

21   over that whole entire form in order to create a set of

22   code and instructions that the computer can use to

23   re-create the form called a form file.  You pass the form

24   file to another computer.  It looks at all the

25   computerized instructions that have been created, and it

```
1   can re-create the form.
2       So this is some sample code from the Aatrix form
3   file creation program.  In Aatrix's favorite embodiment
4   it generates a form file in an interpreted language, so
5   here's our tax form again, and the code for this would be
6   text.  Center black bold means put this symbol there.
7   This is an instruction to put this text there, and this
8   FLD is a declaration of a variable of I'm declaring a
9   field.  Its name is wages.  It should appear in dollars,
10  and it will be entered.  And then there are also fields
11  down here for calculations, so that's what the code looks
12  like.
13      The important point is all of this, it's not the
14  original image.  That's long gone.  The Florida -- paper
15  Florida tax form, if we used one, that's gone.  This is
16  all computer code that's been created, and this part of
17  it in particular is programming code.
18      So you take all this code, this is the same code
19  that we saw in the last page, and you pass it to an
20  interpreter in a computer.  And that's the form viewer
21  program of the Aatrix software, and it is a well-educated
22  form viewer.  It's been around for quite a few years, and
23  it knows just exactly what to do with all of these short
24  form instructions that are put in a form file in order to
25  re-create a form on a computer screen for the user.
```

1         The data files.  This is one of the issues they

2    faced when they first came up with the idea of creating

3    this add-on software, the Aatrix add-on software.  The

4    end user application is a business accounting software or

5    some other separate software.  It has a lot of data in

6    it, and we want to take some of that data and we want to

7    put it in a form, create -- fill the form out and create

8    a form with it.

9         The problem back in the day, back in the early 1990s

10   was that the people who created that user application,

11   the business accounting software, held that close to the

12   vest.  They didn't want to tell anyone how their data was

13   structured.  If they did, somebody could restructure the

14   data, put it in a different form, keep that secret, and

15   they've lost a customer.  So there had to be a way to

16   pass the data without knowing the structure that the data

17   sits in the business accounting software.

18        So what Aatrix did was said, well, okay.  You won't

19   tell us.  We will publish to you exactly what data we

20   need from the computer to fill out -- from the business

21   accounting software to fill out a particular form and

22   exactly the format of the file we want you to put that

23   into.

24        So the -- that information is published, and then

25   the end user application, the business accounting

1   software, using that information can export the

2   information into the correct data file format.  It takes

3   it out of its own application database, and instead of

4   passing individual bits of data over to the computer

5   that's going to fill out the file, it sends a data file.

6       And there are two ways to -- there are a couple of

7   things that are important about this.  There's been some

8   discussion off and on about data recognition, which is

9   trying -- a computer trying to figure out what the

10  payment amount of the check is, for example.  This is not

11  that.  In the business accounting software is the value

12  for wages.  It is the value and it's expressed in a

13  computer language and there's no question what it is and

14  where it is.

15      So one thing this does is it passes data that is

16  already identified as the correct data, and then it

17  passes it in a file that's either structured or tagged.

18  Structured means the first item is going to be your last

19  name, the second item is going to be your first name,

20  address, the fifth item is going to be wages, the sixth

21  item is going to be tips.  We're going to separate them

22  all by in this case tabs by -- so you would hit the tab

23  on the computer.

24      So that's exactly what you have here.  You have a

25  record with period tab, employee tab, wages tab, tips.

1   So this is an example of a structured file sent over.

2        The other way is to put each item in a -- if you

3   will, in a shopping cart, and the shopping cart has a

4   flag and it runs around saying I'm the period data or I'm

5   the employee data or I'm the wages.  Either way the

6   computer knows exactly what -- the computer running the

7   form viewer software knows exactly what data to pull out,

8   and it is exactly the correct data.  So that was the

9   concept of the data file.

10       So the data file then gets the data, puts it in a

11  data file.  The data file is passed to the computer that

12  is creating the form.  The code for the form up here has

13  been passed to the interpreter.  The interpreter runs

14  this code for the form, pulls the data out of the form,

15  and presents a viewable form on screen.

16       This is going into some of the prior arguments, and

17  it's an issue only because some of the claim

18  interpretations that Defendant's counsel has presented

19  tried to distance the current Aatrix invention in ways

20  that I don't think are permissible from prior art, so

21  let's just figure out what the prior art looked like.

22       Once upon a time Aatrix had a business accounting

23  software.  It was called the payroll series software, and

24  in that days back in the early 1990s all these things

25  were basically written in compiled source code and as one

1   big continuous block of code.  The program might be

2   58,000 or a million lines long.  All of that would be

3   converted to machine code and sent to the computer, and

4   then the computer would be running all of that code at

5   the same time.  That was the way that everybody did it.

6        The problem -- there were a lot of problems with

7   this continuous block or mono- -- monolithic source code.

8   One was if you wanted to change anything in it, it was

9   difficult.  You had to change a line of code, but

10  everything in the whole block depends on the sequence of

11  the lines of code, so you would have to debug the code,

12  make sure that it runs correctly.  It was a pain.

13       And back in that day if you wanted to display a

14  form, you wrote it in the source code -- in the

15  monolithic source code for the business accounting

16  software.  It was part of that code.  So next year when

17  you decided you wanted to update that code, it was a

18  problem.  You had to redo that whole monolithic code

19  block.

20       So what this basically shows is that you take that

21  old code block, run it through a compiler.  It would

22  split it up into machine code, and it would run all that

23  code at one time.  And you can see this in the patent.

24  This is our former patent citation, so that's the patent.

25  Column 1, lines 13 to 21.

1    So the first step was a simple copy and paste job.

2    It's got to be easier to make a form than writing code

3    for the form, which takes a long time, so the -- one of

4    the inventors, Dale Jensen, came up with a set of these

5    graphical tools so that you could place graphics boxes

6    and texts and things like that on a form.  But what was

7    created was not a form file.

8    What was created was a set of source code, several

9    lines of code, and you would copy that and you would then

10   paste it into -- right over here again into the

11   monolithic code.  You would paste a section for source

12   code for the 941 form.  And the problem with that again

13   is you got to debug it because you're dealing with a

14   whole big mono block code.  It's not simple.

15   So he came up with a third step, and this was the

16   first instance of the use of a separate form file.  So

17   what he did was -- and this is disclosed in the patent,

18   expressly disclosed in the patent at column 1, lines 55

19   to 65.  In the continuous block of code, instead of

20   putting the code for the form in there, he wrote in an

21   interpreter that could understand a form file.

22   This code would all be compiled, and that

23   interpreter would sit in the machine code and then you

24   could write a separate form file called the AFD file,

25   Aatrix forms design file, and the interpreter would know

1    how to re-create the form using this file.  So that was

2    the first instance.  Not the whole invention.  It's not

3    the combination that's in the patents, but that was the

4    first instance of the use of a form file run with an

5    interpreter.

6         So this is going to look very complicated, but this

7    is kind of -- we're getting at how it all works.  A

8    programmer sits over here, and he writes two programs.

9    One is a form file creation program in source code, and

10   the other is a form viewer program in source code.  Each

11   of these gets sent to a compiler.  The form file creation

12   program comes out as machine code, and it is used to

13   create each of the form files just the way I described

14   it, laying the graphics and the text boxes, defining the

15   data fields, and saving the file.

16        And then the form viewer source code gets compiled

17   and put into a single executable that sits on -- let's

18   say it sits on your computer.  I sent you the form file,

19   and your computer knows how to use that form file, knows

20   how to re-create it.

21        This is a block diagram basically of the structure

22   of the patents.  There's a form file creation program.

23   Creates a form file, gives it to the form viewer program,

24   and a user application, a business accounting software,

25   that creates a data file, gives it to the form viewer

1    program, and the form viewer program creates a viewable

2    form on the computer.

3          THE COURT:  I think that's -- the page before that

4    in this red herring page are ones that aren't in here --

5    are not in the draft that you gave me.

6          MR. LUNSETH:  Yeah.  This page is not in the draft.

7    That's correct.  Yeah.  I just thought it would be -- you

8    know, it's here, but this is really complicated.  This is

9    just a simple way of wrapping it up and saying this is

10   the basic structure.

11         So there are -- now that I've given you a basic

12   understanding of how programming works and form files and

13   data files, there's some red herring arguments that I

14   want to address as long as this is in mind, and we'll

15   talk about them later on in connection with each of the

16   claims.

17         One is that form files were a departure from the

18   prior art because they were not written in compilable or

19   compiled code.  That's just not true.  What they were

20   originally was part of the monolithic software, which was

21   compiled code, but the form files can be in any language,

22   computer language, as long as it -- the programming part

23   of it is in a programming language.  It doesn't matter if

24   it's in compiled machine code or some other form of code.

25   We happen to favor interpreted language.

1        Another one was that programming can't have data in
2    it, the data has to be separately set out in a separate
3    file.  Well, I showed you examples of exactly how
4    programmers put data in programming.

5        And another one is something called extensible
6    programming, so the argument as I understood it was,
7    well, these can't be form files because form files would
8    have to be written in an extensible programming language.
9    Extensible means you can add behaviors to it.

10       Well, first of all, it's an argument among those
11   skilled in the art whether programming languages should
12   be extensible or not because what happens is they become
13   very complex and very hard to work with.  But what's more
14   important is that we're not talking about programming
15   languages.  We are talking about programs.  Programs
16   don't need to be modified.  They don't need to have
17   behaviors added.  They don't need to be extensible.  Form
18   files do not need to be extensible.  If you write a form
19   file for a form, that form is good this year and it's
20   good right up till the end of the year when you modify
21   the form and the program.  Code does not need to be
22   changed.

23       All right.  Let's talk about some basics of patent
24   claim construction.  First, claim construction begins and
25   ends with the words of the claims.  It's the words of the

1   claims that the patentee chose to -- to limit his

2   invention.

3        And second, limitations are not read into the claims

4   from the specification, and the most famous landmark case

5   says that's a cardinal sin.

6        Third, the words of the claim are to be given their

7   ordinary and customary meaning to a person of ordinary

8   skill in the art in question at the time of the

9   invention.

10       Now, I might be skipping ahead a little bit here,

11  but there's something that's important for you to

12  understand.  When a patentee writes a -- submits a patent

13  application, he has to provide what's called a

14  specification, and that is expressly set out in 35 USC

15  112.  And it says it requires him to provide a

16  description of the invention sufficient for someone else

17  skilled in the art to be able to make, use, and modify if

18  they like the invention.

19       And it also requires the inventor to do so in his

20  best mode, and the reason for this was to make sure that

21  an inventor didn't have a really great way of doing it in

22  his mind but another way that he could write down on

23  paper so when he submitted his patent, which was

24  available to all the others skilled in the art, they

25  didn't know this best way of doing it.

1        Well, the patent statute requires that the patentee

2   has to describe his best mode.  Defendants love this in

3   claim construction because they want to take the language

4   from the specification and say, look, it says exactly

5   match.  It's got to be exactly match.  Well, that's the

6   preferred embodiment that the patentee was required to

7   state in the specification of the patent, but it is not

8   the -- the general rule is that the patentee does not --

9   infringement is not evaluated by comparing the device to

10  an embodiment in the patent, what's in the -- or an

11  embodiment in the specification.

12       What's in the specification only needs to exemplify

13  the principles of the invention, and any other -- any --

14  I'm not quite there yet.  Any other ways of doing the

15  same thing that are unknown to those skilled in the art

16  also are within the invention.

17       Here we go.  And then there's another -- this is

18  called claim differentiation, and claim differentiation

19  is also very important.  It says different claims are

20  presumed to have different claimed scope and different

21  words are presumed to have different meanings when they

22  appear in the claims.  And there's also a presumption

23  that even two independent claims have different scope

24  when different words and different phrases are used.

25  This is a heavy presumption that --

1    THE COURT:  Go back.  Go back to the slide where you

2  have Aatrix patent claim construction.  I think it's two

3  before that.  Okay.  The last bullet point, the words of

4  a claim are to be given their ordinary and customary

5  meaning to a person of ordinary skill in the art in

6  question.

7    MR. LUNSETH:  That's right.

8    THE COURT:  Okay.  So if I have a declaration from

9  you from a person skilled in the art that says print

10  means and I have a declaration from an expert from the

11  defendant that says print means, I'm not skilled in the

12  art.  Those two people are, so does that mean that, well,

13  you can't grant summary judgment here because there's --

14  what does that word mean?  Conflict in evidence.  No rule

15  56.  Do you submit then that question to those 12 people

16  that are no more skilled in the art than anybody in the

17  world and they pick which definition of print they like?

18    MR. LUNSETH:  No.  The answer to that is no.  Claim

19  construction is a matter of law for the Court.

20    THE COURT:  For the Court.

21    MR. LUNSETH:  And to get there the Court has to make

22  factual determinations, but the Court does not give

23  factual questions that go to patent claim term

24  interpretation to a jury.  What the claim term

25  interpretations are is actually jury instructions, so by

1  the time we get to that jury, we better have the patent

2  claim terms defined.

3       THE COURT:  As to what it is.  Okay.  So it's up to

4  the Court to then interpret, well, which print am I going

5  to use?

6       MR. LUNSETH:  Yep.  Do I believe this one or do I

7  believe this one?  And there has been quite a bit of

8  change at the federal circuit.  The Supreme Court had at

9  one point the federal circuit was -- the standard was no

10 deference, and the Supreme Court has changed it so that

11 where factual determinations are made, there is deference

12 to the trial court.

13      I think you'll find that there aren't two

14 declarations here that say print means this versus print

15 means this.  There's a declaration from us saying print

16 means this and another declaration saying, well, yeah, it

17 means that, but that's just confusing for a jury.  Well,

18 it means that to one skilled in the art.  We'll get

19 there.

20      Okay.  There's a heavy presumption that a claim term

21 carries its ordinary and customary meaning, so if a word

22 means something to all of us -- model is my favorite

23 example.  That's what that word means.  It's perfectly

24 good just as it stands, and there's no good reason to

25 change the word by defining it.

1      And an accused infringer may overcome this heavy

2   presumption and narrow a claim term's ordinary meaning

3   but cannot do so by -- by simply pointing to the

4   preferred embodiment or other structures or steps

5   disclosed in the specification prosecution history.  So

6   you got to come up with other good evidence what does one

7   skilled in the art really mean -- think that this term

8   means.

9      And this is an important one, and I mentioned it

10  before.  It's only necessary that the principle claimed

11  is exemplified by the inventor's written description of

12  it, so if the inventor discloses a form of programming

13  and the claim language covers any program, then the claim

14  language governs and any program is covered.

15     If a claim recites a general structure without

16  limiting that structure to a specific subset of

17  structures, the term is construed to cover all known

18  types of that structure that the patent disclosure

19  supports.

20     So my favorite example of this comes from a case

21  that -- I think it's cited in the briefs called Greenberg

22  versus Ethicon.  The word was clamp.  You can go to the

23  hardware store, and you can probably find hanging on the

24  shelves 30 different types of clamps.  They're all

25  clamps.  There are C clamps, there are screw clamps,

1   there are wood clamps.  They're all clamps, and if the

2   language in the claim is clamp, then all of them aren't

3   covered.

4       It's up to one skilled the art who knows what these

5   known structures are to pick the right one to implement

6   the patent.  It's a bedrock principle.  This is the same

7   stuff, but I'm just trying to get across that it's the

8   claims and it is not the specification that governs the

9   scope of the patent.

10      And the bottom one is important.  This is why the

11  specification does not delimit the patent.  It's because

12  the law doesn't require the impossible, so if this

13  patentee who has to write a disclosure of the invention

14  were required to specify in that disclosure each and

15  every way that his invention could possibly be done,

16  patents would be miles long.  He'd have to think of every

17  way you can do something and write it all out, and that

18  is just not required.

19      Claim are the metes and bounds, and it's the

20  function of the claims and not the specifications to set

21  forth the limit of the patentee's claim, otherwise there

22  wouldn't be a need for claims.  And by the way, that same

23  statute, 112 -- 35 USC 112, describes what's in the

24  specification and in subparagraph D I think it says, and

25  the specification shall conclude with a set of claims

1    that sets out the metes and bounds there.  Keep it short.

2    So claims are required.

3         I believe -- well, let me just do this.  We're start

4    -- I'm starting to walk into the terms here, Your Honor,

5    and what I'm telling you with this slide is that we have

6    some good news, that working through the claim

7    construction process we have agreed construction for

8    these -- I believe it's five, comprising, form designer,

9    data processing system, allow, and report.

10        THE COURT:  Right.  I think that was docket 124.

11        MR. LUNSETH:  Yeah.  Yeah.  If it's in the record,

12   great.  It's in the record, so we're dealing with the

13   rest of them.  And I think there are a couple of others

14   where we were really very close, and I guess we'll see

15   what else there is here.

16        I think that ends my presentation on the technology

17   and claim construction.  If you have any questions, I'm

18   glad to answer them.  Otherwise I'll --

19        THE COURT:  No.  Now, what do we do with the rest of

20   them?  You're going to come back to this or --

21        MR. LUNSETH:  Yes. Yeah.  Keep it.  Yeah.  There

22   are more slides.

23        THE COURT:  Okay.

24        MR. LUNSETH:  Thank you.

25        THE COURT:  So let me just mention this that I

1  didn't tell you at the outset.  So we've been here about

2  an hour.  I usually run about an hour and a half or so.

3  If any of you need a break before then, just kind of

4  raise your hand.

5        MR. LUNSETH:  Thank you, Your Honor.

6        THE COURT:  I've learned that we don't all have the

7  same biological clock, and unfortunately I usually get a

8  signal from one of the jurors that -- that back -- this

9  had to be -- I know he passed away about 1973, so it had

10 to be before 1973.  I was trying a case before Judge

11 McRae, who was the chief judge at the time, and all of a

12 sudden one of the -- a male, one of the jurors gets up in

13 the jury box and starts walking out of the courtroom, and

14 the judge says, where are you going?  And he turned to

15 the judge and said, I don't know about you, but if you

16 don't want me to do it in my pants, I need to go to the

17 bathroom.  I learned then you better tell the jurors give

18 me a little wave, so same thing for the lawyers.  If you

19 need a break, let me know.

20       MR. BAIN:  Thank you, Judge.  Then what I would

21 propose to do -- because I think we've been going about

22 45 minutes.  My responsive background discussion is not

23 going to be as long, maybe 10 or 15 minutes, so then

24 maybe that would be a good breaking point.

25       THE COURT:  Okay.  Sounds good to me.

1          MR. BAIN:  And then we -- I think the parties agreed

2    then we're going to take each of the 15 terms.  He'll

3    make his arguments for one term, and I'll respond.  So

4    hopefully the net -- hopefully the net time that I get

5    for the defendants will be roughly equal, but hopefully

6    -- it might not even be relevant.

7          THE COURT:  And, you know, I have a time limit with

8    respect to the hearing.

9          MR. BAIN:  Right.

10         THE COURT:  If we don't cover a subject in the time

11   that was set aside, we just have another hearing.

12         MR. BAIN:  Very good.

13         THE COURT:  I mean, we're not wedded to, hey -- I

14   have no judges in my life that have told lawyers you've

15   got four days to try this case and on that fourth day

16   we'll say that's it.  Well, sometimes the most critical

17   witness didn't get in in the four days, and that's not

18   fair to the parties to do that, but some judges worry

19   more about logistics and --

20         MR. BAIN:  Your Honor --

21         THE COURT:  Senator Biden, file your Civil Justice

22   Reform Act thing.  I just had my law clerk ask me about

23   that today.  There's a summary judgment motion pending

24   and they wanted an extension, and the question -- new law

25   clerk sitting right behind you said, well, should we deny

1  the motion without prejudice so that it doesn't get

2  reported as a six-month pending motion?  I said, well, it

3  just got filed, so we don't have to worry about March.

4  We don't worry about September either.

5      I mean, just because somebody came up with this

6  brilliant idea, oh, yeah, we're going to save a lot of

7  money, it's almost as bad as lawyer advertising.  I can't

8  imagine.  The justices are turning over in their grave

9  when they came up with this thing.  Oh, yeah, we'll let

10  lawyers advertise.  It will bring the costs down just

11  like it brought the cost down for pharmacies.

12      I think that was the first case.  Virginia had a

13  statute that prohibited pharmacies from advertising their

14  prices.  Oh, that's unconstitutional because we'll get

15  the price of drugs down.  All you -- I've never seen

16  anything about prices of drugs coming down or lawyers'

17  fees coming down.  It only goes in one direction, so go

18  ahead.

19      MR. BAIN:  Okay.  Your Honor, I also have a hard

20  copy of my slide show that you can have.  May I approach?

21      THE COURT:  Okay.  Thank you.

22      MR. BAIN:  Before I go to the slides, I think just

23  to come right off of the -- sort of the overview of the

24  patent law and claim construction, I think that what's

25  central to this case and what's central to the approach

1    to claim construction is the Phillips case, which I think

2    was among the ones that he mentioned.

3        Phillips is very important in this case, Judge,

4    because there was a tension before Phillips as to when

5    you're -- clearly we all agree that the words are to be

6    accorded their ordinary meaning -- plain and ordinary

7    meaning to one skilled in the art.

8        THE COURT:  Right.

9        MR. BAIN:  But the question is how do you discern

10   that.  Prior to Phillips there was two directions.  The

11   Texas Digital approach was go to the dictionaries and the

12   extrinsic evidence first, come up with your plain and

13   ordinary meaning, and then visit the specification to see

14   if there's anything that contradicts that.

15       THE COURT:  And there are a lot of definitions from

16   dictionaries and they're used a lot.

17       MR. BAIN:  Right.  The other direction, which I

18   think was Vitronics and CCS cases, said, no, you must

19   start with the intrinsic record first.  You must look to

20   the patent.  One skilled in the art must discern the

21   plain and ordinary meaning after reading the entire

22   patent and understanding the context of the term as used

23   in the patent.

24       So, for example, we're going to find here when we

25   discuss and get down to the specific terms like the word

1    model you can go to the dictionary and you can -- you can

2    go to multiple dictionaries and find tons of definitions

3    of the word model.  I think in the briefing there was an

4    analogy to an airplane model, but many of those

5    definitions simply are out of context of the -- of the

6    invention as disclosed in the patent.

7        So what Phillips says, and I don't think we would

8    disagree about this, is that the person skilled in the

9    art is to read the patent first, see how the term is used

10   in the patent, and then reconcile that with the extrinsic

11   evidence such as dictionary definitions and -- and expert

12   testimony, for example.

13       So to your question about how do we handle print

14   when you've got two experts that have maybe different

15   opinions about that word, because it is a question of law

16   for the Court under Markman and under Phillips, you

17   should review the patent and say what does the intrinsic

18   record tell me, guide me that one skilled in the art

19   would understand the word to mean.  And then if the

20   experts -- if one of the expert's testimony contradicts

21   that, it's to be accorded little weight.

22       So it's -- so the important point is that the

23   intrinsic record, particularly the specification in the

24   claims and to the extent that it's in the record, the

25   file history, informs the Court as to what one skilled in

1    the art would understand a particular term to mean.  In

2    the context of that patent, that trumps what some

3    extrinsic dictionary or extrinsic expert testimony might

4    say.

5         THE COURT:  Which does doesn't fit in -- doesn't fit

6    in to what the end result of what the patent is -- is

7    meant to establish.

8         MR. BAIN:  Right.  Like what we're -- I think we'll

9    demonstrate later today that model -- again you can go --

10   you can take the approach -- the Texas Digital approach

11   which was pre Phillips.  I'm going to go to the

12   dictionary and look at all these different words of

13   model, and I'm not going to narrow model.  Or you go

14   to the specification.  I think we'll demonstrate that the

15   intrinsic record show that they accorded the word model a

16   particular meaning, and -- and that's I think, for

17   example, one of the cases -- one of the terms where we

18   are in dispute.

19        So with the Phillips sort of standard in mind, there

20   was a lot of computer science discussions, and it was a

21   very good overview to give us some primer on this area of

22   science.  But ultimately many of the things -- let me

23   give you an example.  We don't disagree -- I think we

24   reflected this in the brief.  We don't disagree that

25   there are many different types of programming language.

1   Assembly language, for example, is one of them that they
2   pointed to, and I think he noted today there was 54 that
3   he found on Google.
4       But under a Phillips standard most of -- most, if
5   not all, of those don't matter.  I think what really gets
6   boiled down to in this case, the real dispute between the
7   parties is -- I think we both agree, and I'm going to
8   demonstrate based on what they argued earlier in this
9   case in connection with Alice that source code written by
10  programmers and then compiled is one type of programming
11  that's relevant in this case.
12      They have now introduced in Markman a second
13  programming language called interpreted language.  This
14  is a new animal and we have to decide is that really part
15  of what's involved in the patent or not.  We're going to
16  demonstrate today that it is not.
17      But I think I did hear him say that out of the 54
18  the two types of programming that are really relevant is
19  source code that is compiled or interpreted language, and
20  I think we can focus our energies on those.
21      We will demonstrate later that this notion that
22  the -- that the form files of the invention of the patent
23  are generated in interpreted language.  We believe that
24  we will demonstrate that the intrinsic record does not,
25  in fact, disclose that.  It's passing mentioned in the

1   background section.

2       So with those sort of responsive comments, let me

3   come to my slides, Judge.  Although there's 15 terms in

4   dispute still despite our best efforts to come to some

5   agreement -- and I think we have narrowed the issues for

6   many of them.  There are two central themes throughout

7   the patents in this action.  Some of this is going to

8   sound familiar to you during the motion practice on the

9   motion to dismiss for ineligibility under 101.

10      To tout the advantages of the invention over the

11  problems of the prior art to demonstrate that this was

12  some type of innovation, there was an emphasis by Aatrix

13  on the fact that computerizing forms has historically

14  required the compiling of source code that's written by

15  expensive programmers.

16      And the second dilemma that the inventors had to

17  deal with is the idea that the official forms that

18  they're trying to fill in with their software must be

19  exact, that -- I'm sure you've heard many times and seen

20  in many of the briefings sometimes down to a pixel or

21  two.  So these were two dominant themes and problems that

22  the invention is argued to have overcome, and the

23  asserted solution is that they created a model of the

24  official form in a form file and importantly took it out

25  of the business software.  So when it came time to modify

1   it as he explained, you don't have to recompile the

2   entire business software.  It's now a standalone animal.

3   It's a standalone component called a form file, and

4   inside of it it has a model of the official form.

5       It's important to keep in mind what does the

6   specification teach one skilled in the art about that

7   criticality of this model, the need for it to be exact,

8   and we're going to demonstrate that from the intrinsic

9   record.

10      The second goal was to try to get away from the

11  expensive programmers.  I think that I heard Aatrix say

12  today that you can have as many as 54 different types of

13  programmers, but it's -- programs, but it's programmers

14  that write programs.  Okay.  And one of the purposes and

15  goals of the invention -- and this is not just the

16  attorney argument in the affidavits, this is also within

17  the background section of the patent itself -- was this

18  idea that you wanted to get away from the expensive

19  programmers.  You wanted to create a form file creation

20  system where you no longer needed to have programmers.

21  So it's important to keep those two central themes in

22  mind as we get down to the details of the 15 claims.

23      Aatrix of course -- this is in the patent as well as

24  in -- this is an overview of the things that they've

25  argued in the patent as well as in the arguments before

1    the Court earlier in this case.  Computerized forms are

2    not simple.  They must be exact copies because of the

3    requirements of the government.  It requires a lot of

4    work by programmers.  Revising the forms is very

5    difficult.  You have this monolithic code problem where

6    when you change one form that's been hard-coded into the

7    monolithic code, you're now required to change and test

8    the entire software.  It requires more work for very

9    expensive programmers.

10        The other problem you have is that these large files

11   are very difficult to distribute updated forms, so this

12   is how they characterize some of the problems that the

13   invention addresses.

14        More specifically to the record, form files must

15   provide exact copies.  It's been alleged in the

16   Complaint, docket 62 at paragraph 22, that government

17   requirements are so exacting that Aatrix is sometimes

18   asked to move a character a pixel or two.

19        In the Complaint it's also alleged the ability to

20   make an exact copy is highly desirable because the

21   government agencies will sometimes not accept the reports

22   if they're not exact copies.

23        In the patent -- in the 615 patent it recites

24   consistent with that that the form designer program

25   allows the form designer to create a form file that when

1    subsequently printed will exactly match an original paper

2    form and will generate a report that exactly matches the

3    original paper form.

4        Further evidence in the record of the importance of

5    the form file providing exact copies is in the patent

6    itself.  The principle and object of the invention is to

7    create a viewable electronic form that exactly mirrors

8    the physical representation of the original paper form.

9    In the patent it is stated that when the form is

10   ultimately completed, the seller knows that the printed

11   form will be an exact copy of the original form.  Also in

12   the patent, once the completed form is printed out, it's

13   sometimes difficult to differentiate the copy from the

14   original.

15       So coming back to this -- to this Phillips standard,

16   Judge, these are statements made by the inventors to a

17   person skilled in the art reading the patent about the

18   degree of exactness or correspondence that's intended by

19   the invention.  This has been characterized as an

20   improper importation of the limitations into the claim,

21   and as we get into the specific claims, we'll see where

22   -- where that balance shakes out.

23       So the other -- the other important theme of course,

24   as I mentioned earlier, was the form require -- form

25   files historically required compiled source code and

1  therefore expensive programmers.  In the history of the

2  evolution of the invention that Aatrix just presented

3  they explained that early on the form details were

4  hard-coded into the monolithic code.  One of the early

5  improvements that the inventors came up with was the idea

6  of taking the source code for the form files, separately

7  writing that as a small piece of code, and then adding it

8  to the monolithic code.

9      The important thing is that the problem that they

10  were overcoming -- one of the problems they were

11  overcoming was the need for compiled source code written

12  by expensive programmers.  The Second Amended Complaint

13  makes these allegations and tells the story which we are

14  all familiar with from the prior briefing.

15      The description of the monolithic code problem that

16  the software was in wide use at the time required a

17  monolithic code so that whenever you wanted to change any

18  component such as a form that was hard-coded, it required

19  a recompiling of the entire monolithic code.

20      The old form files required the compiled source code

21  written by programmers.  In the evolution of the

22  invention this continued to be a problem.  All the work

23  was done by the programmers.  The software programmers

24  had to be employed to write, modify, and debug the code.

25      So in the evolution of the form file to ultimately

1    getting to what they contend is the form file of the

2    patents, there was an interim solution to the monolithic

3    code problem in which the coinventor, Mr. Jensen,

4    developed a precursor in which he basically wrote the

5    form -- form file as the term is used.  Sorry.  He wrote

6    it as source code, and this is an important thing, Judge.

7    This is not the form file as that term is used in the

8    Aatrix patent, so they contrasted the segment of source

9    code that Mr. Jensen wrote as an interim solution and

10   contrasted that with the form design -- form file that

11   they contend the patent covers.

12        So reading the patent one comes away -- one skilled

13   in the art comes away with an understanding that the

14   claim form files were written for the purpose of getting

15   away from programmers.

16        They point to -- they say, no, no.  There's still

17   programming involved, and they point to the background

18   section of the invention where they mention an

19   interpreter once, but in that same discussion, which I

20   set forth here, they explained that the use of this

21   interpreter, and that's the only mention of interpreter

22   in the entire patent, this changed the focus of the tool

23   which was still requiring a bit of programming effort

24   to one in which forms could be developed, and I

25   highlight, completely independent of programmers.

1        And then they emphasize that on the next column.

2    Forms for all 50 states were created with the AFD tool by

3    nonprogrammers and could be implemented without any

4    additional effort by coders.  So one skilled in the art

5    reading that is not going to come away with the

6    understanding that the one passing mention of interpreter

7    in the background section was teaching them that, oh, one

8    of the ways you can create form files is to use an

9    interpreted language because an interpreted language

10   requires that -- by their own explanation programmers,

11   and they got away from programmers.

12        Further a statement is made in the case that

13   emphasize the form files was a solution to get away from

14   programmers was in the oral argument on the motion to

15   dismiss under 101 three years ago, two and a half years

16   ago.  As that evolved it wrote, not a piece of source

17   code to be cut and pasted, but a separate file called a

18   form file that's separate from the monolithic code.

19   Mr. Jensen eventually developed a form designer further

20   so that it would generate a separate form file containing

21   a representation or model of the form rather than

22   generating a piece of source code.

23        In the Second Amended Complaint, instead of

24   requiring people with programming skills, now the form

25   file can have people with -- with more generic computer

1  skills and a rudimentary understanding of accounting

2  principles.  The invention transformed the payroll series

3  which was mentioned earlier from a system that

4  programmers configured to a system that enabled

5  nonprogrammers to be able to do so.

6       So the clear instruction, the clear teaching of both

7  the patent and the representations made in this case is

8  that the form file was a solution to get away from

9  programmers, and this was all touted to result in a

10  number of benefits that are going to -- that Aatrix

11  contends helps them to survive Alice.

12       It provides exact copies of government forms.  It

13  separates those files from the monolithic code, giving

14  you the ability to revise them without revising the

15  entire code.  Computer programmer is not needed.  This is

16  in the Second Amended Complaint, Judge, document 62 at

17  paragraph 34.  More efficient computers.  Document --

18  document 62 at paragraphs 38 to 39.  And the small size,

19  the ability to transfer these very small form files

20  because they're much smaller than source code and can be

21  sent out over relatively slow Internet connections.

22       What -- why does this matter?  Why does -- this

23  dispute about whether the form files include compiled

24  code or not, whether it requires programmers or not?

25  It's important to have context to the claim disputes, and

1 | it's appropriate under the federal circuit law to have

2 | some knowledge, to have sort of a look at what are the

3 | accused products and processes to provide meaningful

4 | context to the claim construction.

5 |     And as I think we've provided in our opposition to

6 | the motion for reply, we provided the infringement

7 | contention -- an excerpt of the infringement contentions

8 | from Aatrix as to what exactly are they accusing to be a

9 | form file, and from that you will see, which is at

10 | docket -- docket 126, 2, they contend that the Microsoft

11 | Visual Studio, which is used by Green Shades, creates a

12 | form file by compiling components.  And it contends that

13 | these two components, which are called a xaml file and a

14 | xaml cs file, are both computer source codes.

15 |     Okay.  So this is a critical claim construction

16 | determination because if form files don't, in fact,

17 | include source code written by programmers that are

18 | compiled, then the Green Shades product simply doesn't

19 | have what the claim requires.

20 |     And we believe we will demonstrate -- and this will

21 | be -- this will conclude my opening section.  We believe

22 | we will demonstrate that this introduction of a

23 | discussion about interpreted language is really being

24 | done as sort of a camel nose under the tent, if you will,

25 | to say, well, the patent mentions interpreted language as

1    a form of form file, so therefore all programming is

2    available, including source code.

3        The problem with that logic is that that directly

4    contradicts all the arguments as to the innovation of the

5    invention where they said the purpose of the form file

6    was to get away from compiled source code written by

7    programmers.

8        So that would conclude my overview before we get

9    into the individual claims, so maybe now would be a good

10   time for a break.

11       THE COURT:  Sure.  So why don't we go ahead and take

12   ten minutes.  It says it's 2:45.  We'll come back at

13   2:55.

14       (Recess from 2:46 p.m. to 2:59 p.m.)

15       THE COURT:  There you go.

16       MR. LUNSETH:  I think we're good.  The term -- the

17   first term up for construction is a group of terms

18   actually, application, application program, and program,

19   and on this slide you can see that the defendant's

20   construction is that the terms are all synonyms and they

21   mean machine code instructions compiled from source code

22   written by a programmer and executed by a computer.

23       Our position is that the terms are not synonomous

24   and you can just use the plain and ordinary meaning of

25   the term.  You can just use the words themselves, so this

1    is it.  The terms aren't synonymous.

2        Program is a broad general term.  A program is a

3    sequence of instructions suitable for processing by a

4    computer.  Processing may include the use of an

5    assembler, a compiler, an interpreter, or a translator to

6    prepare the program for execution as well as to execute

7    it.  That should be familiar.  We've talked about that --

8    that concept before, that it could be assembled language,

9    compiled language, interpreted language, or some other

10   translated language.

11       Application is a set of computer components used to

12   perform specific types of user-oriented work on a

13   computer.  So we change gears now.  Now what we're

14   talking about is a word processing application or a

15   spreadsheet application, some specialized piece of

16   computer program that is devoted to a specific

17   user-oriented task.  So you and I aren't zebras.  The

18   logic of the argument is -- that the defendant is making

19   is that we are because you're a mammal, I'm a mammal, and

20   a zebra is a mammal.  And since a zebra is a mammal,

21   we're zebras, but that's not how it works.

22       Programs are a broad category.  Applications are a

23   subset of programs.  Programs include applications, but

24   not all programs are applications.  And there are lots of

25   examples.  OS means operating system, so your Microsoft

1    operating system is not considered an application.

2        Modular -- these days a lot of software, including

3    the Aatrix inventions, are broken up into modular

4    programming components, pieces in files.  And modular

5    programming components are programs, but they're not

6    applications.  In fact, they probably can't even run

7    unless they're run from some other application.

8        But the clincher is this -- this is Defendant's

9    expert.  He says the defendant attempts to dismiss this

10   difference between program and application as mere

11   semantics, but his expert says what I said.  The terms

12   application and application program are equivalent, but

13   the term program is broader and can encapsulate more than

14   software that is executable on a program on a particular

15   operating system or Microsoft -- or microprocessor.  Then

16   he goes on to describe programs and applications in just

17   exactly the way that we describe them.

18       Then he says the same thing about different types of

19   programming languages.  He said I understand there are

20   different programming languages.  There are assembled

21   languages, there are compiled language, there are

22   interpreted languages.  These are not relevant to the

23   discussion of the definition of program because whether

24   the system utilizes assembly language or utilizes a

25   compiled language or utilizes an interpreted language,

1   the resulting program in each case is a sequence of

2   instructions that can be executed by a computer.

3        That's exactly our point.  The defendants want to

4   limit the term program to machine code instructions

5   compiled from source code.  That's just exactly wrong.

6   Their own expert says it's just exactly wrong.

7        It's not limited to code in a compilable language.

8   POSA is a person of reasonable skill in the art.  To a

9   POSA programs and applications may be in a compilable

10  language.  They can also be in an assembly language.

11  They also can be in an interpreted language or any other

12  translated language.  To a person of skill in the art

13  code can be written by anyone.  If you know how to do it,

14  you can write it whether you call yourself a programmer

15  or not.

16       To a person of reasonable skill in the art they

17  claim that the code has to be written by a programmer and

18  then compiled, but actually programs can be written by

19  programs.  And we give examples of that in our expert's

20  declaration, in Mr. Rosenblatt's declaration.

21       And a compiler is an example -- a perfect example of

22  a program that writes code because a compiler takes

23  source code in one end and writes machine code out the

24  other end.  There's no justification for limiting a

25  program or application that is -- to one that is actually

 1  running on a computer, which is what their language does.

 2       Their argument is that the program has to be

 3  executed on a computer.  A program is one -- is code that

 4  is suitable for processing, and it's not been run yet.

 5  It's still a program.  So there are no -- there's no

 6  authority for these limitations.  The plain and ordinary

 7  meaning of the term should apply.  Application and

 8  application program is a program devoted to a

 9  user-specific work such as a word processer.  A program

10  itself is a broader term.  It means any set of

11  instructions for a computer regardless of whether that

12  instruction is in compilable language, assembly language,

13  interpreted language.  That's it.

14       MR. BAIN:  Page 15, Your Honor.

15       THE COURT:  Yep.  I'm with you.

16       MR. BAIN:  Okay.  So again I think Phillips comes --

17  is important here because the question is when you read

18  the patent and you see the programs that are claimed,

19  you're talking about things like form file creation

20  program, viewer program.  These are programs that clearly

21  involve an end user or a user interacting with the

22  program, so the -- so the -- we -- and I think we

23  reflected this in the brief.  If we didn't, I'll make it

24  clear, Judge.  We agree that there is a -- that there is

25  a technical distinction between an application program

1    and simply a program.  Program is the broader mammals

2    to use his example, and the application program is the

3    humans or the zebra underneath.

4         But it's really a distinction with no point in the

5    context of this patent and these claims because all of

6    the programs as recited in the claims involve interfacing

7    with a human, so they all fall into that subcategory of

8    being application programs, and ultimately that

9    distinction is not going to have any bearing on

10   infringement or invalidity of positions in this case, so

11   it's really just a distinction to argue about.

12        I do note that their expert did agree that the

13   applications and application programs are synonomous, and

14   they draw this distinction instead between application

15   programs and program.  But there's no proposal as to what

16   that distinction -- what the importance of that

17   distinction is and they I guess leave it to the jury to

18   try to decipher what the relevance of that is.

19        As was pointed out, Dr. Rosenberg did point out that

20   and agreed effectively that a user interface is involved

21   with an application program versus a program, but as I

22   mentioned, all the programs recited in the claims are

23   utilized by a user, so the distinction is of no

24   consequence.  They're all application programs.  And

25   ultimately all the programs recited in the claims are in

1    machine readable form, and I think we agree on that.

2        Where we have a disagreement is, well, can that

3    include compiled source or can it also include

4    interpreted language?  And here we have to be very

5    careful of the sleight of hand.  The dispute over

6    interpreted language versus source -- compiled source

7    code is not on the terms using program.  It's on the word

8    form file, which we're going to discuss later.

9        And what's happening is is this debate, this really

10   I think academic debate that we're having in the

11   application program versus program context is being used

12   as sort of a sideways opportunity to get back into the

13   form file, which as I demonstrated earlier and I'll

14   demonstrate more later, clearly was distinguished from

15   compiled code in touting what the advantages are, what

16   the invention was over the prior art -- their own prior

17   art included.

18       So again this assembly, compiled, interpreted, this

19   theoretical analysis of these technical differences, we

20   don't agree with them as a matter of computer science,

21   but we contend that they simply have no bearing on the

22   claim language in this -- in this patent because one of

23   the things I'll also direct the Court to is that the --

24   and it's sort of hard to prove a negative, but if you

25   look through the patent specification, you will see no

1    mention or discussion of assembly language.  You will see

2    a discussion of source code and the compiling of source

3    code and the ability to get away from that.

4         And with respect to the interpreted language, I

5    leave the question, what does one skilled in the art

6    understand when they see the word mentioned once in the

7    background section that's explaining the evolution of the

8    invention and culminates with, so that's what we did

9    before and now we're about ready to describe to you what

10   the invention is.  Once you get to the summary of the

11   invention and the detailed description, you will find no

12   mention of the word interpreter or interpreted language.

13   It's simply not what the patent and the invention is

14   about.

15        And as I mentioned, Aatrix is effectively trying to

16   expand the definition of program as a back door to argue

17   that a form file can include any program to satisfy its

18   infringement contentions, yet the form file in the claims

19   and specification makes no reference at all to any

20   program.

21        In contrast, if you look up until the Markman

22   briefing in the Second Amended Complaint, in the

23   declaration of Mr. Jensen, in the oral arguments on the

24   motion to dismiss, and in the patent itself, there was

25   this constant emphasis on the problems associated with

 1   compiled source code and the touting of the invention as

 2   an improvement that overcame these problems.  It was

 3   never discussed that we overcame these problems by coming

 4   up with interpreted language.  That was never the

 5   discussion.

 6        And this -- as I mentioned before, this is where we

 7   have this main problem of looking at sort of an extrinsic

 8   story of the evolution of the invention as told by

 9   counsel in affidavits contrasted with what does the

10   actual patent itself tell one skilled in the art because

11   ultimately a patent -- when the competitor, one skilled

12   in the art, wants to say, well, what is the scope of this

13   Aatrix patent, they're going to order the patent from the

14   patent office.  They're going to read it.  They perhaps

15   might look at the file history.  They're not going to

16   have the benefit of the inventor's affidavits.  They're

17   not going to have the benefit of the attorney's argument.

18        So we need to start with the intrinsic record

19   according to Phillips, and that tells us that programs in

20   this case, what they're really talking about is compiled

21   source code.  There's a passing mention of the

22   interpreter in the context of form file, but it's

23   effectively, to use Aatrix's language, a red herring.

24        So the conclusion experts -- Aatrix's expert does

25   agree that there is some syn- -- synonomous language

1    between application and application program.  The other

2    types of program that exist in the abstract in the

3    intrinsic world, we don't disagree with that, but we

4    contend it has no bearing on the programs as used in the

5    claim and that ultimately all the recited programs in the

6    claims are as we have proposed in our construction,

7    compiled machine readable code.

8         MR. LUNSETH:  Now, I want to get on to data file,

9    which is the next term, but I want to respond to

10   something that -- they have -- actually have the

11   affirmative on that claim construction, and some of the

12   argument I hadn't heard before.  Counsel has repeatedly

13   made the argument that the whole purpose of a form file

14   is to get away from compiled code.  He is dead wrong.  We

15   did not make that argument in the Alice motions.

16        The argument we made was that we needed to do -- or

17   in the Aatrix inventions we developed form files as a way

18   of getting the forms out of the monolithic source code

19   for the payroll series, which was compiled code, and

20   because it was all one big block of code, 68,000 or so

21   lines of code, every time you had to revise that form

22   file, you had to revise the entire code for the entire

23   payroll series software.

24        So it wasn't to get away from compiled code.  It

25   doesn't make any difference what the program is that's in

 1   the form file.  What makes a difference is getting it out

 2   of that monolithic code.  That was a departure from the

 3   prior software that we argued.  He also says that we

 4   argued --

 5        THE COURT:  Let me just ask you this, so what you

 6   were trying to do, if I understand it correctly, if there

 7   were 68,000 inputs into it, one way would have to be we

 8   have to repeat 68,000 with whatever we've changed.  The

 9   other way is we only have to put the changes in,

10   everything else can remain the same.

11        MR. LUNSETH:  Basically that's exactly right.  You

12   can leave the payroll series software, the business

13   application software completely alone.  You just fix the

14   form file, and that was the problem.  Every year the

15   forms get changed, and -- by the government, so their

16   forms have to get revised.  And the first time the

17   inventor, Dale Jensen, tried to revise the form in that

18   old model it took him three weeks to do it because of all

19   the debugging of the business accounting software that

20   occurred, so he thought I got to get these things out of

21   there.  That's what happened.

22        Data file.  Our contention is that it's -- and

23   correct me if I'm wrong, but we're very close on this.  I

24   think that a change was made after -- after the briefs

25   were written.  Our contention is a digital file

1    comprising structured or tagged data for a reporting

2    period and theirs is a digital file comprising structured

3    or tagged data.  So the only issue here is the for a

4    reporting period language, and this is why it's here.

5         Their position on this, that for a reporting period

6    should not be in the claim language, is that their expert

7    says a data file does not have an expiration date or some

8    time window in which the data and the file is considered

9    valid.

10        And that's an obfuscation argument, Your Honor,

11   because it's technically correct, but it doesn't say

12   what's going on here.  The data file of the Aatrix

13   patents doesn't have an expiration date.  The data

14   doesn't have an expiration date.  You can put into a file

15   whatever you want to put into the file.  So you can

16   create a file that has your first quarter 2019 tax

17   information and you can mark it first quarter 2019, and

18   six years later that file is still there unless you've

19   actually deleted the file.  The file did not have some

20   kind of automatic expiration like Mr. Phillips and -- I

21   can't remember the television show, you know.  These

22   instructions will self-destruct.  That's not what the

23   issue is.  The issue is that you can put into a data file

24   data for a period, and that's not prohibited by anybody's

25   understanding of what a data file is.

1        The claims have to be read as a whole, so here's why

2   we think the for a reporting period should go into the

3   language.  This is claim 1 of the 615 patent.  Element C

4   is a data file containing data from a user application

5   for populating the viewable form, so that's the data

6   file.

7        And then element D is a form viewer operating on the

8   form file and the data file to create viewable forms and

9   reports.  A viewable form is a blank form.  That's our

10  position.  A report is a form with the data in it, so

11  it's filled out.

12       So this says that in order for the invention to

13  work, the data file has to include data for a reporting

14  period, and then you can fill out the report.  And then

15  the viewer will generate a report by merging the data and

16  the -- in the AUF file, the data file with the specific

17  fields in the form file, and that's it.

18       MR. BAIN:  Your Honor, I structured my order of my

19  slides around the order that's in your order, docket 129,

20  so data file was going to be coming up much later, so I

21  will tell you that that discussion begins on page 78 of

22  my slides.

23       THE COURT:  Okay.  Wait a minute.

24       MR. BAIN:  Aatrix is correct that we've really

25  narrowed our dispute down to whether the data -- we agree

1    on the general definition of a data file.  All data files

2    in the context of this patent have to have some structure

3    or tagged structure to them, but the question is should

4    they be limited to a particular reporting period.  That

5    is -- to the extent that there are embodiments in the

6    specification that discuss, you know, preferences of

7    exporting from an end user application a particular

8    reporting period, that is just an example.

9         And the cardinal sin that Aatrix mentioned earlier,

10   that's a -- that's a patent construction cardinal sin

11   according to, once again, the seminal case Phillips that

12   you don't incorporate these examples of preferred

13   embodiments into the -- to the generic word data file.

14        Aatrix -- and this is an important thing to note.

15   Later on when we get to end user application, which is

16   the source of this data, Aatrix agrees that the source of

17   the data and end user application is not limited to

18   financial software.  That's in their claim construction

19   brief, document 117 at page 23.  So too the data coming

20   into the data file from such an application is not

21   limited to financial data and thus would not require a

22   reporting period.

23        It's an attempt -- and this is going to be relevant

24   possibly, Judge, on the invalidity side.  If we end up

25   finding prior art that demonstrates data being exported

1   from an end user application into a viewer program, they

2   should not be allowed to tell the Court or a jury, oh,

3   that's not the data file of the invention because it

4   doesn't have a particular reporting period in the data

5   file.  It's simply an example, and it finds no basis in

6   the claim.

7        The ordinary meaning of the word data file in the

8   context of the patent does not include a reporting

9   period, so that's the only dispute we have on that term,

10  and we believe that the intrinsic record supports that it

11  should not be limited as Aatrix proposes.

12       THE COURT:  So what you're going to tell me is I

13  should be smart and when I start working on this thing

14  leave data file to the last category that I'm working on

15  and before I finish you'll agree on what data file is so

16  I don't have to do it?  Will you try?

17       MR. LUNSETH:  Sure.

18       MR. BAIN:  Yes.

19       THE COURT:  Thank you.

20       MR. LUNSETH:  Counsel was correct.  We gave you an

21  order in the order -- in the order of --

22       THE COURT:  That's okay.  I'm using your PowerPoint.

23       MR. LUNSETH:  Yeah.

24       THE COURT:  So the next one is model and exactly

25  match.

 1        MR. LUNSETH:  Oh, okay.  We can do it that way.

 2        THE COURT:  Unless you want to switch around because

 3   yours was just the draft.  His is in a notebook.  What

 4   I'm doing is I'm moving his.  I moved page 78 all the way

 5   up before I got to form file creation.  I assume he's

 6   going to tell me where the page for model and exactly

 7   match is, and I'll just change his book around.

 8        MR. LUNSETH:  Okay.

 9        THE COURT:  Because yours aren't numbered.

10        MR. LUNSETH:  Sure.  I understand.  Do you want to

11   try following what's in the order?  Does it make a

12   difference to you how to do this?

13        MR. BAIN:  I'm happy to do whatever you and the

14   Court prefer because I can -- I can identify by page

15   number my sections.

16        MR. LUNSETH:  Okay.

17        MR. BAIN:  So we'll go in the order of your -- of

18   your presentation.

19        MR. LUNSETH:  All right.

20        MR. BAIN:  So what's the next one?

21        MR. LUNSETH:  I think it's data file.  No.  We did

22   data file.

23        THE COURT:  Hang on.  Yes.  No.  We just did data

24   file.

25        MR. LUNSETH:  Data field.

 1      THE COURT:  The third one should be model and

 2   exactly match.  Are you up with me?

 3      MR. LUNSETH:  I think the next one is data field and

 4   field.

 5      THE COURT:  Oh.  Data field.  Hang on.  I'm on data

 6   file.  Yes.  Okay.

 7      MR. LUNSETH:  Okay.

 8      THE COURT:  I see where you switched to data field.

 9      MR. LUNSETH:  All right.  Data field.  Our proposed

10   construction of data field/field is data field/field, an

11   area on a form to be filled in with alphanumeric

12   information, and that is essentially taken directly out

13   of the specification.  Theirs is -- Defendant proposes

14   construction of a data location in the form file is

15   stored data received from the data file.

16      The patent defines data field and field to be the

17   same thing, and there is a rule that the patentee is

18   entitled to be his own lexicographer.  In other words, if

19   he clearly defines a term in the patent, that's what it

20   is, so that's what's happened here.

21      The patentee has said creation of AUF file forms

22   programming is the section of the program that works with

23   data fields.  Fields are areas on a form that need to be

24   filled in with alphanumeric information.  That's our

25   definition of it.

1        I should explain something about the technology,

2    though.  When we were going through the technology

3    earlier on, you remember that I talked about declaring

4    variables and the variables needed an address and memory

5    because that's how the computer registers a value.  So

6    one skilled in the art understands that fields in the

7    form file language of that type refers to exactly that

8    process, the declaration of a variable and the definition

9    of the attributes of the variable and the place where the

10   variable is to be stored.

11       A field to the computer is an assigned memory

12   address.  The form file doesn't store data in the sense

13   of data from the user application or data file.  Rather a

14   field defined in a form file stores data.  So that's it.

15       MR. BAIN:  Your Honor, you didn't have to wait very

16   long on this one.  In view of -- as we were preparing for

17   the hearing and we were assessing the relevance of this

18   dispute we're having over where the data field is

19   relative to the infringement and invalidity contentions

20   in this case, we realized that the distinction really is

21   not one of much import, so we're happy to proceed with

22   Plaintiff's proposed construction for data fields in this

23   case.  We can use that for both our invalidity and for

24   the noninfringement.

25       MR. LUNSETH:  My next one, Your Honor, is model, and

1    I've done model and exactly match because the two are --

2         THE COURT:  Right.

3         MR. LUNSETH:  -- intertwined in the arguments of

4    counsel.

5         THE COURT:  Hold on one second.  What page were you

6    on the data field in your book so I can mark that?

7         MR. BAIN:  Which one, data?

8         THE COURT:  Yeah.  On the data field.

9         MR. GILLIS:  56, Your Honor.

10        THE COURT:  56.

11        MR. BAIN:  56.  Thank you.

12        THE COURT:  Let me just move that up so I'll know

13   where I am.  Okay.  Then I think to make sure I'm doing

14   it right -- okay.  Now you're going to do model and

15   exactly match.

16        MR. LUNSETH:  Yes, Your Honor.

17        THE COURT:  Okay.

18        MR. LUNSETH:  We've proposed no construction or just

19   plain ordinary meaning of the word model, and for exactly

20   match we've proposed correctly correspond in all

21   pertinent criteria when compared.  If a form is certified

22   by a governmental agency, it is an exact match for the

23   agency's original paper form.

24        Green Shades for model proposes data information

25   stored in the form file and read and operated on by the

1    viewer program to display and/or print a viewable form

2    that exactly mirrors, i.e., exactly matches, replicates

3    the physical representation of an original paper form.

4         And then their definition of exactly match is a

5    little shorter, providing an exact copy, replica, or

6    model.

7         This is -- the defendant's construction is a classic

8    violation of the rule of claim differentiation, so I

9    pulled up here claims 1 of the 615 patent and claim 22 of

10   the 615 patent to show you exactly why.  These two claims

11   have different scope, and it would be improper to read

12   exactly match from claim 22 into claim 1 because claim 1A

13   is for a form file that models the physical

14   representation of an original paper form and establishes

15   the calculations and rule conditions required to fill in

16   the viewable form.  A form viewer program, and C is a

17   form viewer program, operating on the form file and the

18   data file to create viewable forms and reports.

19        I think we have an issue about what viewable means

20   that we'll discuss later on, but it's plain as day in the

21   patent that a viewable form is the equivalent of what

22   you're looking at on your computer screen.  A viewable

23   form is something that you look at on the screen.  It is

24   an on-screen display.  It is not a hard copy printed

25   document.

1    So let's take a look at claim 615 that has the

2    exactly match language.  22A, the form designer program

3    allowing the form designer to create a form file that

4    when subsequently printed will exactly match an original

5    paper form.

6    So here's -- I got my cell phone past security just

7    so I could show you this, Your Honor.  A viewable form is

8    what you see on the screen.  If it had to be the exact

9    size of the original form, I could not get it on my cell

10   phone.  I just want to see a model of the form on my cell

11   phone.  It's going to be a lot smaller, but I just want

12   to see the thing and I want to see that it's filled out

13   on your computer screen.  If you have old eyes like me,

14   you can blow it up to 150 percent or you can shrink it

15   down to 33.

16   A viewable form, the agency doesn't care what the

17   viewable form looks like, the governmental agency.

18   Governmental agencies care because the way they intake

19   data, when they get a whole bunch of tax returns, is they

20   put them through high speed scanners.  These scanners do

21   have to conduct data recognition, and they have to find

22   correct numbers on the form and then put -- convert those

23   values and put them in the governmental entity's

24   database.

25   For that reason when they get a form that's been

1    filed with them, it needs to be an exact match with the

2    form that they have published.  So if the form is printed

3    out and sent to the agency, it has to be an exact match.

4    What you see on your screen is just an everyday model.

5    It's just whatever you want to see on your screen.

6         And that's clear in these two claims, and it would

7    be a violation of the claim differentiation doctrine

8    to move exactly match into claim 1 of the 615 and define

9    model to be an exact match and make the two claims

10   exactly the same.

11        And this is -- you've seen the screen shot before,

12   but this is exactly how Aatrix -- the Aatrix technology

13   does this.  So I put my cursor -- let's see if I can get

14   it to stay up.  I put my cursor on the little symbol

15   that's highlighted in yellow in the upper left-hand

16   corner.  On every Aatrix form that symbol is placed one

17   inch down from the top margin and one inch in from the

18   left margin, and when you want to print a form out, you

19   adjust your printer so that that dot will fall in exactly

20   that place on the copy that's printed out.  Once you do

21   that, once you make that adjustment to your printer,

22   every single one of the 750-some Aatrix forms will print

23   out exactly to match the governmental form, but what's on

24   the screen who cares.

25        THE COURT:  So you're talking about the government

1   wants it 8 and a half by 11, but you might have it 3 by

2   4?

3          MR. LUNSETH:  Can't do that.  They will reject that

4   form.  In fact --

5          THE COURT:  No.  The 3-by-4.

6          MR. LUNSETH:  Yeah.  The 4 -- they --

7          THE COURT:  If it was 8 and a half by 11, they would

8   accept it?

9          MR. LUNSETH:  Yes.  And, in fact, here's -- the

10  process is that companies like Green Shades and Aatrix

11  have to submit these forms to the governmental agency --

12         THE COURT:  For approval.

13         MR. LUNSETH:  -- for approval every year, every time

14  it's revised, and the governmental agency will most of

15  the time kick it back once or twice to say you got to

16  revise this.  And as we have said, that specification is

17  as close as a single pixel.  It's 1/72nd of an inch, so

18  you got to go back to the drawing boards and get it

19  right, but that's when printed.  It is not the viewable

20  form.

21         THE COURT:  So let me ask you this, maybe after

22  April 15th are you going to say the case is over because

23  everybody switched to free TurboTax?

24         MR. LUNSETH:  I don't know.  We'll try.  If I can --

25         THE COURT:  I don't know how they're doing it

1  because I've used TurboTax for years, but I get the disk.

2  And I don't understand what they're doing about this

3  commericial that says you can get it for free, just push

4  here.  Do they then charge you for filing it or whatever

5  it is?

6         MR. BAIN:  Good question.

7         THE COURT:  Does anybody know?

8         MR. LUNSETH:  No.

9         MR. BAIN:  Maybe they have advertising in it, Judge,

10 and the advertisers are financing it.

11        THE COURT:  Is that what it is?

12        MR. BAIN:  Maybe, yeah.

13        MR. LUNSETH:  So pretend this is a viewable form.

14 You can see what I'm doing with the viewable form on the

15 screen.

16        THE COURT:  I understand.

17        MR. LUNSETH:  The government doesn't care if I do

18 that to the form.

19        So here's what model means.  I gave you a dictionary

20 definition.  A representation of a reality of an artifact

21 or activity intended to explain the behavior of some

22 aspect of it.  In creating a model an abstraction or

23 technique is used, thus the model is typically less

24 complex or complete than the reality model.  This

25 technique identifies commonalities and in doing so loses

1  detail.  The model only includes the most important

2  properties of the original system, so that's the

3  definition.  The definition says the model is somewhat

4  less.

5      Here's a picture of a Boeing 737, and I remember

6  looking at that blue engine out the window of the

7  aircraft we were on last night.

8      THE COURT:  And saying come on, start up.

9      MR. LUNSETH:  This is a model of a Boeing 737.  We

10  all know what a model is.  Somebody created this so you

11  would have a much smaller version of it that you can put

12  on your desk and it would have the outward appearance of

13  a Boeing 737.

14      This is another model.  This happens to be flight

15  simulator X.  It's a model that looks like it's flying.

16  It performs very realistically.  The nifty thing about

17  this model is if you miss your landing and you crash it

18  in to those mountains that are just ahead, all you have

19  to do is reset it.  You live, the plane lives, and

20  everybody flies again.  I'm a pilot, so this is important

21  to me that we don't miss landings.

22      Exactly match.  Exactly match means correctly

23  correspond in all pertinent criteria when compared, so --

24  and if the form is certified by a governmental agency, it

25  is an exact match for the agency's original paper form.

 1        There's a case called Blue Spike.  It's cited in the

 2   briefs.  It says the exact match doesn't have to be

 3   to each and every item, and the specification of the

 4   patent in this case expressly says that there are some

 5   elements of an original form such as legally protected

 6   state seals that can't be copied.

 7        The whole point of this is, yes, the match has to be

 8   exact, but it can be missing a few things.  And if the

 9   government -- the governmental agency is the arbiter.  If

10   they approve the form and they say that's an exact match,

11   it's an exact match.  That's it.

12        MR. BAIN:  Judge, our corresponding section is at

13   page 57.

14        THE COURT:  Now --

15        MR. BAIN:  Is that the model?

16        THE COURT:  That goes past 72?

17        MR. BAIN:  Yes.

18        THE COURT:  Okay.

19        MR. BAIN:  And that's because my --

20        THE COURT:  That's okay.

21        MR. BAIN:  -- section is very dense with evidence

22   from the intrinsic record.

23        THE COURT:  I got it.  Let me --

24        MR. BAIN:  I think a starting point to this

25   discussion is once again Phillips, and the guidance that

1    Phillips tells us is you don't go to dictionaries first

2    and find the generic definition of model that includes

3    airplanes, et cetera.  We all know what a model is.  I

4    agree out of context.

5         You read the patent first, and we ask ourselves what

6    does the patent tell us the patentee, the inventors

7    intended to instruct one skilled in the art what a model

8    is in the context of this invention.

9         So if we look at the intrinsic record for that

10   guidance, you know, Aatrix advocates a plain and ordinary

11   meaning, and really it's being done in an effort to

12   expand the scope of the patents.  They rely on generic

13   dictionary definitions that are untethered from the

14   specification that -- it doesn't connote any particular

15   correspondence to the thing being modeled, and they say

16   that the degree of correspondence depends on the purpose

17   of the model.

18        And we agree with that, but the purpose of the model

19   in the -- according to the invention is this notion of

20   having this exactitude, this exact correspondence that

21   the government requires, not just a general

22   correspondence and the general correctness.

23        And once again as I mentioned, Phillips clearly

24   instructs us go to the patent first, see what it tells

25   you what the context is for the particular term that

1    you're disagreeing about, in this case model.

2        The other important principle that I'd like to

3    introduce before I show you the evidence, Judge, is this

4    idea of claim differentiation.  There a principle of

5    claim differentiation, and we've expanded upon it in our

6    brief.  It traditionally arises when you have a -- if you

7    have a main claim that says that the patent includes a

8    nail -- or, excuse me, a fastener and then you have

9    dependent claim 2 that says wherein the fastener is a

10   nail.  Traditional claim differentiation says you can't

11   read that nail into fastener because of the requirement

12   under 112 that dependent claims further narrow.

13       There is a corresponding principle of claim

14   differentiation between two independent claims, which is

15   what we're talking about here, but it is not a conclusive

16   doctrine that says if you use a different word in a

17   different claim, it must have a different scope.  It may

18   have a presumption of it, but ultimately the courts have

19   also said that two claims with different terminology can

20   define the exact same subject matter.  And ultimately at

21   the end of the day claim differentiation can't be used as

22   an escape hatch to basically override the clear

23   statements of the claim scope found in the specification

24   and prosecution history.

25       And here we contend that yes, some of the claims say

1   exactly match and some of the claims say model, but when

2   I walk you through what -- how the word model is used and

3   how it's read by one skilled in the art in the context of

4   the entire patent and all the other corresponding

5   statements made, one skilled in the art would come away

6   with saying, yeah, in this context model really means

7   replica, exact match, duplicate.  Pick your synonym.

8        The specification describes to the person skilled in

9   the art.  There's only one use of the word model

10  throughout the whole specification, and it's very

11  important the way it's presented.  In the very beginning

12  of the detailed description of the top of claim 3 it says

13  the form file directs the program in producing a replica

14  of the original form.  That's the starting point of the

15  teaching.

16       It follows by saying this form file is designed to

17  model not only the physical representation of the form

18  but also the calculation and rule conditions required to

19  fill in the form.  So in the sole use of the word model

20  in the patent it clearly presents to one skilled in the

21  art that what they're talking about is replicating.

22       Then the specification makes clear that -- the

23  purpose of the model and the required degree of

24  correspondence.  In column 2 one of the principal objects

25  of the invention is to create a -- now, he was saying

1  before it has to be printed to be mirroring, not as an

2  electronic form on your iPhone.  But that's -- that's an

3  extrinsic attorney argument of an example.

4      One skilled in the art is going to read the patent,

5  and what does the patent tell them?  A principal object

6  of the invention is that the viewable electronic form

7  exactly mirrors the physical representation of an

8  original paper form.  It states later this is done so

9  that when the form is ultimately completed, the seller

10 knows the printed form will be an exact copy.

11     Once the completed form is printed out, it is

12 sometimes difficult to differentiate.  Alphanumeric and

13 bar code fonts are specifically designed to fit the needs

14 of the program so that the duplicated form exactly

15 matches the original.

16     Now, he points to an example of where the

17 specification teaches one skilled in the art that while

18 things like government seals and stuff have to be

19 excluded, I would point out that that is emphasized as

20 the only exception.  The disclosure paragraph in column 3

21 states -- first it teaches that a form design in this

22 patent is the process by which the seller creates

23 computer-generated forms that when printed will exactly

24 match the original paper form.  So that's the definition.

25 That's the standard.

1      Now, there's one single exception to that.  Note the

2   only exception to this is if the form contains

3   copyrighted graphic images.  So what Aatrix is doing is

4   trying to use a narrow exception to sort of swallow the

5   rule and say, well, this therefore means that model

6   doesn't mean exact match.  To the contrary it emphasizes

7   that when they say exact match and when they say model,

8   they mean just that.

9      That's just the patent itself, the prosecution

10   history, which is of record and is part of the intrinsic

11   record.  In their efforts to get the patent allowed they

12   made various arguments along the way.  One of the

13   statements they made is applicant's invention allows the

14   exact duplication of paper forms in order that they would

15   be indistinguishable from the prior original paper form.

16   This is a distinct advantage over Millard.  Millard was

17   one of the patents that was cited against them.

18      Later in that office action they say, in other

19   words, Millard teaches the production of original

20   documents, not the exact duplication of paper documents.

21      Later in connection with another rejection they --

22   the applicants discuss Laverty and Padova is oriented

23   towards creating PDF files, not printing an exact

24   representation of a preexisting paper form.  Padova only

25   discloses exporting form data, not a perfect

1    representation.  So exact, perfect, replica, duplicate.

2         In later office actions a third-party application

3    such as Photoshop cannot open a PDF and modify while

4    preserving the integrity of the perfectly duplicated

5    paper form.  Applicant's invention transmits both the

6    perfect -- perfectly duplicated form as well as the user

7    provided data.  Later the exact duplicate of the paper

8    form is referenced.

9         Aatrix is rectifying their form designer as an

10   application which allows a processer to make exactly

11   duplicating existing paper form.  This is the consistent

12   disclosure teaching statements made by the inventors in

13   the patent and in the prosecution history.

14        Later in the 393 patent, the second patent at issue,

15   they discussed the stored program.  The form designer is

16   used to create the file that duplicates the paper form.

17   That's consistent with the replica disclosed in the

18   specification.  They later say, similarly the form

19   designer is used to create a file that duplicates the

20   paper form.

21        The examiner clearly got that message, Your Honor.

22   In his reasons for allowance he says, the prior art of

23   record talks most of Applicant's claimed limitations but

24   does not expressly teach the feature -- features, and

25   there were other ones, but including printing an exact

1    representation of the paper form with the manipulated

2    data.  So the examiner found that to be one of the things

3    that was being argued to him that he found persuasive.

4        There's a continuation of part application that we

5    reference in the briefs.  That one was abandoned, but as

6    we cite in the Microsoft case at the bottom of this

7    slide, the prosecution history of that related patent has

8    a bearing on this.  And in that case they described the

9    claim program to create a form file that models the

10   physical representation of the form and allows the user

11   to create a duplication of a physical form.  So in that

12   prosecution history the inventor is directly ascribing

13   the model language in the claims with the act of

14   duplication.

15       All of this intrinsic record is consistent with the

16   arguments we've heard before in the Alice, which are

17   summarized here, but effectively to the point that it's

18   critical to have the exactness down to a pixel or two.

19   And, Your Honor, in the original motion to dismiss based

20   on 101 it reflected that you read the patent, you

21   understood what it said, and you -- it turns out based on

22   this detailed review of the intrinsic record you were

23   correct that this element B which is directed to the form

24   file creation program doesn't create a new form but

25   describes a structural component that functions to create

1    a replica.  That's a very good word choice.  A replica of

2    the original form that's already in existence.

3         The form file in element A models the physical

4    representation of an original form.  In other words, this

5    is the way it struck you, Judge, which was correct.  In

6    other words, the form file contains an electronic replica

7    of an original paper form.  Modeling is replicating,

8    duplicating, which we contend would be exactly matching.

9         So the specification and the file history and Aatrix

10   -- Aatrix's own arguments are consistent.  The purpose of

11   the invention is to create an electronic form that

12   exactly mirrors the physical representation of the

13   original form.

14        Model must be construed in the context of the spec

15   and not untethered out of context dictionary definitions.

16   Claim differentiation cannot serve to broaden these

17   claims beyond the meaning that this specification clearly

18   conveys.

19        Let me just briefly do correspondingly and exactly

20   match.  I think that -- those words are even less -- I

21   didn't see anything in the record to argue that there's a

22   dictionary definition that exactly match doesn't mean

23   just that, exactly matching.  It's basically requiring an

24   exact copy, a replica, or a model.

25        Again, specification supports that and all the

 1  various examples we gave earlier for model.  The only

 2  exception is just that, it's an exception.  It shouldn't

 3  be allowed to swallow the rule and change the definition

 4  or scope.

 5      And the one thing in the prosecution -- originally

 6  they had tried to loosen that up a little bit by saying

 7  substantially match, and that was rejected by the

 8  examiner as being indefinite, so they came back and they

 9  changed substantially match to exactly match.  They made

10  very clear that's exactly what they meant.

11      So against the intrinsic rec- -- evidence that I

12  presented there is no description in the spec for this

13  alternative that's being proposed, correctly

14  corresponding in all pertinent criteria.  There's no

15  discussion of that in this intrinsic record.

16      So we contend that exactly match should mean just

17  that, exactly match, and not correctly corresponding in

18  all pertinent criteria or this other even broader

19  definition of certified by a government agency.

20      MR. LUNSETH:  All the way back to the basics of

21  claim construction.  When one creates an invention that

22  is so good and so accurate that it can create an exact

23  match, one is obligated under 112 to disclose exactly how

24  to do that, and that is the best mode.  That's what's in

25  this specification.  That is exactly the reason why the

1   specification is not read into the claims.  Obviously if

2   you can make a replica that's that accurate, you can make

3   one that's less accurate with the same invention.

4       What they want to do is take a few things out and

5   say, well, this isn't that accurate, it's not an exact

6   copy but use the rest of the Aatrix technology.

7       Claim differentiation applies the model of the claim

8   as a different thing from the exact match, and Counsel

9   read it.  I mean, this says exactly what I said.

10  Examiner's reasons for allowance.  The prior art of

11  record taught most of the applicant's claimed limitation

12  but does not expressly teach the features printing --

13  printing an exact representation of the paper form with

14  the manipulated data.  That's it.

15      I went a little afield.  I'll get back on track

16  here.  Form.  Form.  Our position on this again is that

17  it doesn't need construction.  It's a plain English word

18  that we all understand.  We all deal with forms every

19  day.  They want it to be an official printed document, so

20  first of all, it's got to be official and it's got to be

21  printed.  And then it has blank spaces for insertion of

22  required information.

23      The definition -- or the defendant's definition is

24  an attempt to read into the claims that the patent covers

25  only official printed documents, so -- and because the

1   term viewable form, which we haven't looked at yet,

2   includes the word form, that would then have to be only

3   official printed documents, which would make the viewable

4   form not an on screen form, but an actual official

5   printed document.

6        It would convert -- every form appears throughout

7   the claim, so it would convert everything in the claims

8   into structures or steps that copy or model or display or

9   consist of a form to be an official printed document.

10       But the specification in the claims of the patents

11  also -- or the specification of the patents also make

12  clear that there are lots of other versions of forms that

13  are purely virtual.  So by virtual I mean digital or

14  computerized.  So at the bottom of the page there you can

15  see from claims 730 and 31 of the 615 patent and claim 8

16  of the 39- -- 393 patent there's a limitation of

17  electronically filing, the e-file form.  What is an

18  e-file form?  It's a digital form.

19       The next one is submitting the e-file form on a

20  floppy diskette from claim 8.  That again is a digital

21  form.  Storing the e-file form on a floppy diskette,

22  claim 30 of the 615.  Submitting the e-file form by the

23  file transmission protocol.  FTP is the common -- is a

24  common method of communicating over the Internet, so what

25  this is talking about is you can send an e-file form over

1   the Internet or to another computer.  Again, it's purely

2   digital, so what they're trying to read into the claims

3   is contrary to the language of the claims.  That's it.

4        MR. BAIN:  Page 52, Judge.

5        THE COURT:  52 to what's left in --

6        MR. BAIN:  52 to 55.

7        THE COURT:  I think 55.

8        MR. BAIN:  Yeah.  Not very long.  Well, to make

9   things clear, and I think they were made clear in our

10  briefs, the dispute over the word form, which occurs only

11  by -- as a word all by itself in claim 17 of the 393

12  patent, is not an attempt to affect what it means for

13  viewable form, e-file form.  Those are terms that have a

14  separate meaning.  Viewable form, for example, is a

15  separate disputed term that we'll talk about later.

16       But in the standalone -- the standalone term form as

17  used in claim 17 of the 393 patent is introduced in the

18  step allowing a form designer to create a form file

19  comprising a model of a form and establishing the

20  calculations and rule conditions required to fill in the

21  form.

22       So you'll notice that once again it's sort of like

23  the -- I think you made mention of this in one of your

24  prior orders, that the draftsman's art cannot be used.

25  You can't use wordsmithing and word choice to try to

1    change the scope of the invention that's otherwise taught

2    to one skilled in the art by the patent as a whole.

3         Here what you'll notice is if you compare claim 17

4    of the 393 patent to some of the other claims -- asserted

5    claims in the 393 and the 615, you will see that they

6    said, you know, original paper form.  They'll say, well,

7    this can't be original paper, Judge, because we only use

8    the word form.  They can't use word choice like that to

9    escape the scope of the invention.

10        And in here what we're basically contending is that

11   this is effectively the same original paper form that the

12   patentee just -- that the whole point of the program, the

13   whole point of the invention is to replicate or duplicate

14   an original paper form.  So use of the term form in this

15   claim clearly corresponds to the original form that's

16   already in existence designed and created by some other

17   entity.

18        So Aatrix's proposal for -- they don't even want to

19   give the jury a plain and ordinary meaning.  They want to

20   leave it sort of uncertain.  Invites the opportunity to,

21   once again in violation of Phillips, improperly

22   disconnect the term form from its use in the description

23   of the context of the specification, which is an original

24   form that is already in existence designed and created by

25   some other entity to include, for example -- they would

1    want to expand this form, the ordinary meaning, to

2    include, for example, a template that has no nexus

3    whatsoever to the original form.

4         So accordingly we contend that, you know, we -- the

5    definition that we have we think reflects is an -- is an

6    attempt at articulating effectively that this has to

7    be an original printed document.

8         But the Court I think has -- had a similar

9    articulation in your original order at docket 59 in the

10   motion to dismiss where you made the point that although

11   the claims say in the preamble that it's a method or a

12   system for designing and creating forms, it really

13   doesn't design anything.  It really just is used to

14   replicate an original form that's already in existence

15   designed and created by some other entity, so we could

16   actually be happy to live with that construction that the

17   Court's already come up with in its docket 59.

18        THE COURT:  I think you were up to form file.

19        MR. LUNSETH:  Form file, yes, Your Honor.  Our

20   definition is simple, a collection of digital information

21   representing a form.  The defendant's is very, very

22   complex and detailed and raises a lot of issues.

23        A computer file storing data information as opposed

24   to compiled source code or a program and including a

25   model of an original paper form and the calculations and

1   rule conditions required to fill in a viewable form to be

2   read, written to, and otherwise operated on by the viewer

3   program to generate the viewable form that exactly

4   mirrors, matches, replicates the original paper form.  So

5   they're packing every possible detail into this claim

6   construction.

7         Remember when we went through the -- how computer

8   technology works and what is in a form file, a real

9   Aatrix form file.  It is -- it includes programming, and

10  it must include programming.  Claim 1 of the 615 patent

11  that we looked at earlier says that the form file

12  establishes the calculations and rule conditions.  It

13  cannot establish calculations and rule conditions without

14  having any -- without having instructions or commands in

15  the form file.  Not possible.

16        So this construction that they're attempting

17  to place on a form file to say there's only data that

18  contains no programming whatsoever is simply wrong.  It's

19  just dead wrong.

20        In fact, there's nothing in the language of the

21  claims that says that a form file has to be data or has

22  to be programming, can be one, can't be both, must be

23  another.  They just want to read all of that in, and then

24  they want to read in including a model of an original

25  paper form and the calculations and rule conditions

1   required to fill in a viewable form.

2       Well, this term form file occurs, and I thought -- I

3   thought I had a copy of it here.  It occurs in claim 1 of

4   the 615 patent.  And claim 1 of the 615 patent already

5   has the language model of an original paper form and the

6   calculations and rule conditions required to fill in a

7   viewable form.

8       So what this construction would do is render that

9   claim language already in the claim in claim 1 of the 615

10  completely redundant.  It would be in that claim twice

11  because the form file would have to have a model of an

12  original paper form and the calculations and rule

13  conditions required to fill in the viewable form, and the

14  claim itself has the exact same language.  So this is a

15  classic example of violation of the rule against super

16  fluidity.

17      The defendant's expert has provided a declaration to

18  the Court that I believe is just wrong on this point.  So

19  I'm on page 14.  This is the declaration of Craig

20  Rosenberg, Ph.D.  It's document 121, paragraph 26.  I'm

21  sorry.  Wrong page.  Page 30.  Page 30, paragraph 52.

22  As -- there's a very significant difference between the

23  form that is described in the 615 and 393 patents and an

24  interpreted language.  As mentioned previously, a form

25  file is a data file that models the physical

1    representation of an original paper form.

2         As will be described in the subsequent section

3    covering support for the construction of data file, a

4    form file, which is a kind of data file, does not include

5    any compiled source code and a form file does not contain

6    any interpreted language.  I could take you all the way

7    back to the original slides we looked at, but if that is

8    true, then why was it that the AFD file was run through

9    an interpreter?  It obviously has interpreted language in

10   it.  The form file has programming.  In fact, the form

11   file, as I said, has to have programming or it can't

12   conduct calculations and rule conditions.

13        On our construction a collection of digital

14   information representing a form -- the specification

15   talks about a number of things that are in the form file.

16   The digital information includes static text and drawn

17   elements.  We've talked about that.  Graphics such as

18   lines, boxes, circles, and triangles.  Again, we've

19   talked about that.  Definitions of data fields for

20   receiving data and of course importantly programming for

21   calculations and rule conditions, which is right in

22   claim 18 of the 615 patent.

23        So our definition encompasses all the various types

24   of information that are stated in the various claims in

25   the patent and in the specification without actually

1    trying to read detail and limitations from the

2    specification into the claims.

3         The defendant also is trying to read model and

4    mirror and exactly match and replicate all into this

5    claim, and we've already talked about why exactly match

6    and model are different.  Exactly mirrors is a term right

7    out of the specification, so they're asking you, Your

8    Honor, to read directly from the specification that model

9    has to be defined to be exactly mirrors and a form file

10   has to be defined to include replica that exactly

11   mirrors.

12        I've already given you this example, but I want to

13   do it again I guess.  The form file does contain both

14   instructions and data because the programming does.  So

15   the form file might have an instruction that says draw a

16   line, semicolon 7.23, meaning draw me a line 7.23 inches

17   long.  The draw a line part is an instruction, and the

18   7.23 part is a piece of data, how long you want it.  So

19   the form file is not limited to just instructions, and

20   it's not limited to just data.

21        The defendant also tries to argue that the form file

22   may not include compiled code.  The form file includes

23   programming.  It doesn't matter what form the programming

24   takes.  Their whole argument that it does not include

25   compiled code is based on this erroneous idea that what

1    the patent was trying to get away from was a form file

2    that has compiled code in it.  That was not it.

3         As we said before and as you understand, we were

4    trying to get the form file out of that big pile of

5    monolithic code, which happened to be compiled code.  But

6    you can compile, if you want, code and put it in the form

7    file, and it's still a form file.

8         So Defendant's construction of this is just wrong.

9    This is the kitchen sink construction.  Everything they

10   want in it, and it has no basis.  No basis whatsoever.

11   As I've said many times before, the patent is required to

12   disclose the best mode, so if the patentee says he can

13   make something good enough to exactly mirror a document

14   in this specification, that's his best mode.  Doesn't

15   mean he has to claim his best mode.  He can claim a model

16   to display a viewable form, and he can claim -- claim an

17   exact match when that viewable form is printed.  He's

18   entitled to claim those things.  He's created something

19   that can do either one of those things.  They are

20   disclosed in the specification, so that's it.

21        MR. BAIN:  Our section begins at 29, and this one is

22   a little long because again --

23        THE COURT:  29 through 41?

24        MR. BAIN:  29 through 50 I believe or --

25        MR. GILLIS:  51.

1      MR. BAIN:  51.

2      THE COURT:  All right.  I'll forget I think.  51 or

3   -- I have 41.  Hang on.

4      MR. BAIN:  I think it goes through 51.  I'll start

5   off by being candid that I think Aatrix makes a good

6   point that there's too much in the construction.  This --

7   it's important to note the evolution of this construction

8   in our discussions of can we find common ground.

9   Initially at the very beginning of this process the Court

10  ordered us to exchange proposed constructions, and Aatrix

11  had a collection of digital information representing a

12  form.

13     And as I think I reflected in one of my briefs and

14  affidavits, I indicated, well, as long as you agree that

15  doesn't include compiled source code, I think we might be

16  able to find common ground.  And as you heard today and

17  as you saw in the briefs, no, no, it can certainly

18  include compiled source code.

19     THE COURT:  Let me ask you a question about that.

20     MR. BAIN:  Yes.

21     THE COURT:  Of course you have a number of things in

22  here.  Page 28 is form file creation program.

23     MR. BAIN:  Yes.

24     THE COURT:  42 is form file intrinsic record, and

25  that goes I believe to page 51 where you have form file

 1   conclusion.

 2        MR. BAIN:  Yes.  That's part --

 3        THE COURT:  Where does page 28 go?

 4        MR. BAIN:  28 should stay where it is.  If you're

 5   reorganizing our binder, Your Honor, you should start at

 6   29.

 7        THE COURT:  That's what I have after.

 8        MR. BAIN:  And go all the way to 52 -- or 51.

 9        THE COURT:  And just leave --

10        MR. BAIN:  28.

11        THE COURT:  -- form file creation program as a

12   separate item?

13        MR. BAIN:  Yeah.  That's the conclusion page of

14   another term we're going to discuss.

15        THE COURT:  Another section.

16        MR. BAIN:  Yes.

17        THE COURT:  Okay.  Go ahead.  I'm with you now.

18        MR. BAIN:  So again I think that -- I will be candid

19   and acknowledge that there's too much.  Aatrix makes a

20   good point that everything after and including a model --

21        THE COURT:  So we --

22        MR. BAIN:  The claims -- the claims already say

23   that.  He's correct.

24        THE COURT:  You want to work on that again?  Because

25   this is, I mean, a big section.  It's now ten minutes

1    after four, and we're up to -- we've only done six.

2         MR. BAIN:  Well, I think I'm --

3         THE COURT:  Out of 15 out, right?

4         MR. BAIN:  Yeah.  I think I'll -- we have 15, yes.

5    I think I'll go -- this is a very important one to us,

6    Your Honor, and I think that even though it's many pages,

7    I think it will go quickly because much --

8         THE COURT:  Take all the time you want, as I said at

9    the beginning.  If we don't finish, then we --

10        MR. BAIN:  Because what I --

11        THE COURT:  -- we'll come back.

12        MR. BAIN:  -- really focus on in these 20 or so

13   pages is really the first part, which is the critical

14   part that the form file stores data and information as

15   opposed to compiled source code or a program.  That's the

16   critical thing.

17        THE COURT:  Okay.

18        MR. BAIN:  And if you go to page -- which is exactly

19   what I say at page 30.  The center really disputes on

20   what does the form file contain.  Green Shades' position

21   is that it cannot include compiled source code.  Aatrix's

22   position, which is from their brief, is form files need

23   not be pure data at all and they may comprise

24   instructions in any of the basic programming languages.

25   So this is that sort of camel nosed reference I made

1   earlier that they talk about interpreted language as an

2   ability to expand it to include any language, including

3   compiled code, which of course we've explored extensively

4   how the intrinsic record emphasized the way they got away

5   from compiled code.

6        Now, I disagree with Aatrix's contention that all

7   they did to get away from compiled code was get away from

8   the monolithic code by bringing the form file outside.

9   That's only part of it.  They had to get away from source

10  code that was compiled in order to get away from

11  programmers.  One of the things that they emphasized to

12  survive Alice -- in their efforts to survive Alice is the

13  great inventive nature of these form files no longer

14  needed programmers.

15       So I posit the very interesting question, how can

16  you have a form file that doesn't involve programmers but

17  still have source -- compiled source code in it?

18       The summary of Aatrix's argument is -- remember it

19  was all discussed in the context of programming, is that

20  programming is a general concept that includes compiled,

21  interpreted, and assembled.  We agree.  The patent

22  background discloses in a single instance that the form

23  files could be interpreted.

24       I would invite the Court to read that whole

25  background section because to one skilled in the art,

1    that interpreted language -- that interpreter -- the

2    passing reference to interpreter appears to be in the

3    context of what they contend is a prior art version of

4    the form file leading to the predicate that, and we've

5    improved upon it and now the new invention is this new --

6    new invented form file.

7        So they distinguished over the interpreted version,

8    which I think they described as an interim because form

9    files include -- their logic is that because form files

10   include interpreted programs and they also include other

11   programs including, for example, the compiled source

12   code, but that position directly contradicts the position

13   they have been taking to try to survive Alice.

14       So despite these specific stated benefits that they

15   tout as being a distinction -- an inventive improvement

16   over Alice, Aatrix now seeks to broaden the scope of form

17   file through the claim construction process to

18   accommodate its infringement contention because, as you

19   know, as we showed you, Judge, their infringement

20   contention is they want to point to compiled code in the

21   Green Shades product and say that's a form file.  It's

22   inconsistent.

23       Because the claims -- and this is an important

24   principle you -- I'm sure you know, Judge.  The claims

25   have to be construed the same for infringement going

1   forward and looking back at invalidity or at Alice.  It

2   has -- it can't be -- it can't be a nose of wax.  There

3   was a reference in one of the briefs about shifting

4   sands.  This is the type of shifting sands that the

5   court wants the -- the district courts to avoid.

6       So Aatrix's assertion that the patent discloses form

7   files that are interpreted and therefore interpreted

8   programs is supported only by a single use of the word

9   interpreter in the background section, and what's

10  important is nothing in the description of the invention

11  -- if you read from the summary of the invention and the

12  detailed description of the invention, you will not find

13  the word interpreter or interpreted anywhere used in

14  that, so they haven't disclosed to one skilled in the art

15  that that's what they intend.

16      As Dr. Rosenberg has explained, one skilled in the

17  art would understand that an interpreted language is

18  something that's a flexible and extendible set of

19  instructions, and as I'm going to show you in the

20  intrinsic record, the nature of the use of form file and

21  the ways that it's been described are in the nature of a

22  data file, not as interpreted programming language that's

23  flexible and extendible.

24      You will recall that the earlier assertions in this

25  case were that the programs were compiled source code.

1    Its focus has always been on the distinction over the

2    problems associated with compiled source code, as we've

3    discussed earlier, and this is reiterated here.

4        Aatrix draws a distinction between its preliminary

5    file form and the file form as used in the patents.  The

6    preliminary step was that Mr. Jensen used the tool to

7    create little pieces of source code that he could then

8    incorporate into the larger monolithic code.

9        Then they draw the distinction between an interim

10   solution for the form file.  As that process evolved, it

11   wrote not a piece of source code to be cut and pasted,

12   but a separate file called a form file that's separate

13   from the monolithic code.  That's point one that Aatrix

14   made, and we agree.  That's part of the -- their

15   contended solution.

16       But then he eventually developed it so that it would

17   generate a separate form file, and here's the details,

18   containing a representation or model of the form rather

19   than generating a piece of source code.  And he touted --

20   this is the critical part.  They touted that one of the

21   advantages of that is no need for programmers anymore.

22       So if this form file -- if the scope of the form

23   file includes source code that's going to be compiled,

24   then they haven't gotten away from the no programmer

25   feature that they contend is one of the advantages of the

1   invention.

2        On that point, Judge, if you actually look at --

3   there was some examples given earlier of what they

4   contended was interpreted language, but a true

5   interpreted program is something that's really going to

6   still require programmers.  For example, JavaScript is an

7   example of an interpreted program, and I've given you a

8   little excerpt of some Java -- JavaScript coding and ask

9   the Court to consider whether that's something that could

10  be written by a nonprogrammer.

11       So Aatrix's logic is because the form file included

12  an interpreted program in a passing mention, it can also

13  include other compiled and assembled programs.  This

14  logic is false.  Even if it included an interpreted

15  language, it does not follow that it would therefore

16  possibly include compiled source code written by

17  programmers that Aatrix has said it's done away with.

18       I would contend Aatrix's own expert agrees with

19  that.  He says -- in document 119, paragraph 13

20  Mr. Rosenblatt says a person that's skilled in the art

21  would not apply the term source code to interpreted code

22  because interpreted code is not a source to a process

23  that transforms.

24       And, again, the very section that Aatrix points

25  to as their sole support for the idea of an interpreter,

1    in the same paragraph it says that the change within the

2    focus of the tool was to get away from one requiring

3    programming effort to one in which the forms could be

4    developed completely independent of programmers.  So a

5    form file that's developed completely independent of

6    programmers cannot include interpreted language.

7         So in conclusion, a passing reference to an

8    interpreter, the interim development in the background

9    section speak to this not being -- that a form file

10   includes any type of programming, interpreted or

11   otherwise.  It should not be allowed to be used as a back

12   door to reintroduce compiled source code back into the

13   form file that would contradict its patent and its

14   position over Alice.

15        So that's -- that's our critique of the -- of the

16   argument and the -- and the logic or the lack of logic,

17   but what we really need to care about under Phillips is,

18   well, what does the intrinsic record actually tell a

19   person skilled in the art about the form file.  That's

20   what really matters.

21        When we start with the claims, as we've explained in

22   our briefs, all the claim uses of form file are

23   consistent with the attributes of a data file.  It's

24   created by a program.  It's operated on by a program.  It

25   contains data, and it's transmitted for storage.  And we

1    have many other examples, and these are all consistent

2    to one skilled in the art with a file that's intended to

3    be a data file.

4        The specification is consistent with that.  It

5    discusses, for example, that the viewer program will

6    generate a report by merging data into -- in the data

7    file with specific fields in the form file.  The form

8    file stores data that can be converted to text, and these

9    are all, as our expert has explained, indicative of a

10   data file.

11       There's also -- and this is very important.  The

12   illustrations are consistent with that.  As we pointed

13   out in our briefs, the flow chart symbol for data storage

14   is this half cylinder shell, and you will notice that the

15   symbol that they choose to represent the data file 20 is

16   the exact symbol that they choose to represent the form

17   file 10, and this is in contrast with the rectangles that

18   reflect programs.  Form viewer is a program.  That's

19   number 30.  The vendor application at the top is a

20   program, and that's also number 30.

21       Now, part of the response to that by Mr. Rosenblatt

22   is that the source of our flow chart evidence from the

23   Internet is unreliable, that one skilled in the art would

24   look to the international standard, the ISO 5087.  He

25   goes on to give an opinion based on that, but yet he does

1   not provide the Court with a copy of this ISO 5087.

2        So we ordered a copy.  I asked Mr. Lunseth if we

3   have copies of it today.  He agree -- he does not object

4   to us providing that to the Court, so if you would like

5   it, I'd like to give it to you.

6        THE COURT:  Okay.  Yeah sure.

7        MR. BAIN:  May I approach?

8        THE COURT:  Yes.  Do you want that put in the

9   record?

10       MR. BAIN:  Yes, I would, Your Honor.

11       THE COURT:  Admit that.

12       MR. BAIN:  Can we get that as Exhibit -- Defendant's

13  Exhibit A.

14       THE COURT:  There's two copies.  Defendant's A will

15  be admitted without objection.

16       (Defendant's Exhibit A was received in evidence.)

17       MR. BAIN:  And what you will find when you review

18  that against this flow charts in the patent, you will

19  find that, in fact, the patent symbols are consistent

20  with the ISO standard and they're consistent with the

21  idea to one skilled in the art that the form file is

22  being conveyed to him or her as a data file and not as a

23  programming file.

24       A data flow chart consists of data -- these are

25  reflections from the ISO document I just submitted at

1   pages 1 and 2.  Data symbols indicate the existence of

2   data.  They may also indicate the medium used for this

3   data.  The half shells that are shown apparently are

4   generic.  They're not specific to any type of data

5   storage.  In contrast, the rectangles, the process

6   symbols, indicate processes to be executed on data.

7        The arrows are line symbols to indicate the data

8   flow, and then there are also -- also special symbols to

9   facilitate the reading and writing of the flow chart.  So

10  that's the overview that the ISO provides, and consistent

11  with that the form file just like the data file at 20 is

12  illustrated as being in the nature of a data, the

13  existence of data.

14       9.1.12 of the ISO standard describes this half shell

15  as data, stored data.  In contrast the process that you

16  would typically reflect for a program or an application

17  as they've done in the patent, vendor application, and

18  viewer -- form viewer 30 are done with a rectangle

19  consistent with the ISO.  And further consistent, if you

20  want to reflect the document like the original form in

21  the upper left-hand corner, you show it with this

22  rectangle with a curved bottom.

23       So unlike what Mr. Rosenblatt said without providing

24  a copy of the ISO, when you actually review the ISO you

25  will see that the flow chart is consistent with it and

1  it's consistent reflecting the form file, just like the

2  data file, is in the nature of data.  That's summarized

3  on this page 48.

4       So as I mentioned before, Your Honor, I think I

5  would acknowledge that there's -- the form file proposed

6  construction that we presented at the beginning of this

7  process includes details about the model and the

8  interfacing with the viewer program, which the claims do

9  separately recite.  And what we would propose is that

10 what the Court should consider is whether between

11 Aatrix's proposed construction and Green Shades', the --

12 really the critical distinction is whether the Court

13 should order or instruct the jury that the form file does

14 not include compiled source code.

15      I've given you authority -- the authority that

16 provides the Court's not bound.  It's not an either/or

17 proposition that the judge has to pick one construction

18 or the other.  The Court can come up with their own, and

19 in this case that may be appropriate.

20      And it's also appropriate for the Court to expressly

21 explain to the jury what's not included in a particular

22 term, so in these cases I found you will see examples

23 where the Court's instruction to the jury says, for

24 example, the form file could be as Aatrix proposes, a

25 collection of digital information representing a form,

```
 1    but I instruct you that it does not include compiled

 2    source code.  That would be permitted under these cases.

 3         So the conclusion.  The form file is taught to a

 4    person skilled in the art based on the disclosure by the

 5    claims and the figures is in the nature of a data file,

 6    and at a minimum it does not include compiled source code

 7    written by a programmer.  Reference to an interpreter in

 8    a background section cannot be a back door method to get

 9    in generically programs and therefore sort of sneak back

10    in compiled source code into the form file.

11         So the judge -- the Court should instruct the jury

12    expressly that the patented form files do not include

13    compiled source code written by programmers.

14         MR. LUNSETH:  I think, Your Honor, that construction

15    just completely changed after the last briefs and after

16    our discussion, so I'm -- I'm going to try to figure out

17    if I can what the construction is.  I think what Counsel

18    said is that a form file is a computer file storing data

19    information as opposed to compiled source code or a

20    program, period.

21         MR. BAIN:  That would be fine.

22         MR. LUNSETH:  With an additional instruction saying

23    that a form file cannot include compiled source code

24    written by a programmer, which is brand new.  I mean, I

25    just heard it when he was standing at the podium today.
```

1        You know, what I think we should do is actually look

2   at the claim language.  This is claim 1 of the 615

3   patent, and it's my favorite because I think it best sets

4   out the building blocks of this patent.  And it's got two

5   that are of interest here.  B.  I'll distill B down a

6   little bit.  It says a form file creation program that

7   creates the form file.  In other words, this patent claim

8   on its own says that it is the form file creation program

9   that creates the form file that generates the form file.

10  It's not done -- a human sits at the computer and creates

11  the form boxes, all that kind of stuff, but the form file

12  creation program generates the file.

13       And then it says a form file that models the

14  physical representation of an original paper form and

15  establishes the calculations and rule conditions required

16  to fill in the viewable form.  That's pretty simple.  All

17  this other stuff that Counsel is talking about like

18  excluding compiled code and departing from the prior art

19  and reading from the diagrams in the specification are

20  just attempts to read into the claims what is not in the

21  plain claim language.

22       Form file in the claim language in claim 1 of the

23  615 is what it says, a form file that models the physical

24  representation of an original paper form and establishes

25  the calculation and rule conditions required to fill in

1   the viewable form.  It doesn't say how you have to get

2   there.  It doesn't say, yes, you can use this kind of

3   programming language and -- but not that kind of

4   programming language.  It doesn't say, yes, you can use

5   interpreted language but you can't use compiled code.

6   Yes, you can use this code but not that code.  That's not

7   in the claims.

8        What was exemplified in the patent was a form file

9   which included both data, and it included programming.

10  That was it.  The example it was given was interpreted

11  language programming, but that's an example of

12  programming.  It does not matter what the form file

13  contains.

14       Counsel is making a lot of arguments about what we

15  said to try to separate the patent from Alice, and

16  virtually every one that I've heard today so far has been

17  a misrepresentation as though Counsel was not there.  As

18  I said before, what we did to distinguish the patent from

19  Alice was to say the forms used to be in that big

20  monolithic block of source code which was a headache.  We

21  separated them out.  We put them in a file.  Now, how you

22  write that file is not particularly important, but we

23  didn't say you have to leave all the compiled code back

24  there.

25       Another little twist to Counsel's argument is he

1    keeps saying that the -- that the form file cannot

2    include compiled code.  Well, there's compilable code --

3    source code and there's compiled code.  Compiled code is

4    the machine language.  It's -- if you go all the way back

5    to the first slide that I showed you, it is zeros and

6    ones.  It is code expressed in binary, and there's

7    nothing in the patent that says that you can't put binary

8    code in the form file.  Nothing whatsoever.  That's what

9    compiled source code is.

10        I might agree with him if -- if he's arguing that

11   programmers can't write source code which then gets

12   compiled and put into a form file.  That's not what the

13   form file creation program calls for, but neither is that

14   a fair interpretation of a form file.  The form file

15   simply does what it says in here.  It models the physical

16   representation of an original paper form and establishes

17   the calculations and rule conditions required to fill in

18   the viewable form.  And whatever you have to put in that

19   file to do that is covered.  It's that simple.

20        All he wants to do is try to use everything nut and

21   bolt in the specifications to say, well, it's not this

22   and it has to be this and -- which is exactly what is not

23   permitted by claim construction.  So I -- we don't

24   disagree.  I mean we don't agree at all with -- even with

25   their revised definition.  It -- there's no need.

1      I'm going to get back to the revised definition

2   here.  I don't know of any rule of patent construction

3   that says that you read into the interpretation of a

4   claim the distinction between the patent and the prior

5   art.  None.  I've never seen a case that permits that.

6   That's what he is supposedly doing here by saying that

7   the computer file's storing data information as opposed

8   to compiled source code.  There's no authority for that,

9   none whatsoever.

10      So we disagree with this construction of the claim.

11  The construction we've given you is simple.  It covers

12  everything that is in the specification that goes into a

13  form file.  What is in the claim language is simple.  It

14  says what the form file needs to do.  That's what guides

15  the Court's construction and not what Counsel has

16  provided.

17      I kind of went off on a tangent there, so I -- you

18  know, if Counsel wants to reply to that, I'm fine or I'll

19  go ahead with the next question.

20      THE COURT:  I think you're up to form file creation

21  program.

22      MR. LUNSETH:  Yes, Your Honor.

23      THE COURT:  That would be number 7.

24      MR. LUNSETH:  Yep.  Form file creation program, a

25  set of software tools that is -- our construction is a

1    set of software tools that is suited for designing a form

2    and creating a form file.  Green Shades' construction is

3    a computer program for generating a file storing data,

4    for duplicating an outside original form.

5         There is no -- there is nothing in the form file

6    creation that says that the file -- the form file either

7    stores data or doesn't store data for duplicating an

8    outside form, so our construction is correct.

9         As we've previously shown, the form file creation

10   program of the Aatrix patents is a set of software tools,

11   and those software tools are suited for designing a form

12   and creating a form file.  And there are actually several

13   pages in the patent where all of those tools are

14   disclosed and how they can be used.  The form source file

15   or created form file, which comes out of the process of

16   creating a form, can then also be converted, and it's

17   disclosed in the patent that there are a couple of

18   utilities that allow the conversion of this file.  One is

19   called RF Explorer that allows the file to be converted

20   to plain text, and plain text is a form of interpreted

21   language.

22        And another is called the FRED program that allows

23   the file to be encrypted.  So after it's processed by

24   these utilities, it is the form file and it gets passed

25   on.  Utilities are part of the form file creation

1    program.

2         Nothing in the patent specification -- Defendant's

3    construction is wrong.  There is absolutely nothing in

4    the patent specification that limits the form file to

5    data, and I want to read this again because their expert

6    says there is not a word about an interpreter in the

7    patent.  Here's what it says, the critical piece of early

8    AFD Aatrix forms design development was the creation of

9    an interpreter, and then it goes on to describe how this

10   was a piece of -- originally a piece of source code that

11   sat in the payroll series and could take an FD file,

12   interpret the file, and run it on the computer.  There it

13   is.

14        The form file includes both instructions, and it

15   includes running rule calculations and conditions.

16   Nothing limits it to an outside original form, and the

17   term outside here is completely undefined and unsupported

18   by the defendant, so I don't know what else he means.

19   Does he mean to imply that it's a form that comes from

20   somewhere else than the system?  I don't know.  It's not

21   anywhere in any specification and nothing in the patent

22   talks about outside original forms.

23        So I -- their construction is very -- is confusing,

24   Your Honor, and it's just dead wrong.  And, again,

25   they're completely ignoring what is disclosed in the

1   specification.  Thank you.

2       MR. BAIN:  The corresponding section begins at

3   page 23, Your Honor, and continues to 28.

4       THE COURT:  Just one second.

5       MR. BAIN:  23 to 28.

6       THE COURT:  You said 22?

7       MR. BAIN:  23 to 28.  Five -- five pages.

8       THE COURT:  Okay.

9       MR. BAIN:  Turning to the page 24, let's start off

10  with the positive.  The parties, and I'll show also the

11  Court in its original order on the motion to dismiss,

12  agreed that the form file creation program creates the

13  form file, so we've got that accomplished.

14      The two essential agreements -- disagreements are

15  that there's -- Aatrix is proposing that this form file

16  creation program not only creates a form file but also

17  designs a form, and the -- that's basically incorporating

18  a preferred example into the claim.  There's no

19  requirement in the claims that there be a set or a plural

20  grouping of tools.  It can be a singular program.

21      There's no requirement to design a form.  The Court

22  has already correctly found in its original order at

23  docket 59 that a form is not designed, but rather an

24  existing form is replicated.  The Court stated in March

25  of '16 that element B of the form file creation program

1   does not describe a structural component of the functions

2   to design a new form, rather it describes a structural

3   component that functions to create a replica of an

4   original form that is already in existence, designed, and

5   created by some other entity and then creates a form

6   file.  And that proposed articulation is acceptable

7   to Green Shades because it's correct.

8        There's also no requirement in the claims that the

9   form file creation program involve a set of tools.

10  Aatrix's proposed construction introduces the

11  indeterminate set of software tools, and so that raises

12  the question what tools are required and which ones are

13  not required and does it have to be more than one.

14       In contrast to this Aatrix acknowledges that the

15  program -- that the form file creation program may be a

16  single application and it may include one or more

17  utilities, so these are clearly alternatives and options

18  disclosed by the specification, and these examples and

19  options cannot be incorporated into the claims.

20       Green Shades' construction is supported by the

21  specification.  The patent discloses in column 3 under

22  the subtitle Creation of Proprietary Form File that the

23  form's design is the process -- this is the definition,

24  Your Honor.  Form's design is the process by which the

25  seller creates a computer-generated form so that when

1   printed it will exactly match the original paper form.

2   So there's not only the origin of the form being an

3   original paper form, as the Court originally found, but

4   also this idea that it will exactly match.

5        Once the completed form is printed out, it is

6   sometimes difficult to differentiate, which is the goal

7   of the program, so therefore we contend that the form

8   file creation program is a computer program for

9   generating a file, storing data for duplicating an

10  outside original form, or alternatively as the Court has

11  already articulated in its prior order, a program to

12  create a replica of an original form that is already in

13  existence designed and created by some other entity and

14  then creates a form file.

15       THE COURT:  I believe the next one is form viewer

16  program.

17       MR. LUNSETH:  Form viewer program, yes, Your Honor.

18       THE COURT:  That would be number 8.

19       MR. LUNSETH:  Yes.  So I don't know if we have a

20  difference here or not.  We say no construction is

21  necessary, a plain and ordinary meaning.  They say no

22  construction is necessary if recited functions are a

23  necessary allowance of claim terms.  Where they started

24  out was that they had a construction, and that may be the

25  one that appears in the order where they try to list all

1   the various sublimitations that appeared in various

2   claims for the term form viewer program and put them all

3   together in one.  And we said you can't do that.  Claim

4   differentiation applies, so they have since taken them

5   out expressly, but I'm not entirely sure what they're

6   doing here.

7        So we agree that in each separate claim of the

8   patent the limitations of that patent claim apply.  The

9   separate limitations of that patent claim apply.  What we

10  don't agree is that all limitations that are found in

11  each claim concerning a form viewer program can be

12  wrapped into one definition of the term.  This kind of

13  goes back to -- I don't know if you had an opportunity

14  to read our brief.

15       THE COURT:  I've read everything in that book that I

16  told you about at the beginning.

17       MR. LUNSETH:  Good.  I mean, at some --

18       THE COURT:  You want me to tell you what my note

19  was?

20       MR. LUNSETH:  No.

21       THE COURT:  No.  I don't -- listen --

22       MR. LUNSETH:  I --

23       THE COURT:  It's no secret.  This is what I wrote.

24       MR. LUNSETH:  I'm sorry.

25       THE COURT:  Only way to resolve this issue is

 1   compare with the defendant's claims.  I mean, I read this
 2   in entirety and it's first and by the time I got to the
 3   defendant's portion, I said, well, I don't remember what
 4   number 1 is now, so I'm going to read them all over
 5   again.  I'm going to read 1 and 1 rather than read from
 6   page 1 to page 40-something and then go page 1 to
 7   40-something because you can't do it.  If you could do
 8   it, you'd be pretty good.  I haven't met anybody -- so
 9   when you go back and tell your clients when they say did
10   you save us money, I haven't seen anybody with a
11   paralegal up here working the viewer.
12       The first year that Griffin Bell was no longer the
13   attorney general he went back with King & Spalding, and
14   this is a program he put on at the old 5th -- no -- yeah.
15   It was the -- no.  11th Circuit had been created and it
16   was 1981 I guess after Reagan went in.  This is what he
17   said, you have to keep up with modern work habits in law
18   firms.
19       Every Monday morning we would have a firm meeting.
20   I went and tried a case in Columbus, Georgia.  It ended
21   on Friday.  I got the jury verdict for us.  Monday
22   morning I'm reporting it at the firm meeting and somebody
23   says, who went to Columbus with you?  And he said, what
24   do you mean who went with me?  It was my case.  I went by
25   myself.

1    And they said, oh, you have to be indoctrinated.

2  During the time you were the attorney general this is --

3  things have changed.  You got to take a senior associate,

4  a junior associate, a brand new law clerk, and a

5  paralegal with you.  When he asked him what are all these

6  titles, so -- go ahead.

7    MR. LUNSETH:  I've seen five people on the other

8  side of a deposition and just me on my side of the table.

9  I know what you're talking about.

10    THE COURT:  We're in a process of converting our

11  e-mail system from Lotus Notes, which we've used for

12  about 30 years, to Outlook Express, so you have to go to

13  a training session.  And they hooked it up so you can

14  watch it on your iPad, but you couldn't get the sound.

15  You had to have your iPhone with a call-in number, and it

16  was only an hour.  I finished.  I said to my wife, well,

17  I think I'm going to go back to a yellow pad and a

18  pencil.  I had no idea what half of the things were that

19  they were talking about.  That's why you bring five

20  people.  You were pretty good at making it larger, making

21  it smaller, cutting this out.  I wouldn't have the

22  faintest idea how to do that.

23    MR. LUNSETH:  Well, I was going to talk about a

24  section from my brief, but I forgot what it was now, so

25  look, maybe this is really simple.  Maybe we should let

1   Defendant's counsel get up here and see if he -- it's the

2   last part of that sentence I don't get.  I just don't

3   understand.  If recited functions are necessary elements

4   of the claim terms, that's correct.  They're necessarily

5   -- necessary elements of the claim term that don't get

6   read into other claim terms.  I'll let him get up here

7   and explain.

8          THE COURT:  Okay.  He's giving up, right?

9          MR. BAIN:  It's pages 83 and 84, but I wanted to

10  bring my computer up because I think we do have an

11  agreement.  The concern I've had is that there would be a

12  contention, it doesn't sound like they're going to make

13  that contention, that a form viewer program is simply --

14  it allows you to view a form and it's not required to

15  have all the other elements.  But it sounds like they --

16  as I've reflected on page 84, the -- right from their own

17  brief they've said the three independent claims in which

18  this term appears already sufficiently state the

19  necessary elements, and with that representation we were

20  fine with no construction.

21         THE COURT:  Okay.

22         MR. LUNSETH:  I guess I still don't quite

23  understand, but as I understand it, he's currently

24  advancing no construction and we're advancing no

25  construction, so why don't we leave it at that.

1      THE COURT:  That's what we're going to do.

2      MR. LUNSETH:  And then the next one is of the same

3  kind.  It's original paper form, slash, paper form.  Our

4  argument is no construction is necessary, the plain and

5  ordinary meaning, and they agree, plain and ordinary

6  meaning.  But they want a prohibition that Aatrix cannot

7  advocate that original paper form, slash, paper form need

8  not require actual paper.  And that's usually done at the

9  motion in limine stage, but I want to -- I want to make

10 sure that they're clear that that prohibition is just

11 wrong.

12      They don't really say what they mean, but the claim

13 is, 1A, a form file that models the physical

14 representation of an original paper form, so the physical

15 representation means something.  And we haven't talked

16 about that yet, but it means something and the models

17 means something.

18      So this claim -- it would be wrong to prohibit the

19 plaintiff from arguing that this claim is addressing

20 something other than an original paper form because it

21 addresses a model and it addresses a physical

22 representation of an original paper form.  This claim

23 language is not redundant or the claim language is not

24 redundant or superfluous, and the model and the physical

25 representation can't be ignored.

1          So the physical representation of original paper

2     form is the visual elements of it.  It's what you see

3     when you look at it as opposed to the physical piece of

4     paper itself.  What Defendants want to do is to read into

5     the claim that the form file creation process must be

6     initiated by scanning an actual paper form.

7          THE COURT:  Rather than creating it?

8          MR. LUNSETH:  Pardon me?

9          THE COURT:  Rather than creating it?

10          MR. LUNSETH:  No, not quite.  I'll explain.  And

11     this doesn't square with the claim language, and it

12     disregards the fact that there are other ways now that

13     governmental entities have made these forms available.

14     So they now produce PDF versions of their forms, which is

15     an exact -- although it's digital, it's an exact copy of

16     their form.

17          And they produce transparencies, which they give to

18     or provide to entities like Green Shades and Aatrix.  And

19     the transparency is the form, but it's on a -- as I've

20     said, a transparency.  It's specifically designed so that

21     people who want to design digital forms have something to

22     work with other than a paper form.

23          These are physical representations of the original

24     paper form.  The governmental entity made sure that they

25     are exactly sized because, as we've said before, the

1    document they get back that's printed, they want to have

2    that exactly sized.

3         So physical representation of an original paper form

4    is something other than just an original paper form, and

5    it would be wrong to prohibit the plaintiff from arguing

6    that, for example, a PDF couldn't be used to do the

7    design work or the transparency that the governmental

8    agencies provide can't be used to do the design work.

9    That's it.

10        MR. BAIN:  Page 91, Your Honor.

11        THE COURT:  Is it just 91, 92, and 93?

12        MR. BAIN:  91 and 92, 93.  Three pages.

13        THE COURT:  Okay.

14        MR. BAIN:  This is exactly the concern I have.

15   These PDFs and these transparencies referenced, none of

16   that's in the patent.  That's extrinsic examples.  The

17   patent talks about bringing in the image of an actual

18   physical paper form not just by scanning it.  I think it

19   also proposes you can alternatively do it by digital

20   camera.

21        But what's important is that the origin of it is an

22   actual -- I don't know how to better articulate it.  It's

23   actually physical paper you can hold in your hand as

24   opposed to some virtual equivalent that Counsel has just

25   made clear that's what their intention is.

1       They said this is consistent -- his argument is

2    consistent with what he says in the brief.  He argues

3    that if the inventors had wanted to specify the original

4    paper form must be physical, they would have choosen --

5    chosen to include that term, but they did not.  And the

6    fact that they didn't use the word physical doesn't take

7    away from the ordinary meaning.  And if you ask a juror

8    what's paper -- what's a paper form, what's an original

9    paper form, they're going to think it's physical that you

10   hold in your hand, not some virtual equivalent, and

11   they're trying to improperly expand it away from that.

12       And the specification discloses the use of paper

13   form that's either scanned or digitally photographed, so

14   consistent with that teaching in the spec and the

15   ordinary meaning, when you say something's a paper form,

16   people don't contemplate, well, that also includes the

17   virtual equivalents, which, by the way, are not in the

18   specifications.

19       So our contention is that it -- you would need to

20   instruct the jury appropriately or advise Aatrix not to

21   advocate that it's anything other than actual physical

22   paper.

23   MR. LUNSETH:  The next one is physical

24   representation of an original paper form, and I think

25   this solves that last one too, Your Honor.  It says our

1   proposed construction is the visual elements of an

2   original paper form.  In other words, what you see or

3   what you look at when you see the paper form.  The

4   defendants say the same thing.  The entire actual

5   appearance of an original paper form.  Physical

6   representation of an original paper form by their own

7   construction is not the form itself.  It's the entire

8   actual appearance of that form, so we're both talking

9   about the same thing.  I think our -- our definition is a

10  better definition.

11      But going back to what we were talking about before,

12  it would be wrong to preclude the plaintiff from arguing

13  that a physical representation of an original paper form

14  is not a paper form just because it has the words

15  original paper form in it.

16      Physical representation of an original paper form

17  appears in claim 1A of the 615 patent, which recites in

18  claim 1D the creation of the viewable form, in other

19  words, what the users might view or see when they look at

20  the computer screen.  This is the visual elements of the

21  form.  It's not the form itself.  You can't stick a

22  printed form in a computer screen.  It doesn't happen, so

23  this is another violation of claim differentiation.

24      An original paper form appears in claim 22 of the

25  615 patent.  Claim 1 of the 615 and claim 22 of the 615

1  have different scopes, and we've talked about this

2  before.  Claim 1 addresses the creation of viewable forms

3  and reports, in other words, what appears on a computer

4  screen, and the key term is models the physical

5  representation of an original paper form.  The model then

6  appears on screen as a viewable form.

7       Claim 2 is a method claim.  It addresses what occurs

8  when a form is subsequently printed.  It then exactly

9  matches an original paper form.  This is reinforced by

10  claim 16 of the 393 patent which recites the data

11  processing system of claim 13 when the viewable form is

12  printed to duplicate the original form.

13       So that says the same thing as claim 22, and it's

14  different from claim 1 of the 615 patent, so claim

15  differentiation, which we talked about at the very

16  beginning of this, bars the construction that the -- the

17  defendants want.  The model resulting in an on-screen

18  form in claim 1 would be limited to the same exact match

19  for printed form in claim 22 if you follow their

20  construction.

21       Nothing in the patent requires that a model of a

22  physical representation of an original paper form must be

23  the entire actual appearance of the form.  It is a model,

24  which by definition may be less detailed than the

25  original, and it is a model of the physical

1    representation of an original form and not of the form

2    itself.  That's it.

3         MR. BAIN:  Corresponding section is 94 through 96.

4    I think 96 is a duplicate.  I apologize.  It's really

5    just one page.  Really our dispute turns on the degree of

6    correspondence.  Some visual elements, which I don't

7    think would be clear to the jury, versus the entire

8    appearance.  In the specification it makes it clear that

9    it's the entire appearance.  The form, as we mentioned

10   earlier -- and this is the top of column 3 of the

11   patents.  The form file directs the programmer in

12   producing a replica of the original form.  The form file

13   is designed to model the physical representation of the

14   form, so a replica, we would contend, requires the entire

15   appearance.

16        And in the point about the model, this gets back to

17   our fundamental dispute that they want to take a very

18   generic abstract definition of model from dictionaries

19   versus what we believe is clearly instructed, that a

20   model as used in the patent is in the nature of a replica

21   and a duplicate as set forth by all of the intrinsic

22   record citations we provided.

23        THE COURT:  Okay.

24        MR. LUNSETH:  Print.  So print is a simple one, but

25   you need to know computer technology to understand our

1  definition.  Our definition is to output to the data

2  processing systems print interface, and the data

3  processing system here is the system of computers on

4  which these very software components are running.

5       Theirs is to generate a paper duplicate.  In other

6  words, they say a piece of paper has to come out of a

7  printer, and that is not what print means in the art.

8  Print has always meant to output to the printer

9  interface, and there are common menu commands.  You hit

10 print, and it says what do you want to print to.  It says

11 do you want to print to a file, print to a PDF, print

12 to a fax, print to a printer and others.  What you're

13 doing when you hit print is running the output through

14 the printer interface, and you can select any of a number

15 of choices.  They're not all hard paper.  They can

16 include printing to files and printing to diskettes.

17      The defendants don't really argue with this.

18 Defendant's sole argument is the plaintiff's expert's

19 statements about this, that print can include print to a

20 PDF, for example.  While perhaps technically accurate

21 to a computer scientist, introduces additional terms that

22 will confuse the jury and unduly complicate a simple

23 print function.

24      Well, it's the purpose of claim construction to

25 construe claim terms as they are understood by one

1    skilled in the art and explain that to the jury, so what

2    his expert is saying, what the defendant is saying is

3    obfuscation.  They say you're right.  You're technically

4    accurate.  We think it would go over the jury's head if

5    you try to do a definition here, and it won't.  It can't.

6    We have to give the jury what a person of reasonable

7    skill in the art understand -- would understand, so

8    that's it.

9         MR. BAIN:  Page 97 through 98, Your Honor.  This is

10   -- this argument and what this -- this disagreement once

11   again turns on Phillips.  Aatrix wants to go to the

12   general field of computer science and dictionaries and

13   literature and say this is what -- and I think that's

14   just even unsupported attorney argument about all these

15   different examples of printing to PDF, et cetera.  What

16   Phillips says is let's see what the patent says.

17        And the patent -- we acknowledge that, yeah, in

18   general in computer science terms print might include

19   those possibilities, but in the intrinsic record the uses

20   and the claims of printing are clear.  615 talks about

21   test printing a background image and then comparing it to

22   the background image.  This involves printing out

23   physically a duplicate so that you can make a comparison.

24        Claim 16 expressly says wherein the viewable form is

25   printed to duplicate the original paper form.  And more

1   importantly in the specification if you search it, Your

2   Honor, there's over 50 uses of the term print, printing,

3   or print out in the spec, and they all connote -- if you

4   read them in context of each use, they all connote

5   printing to physical paper.

6       There's not a single reference throughout the patent

7   to printing to a printer interface or this other sort of

8   virtual printing that Aatrix is now advocating completely

9   based on extrinsic evidence, so we would maintain that in

10  the context of this patent as used in the spec and in the

11  use in the context of these claims, it's referring to a

12  physical -- generating a paper duplicate, an actual

13  physical paper.

14      THE COURT:  Okay.  End user application program.  I

15  think we have three more or four more.

16      MR. LUNSETH:  Yes, something like that.

17      THE COURT:  Yeah.  We're going to have to speed it

18  up because --

19      MR. BAIN:  I think two.

20      MR. LUNSETH:  Final ones.

21      THE COURT:  We have to close at five o'clock, and

22  it's after five.

23      MR. LUNSETH:  Oh, is it after five?

24      THE COURT:  Yes.  Didn't you hear Big Ben?

25      MR. LUNSETH:  My computer's on central time.  I'm

1    sorry.  My watch says four o'clock.

2         THE COURT:  Big Ben is an old steam whistle that the

3    old generating plant had in -- for some historical

4    reason.  It goes off eight in the morning and five in the

5    afternoon.

6         MR. LUNSETH:  End user application.  That's what we

7    referred to generally as the business accounting

8    software, and we put that in this definition and -- and,

9    in other words, our definition is the financial software

10   application such as an accounting or payroll software

11   that hosts data that may be displayed in a viewable form.

12   The critical part of this is that it hosts the data, and

13   that is in the specification.

14        Defendant's counsel says that financial software

15   application is inaccurate, it's not rendered to that.  I

16   would agree with him except that in this case the only

17   host applications or end user applications are financial

18   software applications, so it was our way of trying to

19   just say to the jury look for the financial accounting

20   application.  You've got it.

21        Defendant's construction I have concerns about.

22   It's simple, an outside application, but there are two

23   problems with it.  Again --

24        MR. BAIN:  Excuse me.  Excuse me, Your Honor.

25        MR. LUNSETH:  -- the word outside is not in the

 1   patent specification.

 2        MR. BAIN:  I'm sorry.  I'm sorry to interrupt, but

 3   you're -- we're not maintaining that contention anymore.

 4        MR. LUNSETH:  Oh, okay.

 5        MR. BAIN:  We're almost exactly the same as yours as

 6   set forth in this number 124.  We just want to make it

 7   clear that it's a -- we just want to make it clear that

 8   it's an example.

 9        MR. LUNSETH:  Application may be displayed in a

10   viewable form.

11        THE COURT:  That's next.

12        MR. LUNSETH:  Okay.  I'll take that.

13        THE COURT:  Okay.

14        MR. BAIN:  So you accept Defendant's proposal?

15        MR. LUNSETH:  Yeah.

16        MR. BAIN:  Okay.  So I think we only have one more,

17   Your Honor.

18        MR. LUNSETH:  Viewable form.

19        THE COURT:  Viewable form.  Wait a minute.  There

20   was one more after that.

21        MR. BAIN:  Two more.  I'm sorry.

22        THE COURT:  Seemingly importing data.

23        MR. BAIN:  Yes.

24        THE COURT:  Oh.  Seamlessly importing data.  Okay.

25   So we're up to viewable form.

1        MR. LUNSETH:  Yep.  Viewable form.  Our construction

2   is a form that can be displayed on a computer screen.

3   Their construction is an electronically generated form

4   displayed and/or physically printed that exactly mirrors,

5   exactly matches, replicates the original paper form.

6   Again, they're squashing mirror, match, and replicate

7   into a claim term where it does not appear in the claim

8   term.

9        Our construction is correct.  The term viewable form

10  has a customary meaning in the art.  We gave you a

11  dictionary definition that means -- it says to view means

12  to cause an application to display information on a

13  computer screen.  That's what those skilled in the art

14  understand.  And the specification also says the viewer

15  presents an on-screen representation of the form.  An

16  on-screen representation of the form.  And there are more

17  references to on-screen displays of the form in the

18  specification.

19        Defendant's construction is not accurate.  They

20  include in it a physically printed form, and the reason

21  they want to do that is because there is prior art that

22  would read on -- on a physically printed form as opposed

23  to a viewable form.  A viewable form is not a physically

24  printed form, and as I've said before, various -- there

25  are various claims that recite that the viewable form can

1   be saved as a Web page, converted to plain text,

2   converted digitally to plain text, transmitted from a

3   client computer and stored in a database on a server

4   computer, transmitted over a network and converted into

5   an e-file form suitable for electronic filing.  That's

6   simply not possible with a physically printed form.

7        And we've talked about sticking exactly match,

8   matches, and replicates into the same claim term that

9   violates claim differentiation.  That's it.

10        MR. BAIN:  Our corresponding section is pages 85

11   through 90.  Since these articulations were exchanged,

12   the Court -- we found that the Court actually probably

13   had a more succinct and appropriate articulation in a

14   recent order denying the motion to dismiss, document 116

15   at page 2, footnote 1 where you said the viewable form

16   created, duplicates the paper form.

17        The Court is not -- as I mentioned earlier, the

18   Court is not bound by either one of our proposed

19   constructions.  The Court can come up with their own

20   third one.  It's entirely supported that you can do that.

21   It's ultimately your duty to construe the claim, and the

22   description you provided is actually supported by the

23   intrinsic record.  All the claims tie the viewable form

24   to the original form modeled by the form file.

25        For example, in claim 1 of the 615 a form file that

1   models an original paper form can fill in the viewable

2   form.  All the preambles recite the purpose is to create

3   and fill in data into a viewable form.  The specification

4   consistently with that describes to a person who's

5   skilled in the art that a principal object is that it

6   creates a viewable electronic form that exactly mirrors

7   the physical representation of an original paper form.

8   The viewable forms duplicating -- the viewable form

9   duplicating the paper form is also recited in the

10  abstract of the second patent, the 393.

11       So the viewable form is not only -- the fact that it

12  can be not only displayed but also printed is supported

13  by some of the claims.  For example, claim 16 expressly

14  states the viewable form is printed to duplicate the

15  original paper form.

16       The more important construction issue is the

17  required connection -- this is the thing that really

18  matters to us, Your Honor, is that the viewable form is

19  connected to the form that's being modeled and that the

20  exactness between these two is maintained.

21       So the Court's articulation actually captures this

22  connection and correspondence in a manner that we believe

23  would be clear to the jury, that is the viewable form

24  created and duplicates the paper form and Defendants

25  would accept that construction to the jury.

1      MR. LUNSETH:  I don't want to raise a touchy

2    subject, but that's the third of fourth time he's asked

3    you to read into these claim constructions something from

4    the March order of 2016, and that was reversed, Your

5    Honor, and --

6      MR. BAIN:  No.  No.  This is the recent one.

7      MR. GILLIS:  Denying your motion to dismiss.

8      MR. BAIN:  Recent order.

9      MR. LUNSETH:  Well, all of that occurred before Your

10   Honor had or accepted any explanation of the technology,

11   so let's do this with what we have in front of us here

12   today.

13      Seamlessly importing data so we can finish up and

14   get out of here.  Our position is it should be construed

15   to mean importing data automatically after the import is

16   initiated, and they claim that this is indefinite because

17   there isn't any certainty or explanation of what

18   distinguishes seamlessly importing data from

19   nonseamlessly importing data.  This is something that one

20   skilled in the art definitely would understand.

21      Mr. Rosenblatt has -- our expert has submitted his

22   declaration saying that -- and that he would understand

23   seamlessly means that once the data import is initiated,

24   the data is automatically imported.

25      The phrase seamlessly importing occurs in the

1    specification and it describes how data from the vendor

2    application is seamlessly imported into the program and

3    used to populate the form fields.  The defendants offer

4    no construction at all.  They just say that it's

5    indefinite.

6         It's really simple.  You click on a menu command,

7    and it says import.  It might ask you what data do you

8    want to import, and so you might have to make some

9    choices.  And you say start, and all of the processing of

10   importing the data into a file is then automatic.  That's

11   seamlessly importing data, and that's what's in the

12   specification and in the patent.

13        That's distinct from a situation where you want to

14   import data from a database into a file and you go in

15   with your cursor and you find each item of data and you

16   move it over here to the file and you stick it where you

17   want it in the file.  That is not seamlessly importing

18   data.  Seamlessly importing data is letting the machine

19   do it once you've hit the command that says start the

20   import.  Simple.

21        MR. BAIN:  Page 100, Your Honor.

22        THE COURT:  Yes.

23        MR. BAIN:  That simple explanation by Counsel was

24   just Counsel's argument.  There's nothing in the

25   specification that says any of that.  Only claim 22 of

1    the 615 recites seamlessly, and interestingly it says

2    that the seamless importing is done -- the data file

3    importing -- that there's a data file importing program

4    that seamlessly imports the data.  That's -- that's the

5    claim term in dispute.

6         There's only two uses of the term seamlessly in the

7    specification in their conclusory sentences where it's

8    used as an adverb.  Instead of saying the data -- what

9    was the language?  The claim language says data file

10   importing program.  The specification in both instances

11   says through the data file.  Data from the vendor

12   application is seamlessly imported.

13        These two uses of the adverb do not provide any

14   guidance on the meaning of the term.  They do not inform

15   a person skilled in the art of the mechanics of how this

16   is done seamlessly.  This idea that you just simply push

17   a button and once you activate it automatically happens,

18   none of that is in the specification.

19        Adding further uncertainty, the spec says it's done

20   through a data file while the claim recites it's done

21   with something called a data file importing program.  The

22   problem is the data file importing program in the claim,

23   you'll find that nowhere in the specification either.

24        So Aatrix asserts that seamlessly means

25   automatically after the import is initiated, but this

1    proposed construction in and of itself is contradictory

2    because to argue it's automatic would suggest it doesn't

3    require any type of manual activity at all.  And if it's

4    going to be automatic, then where does the manual

5    initiation end and the automatic begin?  And more

6    importantly, automatic importing, if you search for that

7    in the patent, you will find it nowhere.

8         Some meaning, the fact that they can offer you

9    something and we haven't offered you anything is not

10   enough to survive indefiniteness.  Under Nautilus it

11   cannot be sufficient that a Court can ascribe some

12   meaning to the patent claims.  Items needed for certainty

13   are missing from the intrinsic record.  There's no

14   explanation whatsoever of the adverb seamlessly, there's

15   no disclosure of this proposal of automatic, and there's

16   no mention of the data file importing program that's in

17   the claim, much less its role in the seamless importing.

18   Instead the spec alternatively states that the data file

19   does this seamlessly importing.

20        So that's the intrinsic record, and there's no

21   clarifying extrinsic evidence.  The only thing they offer

22   is Aatrix's expert.  He does not provide any trade

23   literature or technical literature to corroborate that

24   seamlessly means automatic in the field.  He just simply

25   reiterates the conclusory argument made by Counsel, so

1   one skilled in the art is left uncertain as to what

2   renders the data importing seamless and whether that's

3   accomplished by a data file or an unexplained data

4   importing program.

5        As a result of this inadequate disclosure and lack

6   of explanation of seamless, the term is simply

7   indefinite.  The reason we didn't propose a construction

8   is that it's incapable of construction, Your Honor.

9        THE COURT:  Anything else?

10       MR. BAIN:  That's all for me.  Thank you.

11       MR. LUNSETH:  Yeah.  No more, Your Honor.

12       THE COURT:  Are you flying back tonight?

13       MR. LUNSETH:  No.  Tomorrow morning.

14       THE COURT:  Enjoy the weather.  I assume you guys

15   are going back?

16       MR. BAIN:  We're going back to our office a few

17   miles away.

18       THE COURT:  Okay.  When do you get back in your

19   office?

20       MR. LUNSETH:  I'm not sure.  I'll be back by, let's

21   say, three o'clock in the afternoon tomorrow.

22       THE COURT:  Okay.  Can you have maybe a telephone

23   conference on Friday about -- there were one or two

24   things that you said you thought you could agree on,

25   agree on the actual language and just file that.  Like

 1   you file that agreeable portion so -- I made a note to

 2   leave I think two things to the end, and that's what I'll

 3   do.

 4        MR. LUNSETH:  Certainly, sir.

 5        THE COURT:  If you would do that, that would help.

 6   Okay.  Anything else?  Everybody have a good evening.

 7        MR. BAIN:  Thank you, Your Honor.

 8        MR. LUNSETH:  Thank you for your patience, Your

 9   Honor.

10        THE COURT:  No problem.

11        (Proceedings were concluded at 5:17 p.m.)

12                           - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2
     STATE OF FLORIDA)
 3
     COUNTY OF DUVAL )
 4

 5             I, Stephanie T. Lachowicz, Registered Professional

 6   Reporter, Florida Professional Reporter, and Notary Public in

 7   and for the State of Florida at Large, hereby certify that I

 8   was authorized to and did stenographically report the

 9   proceedings and that the transcript, pages 1 through 147, is a

10   true record of my stenographic notes.

11

12             I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties, nor am I

14   a relative or employee of any of the parties' attorneys or

15   counsel connected with the action, nor am I financially

16   interested in the action.

17

18             DATED this 25th day of March 2019.

19

20                     _____
                       Stephanie T. Lachowicz
21                     Registered Professional Reporter
                       Florida Professional Reporter
22

23

24

25
```

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

Index: $1,000..91

**$**

**$1,000**  10:9

**$10,000**  18:12

**$2**  18:12

**$50,000**  18:18,19

**1**

**1**  27:25 28:18 67:3 74:9,
12 76:8 95:10 96:3,4,9
111:1 114:2,22 124:4,5,
6 131:25 132:2,14,18
140:15,25

**1/72nd**  77:17

**10**  18:19 39:23 109:17

**100**  143:21

**101**  46:9 52:15 87:20

**11**  77:1,7

**110**  4:2

**111**  4:8

**112**  4:3,19 32:15 37:23
82:12 89:23

**114**  4:11

**115**  4:10

**116**  140:14

**117**  4:14 68:19

**119**  107:19

**11th**  124:15

**12**  34:15

**121**  4:20 96:20

**122**  4:21

**124**  3:25 22:6 38:10
138:6

**126**  54:10

**128**  4:25

**129**  5:5 67:19

**12:49**  6:10

**13**  27:25 107:19 132:11

**14**  96:19

**15**  39:23 40:2 46:3 47:22
59:14 102:3,4

**150**  75:14

**15th**  77:22

**16**  13:3 14:20 120:25
132:10 135:24 141:13

**17**  92:11,17 93:3

**18**  97:22

**1967**  10:10

**1973**  39:9,10

**1981**  124:16

**1990s**  24:9 26:24

**1A**  74:12 127:13 131:17

**1D**  131:18

**2**

**2**  54:10 82:9 83:24 111:1
132:7 140:15

**20**  102:12 109:15 111:11

**20-something**  4:12

**2016**  142:4

**2019**  66:16,17

**21**  27:25

**22**  48:16 74:9,12 120:6
131:24,25 132:13,19
143:25

**22A**  75:2

**23**  68:19 120:3,5,7

**24**  120:9

**26**  96:20

**28**  100:22 101:3,4,10
120:3,5,7

**29**  99:21,23,24 101:6

**2:45**  55:12

**2:46**  55:14

**2:55**  55:13

**2:59**  55:14

**3**

**3**  77:1 83:12 84:20
121:21 133:10

**3-by-4**  77:5

**3-D**  21:3

**30**  36:24 91:22 96:21
102:19 109:19,20
111:18 125:12

**31**  91:15

**33**  75:15

**34**  53:17

**35**  32:14 37:23

**38**  53:18

**39**  53:18

**39-**  91:16

**393**  86:14 91:16 92:11,
17 93:4,5 96:23 132:10
141:10

**4**

**4**  77:2,6

**40**  7:25

**40-something**  124:6,7

**41**  99:23 100:3

**42**  100:24

**45**  39:22

**48**  112:3

**5**

**5,000**  18:19

**50**  52:2 99:24 136:2

**5087**  109:24 110:1

**51**  99:25 100:1,2,4,25
101:8

**52**  92:4,5,6 96:21 101:8

**54**  11:22 16:15 45:2,17
47:12

**55**  28:18 92:6,7

**56**  34:15 73:9,10,11

**57**  80:13

**58,000**  27:2

**59**  94:9,17 120:23

**5th**  124:14

**6**

**615**  48:23 67:3 74:9,10
75:1 76:8 91:15,22 93:5
95:10 96:4,9,23 97:22
114:2,23 131:17,25
132:14 135:20 140:25
144:1

**62**  48:16 53:16,18

**65**  28:19

**68,000**  64:20 65:7,8

**7**

**7**  117:23

**7.23**  16:21,23 17:5,25
98:16,18

**72**  80:16

**730**  91:15

**737**  79:5,9,13

**750-some**  76:22

**78**  67:21 70:4

**8**

**8**  77:1,7 91:15,20 122:18

**83**  126:9

**84**  126:9,16

**85**  140:10

**8th**  4:25

**9**

**9.1.12**  111:14

**90**  140:11

**91**  129:10,11,12

**92** 129:11,12

**93** 129:11,12

**94** 133:3

**941** 28:12

**96** 133:3,4

**97** 135:9

**98** 135:9

**99** 13:10

---

**A**

**Aatrix** 10:15 18:22 21:3, 5 22:17 23:2,21 24:3,18 26:19,22 28:25 34:2 46:12 47:11,23 48:17 50:2 51:8 53:10 54:8 57:3 62:15 63:13 64:17 66:12 67:24 68:9,14,16 69:11 76:12,16,22 77:10 81:10 85:3 86:9 88:9 90:6 95:9 100:5,10 101:19 104:16 106:4,13 107:17,24 112:24 118:10 119:8 120:15 121:14 127:6 128:18 130:20 135:11 136:8 144:24

**Aatrix's** 23:3 63:23,24 88:10 93:18 102:21 103:6,18 105:6 107:11, 18 112:11 121:10 145:22

**abandoned** 87:5

**abbreviated** 18:6

**ability** 48:19 53:14,19 62:3 103:2

**absolutely** 119:3

**abstract** 64:2 133:18 141:10

**abstraction** 78:22

**academic** 61:10

**accept** 48:21 77:8 138:14 141:25

**acceptable** 121:6

**accepted** 142:10

**access** 19:19

**accommodate** 104:18

**accomplished** 120:13 146:3

**accorded** 42:6 43:21 44:15

**accounting** 21:22 24:4, 11,17,21,25 25:11 26:22 27:15 29:24 53:1 65:19 137:7,10,19

**accurate** 89:22 90:2,3,5 134:20 135:4 139:19

**accused** 36:1 54:3

**accusing** 54:8

**acknowledge** 101:19 112:5 135:17

**acknowledges** 121:14

**act** 40:22 87:13

**action** 46:7 85:18

**actions** 86:2

**activate** 144:17

**activity** 78:21 145:3

**actual** 7:21 9:3 63:10 91:4 127:8 128:6 129:17,22 130:21 131:4, 8 132:23 136:12 146:25

**adapter** 3:16

**add** 13:25 31:9

**add-on** 24:3

**added** 31:17

**adding** 50:7 144:19

**addition** 18:15

**additional** 52:4 113:22 134:21

**address** 19:21 21:12 25:20 30:14 72:4,12

**addresses** 48:13 127:21 132:2,7

**addressing** 127:19

**adjust** 76:19

**adjustment** 76:21

**Admit** 110:11

**admitted** 110:15

**advancing** 126:24

**advantage** 85:16

**advantages** 46:10 61:15 106:21,25

**adverb** 144:8,13 145:14

**advertise** 41:10

**advertisers** 78:10

**advertising** 41:7,13 78:9

**advise** 130:20

**advocate** 127:7 130:21

**advocates** 81:10

**advocating** 136:8

**AFD** 28:24 52:2 97:8 119:8

**affect** 92:12

**affidavits** 47:16 63:9,16 100:14

**affirmative** 64:11

**afield** 90:15

**afternoon** 137:5 146:21

**agencies** 48:21 75:18 129:8

**agency** 73:22 75:16,17 76:3 77:11,14 79:24 80:9 89:19

**agency's** 73:23 79:25

**agree** 42:5 45:7 59:24 60:12 61:1,20 63:25 67:25 69:15 81:4,18 100:14 103:21 106:14 110:3 116:10,24 123:7, 10 127:5 137:16 146:24, 25

**agreeable** 147:1

**agreed** 7:23 38:7 40:1 60:20 120:12

**agreement** 46:5 126:11

**agreements** 120:14

**agrees** 68:16 107:18

**ahead** 32:10 41:18 55:11 79:18 101:17 117:19 125:6

**aircraft** 79:7

**airplane** 5:23 6:3 8:6 43:4

**airplanes** 81:3

**Alice** 45:9 53:11 64:15 87:16 103:12 104:13,16 105:1 108:14 115:15,19

**allegations** 50:13

**alleged** 48:15,19

**allowance** 86:22 90:10 122:23

**allowed** 69:2 85:11 89:3 108:11

**allowing** 75:3 92:18

**alphanumeric** 71:11, 24 84:12

**alternative** 89:13

**alternatively** 122:10 129:19 145:18

**alternatives** 121:17

**Amended** 50:12 52:23 53:16 62:22

**amount** 18:20 20:12,13 25:10

**analogy** 43:4

**analysis** 61:19

**and/or** 74:1 139:4

**animal** 45:14 47:2

**anybody's** 66:24

**anymore** 106:21 138:3

**apartment** 7:2

**apartments** 7:14

**apologize** 133:4

**apparently** 111:3

**appearance** 79:12 131:5,8 132:23 133:8,9, 15

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

**appeared** 123:1

**appears** 91:6 104:2 122:25 126:18 131:17, 24 132:3,6

**applicant's** 85:13 86:5, 23 90:11

**applicants** 85:22

**application** 24:4,10,25 25:3 29:24 32:13 55:18 56:11,14,15 57:1,7,10, 12 58:25 59:7,8,25 60:2, 8,13,14,21,24 61:11 64:1 65:13 67:4 68:7,15, 17,20 69:1 72:13 86:2, 10 87:4 109:19 111:16, 17 121:16 136:14 137:6, 10,15,20,22 138:9 139:12 143:2 144:12

**applications** 56:22,23, 24 57:6,16 58:9 60:13 137:17,18

**applies** 90:7 123:4

**apply** 59:7 107:21 123:8,9

**approach** 41:20,25 42:11 44:10 110:7

**appropriately** 130:20

**approval** 77:12,13

**approve** 80:10

**April** 77:22

**arbiter** 80:9

**area** 44:21 71:11

**areas** 71:23

**argue** 60:11 62:16 88:21 98:21 134:17 145:2

**argued** 45:8 46:22 47:25 65:3,4 87:3

**argues** 130:2

**arguing** 116:10 127:19 129:5 131:12

**argument** 31:6,10 47:16 52:14 56:18 59:2 63:17 64:12,13,15,16 66:10 84:3 98:24 103:18 108:16 115:25 127:4

130:1 134:18 135:10,14 143:24 145:25

**arguments** 26:16 30:13 40:3 47:25 55:4 62:23 73:3 85:12 87:16 88:10 115:14

**arises** 82:6

**arranged** 12:25

**arrows** 111:7

**art** 26:20,21 30:18 31:11 32:8,17,24 33:15 34:5,9, 12,16 35:18 36:7 37:4 42:7,20 43:9,18 44:1 46:11 47:6 49:17 51:13 52:4 58:8,12,16 61:16, 17 62:5 63:10,12 68:25 72:6 81:7 83:3,5,9,21 84:4,17 86:22 90:10 92:24 93:2 103:25 104:3 105:14,17 107:20 108:19 109:2,23 110:21 113:4 114:18 117:5 134:7 135:1,7 139:10, 13,21 141:5 142:20 144:15 146:1

**articulate** 129:22

**articulated** 122:11

**articulating** 94:6

**articulation** 94:9 121:6 140:13 141:21

**articulations** 140:11

**artifact** 78:20

**arts** 13:9

**ascribe** 145:11

**ascribing** 87:12

**aspect** 78:22

**assemble** 11:5

**assembled** 12:7 14:24 56:8 57:20 103:21 107:13

**assembler** 12:7 56:5

**assembly** 11:4,9 45:1 57:24 58:10 59:12 61:18 62:1

**asserted** 46:23 93:4

**assertion** 105:6

**assertions** 105:24

**asserts** 144:24

**assessing** 72:17

**assign** 15:8 19:17,23

**assigned** 72:11

**assistance** 22:12

**associate** 125:3,4

**assume** 70:5 146:14

**Atlanta** 6:9

**attached** 4:13

**attempt** 68:23 90:24 92:12 94:6

**attempting** 95:16

**attempts** 57:9 114:20

**attorney** 47:16 84:3 124:13 125:2 135:14

**attorney's** 63:17

**attributes** 72:9 108:23

**AUF** 67:16 71:21

**authority** 59:6 112:15 117:8

**automatic** 66:20 143:10 145:2,4,5,6,15, 24

**automatically** 15:16 142:15,24 144:17,25

**avoid** 105:5

---

**B**

**back** 5:12 6:20 16:13 24:9 26:24 27:13 34:1 38:20 39:8 49:15 55:12 61:12 62:16 77:15,18 89:8,20 90:15 97:7 102:11 105:1 108:11,12 113:8,9 115:23 116:4 117:1 123:13 124:9,13 125:17 129:1 131:11 133:16 146:12,15,16,18, 20

**background** 19:4 39:22 46:1 47:17 51:17

52:7 62:7 103:22,25 105:9 108:8 113:8 135:21,22

**bad** 6:1 41:7

**Bain** 4:11 7:20 8:8 39:20 40:1,9,12,20 41:19,22 42:9,17 44:8 59:14,16 67:18,24 69:18 70:13, 17,20 72:15 73:7,11 78:6,9,12 80:12,15,17, 19,21,24 92:4,6,8 99:21, 24 100:1,4,20,23 101:2, 4,8,10,13,16,18,22 102:2,4,10,12,18 110:7, 10,12,17 113:21 120:2, 5,7,9 126:9 129:10,12, 14 133:3 135:9 136:19 137:24 138:2,5,14,16, 21,23 140:10 142:6,8 143:21,23 146:10,16 147:7

**balance** 49:22

**banc** 3:19,21

**bar** 84:13

**bars** 132:16

**base** 12:20 13:17

**based** 45:8 87:19,21 98:25 109:25 113:4 136:9

**basic** 10:17 16:17 30:10,11 102:24

**basically** 13:5 20:7 26:25 27:20 29:21 51:4 65:11 82:22 88:23 93:10 120:17

**basics** 31:23 89:20

**basis** 69:5 99:10

**bat** 8:24

**bathroom** 39:17

**bearing** 60:9 61:21 64:4 87:8

**bedrock** 37:6

**begin** 145:5

**beginning** 18:22 83:11 100:9 102:9 112:6 123:16 132:16

**begins** 31:24 67:21 99:21 120:2

**behavior** 78:21

**behaviors** 31:9,17

**Bell** 124:12

**Ben** 136:24 137:2

**benefit** 63:16,17

**benefits** 53:10 104:14

**Biden** 40:21

**big** 7:15 27:1 28:14 64:20 99:4 101:25 115:19 136:24 137:2

**binary** 10:21 12:10 13:7 14:20,21 116:6,7

**binder** 101:5

**biological** 39:7

**bit** 7:17 10:17 13:1,6 32:10 35:7 51:23 89:6 114:6

**bits** 12:25 25:4

**black** 21:18 23:6

**blank** 67:9 90:21

**block** 18:10 27:1,7,10, 19,21 28:14,19 29:21 64:20 115:20

**blocks** 114:4

**blow** 75:14

**blue** 21:25 22:2,7 79:6 80:1

**board** 11:18

**boards** 77:18

**Boeing** 79:5,9,13

**boiled** 45:6

**bold** 23:6

**bolt** 116:21

**book** 5:9 70:7 73:6 123:15

**booklet** 3:25

**bottom** 20:11,14 37:10 87:6 91:14 111:22

**bound** 112:16 140:18

**bounds** 37:19 38:1

**box** 21:12,16 22:2,4,7, 17,18,19 39:13

**boxes** 19:10 21:8,21,25 28:5 29:14 97:18 114:11

**bracket** 15:2

**brand** 113:24 125:4

**break** 39:3,19 55:10

**breaking** 39:24

**bridges** 6:17

**briefing** 43:3 50:14 62:22

**briefings** 46:20

**briefly** 88:19

**briefs** 36:21 65:24 80:2 87:5 92:10 100:13,17 105:3 108:22 109:13 113:15

**brilliant** 41:6

**bring** 7:21 20:15 41:10 125:19 126:10

**bringing** 103:8 129:17

**broad** 56:2,22

**broaden** 88:16 104:16

**broader** 57:13 59:10 60:1 89:18

**broken** 6:3 57:3

**brought** 21:23 41:11

**brush** 13:15

**building** 114:4

**buildings** 7:11

**bullet** 34:3

**bunch** 75:19

**business** 21:22 24:4, 11,17,20,25 25:11 26:22 27:15 29:24 46:25 47:2 65:12,19 137:7

**button** 144:17

**byte** 13:2,3,6 14:21

**bytes** 13:1

**C**

**calculated** 18:14,16

**calculation** 83:18 114:25

**calculations** 20:3 23:11 74:15 92:20 94:25 95:12,13,25 96:6,12 97:12,21 114:15 116:17 119:15

**calculator** 18:15

**call** 9:4 12:20 13:18 58:14

**call-in** 125:15

**called** 11:12,16 14:19 15:21,22 19:19 21:5 22:13,23 26:23 28:24 31:5 32:13 33:18 36:21 45:13 47:3 52:17 54:13 80:1 106:12 118:19,22 144:21

**calls** 116:13

**camel** 54:24 102:25

**camera** 129:20

**campus** 7:14

**Canada** 7:9

**candid** 100:5 101:18

**caption** 18:9

**capture** 19:1,12

**captures** 141:21

**cardinal** 32:5 68:9,10

**care** 75:16,18 78:17 108:17

**careful** 61:5

**cares** 76:24

**Carolina** 6:23

**carries** 35:21

**cart** 26:3

**case** 15:16 25:22 32:4 36:20 39:10 40:15 41:12,25 42:1,3 45:6,9,

11 48:1 52:12 53:7 58:1 60:10 63:20 68:11 72:20,23 77:22 80:1,4 82:1 87:6,8 105:25 112:19 117:5 124:20,24 137:16

**cases** 42:18 44:17 112:22 113:2

**category** 56:22 69:14

**CCS** 42:18

**cell** 75:6,9,10

**center** 23:6 102:19

**central** 41:25 46:6 47:21 136:25

**cents** 19:25

**certainty** 142:17 145:12

**certified** 73:21 79:24 89:19

**cetera** 81:3 135:15

**change** 9:25 27:8,9 35:8,25 48:6,7 50:17 56:13 65:24 70:7 89:3 93:1 108:1

**changed** 8:18 10:3,5 31:22 35:10 51:22 65:8, 15 89:9 113:15 125:3

**character** 13:2 48:18

**characteristics** 19:24

**characterize** 48:12

**characterized** 49:19

**charge** 10:9 78:4

**charging** 5:21

**chart** 4:1 109:13,22 110:24 111:9,25

**charts** 110:18

**check** 25:10

**chief** 39:11

**choice** 18:3 88:1 92:25 93:8

**choices** 12:5 134:15 143:9

**choose** 109:15,16

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

**choosen** 130:4

**chose** 32:1

**chosen** 130:5

**circle** 7:16

**circles** 97:18

**circuit** 3:19,21,22 9:2 35:8,9 54:1 124:15

**circuits** 12:14

**citation** 27:24

**citations** 133:22

**cite** 87:6

**cited** 36:21 80:1 85:17

**Civil** 40:21

**claim** 4:10 8:2 10:17 17:12 26:17 31:24 32:6 33:3,18 34:2,4,18,23,24 35:2,20 36:2,13,15 37:2, 19,21 38:6,17 41:24 42:1 49:20 51:14 53:25 54:4,15,19 58:17 61:22 64:5,11 66:6 67:3 68:18 69:6 74:8,9,12 75:1 76:7,8 82:4,5,7,9,10,13, 17,21,23 83:12 87:9 88:16 89:21 90:7 91:7, 15,20,22 92:11,17 93:3, 15 95:5,10 96:3,4,9,10, 14 97:22 98:5 99:15,16, 18 104:17 108:22 114:2, 7,21,22 116:23 117:4, 10,13 120:18 122:23 123:3,7,8,9,11 126:4,5,6 127:12,18,19,22,23 128:5,11 131:17,18,23, 24,25 132:2,7,10,11,13, 14,18,19 134:24,25 135:24 139:7 140:8,9, 21,25 141:13 142:3,16 143:25 144:5,9,20,22 145:17

**claimed** 33:20 36:10 59:18 86:23 90:11

**claims** 4:1,2,15,18 10:18 30:16 31:25 32:1, 3 33:19,22,23 37:8,20, 22,25 38:2 43:24 47:22 49:21 55:9 60:5,6,22,25 62:18 64:6 67:1 74:9,10 76:6,9 82:12,14,19,25

83:1 87:13 88:17 90:1, 24 91:7,10,15 92:2,3 93:4,5 94:11 95:21 97:24 98:2 101:22 104:23,24 108:21 112:8 113:5 114:20 115:7 120:19 121:8,19 123:2 124:1 126:17 135:20 136:11 139:25 140:23 141:13 145:12

**clamp** 36:22 37:2

**clamps** 36:24,25 37:1

**clarifying** 145:21

**classes** 10:20

**classic** 74:7 96:15

**clear** 53:6 59:24 76:6 82:22 83:22 89:10 91:12 92:9 127:10 129:25 133:7,8 135:20 138:7 141:23

**clerk** 3:24 40:22,25 125:4

**clever** 7:8

**click** 143:6

**client** 5:20 140:3

**clients** 124:9

**clincher** 57:8

**clock** 39:7

**close** 24:11 38:14 65:23 77:17 136:21

**closer** 7:17

**closet** 7:1

**coat** 7:1

**code** 10:20,24,25 11:2, 3,11,17,19,20,21 12:10, 18,24,25 13:7 14:18,20, 22,23,25 15:2,16,17,19, 20,23 16:2,5,24,25 17:5, 6,9,13,14,17,23 19:12, 13 20:12 22:22 23:2,5, 11,16,17,18 26:12,14,25 27:1,3,4,7,9,11,14,15, 16,17,18,21,22,23 28:2, 8,9,11,12,14,19,20,22, 23 29:9,10,12,16 30:19, 21,24 31:21 45:9,19 46:14 48:5,7 49:25 50:4,

6,7,8,11,15,17,19,20,24 51:3,6,9 52:17,18,22 53:13,15,20,24 54:17 55:2,6,21 58:4,5,7,13, 17,22,23 59:3 61:7,15 62:2,3 63:1,21 64:7,14, 18,19,20,21,22,24 65:2 84:13 94:24 97:5 98:22, 25 99:2,5,6 100:15,18 102:15,21 103:3,5,7,8, 10,17 104:12,20 105:25 106:2,7,8,11,13,19,23 107:16,21,22 108:12 112:14 113:2,6,10,13, 19,23 114:18 115:5,6, 20,23 116:2,3,6,8,9,11 117:8 119:10

**coders** 52:4

**codes** 54:14

**coding** 107:8

**coinventor** 51:3

**collection** 94:20 97:13 100:11 112:25

**Columbus** 124:20,23

**column** 27:25 28:18 52:1 83:24 84:20 121:21 133:10

**combination** 29:3

**comfortable** 5:18

**command** 16:21 17:25 143:6,19

**commands** 13:23 18:2 95:14 134:9

**comments** 46:2

**commericial** 78:3

**common** 91:23,24 100:8,16 134:9

**commonalities** 78:25

**communicating** 91:24

**companies** 77:10

**compare** 93:3 124:1

**compared** 73:21 79:23

**comparing** 33:9 135:21

**comparison** 135:23

**competitor** 63:11

**compilable** 16:5,23 30:18 58:7,9 59:12 116:2

**compile** 99:6

**compiled** 11:8 12:8 14:23,24,25 15:21 16:20 26:25 28:22 29:16 30:19,21,24 45:10,19 49:25 50:11,20 53:23 54:18 55:6,21 56:9 57:21,25 58:5,18 61:3,6, 15,18 63:1,20 64:7,14, 19,24 94:24 97:5 98:22, 25 99:2,5 100:15,18 102:15,21 103:3,5,7,10, 17,20 104:11,20 105:25 106:2,23 107:13,16 108:12 112:14 113:1,6, 10,13,19,23 114:18 115:5,23 116:2,3,9,12 117:8

**compiler** 11:13 12:8 15:15 17:16 27:21 29:11 56:5 58:21,22

**compiling** 46:14 54:12 62:2

**Complaint** 48:16,19 50:12 52:23 53:16 62:22

**complete** 78:24

**completed** 49:10,12 84:9,11 122:5

**completely** 51:25 65:13 96:10 108:4,5 113:15 119:17,25 136:8

**complex** 31:13 78:24 94:22

**complicate** 134:22

**complicated** 20:6 29:6 30:8

**component** 47:3 50:18 87:25 121:1,3

**components** 54:12,13 56:11 57:4,5 134:4

**comprise** 102:23

**comprising** 38:8 66:1,2 92:19

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

**computer** 9:5 10:21 11:6,11,18 12:12,15 13:5,6,9,12,18,20,22,24, 25 14:1,6,8,16 15:12,17 16:4,6 18:21,23,25 19:12,13,14,16,18,21 20:15,21,22,24 21:13 22:12,14,22,24 23:16, 20,25 24:20 25:4,9,13, 23 26:6,11 27:3,4 29:18, 19 30:2,22 44:20 52:25 53:15 54:14 55:22 56:4, 11,13,16 58:2 59:1,3,11 61:20 72:5,11 74:22 75:13 92:1 94:23 95:7 113:18 114:10 117:7 118:3 119:12 122:8 126:10 131:20,22 132:3 133:25 134:21 135:12, 18 139:2,13 140:3,4

**computer's** 20:1 21:20 136:25

**computer-generated** 84:23 121:25

**computerized** 20:23 22:25 48:1 91:14

**computerizing** 46:13

**computers** 12:3,11 20:25 53:17 134:3

**concept** 26:9 56:8 103:20

**concern** 126:11 129:14

**concerns** 137:21

**conclude** 37:25 54:21 55:8

**conclusion** 63:24 101:1,13 108:7 113:3

**conclusive** 82:15

**conclusory** 144:7 145:25

**concrete** 10:22

**condition** 18:17

**conditions** 20:3,6 22:2 74:15 83:18 92:20 95:1, 12,13,25 96:6,13 97:12, 21 114:15,25 116:17 119:15

**conduct** 75:21 97:12

**conference** 146:23

**configured** 53:4

**Conflict** 34:14

**confuse** 134:22

**confusing** 35:17 119:23

**connected** 141:19

**connection** 6:8 30:15 45:9 85:21 141:17,22

**connections** 53:21

**connote** 81:14 136:3,4

**consequence** 60:24

**considered** 57:1 66:8

**consist** 91:9

**consistent** 48:24 86:11,17 87:15 88:10 108:23 109:1,4,12 110:19,20 111:10,19,25 112:1 130:1,2,14

**consistently** 141:4

**consists** 17:13 110:24

**constant** 62:25

**construction** 4:1,3,10, 15,18 10:17 17:12 31:24 33:3 34:2,19 38:7,17 41:24 42:1 54:4,15 55:17,20 64:6,11 68:10, 18 71:10,14 72:22 73:18 74:7 89:21 90:17 94:16 95:6,16 96:8 97:3,13 99:8,9 100:6,7 104:17 112:6,11,17 113:14,17 116:23 117:2,10,11,15, 25 118:2,8 119:3,23 121:10,20 122:20,22,24 126:20,24,25 127:4 131:1,7 132:16,20 134:24 137:21 139:1,3, 9,19 141:16,25 143:4 145:1 146:7,8

**constructions** 100:10 140:19 142:3

**construe** 134:25 140:21

**construed** 36:17 88:14 104:25 142:14

**contemplate** 130:16

**contend** 51:1,11 54:10 61:21 64:4 82:25 88:8 89:16 94:4 104:3 106:25 107:18 122:7 133:14

**contended** 106:15 107:4

**contending** 93:10

**contends** 53:11 54:12

**contention** 54:7 65:22, 25 103:6 104:18,20 126:12,13 130:19 138:3

**contentions** 54:7 62:18 72:19

**context** 42:22 43:5 44:2 53:25 54:4 60:5 61:11 63:22 68:2 69:8 81:4,8, 25 83:3,6 88:14,15 93:23 103:19 104:3 136:4,10,11

**contextual** 13:8

**continuation** 87:4

**continued** 50:22

**continues** 120:3

**continuous** 27:1,7 28:19

**contradict** 108:13

**contradictory** 145:1

**contradicts** 42:14 43:20 55:4 104:12

**contrary** 85:6 92:3

**contrast** 62:21 109:17 111:5,15 121:14

**contrasted** 51:8,10 63:9

**conversion** 118:18

**convert** 11:11,19 16:24 18:23 75:22 91:6,7

**converted** 27:3 109:8 118:16,19 140:1,2,4

**converting** 16:4 125:10

**converts** 17:6

**conveyed** 110:22

**conveys** 88:18

**copied** 80:6

**copies** 48:2,15,22 49:5 53:12 110:3,14

**copy** 3:23 4:24 8:9,11, 13 28:1,9 41:20 48:20 49:11,13 74:5,24 76:20 84:10 88:24 90:6 91:8 96:3 110:1,2 111:24 128:15

**copyrighted** 85:3

**cord** 3:13

**corner** 76:16 111:21

**correct** 25:2,16 26:8 30:7 65:23 66:11 67:24 69:20 75:22 87:23 88:5 101:23 118:8 121:7 126:4 139:9

**correctly** 27:12 65:6 73:20 79:22 89:13,17 120:22

**correctness** 81:22

**correspond** 73:20 79:23

**correspondence** 49:18 81:15,16,20,22 83:24 133:6 141:22

**correspondingly** 88:19

**corresponds** 93:15

**corroborate** 145:23

**cost** 41:11

**costs** 41:10

**counsel** 26:18 63:9 64:12 69:20 73:4 90:8 113:17 114:17 115:14, 17 117:15,18 126:1 129:24 137:14 143:23 145:25

**Counsel's** 115:25 143:24

**count** 12:22

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

**couple** 10:2 11:13 25:6 38:13 118:17

**court** 3:2,5,13,15,17 4:8 5:20,25 6:5,7,11,13,15, 19,21 7:8 8:13,16,19,21, 23 9:13,16,22 10:8 14:9, 12 16:13 30:3 34:1,8,19, 20,21,22 35:3,4,8,10,12 38:10,19,23,25 39:6,25 40:7,10,13,21 41:21 42:8,15 43:16,25 44:5 48:1 55:11,15 59:15 61:23 65:5 67:23 69:2, 12,19,22,24 70:2,9,14, 23 71:1,5,8 73:2,5,8,10, 12,17 76:25 77:5,7,12, 21,25 78:7,11,16 79:8 80:14,16,18,20,23 92:5, 7 94:8,18 96:18 99:23 100:2,9,19,21,24 101:3, 7,9,11,15,17,21,24 102:3,8,11,17 103:24 105:5 107:9 110:1,4,6,8, 11,14 112:10,12,18,20 113:11 117:20,23 120:4, 6,8,11,21,24 122:3,10, 15,18 123:15,18,21,23, 25 125:10 126:8,21 127:1 128:7,9 129:11,13 133:23 136:14,17,21,24 137:2 138:11,13,19,22, 24 140:12,17,18,19 143:22 145:11 146:9,12, 14,18,22 147:5,10

**Court's** 94:17 112:16, 23 117:15 141:21

**courthouse** 7:5

**courtroom** 3:4 9:11 39:13

**courts** 3:18 82:18 105:5

**cover** 14:15 36:17 40:10

**covered** 7:12 36:14 37:3 116:19

**covering** 97:3

**covers** 36:13 51:11 90:24 117:11

**Craig** 96:19

**crash** 79:17

**create** 20:22 22:15,17, 18,19,21 24:7 29:13

**created** 21:4 22:25 23:16 24:10 28:7,8 46:23 52:2 79:10 93:16, 24 94:15 99:18 108:24 118:15 121:5 122:13 124:15 140:16 141:24

**creates** 29:23,25 30:1 54:11 84:22 89:21 114:7,9,10 120:12,16 121:5,25 122:14 141:6

**creating** 24:2 26:12 78:22 85:23 94:12 118:2,12,16 128:7,9

**creation** 21:5 23:3 29:9, 11,22 47:19 59:19 70:5 71:21 87:24 100:22 101:11 114:6,8,12 116:13 117:20,24 118:6, 9,25 119:8 120:12,16,25 121:9,15,22 122:8 128:5 131:18 132:2

**criteria** 73:21 79:23 89:14,18

**critical** 40:16 54:15 87:18 102:13,16 106:20 112:12 119:7 137:12

**criticality** 47:7

**criticize** 3:18

**critique** 108:15

**crunch** 14:8

**cs** 54:14

**culminates** 62:8

**current** 26:19

**cursor** 22:18 76:13,14 143:15

**curved** 111:22

**customary** 32:7 34:4 35:21 139:10

**customer** 24:15

**cut** 52:17 106:11

**cutting** 125:21

**cylinder** 109:14

**D**

**Dale** 28:4 65:17

**data** 13:5,10,17,19,20 14:2,5,15 15:10,25 17:13,19,20,21 18:1 19:23 21:13,14,19,21 22:4,5,7,9,18 24:1,5,6, 12,14,16,19 25:2,4,5,8, 15,16 26:4,5,7,8,9,10, 11,14 29:15,25 30:13 31:1,2,4 38:9 64:8 65:22 66:1,3,7,8,12,13,23,24, 25 67:4,5,8,10,13,15,16, 20,25 68:1,13,16,17,19, 20,21,22,23,25 71:3,5,8, 9,10,14,15,16,23 72:12, 13,14,18,22 73:6,7,8,24 74:18 75:19,21 85:25 86:7 87:2 90:14 94:23 95:17,21 96:25 97:3,4, 19,20 98:14,18,20 102:14,23 105:22 108:23,25 109:3,6,8,10, 13,15 110:22,24 111:1, 2,3,4,6,7,11,12,13,15 112:2 113:5,18 115:9 117:7 118:3,7 119:5 122:9 132:10 134:1,2 137:11,12 138:22,24 141:3 142:13,15,18,19, 23,24 143:1,7,10,11,14, 15,18 144:2,3,4,8,9,11, 20,21,22 145:16,18 146:2,3

**database** 25:3 75:24 140:3 143:14

**date** 66:7,13,14

**day** 5:14,19 24:9 27:13 40:15 74:20 82:21 90:19

**days** 7:23 26:24 40:15, 17 57:2

**dead** 64:14 95:19 119:24

**deal** 46:17 90:18

**dealing** 28:13 38:12

**debate** 61:9,10

**debug** 27:11 28:13 50:24

**debugging** 65:19

**decide** 18:18 45:14

**decided** 5:13 27:17

**decides** 16:8

**decipher** 60:18

**decision** 17:8

**declaration** 4:4,5,16, 17,20 15:11 23:8 34:8, 10 35:15,16 58:20 62:23 72:8 96:17,19 142:22

**declarations** 4:11 35:14

**declare** 15:4,6,7,25 19:17

**declaring** 23:8 72:3

**defendant** 34:11 56:18 57:9 71:13 98:3,21 119:18 135:2

**defendant's** 4:10,17,18 26:18 55:19 57:8 74:7 90:23 94:21 96:17 99:8 110:12,14,16 119:2 124:1,3 126:1 134:18 137:14,21 138:14 139:19

**defendants** 33:2 40:5 58:3 128:4 131:4 132:17 134:17 141:24 143:3

**deference** 35:10,11

**define** 76:8 82:20

**defined** 35:2 72:14 98:9,10

**defines** 71:16,19

**defining** 29:14 35:25

**definition** 34:17 57:23 62:16 68:1 71:25 72:8 74:4 78:20 79:3 81:2 84:24 88:22 89:3,19 90:23 94:5,20 97:23 116:25 117:1 121:23 123:12 131:9,10 132:24 133:18 134:1 135:5 137:8,9 139:11

**definitions** 42:15 43:2,
5,11 81:13 88:15 97:19

**degree** 49:18 81:16
83:23 133:5

**deleted** 66:19

**delimit** 37:11

**deliver** 7:13

**Delta** 6:6,7

**demonstrate** 44:9,14
45:8,16,21,24 46:11
47:8 54:20,22 61:14

**demonstrated** 61:13

**demonstrates** 68:25

**denied** 4:22

**dense** 80:21

**deny** 40:25

**denying** 4:25 140:14
142:7

**departing** 114:18

**department** 7:5

**departure** 30:17 65:2

**dependent** 82:9,12

**depends** 27:10 81:16

**deposition** 125:8

**DEPUTY** 3:4 9:11

**describe** 33:2 57:16,17
62:9 119:9 121:1

**describes** 37:23 83:8
87:25 111:14 121:2
141:4 143:1

**description** 32:16
36:11 50:15 62:11 83:12
89:12 93:22 105:10,12
140:22

**design** 21:19 28:25
51:10 84:21 94:13 119:8
120:21 121:2,23,24
128:21 129:7,8

**designed** 7:18 83:16
84:13 93:16,24 94:15
120:23 121:4 122:13
128:20 133:13

**designer** 22:13 38:8
48:24,25 52:19 75:2,3
86:9,15,19 92:18

**designers** 22:17

**designing** 94:12 118:1,
11

**designs** 120:17

**desirable** 48:20

**desk** 79:12

**detail** 79:1 95:5 98:1

**detailed** 62:11 83:12
87:22 94:22 105:12
132:24

**details** 47:22 50:3
106:17 112:7

**determination** 54:16

**determinations** 34:22
35:11

**developed** 51:4,24
52:19 64:17 106:16
108:4,5

**development** 108:8
119:8

**device** 33:9

**devoted** 56:16 59:8

**diagram** 29:21

**diagrams** 114:19

**dictionaries** 42:11,16
43:2 81:1 133:18 135:12

**dictionary** 43:1,11
44:3,12 78:19 81:13
88:15,22 139:11

**difference** 19:11 57:10
64:25 65:1 70:12 96:2
122:20

**differences** 61:19

**differentiate** 49:13
84:12 122:6

**differentiation** 33:18
74:8 76:7 82:4,5,10,14,
21 88:16 90:7 123:4
131:23 132:15 140:9

**difficult** 11:1 27:9 48:5,
11 49:13 84:12 122:6

**digit** 13:1

**digital** 42:11 44:10
65:25 66:2 91:13,18,20
92:2 94:20 97:13,16
100:11 112:25 128:15,
21 129:19

**digitally** 130:13 140:2

**digits** 12:21 13:2 14:20

**dilemma** 46:16

**direct** 17:9 61:23

**directed** 87:23

**direction** 41:17 42:17

**directions** 42:10

**directly** 11:17,19 55:3
71:12 87:12 98:8 104:12

**directs** 11:21 83:13
133:11

**disagree** 43:8 44:23,24
64:3 103:6 116:24
117:10

**disagreeing** 82:1

**disagreement** 61:2
135:10

**disagreements** 120:14

**discern** 42:9,20

**disclose** 45:25 89:23
99:12

**disclosed** 28:17,18
36:5 43:6 86:17 99:20
105:14 118:14,17
119:25 121:18

**discloses** 36:12 85:25
103:22 105:6 121:21
130:12

**disclosure** 36:18
37:13,14 84:20 86:12
113:4 145:15 146:5

**disconnect** 93:22

**discuss** 42:25 61:8
68:6 74:20 85:22 101:14

**discussed** 63:3 86:15
103:19 106:3

**discusses** 109:5

**discussion** 25:8 39:22
51:19 54:23 57:23 62:1,
2 63:5 67:21 80:25
89:15 113:16

**discussions** 44:20
100:8

**disk** 19:20 78:1

**diskette** 91:20,21

**diskettes** 134:16

**dismiss** 46:9 52:15
57:9 62:24 87:19 94:10
120:11 140:14 142:7

**display** 19:24 20:14
27:13 74:1,24 91:8
99:16 139:12

**displayed** 137:11 138:9
139:2,4 141:12

**displaying** 22:9

**displays** 139:17

**dispute** 44:18 45:6 46:4
53:23 61:5 67:25 69:9
72:18 92:10 133:5,17
144:5

**disputed** 92:15

**disputes** 53:25 102:19

**disregards** 128:12

**distance** 26:19

**distill** 114:5

**distinct** 85:16 143:13

**distinction** 59:25 60:4,
9,11,14,16,17,23 72:20
104:15 106:1,4,9 112:12
117:4

**distinguish** 115:18

**distinguished** 61:14
104:7

**distinguishes** 142:18

**distribute** 48:11

**district** 105:5

**docket** 3:23,25 4:1,3,8,
9,14,24 5:5 38:10 48:16
54:10 67:19 94:9,17
120:23

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

doctrine 76:7 82:16

document 5:8 13:14
53:16,17,18 68:19 74:25
90:19 91:5,9 94:7 96:20
99:13 107:19 110:25
111:20 129:1 140:14

documents 5:7 85:20
90:25 91:3

dollar 15:24

dollars 5:14 19:25 23:9

dominant 46:21

door 6:20 62:16 108:12
113:8

dot 76:19

downtown 7:3

draft 8:21 9:23 30:5,6
70:3

draftsman's 92:24

draw 16:21,22 17:3,4,5,
25 60:14 98:15,16,17
106:9

drawing 77:18

drawn 97:16

draws 106:4

drop 19:10

drugs 41:15,16

due 20:12

duplicate 83:7 86:1,7
93:13 132:12 133:4,21
134:5 135:23,25 136:12
141:14

duplicated 84:14 86:4,
6

duplicates 86:16,19
140:16 141:24

duplicating 86:11 88:8
118:4,7 122:9 141:8,9

duplication 85:14,20
87:11,14

duty 140:21

**E**

e-file 91:17,18,19,21,22,
25 92:13 140:5

e-mail 125:11

earlier 5:5 45:8 48:1
49:24 53:3 61:13 68:9
72:3 89:1 95:11 103:1
105:24 106:3 107:3
133:10 140:17

early 24:9 26:24 50:3,4
119:7

earn 3:20

easier 3:6 28:2

easiest 3:6

easy 16:10 18:2

effectively 60:20 62:15
63:23 87:17 93:11 94:6

efficient 53:17

effort 51:23 52:4 81:11
108:3

efforts 46:4 85:11
103:12

either/or 112:16

elected 7:21

electronic 12:16 49:7
84:2,6 88:6,11 140:5
141:6

electronically 91:17
139:3

element 67:3,7 87:23
88:3 120:25

elements 80:5 97:17
126:3,5,15,19 128:2
131:1,20 133:6

embodiment 23:3 33:6,
10,11 36:4

embodiments 68:5,13

emphasis 46:12 62:25

emphasize 52:1,13

emphasized 84:19
103:4,11

emphasizes 85:6

employed 50:24

employee 25:25 26:5

en 3:19,21

enabled 53:4

encapsulate 57:13

encompasses 97:23

encrypted 118:23

end 7:14 24:4,25 31:20
44:6 58:23,24 59:21
68:7,15,17,24 69:1
82:21 136:14 137:6,17
145:5 147:2

ended 124:20

ends 31:25 38:16

energies 45:20

engine 79:6

engineer 8:24 9:6

engineering 8:25

English 90:17

Enjoy 146:14

enlighten 9:6

entered 5:4 23:10

entering 4:25

entire 14:21 22:21
42:21 47:2 48:8 50:19
51:22 53:15 64:22 83:4
131:4,7 132:23 133:7,9,
14

entirety 124:2

entities 128:13,18

entitled 71:18 99:18

entity 93:17,25 94:15
121:5 122:13 128:24

entity's 75:23

entry 3:25 4:1 5:5

equal 40:5

equals 17:15 20:5

equivalent 57:12 74:21
129:24 130:10

equivalents 130:17

erroneous 98:25

escape 82:22 93:9

essential 120:14

essentially 71:12

establish 44:7 95:13

establishes 74:14
95:12 114:15,24 116:16

establishing 92:19

Ethicon 36:22

evaluated 33:9

evening 147:6

eventually 52:19
106:16

everyday 76:4

evidence 34:14 36:6
42:12 43:11 49:4 80:21
82:3 89:11 109:22
110:16 136:9 145:21

evolution 50:2,21,25
62:7 63:8 100:7

evolved 52:16 106:10

exact 46:19 47:7 48:2,
15,20,22 49:5,11 53:12
73:22 74:5 75:8 76:1,3,9
79:25 80:2,8,10,11
81:20 82:20 83:7 84:10
85:6,7,14,20,23 86:1,7,
25 88:24 89:22 90:5,8,
13 96:14 99:17 109:16
128:15 132:18

exacting 48:17

exactitude 81:20

exactness 49:18 87:18
141:20

examiner 86:21 87:2
89:8

Examiner's 90:10

examples 31:3 56:25
58:19 68:12 89:1 107:3
109:1 112:22 121:18
129:16 135:15

exception 84:20 85:1,2,
4 89:2

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

Index: excerpt..financial

**excerpt** 54:7 107:8

**exchange** 100:10

**exchanged** 140:11

**excluded** 84:19

**excluding** 114:18

**excuse** 82:8 137:24

**executable** 29:17 57:14

**execute** 11:20 56:6

**executed** 55:22 58:2 59:3 111:6

**executing** 11:21

**execution** 56:6

**exemplified** 36:11 115:8

**exemplify** 33:12

**Exhibit** 110:12,13,16

**exhibits** 4:12,13

**exist** 64:2

**existence** 88:2 93:16, 24 94:14 111:1,13 121:4 122:13

**existing** 86:11 120:24

**expand** 62:16 81:12 94:1 103:2 130:11

**expanded** 82:5

**expensive** 46:15 47:11, 18 48:9 50:1,12

**expert** 34:10 43:11 44:3 57:9,11 58:6 60:12 63:24 66:6 96:17 107:18 109:9 119:5 135:2 142:21 145:22

**expert's** 43:20 58:19 134:18

**experts** 43:14,20 63:24

**expiration** 66:7,13,14, 20

**explain** 72:1 78:21 112:21 126:7 128:10 135:1

**explained** 47:1 50:3 51:20 105:16 108:21

109:9

**explaining** 7:4 62:7

**explanation** 52:10 142:10,17 143:23 145:14 146:6

**explored** 103:3

**Explorer** 118:19

**export** 25:1

**exported** 68:25

**exporting** 68:7 85:25

**Express** 125:12

**expressed** 25:12 116:6

**expressly** 28:18 32:14 80:4 86:24 90:12 112:20 113:12 123:5 135:24 141:13

**extendible** 105:18,23

**extensible** 31:5,8,9,12, 17,18

**extension** 40:24

**extensively** 103:3

**extent** 43:24 68:5

**extra** 8:13 10:2

**extrinsic** 42:12 43:10 44:3 63:7 84:3 129:16 136:9 145:21

**eyes** 75:13

_____

**F**

**faced** 24:2

**facilitate** 111:9

**fact** 45:25 46:13 54:16 57:6 77:4,9 95:20 97:10 110:19 128:12 130:6 141:11 145:8

**factual** 34:22,23 35:11

**faintest** 125:22

**fair** 40:18 116:14

**fall** 6:25 60:7 76:19

**false** 107:14

**familiar** 46:8 50:14 56:7

**famous** 10:12 32:4

**fastener** 82:8,9,11

**favor** 30:25

**favorite** 23:3 35:22 36:20 114:3

**fax** 134:12

**FD** 119:11

**feature** 86:24 106:25

**features** 86:24 90:12

**February** 4:25

**federal** 3:19 35:8,9 54:1

**feel** 3:7

**fees** 41:17

**feet** 6:18

**field** 18:10,12,14,16,17 19:23 20:12 21:19 22:5, 7,18 23:9 70:25 71:3,4, 5,8,9,16 72:11,14,18 73:6,8 135:12 145:24

**field/field** 71:10

**fields** 18:5 19:16 21:11 23:10 29:15 67:17 71:23 72:6,22 97:19 109:7 143:3

**figure** 25:9 26:21 113:16

**figured** 3:15

**figures** 113:5

**file** 4:22 18:1 21:5 22:23, 24 23:3,4,24 24:22 25:2, 5,17 26:1,9,10,11 28:7, 16,21,24,25 29:1,4,9,11, 15,18,19,22,23,25 31:3, 19 40:21 43:25 46:24 47:3,19 48:25 49:5 50:25 51:1,5,7,10 52:17, 18,20,25 53:8 54:9,12, 13,14 55:1,5 59:19 61:8, 13 62:17,18 63:15,22 64:8,13,22 65:1,14,22, 25 66:2,7,8,12,14,15,16, 18,19,23,25 67:4,6,8,13, 16,17,20 68:1,13,20 69:3,5,7,14,15 70:5,21, 22,24 71:6,14,15,21

72:7,12,13,14 73:25 74:13,17,18 75:3 83:13, 16 86:16,19 87:9,24 88:3,6,9 91:23 92:18 94:18,19,23 95:8,9,11, 15,17,21 96:2,11,25 97:3,4,5,8,10,11,15 98:9,13,15,19,21,22 99:1,4,7 100:22,24,25 101:11 102:14,20 103:8, 16 104:4,6,17,21 105:20,22 106:5,10,12, 17,22,23 107:11 108:5, 9,13,19,22,23 109:2,3,7, 8,10,15,17 110:21,22,23 111:11 112:1,2,5,13,24 113:3,5,10,18,23 114:6, 7,8,9,11,12,13,22,23 115:8,12,21,22 116:1,8, 12,13,14,19 117:13,14, 20,24 118:2,3,5,6,9,12, 14,15,18,19,23,24,25 119:4,11,12,14 120:12, 13,15,16,25 121:6,9,15, 22 122:8,9,14 127:13 128:5 133:11,12 134:11 140:24,25 143:10,14,16, 17 144:2,3,9,11,20,21, 22 145:16,18 146:3,25 147:1

**file's** 117:7

**filed** 4:15 41:3 76:1

**files** 18:5 24:1 29:13 30:12,13,17,21 31:7,18 45:22 48:10,14 49:25 50:6,20 51:14 52:8,13 53:13,19,23 54:16 57:4 64:17 68:1 85:23 102:22 103:13,23 104:9 105:7 113:12 134:16

**filing** 78:4 91:17 140:5

**fill** 20:16 24:7,20,21 25:5 46:18 67:14 74:15 83:19 92:20 95:1 96:1,6,13 114:16,25 116:17 141:1, 3

**filled** 20:10 21:23 67:11 71:11,24 75:12

**final** 8:11 9:19 136:20

**financial** 68:18,21 137:9,14,17,19

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.

, Hearing on 02/27/2019

**financing** 78:10

**find** 8:17 35:13 36:23
42:24 43:2 62:11 75:21
81:2 100:8,16 105:12
110:17,19 143:15
144:23 145:7

**finding** 68:25

**finds** 69:5

**fine** 113:21 117:18
126:20

**finish** 69:15 102:9
142:13

**finished** 125:16

**firm** 124:19,22

**firms** 124:18

**fit** 44:5 84:13

**fix** 65:13

**flag** 26:4

**flat** 18:18

**FLD** 23:8

**flexible** 105:18,23

**flies** 79:20

**flight** 79:14

**flip** 5:8

**floppy** 91:20,21

**Florence** 6:22

**Florida** 18:6,9 20:11,21
23:14,15

**floss** 13:16

**flow** 109:13,22 110:18,
24 111:8,9,25

**fluidity** 96:16

**flying** 6:5 79:15 146:12

**focus** 45:20 51:22
102:12 106:1 108:2

**follow** 107:15 132:19

**fonts** 84:13

**football** 10:11,12

**footnote** 140:15

**forever** 7:22

**forget** 100:2

**forgot** 125:24

**form** 5:13 14:18 17:23
18:5,6,9,23 19:1,6,7
20:11,21,23,25 21:4,5,9,
18,23,24 22:13,17,21,23
23:1,2,4,5,15,20,22,24,
25 24:7,8,14,21 26:7,12,
14,15 27:14 28:2,3,6,7,
12,16,20,21,24 29:1,4,9,
10,11,13,16,18,19,22,
23,25 30:1,2,12,17,21,
24 31:7,17,18,19,21
36:12 38:8 45:22 46:24
47:3,4,19 48:6,14,24,25
49:2,3,5,7,8,9,11,12,24
50:3,6,18,20,25 51:1,5,
7,10,14 52:8,13,18,19,
20,21,24 53:8,19,23
54:9,12,16 55:1,5 59:19
61:1,8,13 62:17,18
63:22 64:13,17,21 65:1,
14,17 67:5,7,8,9,10,17
70:5 71:11,14,23 72:7,
12,14 73:21,23,25 74:1,
3,13,14,16,17,21,23
75:2,3,5,7,9,10,16,17,
22,25 76:2,16,18,23
77:4,20 78:13,14,18
79:24,25 80:5,10 83:13,
14,16,17,19 84:2,6,8,9,
10,11,14,21,24 85:2,15,
24,25 86:5,6,8,9,11,15,
16,18,20 87:1,9,10,11,
23,24 88:2,3,4,6,7,11,13
90:13,16 91:1,2,4,6,9,
17,18,19,21,22,25
92:10,13,14,16,18,19,21
93:6,8,11,14,15,22,24
94:1,3,14,18,19,21,25
95:1,3,4,8,9,11,15,17,
21,25 96:1,2,5,7,11,12,
13,23,24 97:1,4,5,10,14,
15 98:9,13,15,19,21,22,
23 99:1,4,6,7,16,17
100:12,22,24,25 101:11
102:14,20,22 103:8,13,
16,22 104:4,6,8,9,16,21
105:6,20 106:5,10,12,
17,18,22 107:11 108:5,
9,13,19,22 109:7,16,18
110:21 111:11,18,20
112:1,5,13,24,25 113:3,
10,12,18,23 114:6,7,8,9,
11,13,14,16,22,23,24

115:1,8,12 116:1,8,12,
13,14,16,18 117:13,14,
20,24 118:1,2,4,5,6,8,9,
11,12,14,15,16,20,24,25
119:4,14,16,19 120:12,
13,15,16,17,21,23,24,25
121:2,4,5,9,15,22,25
122:1,2,3,5,7,10,12,14,
15,17 123:2,11 126:13,
14 127:3,7,13,14,20,22
128:2,5,6,16,19,22,24
129:3,4,18 130:4,8,9,13,
15,24 131:2,3,5,6,7,8,
13,14,15,16,18,21,22,24
132:5,6,8,9,11,12,18,19,
22,23 133:1,9,11,12,14
135:24,25 137:11
138:10,18,19,25 139:1,
2,3,5,9,15,16,17,20,22,
23,24,25 140:5,6,15,16,
23,24,25 141:1,2,3,6,7,
8,9,11,14,15,18,19,23,
24 143:3

**form's** 17:23 121:23,24

**format** 12:5 24:22 25:2

**forms** 18:5 21:1 28:25
46:13,17 48:1,4,11
51:24 52:2 53:12 64:18
65:15,16 67:8 71:21
74:18 76:22 77:11 84:23
85:14 90:18 91:12 94:12
108:3 115:19 119:8,22
128:13,14,21 132:2
141:8

**formula** 15:12 17:18
18:16 22:8

**formulas** 22:3

**forward** 105:1

**found** 8:5 45:3 82:23
87:2,3 112:22 120:22
122:3 123:10 140:12

**fourth** 40:15 142:2

**FRED** 118:22

**free** 3:7 77:23 78:3

**Friday** 124:21 146:23

**front** 9:15 142:11

**FTP** 91:23

**full** 7:1

**function** 37:20 134:23

**functions** 87:25 121:1,
3 122:22 126:3

**fundamental** 133:17

**fundamentals** 10:12

----

**G**

**garage** 6:20

**gave** 8:8 9:23 30:5
69:20 78:19 89:1 139:10

**gears** 56:13

**general** 10:25 33:8
36:15 56:2 68:1 81:21,
22 103:20 124:13 125:2
135:12,18

**generally** 137:7

**generate** 49:2 52:20
67:15 95:3 106:17 109:6
134:5

**generated** 45:23 139:3

**generates** 23:4 114:9,
12

**generating** 52:22
106:19 118:3 122:9
136:12 137:3

**generic** 52:25 68:13
81:2,12 111:4 133:18

**generically** 113:9

**Georgia** 124:20

**gibberish** 9:4

**GILLIS** 73:9 99:25
142:7

**give** 7:23 10:14 11:24
14:1,20 15:13 19:21
34:22 39:17 44:21,23
58:19 93:19 109:25
110:5 128:17 135:6

**giving** 15:5 53:13 126:8

**glad** 38:18

**goal** 47:10 122:6

**goals** 47:15

**good** 5:24 8:25 9:5
31:19,20 35:24 36:6

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

38:6 39:24,25 40:12
44:21 55:9,16 78:6 88:1
89:22 99:13 100:5
101:20 123:17 124:8
125:20 147:6

**Google** 45:3

**government** 48:3,16,
21 53:12 65:15 76:25
78:17 80:9 81:21 84:18
89:19

**governmental** 73:22
75:17,18,23 76:23
77:11,14 79:24 80:9
128:13,24 129:7

**governs** 36:14 37:8

**grant** 34:13

**graphic** 21:17 85:3

**graphical** 28:5

**graphics** 19:5,14 21:8
22:1,15 28:5 29:14
97:17

**grasp** 20:4

**grave** 41:8

**great** 32:21 38:12
103:13

**Green** 54:11,18 73:24
77:10 102:20 104:21
112:11 118:2 121:7,20
128:18

**Greenberg** 36:21

**Griffin** 124:12

**ground** 100:8,16

**group** 55:17

**grouping** 120:20

**guess** 5:15 38:14 60:17
98:13 124:16 126:22

**guidance** 80:25 81:10
144:14

**guide** 43:18

**guides** 117:14

**guys** 146:14

## H

**habits** 13:14 124:17

**half** 7:25 39:2 52:15
77:1,7 109:14 111:3,14
125:18

**hand** 9:25 22:11 39:4
61:5 129:23 130:10

**handle** 43:13

**Hang** 70:23 71:5 100:3

**hanging** 36:23

**happen** 30:25 131:22

**happened** 65:21 71:20
99:5

**happening** 61:9

**happy** 9:7 70:13 72:21
94:16

**hard** 31:13 41:19 61:24
74:24 134:15

**hard-coded** 48:6 50:4,
18

**hardware** 36:23

**hatch** 82:22

**hay** 6:9

**He'll** 40:2

**head** 3:19 135:4

**headache** 115:20

**hear** 17:11 45:17 136:24

**heard** 46:19 47:11
64:12 87:16 100:16
113:25 115:16

**hearing** 8:12 40:8,11
72:17

**hearings** 9:3

**heavy** 7:1 33:25 35:20
36:1

**heck** 9:9

**held** 10:11 24:11

**helpful** 5:1

**helps** 53:11

**herring** 30:4,13 63:23

**hexadecimal** 14:19
15:17

**hey** 40:13

**high** 75:20

**highlight** 10:4 51:25

**highlighted** 76:15

**highlighting** 5:2

**highly** 48:20

**historical** 137:3

**historically** 46:13
49:25

**history** 36:5 43:25 50:1
63:15 82:24 85:10 86:13
87:7,12 88:9

**hit** 3:19 6:9 25:22 134:9,
13 143:19

**hold** 73:5 129:23 130:10

**Honor** 4:7 9:15 12:11
38:4 39:5 40:20 41:19
59:14 66:10 67:18
72:15,25 73:9,16 75:7
86:21 87:19 94:19 98:8
101:5 102:6 110:10
112:4 113:14 117:22
119:24 120:3 121:24
122:17 129:10 130:25
135:9 136:2 137:24
138:17 141:18 142:5,10
143:21 146:8,11 147:7,9

**hooked** 125:13

**hope** 7:19

**hospital** 7:14

**host** 137:17

**hosts** 137:11,12

**hotel** 10:6,8

**hour** 7:25 39:2 125:16

**hourly** 5:21

**hours** 5:4,18

**human** 60:7 114:10

**humans** 10:25 11:1
60:3

## I

**i.e.** 74:2

**idea** 24:2 41:6 46:17
47:18 50:5 82:4 98:25
107:25 110:21 122:4
125:18,22 144:16

**identified** 25:16

**identifies** 78:25

**identify** 70:14

**ignoring** 119:25

**illuminate** 17:7

**illuminating** 17:4

**illustrated** 111:12

**illustrations** 109:12

**image** 18:24 19:2,13
20:20,25 21:1 23:14
129:17 135:21,22

**images** 85:3

**imagine** 41:8

**implement** 37:5

**implementation** 20:10

**implemented** 52:3

**imply** 119:19

**import** 72:21 142:15,23
143:7,8,14,20 144:25

**importance** 49:4 60:16

**important** 13:4 14:18
19:3 20:19 23:13 25:7
31:14 32:11 33:19 36:9
37:10 42:3 43:22 47:5,
21 49:23 50:9 51:6
53:25 59:17 68:14 79:1,
20 82:2 83:11 100:7
102:5 104:23 105:10
109:11 115:22 129:21
141:16

**importantly** 46:24
97:20 136:1 145:6

**importation** 49:20

**imported** 142:24 143:2
144:12

**importing** 138:22,24 142:13,15,18,19,25 143:10,11,17,18 144:2, 3,10,21,22 145:6,16,17, 19 146:2,4

**imports** 144:4

**impossible** 37:12

**improper** 49:20 74:11

**improperly** 93:21 130:11

**improved** 104:5

**improvement** 63:2 104:15

**improvements** 50:5

**inaccurate** 137:15

**inadequate** 146:5

**incapable** 146:8

**inch** 76:17 77:17

**inches** 16:23 98:16

**include** 53:23 54:17 56:4,23 61:3 62:17 67:13 69:8 93:25 94:2 95:10 97:4 98:10,22,24 100:15,18 102:21 103:2 104:9,10 107:13,16 108:6 112:14 113:1,6, 12,23 116:2 121:16 130:5 134:16,19 135:18 139:20

**included** 61:17 107:11, 14 112:21 115:9

**includes** 79:1 81:2 82:7 91:2 95:9 97:16 98:22 103:20 106:23 108:10 112:7 119:14,15 130:16

**including** 55:2 57:2 86:25 94:24 95:24 101:20 103:2 104:11

**inconsistent** 104:22

**incorporate** 68:12 106:8

**incorporated** 121:19

**incorporating** 120:17

**indefinite** 89:8 142:16 143:5 146:7

**indefiniteness** 145:10

**independent** 33:23 51:25 82:14 108:4,5 126:17

**indeterminate** 121:11

**indicative** 109:9

**indistinguishable** 85:15

**individual** 25:4 55:9

**indoctrinated** 125:1

**ineligibility** 46:9

**inform** 144:14

**information** 13:5,22 14:6 16:14 19:22 24:24 25:1,2 66:17 71:12,24 73:24 90:22 94:20,23 97:14,16,24 100:11 102:14 112:25 113:19 117:7 139:12

**informs** 43:25

**infringement** 33:9 54:6,7 60:10 62:18 72:19 104:18,19,25

**infringer** 36:1

**Initially** 100:9

**initiated** 128:6 142:16, 23 144:25

**initiation** 145:5

**innovation** 46:12 55:4

**input** 18:10

**inputs** 65:7

**insertion** 90:21

**inside** 47:4

**instance** 28:16 29:2,4 103:22

**instances** 144:10

**instruct** 81:7 112:13 113:1,11 130:20

**instructed** 133:19

**instruction** 14:1,2,3,9 15:12 17:19,22 23:7 53:6 59:12 98:15,17 112:23 113:22

**instructions** 10:21,24 13:23 16:9 22:22,25 23:24 34:25 55:21 56:3 58:2,4 59:11 66:22 95:14 98:14,19 102:24 105:19 119:14

**instructs** 20:15 81:24

**intake** 75:18

**integer** 15:3 17:14

**integrity** 86:4

**intend** 105:15

**intended** 49:18 78:21 81:7 109:2

**intention** 129:25

**interacting** 59:21

**interest** 114:5

**interesting** 103:15

**interestingly** 144:1

**interface** 60:20 134:2,9, 14 136:7

**interfacing** 60:6 112:8

**interim** 51:2,9 104:8 106:9 108:8

**international** 109:24

**Internet** 53:21 91:24 92:1 109:23

**interpret** 35:4 119:12

**interpretation** 34:24 116:14 117:3

**interpretations** 26:18 34:25

**interpreted** 11:16 14:24 15:20,22 16:19 23:4 30:25 45:13,19,23 52:9 54:23,25 56:9 57:22,25 58:11 59:13 61:4,6,18 62:4,12 63:4 96:24 97:6,9 103:1,21, 23 104:1,7,10 105:7,13, 17,22 107:4,5,7,12,14, 21,22 108:6,10 115:5,10 118:20

**interpreter** 11:18 12:8 16:3,7,8,15 17:2,3,8 23:20 26:13 28:21,23,25

29:5 51:19,21 52:6 56:5 62:12 63:22 97:9 104:1, 2 105:9,13 107:25 108:8 113:7 119:6,9

**interrupt** 138:2

**intertwined** 73:3

**intrinsic** 42:19 43:17,23 44:15 45:24 47:8 63:18 64:3 69:10 80:22 81:9 85:10 87:15,22 89:11,15 100:24 103:4 105:20 108:18 133:21 135:19 140:23 145:13,20

**introduce** 82:3

**introduced** 45:12 92:17

**introduces** 121:10 134:21

**introduction** 54:22

**invalidity** 60:10 68:24 72:19,23 105:1

**invented** 104:6

**invention** 26:19 29:2 32:2,9,16,18 33:13,16 37:13,15 43:6 45:22 46:10,22 47:15 48:13 49:6,19 50:2,22 51:18 53:2 55:5 61:16 62:8,10, 11,13 63:1,8 67:12 69:3 81:8,19 83:25 84:6 85:13 86:5 88:11 89:21 90:3 93:1,9,13 104:5 105:10,11,12 107:11

**inventions** 57:3 64:17

**inventive** 103:13 104:15

**inventor** 32:19,21 36:12 65:17 87:12

**inventor's** 36:11 63:16

**inventors** 28:4 46:16 49:16 50:5 81:6 86:12 130:3

**invite** 103:24

**Invites** 93:20

**involve** 59:21 60:6 103:16 121:9

**involved** 45:15 51:17

60:20

**involves** 135:22

**ipad** 125:14

**iphone** 84:2 125:15

**ISO** 109:24 110:1,20,25
111:10,14,19,24

**issue** 17:11 26:17 66:3,
23 74:19 86:14 123:25
141:16

**issued** 3:22

**issues** 24:1 46:5 94:22

**item** 15:25 17:19 25:18,
19,20,21 26:2 80:3
101:12 143:15

**Items** 145:12

_____

**J**

**Jacksonville** 6:9

**Java** 107:8

**Javascript** 107:6,8

**Jensen** 28:4 51:3,9
52:19 62:23 65:17 106:6

**job** 28:1

**joint** 4:1 5:13

**journeys** 8:6

**judge** 6:21 39:10,11,14,
15,20 42:3 46:3 49:16
51:6 53:16 59:24 68:24
78:9 80:12 82:3 88:5
92:4 93:7 104:19,24
107:2 112:17 113:11

**judges** 40:14,18

**judgment** 34:13 40:23

**junior** 125:4

**juror** 130:7

**jurors** 39:8,12,17

**jury** 3:8 34:24,25 35:1,
17 39:13 60:17 69:2
93:19 112:13,21,23
113:11 124:21 130:20
133:7 134:22 135:1,6
137:19 141:23,25

**jury's** 135:4

**Justice** 40:21

**justices** 41:8

**justification** 58:24

_____

**K**

**key** 132:4

**kick** 77:15

**kind** 19:10 29:7 39:3
66:20 97:4 114:11
115:2,3 117:17 123:12
127:3

**King** 124:13

**kitchen** 99:9

**knew** 7:18

**knowing** 24:16

**knowledge** 54:2

_____

**L**

**labeled** 18:9

**lack** 108:16 146:5

**landing** 79:17

**landings** 79:21

**landmark** 32:4

**language** 11:4,8,9,15,
16 12:4,5 14:23 15:1,19,
20,21,22 16:19,20,24
23:4 25:13 30:21,22,23,
25 31:8 33:3 36:13,14
37:2 44:25 45:1,13,19,
23 52:9 54:23,25 56:8,9,
10 57:21,24,25 58:7,10,
11,12 59:1,12,13 61:4,6,
22 62:1,4,12 63:4,23,25
66:4,6 67:3 72:7 75:2
87:13 92:3 95:20 96:5,9,
14,24 97:6,9 103:1,2
104:1 105:17,22 107:4,
15 108:6 114:2,21,22
115:3,4,5,11 116:4
117:13 118:21 127:23
128:11 144:9 146:25

**languages** 10:19 11:23
12:2,6 16:18 31:11,15

57:19,20,21,22 102:24

**large** 48:10

**larger** 106:8 125:20

**Laverty** 85:22

**law** 3:24 9:1 10:17 34:19
37:12 40:22,24 41:24
43:15 54:1 124:17 125:4

**lawyer** 8:2 41:7

**lawyers** 39:18 40:14
41:10

**lawyers'** 41:16

**layer** 19:4,5,16 20:2

**layered** 21:3

**layers** 19:3 20:19

**laying** 29:14

**leading** 104:4

**learned** 39:6,17

**leave** 4:22 60:17 62:5
65:12 69:14 93:20 101:9
115:23 126:25 147:2

**lectern** 3:3,11

**left** 76:18 92:5 146:1

**left-hand** 76:15 111:21

**legally** 80:5

**length** 7:1

**letting** 143:18

**lexicographer** 71:18

**life** 40:14

**limine** 127:9

**limit** 32:1 37:21 40:7
58:4

**limitation** 90:11 91:16

**limitations** 32:3 49:20
59:6 86:23 98:1 123:8,9,
10

**limited** 58:7 68:4,17,21
69:11 98:19,20 132:18

**limiting** 36:16 58:24

**limits** 119:4,16

**lines** 27:2,11,25 28:9,18

64:21 97:18

**list** 11:23,25 122:25

**listen** 123:21

**literate** 9:5

**literature** 135:13
145:23

**live** 79:19 94:16

**lives** 79:19

**location** 71:14

**logic** 12:14 55:3 56:18
104:9 107:11,14 108:16

**logistics** 40:19

**Lombardi** 10:11

**long** 3:13 16:23 23:14
27:2 28:3 30:14,22
37:16 39:23 72:16 92:8
98:17,18 99:22 100:14

**longer** 47:20 103:13
124:12

**looked** 21:2 26:21 91:1
95:11 97:7

**loosen** 89:6

**loses** 78:25

**lost** 24:15

**lot** 9:3,18,22 20:18 21:7,
8 24:5 27:6 41:6 42:15,
16 44:20 48:3 57:2
75:11 94:22 115:14

**lots** 19:8,9 56:24 91:12

**Lotus** 125:11

**love** 33:2

**Lunseth** 3:10,14,16 4:5,
7,17 5:19,23 6:2,6,8,12,
14,18,20 7:7,19 8:15,17,
20,22 9:8,12,14,21 10:2,
10 14:11,13 16:17 30:6
34:7,18,21 35:6 38:11,
21,24 39:5 55:16 64:8
65:11 69:17,20,23 70:1,
8,10,16,19,21,25 71:3,7,
9 72:25 73:3,16,18 77:3,
6,9,13,24 78:8,13,17
79:9 89:20 94:19 110:2
113:14,22 117:22,24
122:17,19 123:17,20,22,

24 125:7,23 126:22
127:2 128:8,10 130:23
133:24 136:16,20,23,25
137:6,25 138:4,9,12,15,
18 139:1 142:1,9
146:11,13,20 147:4,8

**M**

**machine** 10:20,25
11:11,19,21 12:9,18,24,
25 15:14,16 16:5,9,24,
25 17:9,17 27:3,22
28:23 29:12 30:24 55:21
58:4,23 61:1 64:7 116:4
143:18

**made** 35:11 49:16 52:12
53:7 64:13,16 65:24
83:5 85:12,13 86:12
89:9 92:9,23 94:10
102:25 106:14 128:13,
24 129:25 145:25 147:1

**magistrate** 6:21

**main** 63:7 82:7

**maintain** 136:9

**maintained** 141:20

**maintaining** 138:3

**major** 10:20

**make** 5:9,14 7:15 8:14
9:19 11:24 12:6,9 13:24
18:4 27:12 28:2 32:17,
20 34:21 40:3 48:20
59:23 64:15,25 70:11
73:13 76:9,21 86:10
90:2 91:3,11 92:8 99:13
126:12 127:9 135:23
138:6,7 143:8

**makes** 17:8 50:13 62:19
65:1 83:22 100:5 101:19
133:8

**making** 56:18 115:14
125:20

**male** 39:12

**mammal** 56:19,20

**mammals** 60:1

**manipulated** 87:1
90:14

**manner** 141:22

**manual** 145:3,4

**manually** 22:15

**March** 41:3 120:24
142:4

**margin** 76:17,18

**mark** 66:17 73:6

**Markman** 9:3 43:16
45:12 62:21

**match** 33:5 49:1 69:25
70:7 71:2 73:1,15,20,22
74:4,12 75:2,4 76:1,3,8,
9,23 79:22,25 80:2,7,10,
11 83:1,7 84:24 85:6,7
88:20,22 89:7,9,16,17,
23 90:8 98:4,5 99:17
122:1,4 132:18 139:6
140:7

**matches** 49:2 74:2
84:15 95:4 132:9 139:5
140:8

**matching** 88:8,23

**material** 21:7

**mathematics** 12:20

**matter** 30:23 34:19 45:5
53:22 61:20 82:20 98:23
115:12

**matters** 108:20 141:18

**Mcrae** 39:11

**meaning** 13:8,20,22
32:7 34:5 35:21 36:2
42:6,7,13,21 44:16
55:24 59:7 69:7 73:19
81:11 88:17 92:14 93:19
94:1 98:16 122:21
127:5,6 130:7,15 139:10
144:14 145:8,12

**meaningful** 54:3

**meanings** 33:21

**means** 15:3,24 16:22
19:2 23:6 25:18 31:9
34:10,11 35:14,15,16,
17,18,22,23 36:8 56:25
59:10 74:19 78:19 79:22
83:6 85:5 92:12 119:18
127:15,16,17 134:7
139:11 142:23 144:24

145:24

**meant** 44:7 89:10 134:8

**mechanics** 144:15

**medical** 7:10

**medium** 111:2

**meeting** 124:19,22

**memory** 19:19,20 20:1
21:12,20 72:4,11

**mention** 38:25 51:18,21
52:6 62:1,12 63:21
92:23 107:12 145:16

**mentioned** 36:9 42:2
45:25 49:24 53:3 60:22
62:6,15 63:6 68:9 81:23
96:24 112:4 133:9
140:17

**mentions** 54:25

**menu** 134:9 143:6

**mere** 57:10

**merging** 67:15 109:6

**message** 86:21

**met** 124:8

**metes** 37:19 38:1

**method** 91:24 94:11
113:8 132:7

**microprocessor** 57:15

**Microsoft** 54:10 56:25
57:15 87:6

**miles** 37:16 146:17

**Millard** 85:16,19

**million** 5:14 27:2

**mind** 30:14 32:22 44:19
47:5,22

**minimum** 113:6

**Minneapolis** 6:3,22
7:18

**minute** 9:13 10:22
67:23 138:19

**minutes** 7:25 39:22,23
55:12 101:25

**mirror** 98:4 99:13 139:6

**mirroring** 84:1

**mirrors** 49:7 74:2 84:7
88:12 95:4 98:6,9,11
139:4 141:6

**misrepresentation**
115:17

**missed** 6:8

**missing** 8:18 80:8
145:13

**mode** 32:20 33:2 89:24
99:12,14,15

**model** 35:22 43:1,3,4
44:9,13,15 46:23 47:4,7
52:21 65:18 69:24 70:6
71:1 72:25 73:1,14,19,
24 74:6 75:10 76:4,9
78:19,22,23,24 79:1,3,9,
10,14,15,17 80:15 81:2,
3,7,17,18 82:1 83:1,2,6,
9,17,19,23 85:5,7 87:13
88:14,24 89:1 90:7 91:8
92:19 94:25 95:24 96:5,
11 98:3,6,8 99:15
101:20 106:18 112:7
127:21,24 132:5,17,21,
23,25 133:13,16,18,20

**modeled** 81:15 140:24
141:19

**Modeling** 88:7

**models** 74:13 87:9 88:3
96:25 114:13,23 116:15
127:13,16 132:4 141:1

**modern** 124:17

**modified** 31:16

**modify** 31:20 32:17
46:25 50:24 86:3

**modular** 57:2,3,4

**Monday** 124:19,21

**money** 3:20 41:7
124:10

**mono** 28:14

**mono-** 27:7

**monolithic** 27:7,15,18
28:11 30:20 48:5,7 50:4,
8,15,17,19 51:2 52:18
53:13 64:18 65:2 99:5
103:8 106:8,13 115:20

**month** 5:5

**morning** 6:16 13:15 124:19,22 137:4 146:13

**motion** 4:22,23 40:23 41:1,2 46:8,9 52:14 54:6 62:24 87:19 94:10 120:11 127:9 140:14 142:7

**motions** 64:15

**mountains** 79:18

**move** 7:16 48:18 73:12 76:8 143:16

**moved** 70:4

**moving** 70:4

**multiple** 43:2

**multiplication** 22:8,9

**multiplied** 22:6

---

**N**

**nail** 82:8,10,11

**narrow** 36:2 44:13 82:12 85:4

**narrowed** 46:5 67:25

**nature** 103:13 105:20, 21 111:12 112:2 113:5 133:20

**Nautilus** 145:10

**necessarily** 126:4

**needed** 47:20 53:15 64:16 72:4 103:14 145:12

**negative** 61:24

**neighbor** 7:9

**net** 40:4

**network** 140:4

**news** 38:6

**nexus** 94:2

**nice** 3:24

**nifty** 79:16

**night** 5:23 13:16 79:7

**noninfringement** 72:24

**nonprogrammer** 107:10

**nonprogrammers** 52:3 53:5

**nonseamlessly** 142:19

**nose** 54:24 105:2

**nosed** 102:25

**notation** 14:19

**note** 60:12 68:14 85:1 100:7 123:18 147:1

**notebook** 70:3

**noted** 45:2

**notes** 5:9 8:14 125:11

**notice** 92:22 93:3 109:14

**notion** 45:21 81:19

**number** 3:25 4:2,3,8,9, 14,21,25 5:5 14:12 53:10 70:15 97:15 100:21 109:19,20 117:23 122:18 124:4 125:15 134:14 138:6

**numbered** 70:9

**numbers** 13:17,25 14:7 75:22

**nut** 116:20

---

**O**

**oath** 8:23

**obfuscation** 66:10 135:3

**object** 49:6 84:5 110:3 141:5

**objection** 110:15

**objects** 83:24

**obligated** 89:23

**occurred** 65:20 142:9

**occurs** 92:10 96:2,3 132:7 142:25

**offer** 143:3 145:8,21

**offered** 145:9

**office** 63:14 85:18 86:2 146:16,19

**official** 46:17,24 47:4 90:19,20,25 91:3,4,9

**on-screen** 74:24 132:17 139:15,16,17

**open** 86:3

**opening** 4:2,10 54:21

**operate** 13:24 15:18 17:8

**operated** 73:25 95:2 108:24

**operates** 13:22 14:7

**operating** 56:25 57:1, 15 67:7 74:17

**opinion** 3:19,21,22 109:25

**opinions** 43:15

**opportunity** 8:1 61:12 93:20 123:13

**opposed** 13:23 19:25 94:23 102:15 113:19 117:7 128:3 129:24 139:22

**opposition** 4:23 54:5

**options** 121:17,19

**oral** 52:14 62:23

**order** 4:24,25 5:4 15:14 19:6 20:17 22:21 23:24 63:13 67:12,18,19 69:21 70:11,17 85:14 94:9 103:10 112:13 120:11, 22 122:11,25 140:14 142:4,8

**ordered** 100:10 110:2

**orders** 3:22 92:24

**ordinary** 32:7 34:4,5 35:21 36:2 42:6,13,21 55:24 59:6 69:7 73:19 81:10 93:19 94:1 122:21 127:5 130:7,15

**oriented** 85:22

**origin** 122:2 129:21

**original** 3:21 19:1 20:19 22:14,15 23:14 49:1,3,8, 11,14 73:23 74:3,14 75:4,9 79:2,25 80:5 83:14 84:8,15,24 85:15, 19 87:19 88:2,4,7,13 93:6,7,11,14,15,23 94:3, 7,9,14,25 95:4,24 96:5, 12 97:1,7 111:20 114:14,24 116:16 118:4 119:16,22 120:11,22 121:4 122:1,3,10,12 127:3,7,14,20,22 128:1, 23 129:3,4 130:3,8,24 131:2,5,6,13,15,16,24 132:5,9,12,22,25 133:1, 12 135:25 139:5 140:24 141:1,7,15

**originally** 30:20 89:5 119:10 122:3

**OS** 56:25

**outline** 21:16,17 22:1

**Outlook** 125:12

**output** 134:1,8,13

**outset** 39:1

**outward** 79:12

**overcame** 63:2,3

**overcome** 36:1 46:22

**overcoming** 50:10,11

**override** 82:22

**overview** 41:23 44:21 47:24 55:8 111:10

**overwrite** 19:3

**overwriting** 19:5

---

**P**

**p.m.** 55:14

**packing** 95:5

**pad** 5:10 125:17

**Padova** 85:22,24

**pages** 9:24 102:6,13 111:1 118:13 120:7 126:9 129:12 140:10

**pain** 27:12

**pants** 39:16

**paper** 18:7,8,11,23 20:20 23:14 32:23 49:1, 3,8 73:23 74:3,14 75:5 79:25 84:8,24 85:14,15, 20,24 86:5,7,11,16,20 87:1 88:7 90:13 93:6,7, 11,14 94:25 95:4,25 96:5,12 97:1 114:14,24 116:16 122:1,3 127:3,7, 8,14,20,22 128:1,4,6,22, 24 129:3,4,18,23 130:4, 8,9,12,15,22,24 131:2,3, 5,6,13,14,15,16,24 132:5,9,22 134:5,6,15 135:25 136:5,12,13 139:5 140:16 141:1,7,9, 15,24

**paragraph** 48:16 53:17 84:20 96:20,21 107:19 108:1

**paragraphs** 53:18

**paralegal** 124:11 125:5

**Pardon** 9:21 128:8

**part** 23:16 27:16 30:20, 22 45:14 85:10 87:4 98:17,18 101:2 102:13, 14 103:9 106:14,20 109:21 118:25 126:2 137:12

**parties** 40:1,18 45:7 120:10

**parts** 11:6

**pass** 22:23 23:19 24:16

**passed** 20:24 26:11,13 39:9 118:24

**passes** 25:15,17

**passing** 25:4 45:25 52:6 63:21 104:2 107:12 108:7

**past** 75:6 80:16

**paste** 28:1,10,11

**pasted** 52:17 106:11

**patent** 27:23,24 28:17, 18 31:23 32:12,23 33:1, 7,10 34:2,23 35:1 36:18

37:6,9,11 41:24 42:20, 22,23 43:6,9,10,17 44:2, 6 45:15,22 47:17,23,25 48:23 49:5,9,12,17 51:8, 11,12,22 53:7 54:25 59:18 60:5 61:22,25 62:13,24 63:10,11,13,14 67:3 68:2,10 69:8 71:16, 19 74:9,10,21 80:4 81:5, 6,24 82:7 83:4,20 84:4, 5,22 85:9,11 86:13,14 87:7,20 90:24 91:15,16 92:12,17 93:2,4 95:10 96:4 97:22,25 99:1,11 103:21 105:6 108:13 110:18,19 111:17 114:3, 4,7 115:8,15,18 116:7 117:2,4 118:13,17 119:2,4,7,21 121:21 123:8,9 129:16,17 131:17,25 132:10,14,21 133:20 135:16,17 136:6, 10 138:1 141:10 143:12 145:7,12

**patented** 113:12

**patentee** 32:1,12 33:1, 6,8 37:13 71:17,21 81:6 93:12 99:12

**patentee's** 37:21

**patents** 10:16 21:6 29:3,22 37:16 46:7 51:2 66:13 81:12 85:17 91:10,11 96:23 106:5 118:10 133:11

**patience** 147:8

**pay** 5:21 20:17

**payment** 20:15,16 25:10

**payroll** 26:23 53:2 64:19,23 65:12 119:11 137:10

**PDF** 85:23 86:3 128:14 129:6 134:11,20 135:15

**PDFS** 129:15

**pen** 5:10

**pencil** 125:18

**pending** 40:23 41:2

**people** 3:20 13:3 24:10 34:12,15 52:24,25

125:7,20 128:21 130:16

**people's** 13:13

**percent** 13:10 18:19 22:6 75:14

**perfect** 58:21 85:25 86:1,6

**perfectly** 35:23 86:4,6

**perform** 56:12

**performs** 79:16

**period** 25:25 26:4 66:2, 4,5,24 67:2,14 68:4,8,22 69:4,9 113:20

**Perl** 15:22

**permissible** 26:20

**permits** 117:5

**permitted** 113:2 116:23

**person** 21:18 22:13 32:7 34:5,9 43:8 49:17 58:8,12,16 83:8 107:20 108:19 113:4 135:6 141:4 144:15

**persuasive** 87:3

**pertinent** 73:21 79:23 89:14,18

**Ph.d.** 96:20

**pharmacies** 41:11,13

**Phillips** 42:1,3,4,10 43:7,16 44:11,19 45:4 49:15 59:16 63:19 66:20 68:11 80:25 81:1,23 93:21 108:17 135:11,16

**phone** 75:6,10,11

**photographed** 130:13

**Photoshop** 86:3

**phrase** 142:25

**phrases** 33:24

**physical** 49:8 74:3,13 83:17 84:7 87:10,11 88:3,12 96:25 114:14,23 116:15 127:13,14,21,24 128:1,3,23 129:3,18,23 130:4,6,9,21,23 131:5, 13,16 132:4,22,25 133:13 136:5,12,13

141:7

**physically** 135:23 139:4,20,22,23 140:6

**pick** 12:4 21:15 34:17 37:5 83:7 112:17

**picture** 79:5

**piece** 14:22 18:7,8 20:20 50:7 52:16,22 56:15 98:18 106:11,19 119:7,10 128:3 134:6

**pieces** 11:5 57:4 106:7

**pile** 99:4

**pilot** 79:20

**pixel** 46:20 48:18 77:17 87:18

**pixels** 17:4,7

**place** 19:21 28:5 72:9 76:20 95:17

**plain** 42:6,12,21 55:24 59:6 73:19 74:20 81:10 90:17 93:19 114:21 118:20 122:21 127:4,5 140:1,2

**plaintiff** 4:15 127:19 129:5 131:12

**plaintiff's** 4:2,21 72:22 134:18

**plane** 79:19

**plant** 137:3

**played** 19:8

**plug** 3:7

**plural** 120:19

**pneumonics** 11:5

**podium** 113:25

**point** 5:8 12:1 23:13 34:3 35:9 39:24 43:22 51:16,17 58:3 60:4,19 80:7,24 83:14 84:19 87:17 93:12,13 94:10 96:18 100:6 101:20 104:20 106:13 107:2 133:16

**pointed** 45:2 60:19 109:12

**pointing** 36:3

**points** 84:16 107:24

**pop** 10:4

**populate** 143:3

**populating** 67:5

**portion** 124:3 147:1

**POSA** 58:8,9

**posit** 103:15

**position** 8:3,4 55:23 66:5 67:10 90:16 102:20,22 104:12 108:14 142:14

**positions** 60:10

**positive** 120:10

**possibilities** 135:19

**possibly** 37:15 68:24 107:16

**powerful** 11:9

**Powerpoint** 7:25 8:5,7, 10 9:20 69:22

**practice** 46:8

**pre** 44:11

**preamble** 94:11

**preambles** 141:2

**precisely** 19:7

**preclude** 131:12

**precursor** 51:4

**predicate** 104:4

**preexisting** 85:24

**prefer** 70:14

**preferences** 68:6

**preferred** 33:6 36:4 68:12 120:18

**pregnant** 7:11

**prejudice** 41:1

**preliminary** 106:4,6

**prepare** 56:6

**prepared** 3:24

**preparing** 72:16

**presentation** 7:21 14:4 38:16 70:18

**presented** 26:18 50:2 83:11 89:12 112:6

**presenting** 8:3,4

**presents** 26:15 83:20 139:15

**preserving** 86:4

**presumed** 33:20,21

**presumption** 33:22,25 35:20 36:2 82:18

**pretend** 18:7 78:13

**pretty** 6:1 7:8 114:16 124:8 125:20

**previously** 96:24 118:9

**price** 41:15

**prices** 41:14,16

**primer** 44:21

**principal** 83:24 84:5 141:5

**principle** 36:10 37:6 49:6 82:2,4,13 104:24

**principles** 33:13 53:2

**print** 8:11 10:6,9 34:9, 11,17 35:4,14,15 43:13 74:1 76:18,22 133:24 134:2,7,8,10,11,12,13, 19,23 135:18 136:2,3

**printed** 8:8 21:9 49:1, 10,12 74:24 75:4 76:2, 20 77:19 84:1,10,11,23 90:19,21,25 91:3,5,9 94:7 99:17 122:1,5 129:1 131:22 132:8,12, 19 135:25 139:4,20,22, 24 140:6 141:12,14

**printer** 76:19,21 134:7, 8,12,14 136:7

**printing** 85:23 86:25 90:12,13 134:16 135:15, 20,21,22 136:2,5,7,8

**prior** 26:16,20,21 30:18 42:10 46:11 50:14 61:16 65:3 68:25 85:15 86:22 90:10 92:24 104:3 114:18 117:4 122:11

139:21

**problem** 18:22 24:9 27:6,18 28:12 48:5,10 50:9,15,22 51:3 55:3 63:7 65:14 144:22 147:10

**problems** 3:10 27:6 46:11,21 48:12 50:10 62:25 63:2,3 106:2 137:23

**proceed** 72:21

**process** 19:20 38:7 72:8 77:10 84:22 100:9 104:17 106:10 107:22 111:5,15 112:7 118:15 121:23,24 125:10 128:5

**processed** 16:25 118:23

**processer** 19:9 59:9 86:10

**processes** 54:3 111:6

**processing** 11:11 38:9 56:3,4,14 59:4 132:11 134:2,3 143:9

**produce** 128:14,17

**producing** 83:13 133:12

**product** 54:18 104:21

**production** 85:19

**products** 54:3

**program** 11:3 21:5 22:8 23:3,21 27:1 29:9,10,12, 22,23 30:1 31:21 36:13, 14 48:24 55:18 56:2,6, 16 57:10,12,13,14,23 58:1,4,22,25 59:2,3,5,8, 9,20,22,25 60:1,2,15,21 61:7,11 62:16,17,20 64:1,2,25 69:1 71:22 74:1,16,17 75:2 83:13 84:14 86:15 87:9,24 93:12 94:24 95:3 100:22 101:11 102:15 107:5,7, 12 108:24 109:5,18,20 111:16 112:8 113:20 114:6,8,13 116:13 117:21,24 118:3,10,22 119:1 120:12,16,20,25 121:9,15 122:7,8,11,16,

17 123:2,11 124:14 126:13 136:14 143:2 144:3,10,21,22 145:16 146:4

**programmer** 10:14 11:17 12:4 17:22 29:8 53:15 55:22 58:14,17 106:24 113:7,24 133:11

**programmers** 11:2 12:3 13:9 18:4 31:4 45:10 46:15 47:11,13, 19,20 48:4,9 50:1,12,21, 23 51:15,25 52:10,11,14 53:4,9,24 54:17 55:7 103:11,14,16 106:21 107:6,17 108:4,6 113:13 116:11

**programming** 7:24 10:15,19,24 11:2,3,15, 22 12:2,6 17:12 20:2,3,4 22:3,10 23:17 30:12,22, 23 31:1,4,6,8,11,14 36:12 44:25 45:10,13,18 51:17,23 52:24 55:1 57:4,5,19,20 71:22 95:9, 10,18,22 97:10,11,20 98:14,23 102:24 103:19, 20 105:22 108:3,10 110:23 115:3,4,9,11,12

**programs** 12:3 17:12, 20,21 29:8 31:15 47:13, 14 56:22,23,24 57:5,16 58:9,18,19 59:18,20 60:6,8,13,15,22,24,25 63:19 64:4,5 104:10,11 105:8,25 107:13 109:18 113:9

**prohibit** 127:18 129:5

**prohibited** 41:13 66:24

**prohibition** 127:6,10

**pronounced** 4:6

**properties** 79:2

**proposal** 60:15 93:18 138:14 145:15

**propose** 39:21 112:9 146:7

**proposed** 64:6 71:9 72:22 73:18,20 89:13 100:10 112:5,11 121:6, 10 131:1 140:18 145:1

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

Index: proposes..replica

**proposes** 69:11 71:13 73:24 112:24 129:19

**proposing** 120:15

**proposition** 112:17

**Proprietary** 121:22

**prosecution** 36:5 82:24 85:9 86:13 87:7, 12 89:5

**protected** 80:5

**protocol** 91:23

**prove** 61:24

**provide** 32:13,15 48:15 54:3 110:1 128:18 129:8 144:13 145:22

**provided** 54:5,6 86:7 96:17 117:16 133:22 140:22

**providing** 49:5 74:5 110:4 111:23

**publish** 9:11 24:19

**published** 24:24 76:2

**pull** 26:7

**pulled** 11:23 74:9

**pulls** 26:14

**pulse** 12:16

**pulses** 12:16

**pure** 14:14 19:25 102:23

**purely** 91:13 92:1

**purpose** 51:14 55:5 64:13 81:16,18 83:23 88:10 134:24 141:2

**purposes** 47:14

**push** 78:3 144:16

**put** 12:11 15:15 17:20 19:10,18 21:20 22:5 23:6,7,24 24:7,14,22 26:2 29:17 31:4 65:9 66:14,15,23 75:20,22,23 76:13,14 79:11 99:6 110:8 115:21 116:7,12, 18 123:2 124:14 137:8

**puts** 15:16 26:10

**putting** 28:20

---

**Q**

**quarter** 66:16,17

**question** 3:2 25:13 32:8 34:6,15 40:24 42:9 43:13,15 59:17 62:5 68:3 78:6 100:19 103:15 117:19 121:12

**questions** 34:23 38:17

**quickly** 102:7

---

**R**

**raise** 39:4 142:1

**raised** 3:2

**raises** 94:22 121:11

**random** 19:19

**rate** 5:21

**re-call** 6:22

**re-create** 19:7,14 22:23 23:1,25 29:1,20

**read** 9:2 10:25 11:1 32:3 43:9 59:17 63:14 67:1 73:25 74:11 81:5 82:11 83:3 84:4 87:20 90:1,9, 24 92:2 95:2,23,24 98:1, 3,8 103:24 105:11 114:20 117:3 119:5 123:14,15 124:1,4,5 126:6 128:4 136:4 139:22 142:3

**readable** 61:1 64:7

**reading** 42:21 49:17 51:12 52:5 111:9 114:19

**ready** 7:13 62:9

**Reagan** 124:16

**real** 22:16 45:6 95:8

**realistically** 79:16

**reality** 78:20,24

**realized** 72:20

**reason** 8:20 32:20 35:24 75:25 89:25 137:4 139:20 146:7

**reasonable** 58:8,16 135:6

**reasons** 86:22 90:10

**rec-** 89:11

**recall** 105:24

**received** 71:15 110:16

**receiving** 97:20

**recent** 140:14 142:6,8

**recently** 3:22

**recess** 55:14

**recite** 112:9 139:25 141:2

**recited** 60:6,22,25 64:5 122:22 126:3 141:9

**recites** 36:15 48:23 131:17 132:10 144:1,20

**recognition** 25:8 75:21

**recompile** 47:1

**recompiling** 50:19

**reconcile** 43:10

**record** 25:25 38:11,12 42:19 43:18,23,24 44:15 45:24 47:9 48:14 49:4 63:18 69:10 80:22 81:9 85:10,11 86:23 87:15,22 88:21 89:15 90:11 100:24 103:4 105:20 108:18 110:9 133:22 135:19 140:23 145:13, 20

**rectangle** 111:18,22

**rectangles** 109:17 111:5

**rectifying** 86:9

**red** 21:7,16 22:1 30:4,13 63:23

**redo** 27:18

**redundant** 96:10 127:23,24

**reference** 62:19 87:5 102:25 104:2 105:3 108:7 113:7 136:6

**referenced** 86:8 129:15

**references** 139:17

**referred** 137:7

**referring** 13:11 14:5,6 136:11

**refers** 72:7

**reflect** 109:18 111:16, 20

**reflected** 15:17 44:24 59:23 87:20 100:13 126:16

**reflecting** 112:1

**reflections** 110:25

**reflects** 94:5

**Reform** 40:22

**registers** 72:5

**reinforced** 132:9

**reintroduce** 108:12

**reiterated** 106:3

**reiterates** 145:25

**reject** 77:3

**rejected** 89:7

**rejection** 85:21

**related** 87:7

**relative** 72:19

**relevance** 60:18 72:17

**relevant** 40:6 45:11,18 57:22 68:23

**rely** 81:12

**remain** 65:10

**remember** 14:24 21:11 66:21 72:3 79:5 95:7 103:18 124:3

**render** 96:8

**rendered** 137:15

**renders** 146:2

**reorganizing** 101:5

**repeat** 65:8

**repeatedly** 64:12

**replica** 74:5 83:7,13 86:1,17 88:1,6,24 90:2

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019                                                Index: replicate..senior

98:10 121:3 122:12
133:12,14,20

**replicate** 93:13 94:14
98:4 139:6

**replicated** 120:24

**replicates** 74:2 95:4
139:5 140:8

**replicating** 83:21 88:7

**reply** 4:22 54:6 117:18

**report** 38:9 49:2 67:10,
14,15 109:6

**reported** 41:2

**reporting** 66:1,4,5 67:2,
13 68:4,8,22 69:4,8
124:22

**reports** 48:21 67:9
74:18 132:3

**represent** 109:15,16

**representation** 49:8
52:21 74:3,14 78:20
83:17 84:7 85:24 86:1
87:1,10 88:4,12 90:13
97:1 106:18 114:14,24
116:16 126:19 127:14,
15,22,25 128:1 129:3
130:24 131:6,13,16
132:5,22 133:1,13
139:15,16 141:7

**representations** 53:7
128:23

**represented** 13:7

**representing** 94:21
97:14 100:11 112:25

**represents** 14:21

**require** 37:12 49:24
68:21 107:6 127:8 145:3

**required** 33:6 37:14,18
38:2 46:14 48:7 49:25
50:16,18,20 74:15
83:18,23 90:22 92:20
95:1 96:1,6,13 99:11
114:15,25 116:17
121:12,13 126:14
141:17

**requirement** 82:11
120:19,21 121:8

**requirements** 48:3,17

**requires** 11:10 32:15,19
33:1 48:3,8 52:10 53:24
54:19 81:21 132:21
133:14

**requiring** 51:23 52:24
88:23 108:2

**reset** 79:19

**resolve** 123:25

**respect** 40:8 62:4

**respond** 8:1 40:3 64:9

**response** 4:14,18
109:21

**responsive** 4:18 39:22
46:2

**rest** 38:13,19 90:6

**restructure** 24:13

**result** 44:6 53:9 146:5

**resulting** 58:1 132:17

**results** 22:9

**returns** 75:19

**reversed** 142:4

**review** 43:17 87:22
110:17 111:24

**revise** 53:14 64:21,22
65:17 77:16

**revised** 65:16 77:14
116:25 117:1

**revising** 48:4 53:14

**RF** 118:19

**role** 145:17

**Rosenberg** 4:21 60:19
96:20 105:16

**Rosenblatt** 4:4,9,16
107:20 109:21 111:23
142:21

**Rosenblatt's** 58:20

**roughly** 40:5

**route** 7:3

**rudimentary** 53:1

**rule** 10:25 18:17 20:3

33:8 34:14 71:17 74:8,
15 83:18 85:5 89:3
92:20 95:1,12,13,25
96:6,12,15 97:12,21
114:15,25 116:17 117:2
119:15

**rules** 20:6 22:2

**run** 7:25 10:21 12:8,15
13:11 15:14 16:8 17:15
27:21,22 29:4 39:2 57:6,
7 59:4 97:8 119:12

**running** 11:12 16:6
26:6 27:4 59:1 119:15
134:4,13

**runs** 13:6 26:4,13 27:12

—————
## S
—————

**sample** 14:23 15:20
23:2

**sands** 105:4

**sat** 5:19,21,23 7:1
119:11

**satisfy** 62:17

**save** 41:6 124:10

**saved** 140:1

**saving** 29:15

**scaler** 15:24

**scanned** 130:13

**scanners** 75:20

**scanning** 128:6 129:18

**Schedule** 20:14

**school** 7:10 9:1

**science** 44:20,22 61:20
135:12,18

**scientific** 13:13 14:14

**scientist** 134:21

**scope** 33:20,23 37:9
63:12 74:11 81:12
82:17,23 89:4 93:1,9
104:16 106:22

**scopes** 132:1

**screen** 8:7,10 9:14
16:22 17:5 21:4 22:14

23:25 26:15 74:22,23
75:8,13 76:4,5,11,24
78:15 91:4 131:20,22
132:4,6 139:2,13

**screw** 36:25

**seal** 18:8

**seals** 80:6 84:18

**seamless** 144:2 145:17
146:2,6

**seamlessly** 138:24
142:13,18,23,25 143:2,
11,17,18 144:1,4,6,12,
16,24 145:14,19,24

**search** 136:1 145:6

**season** 10:11

**secret** 24:14 123:23

**section** 28:11 46:1
47:17 51:18 52:7 54:21
62:7 71:22 80:12,21
97:2 99:21 101:15,25
103:25 105:9 107:24
108:9 113:8 120:2
125:24 133:3 140:10

**sections** 17:17 70:15

**security** 75:6

**seeks** 104:16

**Seemingly** 138:22

**segment** 51:8

**select** 134:14

**self-destruct** 66:22

**seller** 49:10 84:9,22
121:25

**selling** 5:14

**semantics** 57:11

**semicolon** 98:16

**seminal** 68:11

**Senator** 40:21

**send** 8:11 16:6 91:25

**sending** 12:15

**sends** 25:5

**senior** 125:3

**sense** 11:24 14:14 72:12

**sentence** 126:2

**sentences** 144:7

**separate** 17:21 18:1,2 24:5 25:21 28:16,24 31:2 52:17,18,20 92:14, 15 101:12 106:12,17 115:15 123:7,9

**separated** 115:21

**separately** 31:2 50:6 112:9

**separates** 53:13

**September** 41:4

**sequence** 27:10 56:3 58:1

**series** 26:23 53:2 64:19, 23 65:12 119:11

**serve** 88:16

**server** 140:3

**session** 125:13

**set** 12:12,14 13:17 14:7, 21 17:21,22,25 21:19 22:21 28:4,8 31:2 32:14 37:20,25 40:11 51:20 56:11 59:10 105:18 117:25 118:1,10 120:19 121:9,11 133:21 138:6

**sets** 38:1 114:3

**Shades** 54:11,18 73:24 77:10 104:21 121:7 128:18

**Shades'** 102:20 112:11 118:2 121:20

**shakes** 49:22

**sheet** 3:24

**shell** 109:14 111:14

**shells** 111:3

**shelves** 36:24

**shifting** 105:3,4

**shopping** 26:3

**short** 22:16 23:23 38:1

**shorter** 74:5

**shot** 76:11

**show** 10:22 41:20 44:15 66:21 74:10 75:7 82:3 105:19 111:21 120:10

**showed** 31:3 104:19 116:5

**showing** 14:22

**shown** 111:3 118:9

**shows** 27:20

**shrink** 75:14

**side** 7:15 68:24 125:8

**sides** 5:3

**sideways** 61:12

**signal** 39:8

**significant** 96:22

**similar** 94:8

**similarly** 86:18

**simple** 22:20 28:1,14 30:9 48:2 94:20 114:16 116:19 117:11,13 125:25 133:24 134:22 137:22 143:6,20,23

**simply** 12:11 36:3 43:5 54:18 60:1 61:21 62:13 69:5 95:18 116:15 126:13 140:6 144:16 145:24 146:6

**simulator** 79:15

**sin** 32:5 68:9,10

**single** 12:25 29:17 76:22 77:17 85:1 103:22 105:8 121:16 136:6

**singular** 120:20

**sink** 99:9

**sir** 147:4

**sit** 3:6 18:14 28:23

**sits** 22:13 24:17 29:8, 17,18 114:10

**sitting** 5:17 16:4 40:25

**situation** 143:13

**six-month** 41:2

**sixth** 25:20

**size** 53:18 75:9

**sized** 128:25 129:2

**skill** 32:8 34:5 58:8,12, 16 135:7

**skilled** 31:11 32:17,24 33:15 34:9,11,16 35:18 36:7 37:4 42:7,20 43:8, 18,25 47:6 49:17 51:12 52:4 62:5 63:10,11 72:6 81:7 83:3,5,8,20 84:4,17 93:2 103:25 105:14,16 107:20 108:19 109:2,23 110:21 113:4 135:1 139:13 141:5 142:20 144:15 146:1

**skills** 52:24 53:1

**Skip** 6:23

**skipping** 32:10

**slash** 127:3,7

**sleight** 61:5

**slide** 11:13 16:12 34:1 38:5 41:20 55:19 87:7 116:5

**slides** 10:2 11:13 38:22 41:22 46:3 67:19,22 97:7

**slow** 53:21

**small** 50:7 53:18,19

**smaller** 53:20 75:11 79:11 125:21

**smart** 69:13

**sneak** 113:9

**software** 15:15 21:22 23:21 24:3,4,5,11,17,21 25:1,11 26:7,23 27:16 29:24 30:20 46:18,25 47:2 48:8 50:16,23 57:2, 14 64:23 65:3,12,13,19 68:18 117:25 118:1,10, 11 121:11 134:4 137:8, 9,10,14,18

**sole** 83:19 107:25 134:18

**solution** 46:23 51:2,9 52:13 53:8 106:10,15

**solved** 3:11

**solves** 130:25

**someplace** 21:20

**something's** 130:15

**sophisticated** 11:10

**sort** 21:2 41:23 44:19 46:2 54:2,24 61:12,24 63:7 85:4 92:22 93:20 102:25 113:9 136:7

**sound** 46:8 125:14 126:12

**sounds** 39:25 126:15

**source** 26:25 27:7,14, 15 28:8,11 29:9,10,16 45:9,19 46:14 49:25 50:6,11,20 51:6,8 52:16, 22 53:20 54:14,17 55:2, 6,21 58:5,23 61:3,6 62:2 63:1,21 64:18 68:16 94:24 97:5 100:15,18 102:15,21 103:9,17 104:11 105:25 106:2,7, 11,19,23 107:16,21,22 108:12 109:22 112:14 113:2,6,10,13,19,23 115:20 116:3,9,11 117:8 118:14 119:10

**South** 6:22

**Southwest** 6:5

**spaces** 90:21

**Spalding** 124:13

**speak** 108:9

**speaking** 5:2,7

**spec** 88:14 89:12 130:14 136:3,10 144:19 145:18

**special** 111:8

**specialized** 56:15

**specific** 36:16 42:25 49:21 56:12,16 67:16 104:14 109:7 111:4

**specifically** 48:14 84:13 128:20

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

**specification** 32:4,14 33:4,7,11,12 36:5 37:8, 11,24,25 42:13 43:23 44:14 47:6 61:25 62:19 68:6 71:13 77:16 80:3 81:14 82:23 83:8,10,22 84:17 86:18 88:9,17,25 89:25 90:1 91:10,11 93:23 97:14,25 98:2,7,8 99:14,20 109:4 114:19 117:12 119:2,4,21 120:1 121:18,21 130:12 133:8 136:1 137:13 138:1 139:14,18 141:3 143:1, 12,25 144:7,10,18,23

**specifications** 37:20 116:21 130:18

**speed** 75:20 136:17

**Spike** 80:1

**split** 27:22

**splits** 17:16

**spoke** 17:14

**spreadsheet** 56:15

**square** 128:11

**squashing** 139:6

**squiggle** 15:2

**stage** 127:9

**stand** 3:3,12 5:18,22 6:14

**standalone** 47:2,3 92:16

**standard** 35:9 44:19 45:4 49:15 84:25 109:24 110:20 111:14

**standing** 3:8 5:24 113:25

**stands** 35:24

**start** 10:10 38:3 42:19 63:18 69:13 79:8 100:4 101:5 108:21 120:9 143:9,19

**started** 20:20 122:23

**starting** 38:4 80:24 83:14

**starts** 15:3 39:13

**state** 18:8 33:7 80:6 126:18

**stated** 49:9 97:24 104:14 120:24

**statement** 20:8,13 52:12

**statements** 49:16 82:23 83:5 85:13 86:12 134:19

**states** 52:2 84:8,21 141:14 145:18

**static** 97:16

**statute** 33:1 37:23 41:13

**stay** 76:14 101:4

**steam** 137:2

**step** 28:1,15 92:18 106:6

**steps** 36:4 91:8

**stick** 131:21 143:16

**sticking** 140:7

**storage** 108:25 109:13 111:5

**store** 19:22 21:13 36:23 72:12 118:7

**stored** 20:1 71:15 72:10 73:25 86:15 111:15 140:3

**stores** 7:5 72:14 102:14 109:8 118:7

**storing** 91:21 94:23 113:18 117:7 118:3 122:9

**story** 50:13 63:8

**struck** 88:5

**structural** 87:25 121:1, 2

**structure** 24:16 29:21 30:10 36:15,16,18 68:2, 3

**structured** 24:13 25:17, 18 26:1 66:1,2 67:18

**structures** 36:4,17 37:5 91:8

**student** 7:13

**Studio** 54:11

**study** 13:13

**stuff** 9:1,3 19:10 37:7 84:18 114:11,17

**subcategory** 60:7

**subject** 10:16 40:10 82:20 142:2

**sublimitations** 123:1

**submit** 34:15 77:11

**submits** 32:12

**submitted** 32:23 110:25 142:21

**submitting** 91:19,22

**subparagraph** 37:24

**subsequent** 97:2

**subsequently** 49:1 75:4 132:8

**subset** 36:16 56:23

**substance** 10:5

**substantially** 89:7,9

**subtitle** 121:22

**succinct** 140:13

**sudden** 39:12

**sufficient** 32:16 145:11

**sufficiently** 126:18

**suggest** 145:2

**suggesting** 8:15

**suitable** 56:3 59:4 140:5

**suited** 118:1,11

**Sum** 15:12

**summarized** 87:17 112:2

**summary** 34:13 40:23 62:10 103:18 105:11

**super** 96:15

**superfluous** 127:24

**support** 97:3 107:25

**supported** 105:8 121:20 140:20,22 141:12

**supports** 36:19 69:10 88:25

**supposed** 3:18

**supposedly** 117:6

**Supreme** 35:8,10

**surgeon** 7:10

**survive** 53:11 103:12 104:13 145:10

**swallow** 85:4 89:3

**Swearingen** 6:23

**switch** 12:12 70:2

**switched** 71:8 77:23

**switching** 12:13

**symbol** 15:24 23:6 76:14,16 109:13,15,16

**symbols** 15:23 110:19 111:1,6,7,8

**syn-** 63:25

**synonomous** 55:23 60:13 63:25

**synonym** 83:7

**synonymous** 56:1

**synonyms** 55:20

**system** 11:4 18:21 38:9 47:20 53:3,4 56:25 57:1, 15,24 79:2 94:12 119:20 125:11 132:11 134:3

**systems** 134:2

**T**

**tab** 25:22,25

**table** 3:7 125:8

**tabs** 25:22

**tagged** 25:17 66:1,3 68:3

**takes** 7:22 25:2 28:3 58:22 98:24

**taking** 50:6 104:13

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

Index: talk..uncertain

**talk** 11:6 16:18 30:15 31:23 92:15 103:1 125:23

**talked** 7:20 20:5 56:7 72:3 97:17,19 98:5 127:15 132:1,15 140:7

**talking** 31:14,15 56:14 59:19 63:20 76:25 82:15 83:21 91:25 114:17 125:9,19 131:8,11

**talks** 86:23 97:15 119:22 129:17 135:20

**tangent** 117:17

**task** 56:17

**taught** 90:11 93:1 113:3

**tax** 18:6,9,18 20:11,17, 21 23:5,15 66:16 75:19

**teach** 7:16 47:6 86:24 90:12

**teaches** 84:17,21 85:19

**teaching** 52:7 53:6 83:15 86:12 130:14

**technical** 3:10 59:25 61:19 145:23

**technically** 66:11 134:20 135:3

**technique** 78:23,25

**technology** 7:24 10:16 13:21 18:22 21:3 38:16 72:1,2 76:12 90:6 95:8 133:25 142:10

**telephone** 146:22

**television** 66:21

**telling** 38:5

**tells** 21:18 50:13 63:19 81:1,24

**template** 94:2

**ten** 6:18 9:24 55:12 101:25

**tension** 42:4

**tent** 54:24

**term** 8:2 14:5 34:23,24 35:20 36:7,17 40:3 42:22 43:9 44:1 51:5,7

55:16,17,25 56:2 57:13 58:4 59:7,10 64:9 69:9 71:19 81:25 91:1 92:15, 16 93:14,22 96:2 98:6 101:14 107:21 112:22 119:17 123:2,12 126:5, 18 130:5 132:4 136:2 139:7,8,9 140:8 144:5,6, 14 146:6

**term's** 36:2

**terminology** 82:19

**terms** 35:2 38:4 40:2 42:25 44:17 46:3 55:17, 20,23 56:1 57:11 61:7 92:13 122:23 126:4,6 134:21,25 135:18

**test** 48:7 135:21

**testimony** 43:12,20 44:3

**Texas** 42:11 44:10

**text** 19:10,15,25 21:7 22:19 23:6,7 29:14 97:16 109:8 118:20 140:1,2

**texts** 19:6 28:6

**theme** 49:23

**themes** 46:6,21 47:21

**theoretical** 61:19

**thing** 5:14 15:6 17:10 25:15 33:15 39:18 40:22 41:9 50:9 51:6 57:18 68:14 69:13 71:17 75:12 79:16 81:15 89:5 90:8 102:16 131:4,9 132:13 141:17 145:21

**things** 3:7 8:18 17:18 21:6 25:7 26:24 28:6 44:22 47:24 59:19 61:23 65:20 80:8 84:18 87:2 90:4 92:9 97:15 99:18, 19 100:21 103:11 125:3, 18 146:24 147:2

**third-party** 86:2

**thought** 5:12 30:7 65:20 96:2,3 146:24

**tie** 140:23

**till** 31:20

**time** 7:2,3 13:10 26:22 27:5,23 28:3 32:8 35:1 39:11 40:4,7,10 46:25 50:16 55:10 64:21 65:16 66:8 77:13,15 102:8 124:2 125:2 136:25 142:2

**times** 13:14,15,16 46:19 99:11

**tips** 15:7,10,13 17:15 20:5 25:21,25

**titles** 125:6

**today** 10:6,13 13:3 16:19 40:23 44:9 45:2, 16 47:12 100:16 110:3 113:25 115:16 142:12

**told** 8:8,25 9:24 40:14 63:8 123:16

**tomorrow** 146:13,21

**tonight** 146:12

**tons** 43:2

**tool** 51:22 52:2 106:6 108:2

**tools** 19:9 28:5 117:25 118:1,10,11,13 120:20 121:9,11,12

**toothbrushing** 13:14

**top** 76:17 83:12 109:19 133:10

**total** 15:8,13 17:15 20:5

**touchy** 142:1

**tout** 46:10 104:15

**touted** 53:9 106:19,20

**touting** 61:15 63:1

**track** 90:15

**trade** 145:22

**Traditional** 82:10

**traditionally** 82:6

**training** 125:13

**transfer** 53:19

**transformed** 53:2

**transforms** 107:23

**transistors** 12:12,13

**translated** 56:10 58:12

**translator** 56:5

**transmission** 91:23

**transmits** 86:5

**transmitted** 108:25 140:2,4

**transparencies** 128:17 129:15

**transparency** 128:19, 20 129:7

**trial** 35:12

**triangles** 97:18

**true** 20:8 30:19 97:8 107:4

**trumps** 44:2

**tunnel** 7:12

**Turbotax** 77:23 78:1

**turned** 39:14

**turning** 41:8 120:9

**turns** 87:21 133:5 135:11

**tutorial** 7:24

**twist** 115:25

**two-digit** 14:20

**type** 11:15 21:24 22:19 45:10 46:12 72:7 105:4 108:10 111:4 145:3

**typed** 21:8

**types** 10:19 11:3 16:18 36:18,24 44:25 45:18 47:12 56:12 57:18 64:2 97:23

**typically** 78:23 111:16

───────────

**U**

**ultimately** 21:9 44:22 49:10 50:25 60:8,25 63:11 64:5 82:18,20 84:9 140:21

**uncertain** 93:20 146:1

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

**uncertainty** 144:19

**unconstitutional** 41:14

**undefined** 119:17

**underground** 7:12

**underneath** 22:14 60:3

**understand** 3:17 11:12 13:7 28:21 32:12 43:19 44:1 57:19 62:6 65:6 70:10 78:2,16 90:18 99:3 105:17 126:3,23 133:25 135:7 139:14 142:20,22

**understanding** 10:14, 15 30:12 42:22 51:13 52:6 53:1 66:25

**understands** 11:20 12:11 15:18 72:6

**understood** 31:6 87:21 134:25

**unduly** 134:22

**unexplained** 146:3

**unique** 11:16

**university** 7:11

**unknown** 33:15

**unlike** 111:23

**unreliable** 109:23

**unsupported** 119:17 135:14

**untethered** 81:13 88:15

**update** 27:17

**updated** 3:23 48:11

**upper** 76:15 111:21

**USC** 32:14 37:23

**user** 18:10 20:16 21:24 23:25 24:4,10,25 29:24 59:21 60:20,23 67:4 68:7,15,17 69:1 72:13 86:6 87:10 136:14 137:6,17

**user-oriented** 56:12,17

**user-specific** 59:9

**users** 131:19

**utilities** 118:18,24,25 121:17

**utilized** 60:23

**utilizes** 57:24,25

—————————

**V**

**valid** 66:9

**values** 75:23

**variable** 15:4,6,8 16:1 19:17 23:8 72:8,9,10

**variables** 15:11 72:4

**vendor** 109:19 111:17 143:1 144:11

**venture** 5:13

**verdict** 124:21

**version** 21:3 79:11 104:3,7

**versions** 91:12 128:14

**versus** 35:14 36:22 60:21 61:6,11 133:7,19

**vest** 24:12

**video** 22:16

**view** 72:16 126:14 131:19 139:11

**viewable** 26:15 30:1 49:7 67:5,8,9 74:1,16, 18,19,21,22 75:7,16,17 77:19 78:13,14 84:6 91:1,3 92:13,14 95:1,3 96:1,7,13 99:16,17 114:16 115:1 116:18 131:18 132:2,6,11 135:24 137:11 138:10, 18,19,25 139:1,9,23,25 140:15,23 141:1,3,6,8, 11,14,18,23

**viewer** 23:20,22 26:7 29:10,16,23,25 30:1 59:20 67:7,15 69:1 74:1, 16,17 95:2 109:5,18 111:18 112:8 122:15,17 123:2,11 124:11 126:13 139:14

**Vince** 10:11

**violates** 140:9

**violation** 74:8 76:7 93:21 96:15 131:23

**Virginia** 41:12

**virtual** 91:13 129:24 130:10,17 136:8

**virtually** 115:16

**visit** 42:13

**visual** 54:11 128:2 131:1,20 133:6

**vitae** 4:9

**Vitronics** 42:18

**voucher** 20:15,16

—————————

**W**

**wages** 15:5,10,13 16:1 17:15 18:9 20:5 23:9 25:12,20,25 26:5

**wait** 9:13 67:23 72:15 138:19

**walk** 6:17 7:4 38:4 83:2

**walking** 39:13

**wanted** 5:16 12:22 16:13 27:8,13,17 40:24 47:18,19 50:17 126:9 130:3

**watch** 22:16 125:14 137:1

**wave** 39:18

**wax** 105:2

**ways** 16:16 25:6 26:19 33:14 52:8 105:21 128:12

**weather** 6:1,2 146:14

**Web** 140:1

**wedded** 40:13

**weeks** 65:18

**weight** 43:21

**well-educated** 23:21

**whatsoever** 94:3 95:18

99:10 116:8 117:9 145:14

**Whichever** 3:5

**whistle** 137:2

**wide** 50:16

**wife** 6:25 7:10 8:25 125:16

**Wikipedia** 11:23

**window** 66:8 79:6

**Winnipeg** 7:9

**wintertime** 7:6

**witnesses** 7:22

**wood** 37:1

**wool** 7:1

**word** 9:4,23 13:8,10 14:15 19:8 34:14 35:21, 23,25 36:22 42:25 43:3, 15,19 44:15 56:14 59:9 61:7 62:6,12 68:13 69:7 73:19 82:16 83:2,9,19 88:1 90:17 91:2 92:10, 11,25 93:8 105:8,13 119:6 130:6 137:25

**words** 10:3 17:7 22:13 31:25 32:6 33:21,24 34:3 42:5 44:12 55:25 71:18 85:19 88:4,6,20 114:7 131:2,14,19 132:3 134:6 137:9

**wordsmithing** 92:25

**work** 6:16 8:6 12:9,15 21:13,19 31:13 48:4,8 50:22 56:12 59:9 67:13 101:24 124:17 128:22 129:7,8

**working** 18:11 38:6 69:13,14 124:11

**works** 10:16 19:17 29:7 30:12 56:21 71:22 95:8

**world** 34:17 64:3

**worry** 3:8 40:18 41:3,4

**wrapped** 123:12

**wrapping** 30:9

**write** 5:10 11:2 12:3

AATRIX SOFTWARE, INC. vs GREEN SHADES SOFTWARE, INC.
, Hearing on 02/27/2019

15:19 16:23 17:20,23
18:1,11,12 28:24 31:18
32:22 37:13,17 47:14
50:24 58:14 115:22
116:11

**writes** 11:17 29:8 32:12
58:22,23

**writing** 14:19 28:2 50:7
111:9

**written** 12:18 16:2,15
26:25 30:18 31:8 36:11
45:9 46:14 50:11,21
51:14 54:17 55:6,22
58:13,17,18 65:25 95:2
107:10,16 113:7,13,24

**wrong** 58:5,6 64:14
65:23 95:18,19 96:18,21
99:8 119:3,24 127:11,18
129:5 131:12

**wrote** 27:14 28:20 51:4,
5,9 52:16 106:11 123:23

---

### X

**xaml** 54:13,14

---

### Y

**year** 17:24 27:16 31:19,
20 65:14 77:13 124:12

**years** 6:24 23:22 52:15
66:18 78:1 125:12

**yellow** 5:10 76:15
125:17

---

### Z

**zebra** 56:20 60:3

**zebras** 56:17,21

**zeros** 13:11 14:16 116:5