1          IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
2                JACKSONVILLE DIVISION

3    AATRIX SOFTWARE, INC.,          Jacksonville, Florida

4            Plaintiff,              Case No. 3:15-cv-164-J-20MCR

5         -vs-                       December 11, 2019

6    GREEN SHADES SOFTWARE, INC.,    11:02 a.m.

7            Defendant.              Courtroom 10C

8    _____

9               **TRANSCRIPT OF STATUS CONFERENCE**
          BEFORE THE HONORABLE HARVEY E. SCHLESINGER
10                UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21   OFFICIAL COURT REPORTER:

22        Shelli Kozachenko, RPR, CRR, CRC
          221 N. Hogan Street, #185
23        Jacksonville, FL  32202
          Telephone:  (904) 301-6842
24
                        (Proceedings reported by stenography;
25                       transcript produced by computer.)

1                    A P P E A R A N C E S

2

   COUNSEL FOR PLAINTIFF:
3

4        **John Lunseth, Esquire**
         **Aaron Johnson, Esquire**
         Taft Stettinius & Hollister LLP
5        80 South 8th Street, Suite 2200
         Minneapolis, MN  55402
6

7        **Joanne O'Connor, Esquire**
         Jones, Foster, Johnston & Stubbs, PA
         505 South Flagler Drive, Suite 1100
8        West Palm Beach, FL 33402

9

10  COUNSEL FOR DEFENDANT:

11       **Joseph Bain, Esquire**
         Shutts & Bowen, LLP
12       525 Ockeechobee Boulevard, Suite 1100
         West Palm Beach, FL  33401
13

         **Harold Timothy Gillis, Esquire**
14       **Jeffrey York, Esquire**
         Shutts & Bowen, LLP
15       1022 Park Street, Suite 308
         Jacksonville, FL  32204
16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

December 11, 2019                                    11:02 a.m.

- - -

1     COURT SECURITY OFFICER:  All rise.  This Honorable
Court is now in session.

    Please be seated.

    THE COURT:  Call the next case.

    COURTROOM DEPUTY:  Case No. 3:15-cv-164-J-20MCR,
Aatrix Software, Incorporated, versus Green Shades Software,
Incorporated.

    Counsel, please state your presence for the record.

    MR. LUNSETH:  John Lunseth with the plaintiff.  With
me is Aaron Johnson and my local counsel, Joanne O'Connor.

    MR. BAIN:  Joseph Bain, Shutts & Bowen, on behalf of
the defendants, with my partners Jeffrey York and Timothy
Gillis.

    THE COURT:  As I understand the case at this
juncture, I believe that all the motions that were filed have
been resolved, and this hearing is to set dates for the
pretrial conference and the trial date and a deadline for
motions in limine.

    But before -- before we try to accomplish that, I
need to have some idea trial-wise how many trial days that we
actually need.

    MR. LUNSETH:  Your Honor, I think, having just done a

1   walk-up to a patent trial in this court -- we settled, but I'm

2   going to guess three to four weeks, 15 trial days to 20 trial

3   days.

4           THE COURT:  Okay.

5           MR. BAIN:  That estimate sounds accurate if it has

6   all the issues that it currently has.

7           THE COURT:  Well, do you think some of them might go

8   away?

9           MR. BAIN:  Yes.  I think in view of your *Markman*

10   order, the number of claims at issue should go down.

11           THE COURT:  So what do you think with the issues that

12   you think might get resolved?

13           MR. BAIN:  Well, I think, in view of your *Markman*

14   order, some of the -- right now the last infringement

15   contention we got from the plaintiff, basically all the claims

16   of all the two patents are being asserted.

17           And in view of some of your constructions, I think

18   that some of those should go down.  And obviously if the

19   quantity of patent claims at issue goes down, then the number

20   of things that the experts have to talk about and the witnesses

21   have to talk about will be reduced.

22           And it's also possible, now that we have clarity on

23   the *Markman* -- on the claim construction, you know, we think

24   that we might have some issues that are candidates for summary

25   judgment.  Whether it's completely dispositive or only

1   partially --

2          THE COURT:  Okay.  So let's say you win on

3   everything.

4          MR. BAIN:  If we win on everything --

5          THE COURT:  I'm just --

6          MR. BAIN:  -- we're not going to trial.

7          THE COURT:  Well, there are some claims that you said

8   can't -- you're not going to be able to file summary judgment

9   on, right?

10          MR. BAIN:  Correct.

11          THE COURT:  So I'm -- this is -- this is the

12   Jacksonville secret rule.  The Jacksonville secret rule is that

13   if you're on senior status, you only have to try -- and we

14   appreciate the cases you're handling.  You only have to spend

15   five trial days.

16          I have a hearing this afternoon in an alleged

17   price-fixing case that the lawyers stood in front of me in

18   August and assured me if I set a trial date, it will take no

19   more than two weeks, which I set a trial date in February.

20          Now I have the pretrial stipulation.  Of course, the

21   hearing -- the pretrial is this afternoon, and it reads

22   something like estimated trial time, 20 trial days, not

23   including jury selection, opening and closing statements, all

24   right?

25          Well, the rule in Jacksonville is five trial days,

1   and if the trial is going to last more than five trial days,

2   you don't have to do it.  So now I've got to go look all over

3   the country to try to find somebody that wants to come to sunny

4   Florida in February for about a six-week trial.  These -- the

5   lawyers don't know this.  I'm going to tell them this

6   afternoon.

7            So if you're talking about 20 days, I'll set the

8   date, but it isn't going to be me.

9            So let me ask you this, okay, what your esteemed

10  opponent said a minute ago.  When do y'all decide that it's

11  time to sit down and try to settle this thing rather than --

12  because you mentioned you got ready for another trial and it

13  settled.

14           Do y'all just wait till the eve of trial, or -- no,

15  I'm serious, because -- and I'm not speaking about you because

16  I don't know anything about you guys.

17           You can -- you can easily tell, not in a patent case,

18  when some of the law firms are bilking the client for

19  everything they can.  And then you have a jury pool coming in,

20  and on the steps of the courthouse, they settle the thing.

21           So meanwhile you're sitting here -- and the reason

22  why I mention this, this is a class action case involving

23  anybody in the United States who, during a certain period of

24  time, bought disposable contact lenses.  And so they tell me

25  there's a potential for 41 million claimants.

1    I can't tell you, because I -- I learned long ago --

2    it may have been Henry Ford or Einstein that said, "If I could

3    look something up in a book, I'm not going to memorize it,"

4    okay.  So I don't have this down to memory.

5    But there's almost -- almost 400 lawyers across the

6    country that had these cases that the MDL panel sent here.

7    Well, they can't decide -- I usually do the voir dire myself.

8    Let the lawyers submit questions, and then I'll pick which ones

9    I'll ask and ask -- and I'll ask anything that I think is

10   related to the case.

11   Don't ever ask me to ask them what bumper sticker

12   they have on the back of their car unless it involves maybe a

13   candidate for public office, and I might ask them about that

14   election.

15   But one side wants questionnaires sent out ahead of

16   time, because I raised this issue.  If there's 400 attorneys

17   that are involved in this case, do you want me to ask the

18   jurors do they know any of these 400 lawyers and go down the

19   list?

20   So it's things like that that sometimes you don't

21   think about, and --

22   MR. LUNSETH:  Mr. Bain and I have already had

23   discussions about the setting of the mediation, and we tried to

24   set it at an earlier date, but I think it was both of our

25   conclusions that we needed to get expert reports done.

1          THE COURT:  First.

2          MR. LUNSETH:  At that point the parties would have a

3   handle on their case.  And so we have a proposed new schedule

4   to get through the rest of --

5          THE COURT:  Yeah.

6          MR. LUNSETH:  -- expert discovery that includes that

7   date.

8          THE COURT:  Okay.

9          MR. LUNSETH:  Now, on the other part of it, the case

10  that I just had that settled four days before trial, the other

11  lawyers aren't here.  I'm not going to throw bricks at them,

12  but that was a case that went right down to the wire, and I

13  don't know why it did.  And certainly that can happen.

14         THE COURT:  Well, you know, sometimes that's the way

15  it is, and the lawyers may not be at fault.  It could be the

16  client.

17         MR. LUNSETH:  Could be.  Don't know.

18         THE COURT:  Who knows.

19         MR. LUNSETH:  But the answer to your question is,

20  yes, we want to get together, and we want to talk about

21  settlement --

22         THE COURT:  Okay.

23         MR. LUNSETH:  -- and see what we can do to resolve

24  the case.

25         THE COURT:  Well, and you've all had some exposure to

1    Judge Richardson.

2          MR. BAIN:  Yes.

3          THE COURT:  You can get him for free if you want to

4    use him.  I think in patent cases sometimes -- I don't know if

5    he suffers from the same malady that I suffer from.

6          I would have been an engineer, but math was not my

7    good subject.  Sometimes, in a patent case, it's a good thing

8    to have.  Now, in your case maybe some computer expert.

9          Of course, let me tell you, it was not an easy task

10   to go through on that *Markman* material.

11         MR. LUNSETH:  Some other perspective I can add,

12   though, having just been through this whole process, was that

13   during the summary judgment process, the length of the trial

14   actually increased because the defendants raised arguments that

15   required more witnesses at trial.

16         So we were looking at -- we had a two-week block, and

17   it couldn't be moved.  Judge Davis was going on vacation.  I

18   didn't know how we were going to get those witnesses done in

19   two weeks.

20         THE COURT:  Done in that time?

21         MR. LUNSETH:  We got it settled.

22         I'm thinking --

23         THE COURT:  I know some --

24         MR. LUNSETH:  -- three to four weeks.

25         THE COURT:  I know some district judges that set time

1   limits.  I've never done it.

2         And I know one judge -- he's deceased now -- one

3   Friday afternoon about 2 o'clock, they ran out of witnesses.

4   Of course, the lawyers had them scheduled to come in on Monday,

5   and he said, "That's the case."

6         MR. BAIN:  Wow.

7         THE COURT:  "You run out of witnesses, you run out of

8   case."

9         And I don't think that's a good way to seek justice,

10  whatever you want to call it.

11        Okay.  So --

12        MR. BAIN:  I've been thinking, Judge, about the

13  length of the trial if the issues get reduced, and I don't

14  see -- even -- assuming that there's a case to be tried, I

15  don't see it being reduced to -- down to five days.  I could

16  see it being possibly reduced down to two weeks.

17        THE COURT:  Well, two weeks -- that case was supposed

18  to take two weeks, and I said I would do it.  If you're telling

19  me the potential is two weeks, I'll just keep this thing right

20  now --

21        MR. BAIN:  Yeah.

22        THE COURT:  -- and I'll tell you what dates I'm

23  looking at, and you tell me whether this would give you

24  enough -- enough time.

25        MR. BAIN:  Okay.

1            THE COURT:  I'm looking at the potential of the trial

2    being October 5th of next year and the pretrial conference on

3    August 19th.

4            MR. BAIN:  Are there any other months available,

5    Judge?  Because October is a bad month for me.

6            THE COURT:  Yes.  There's plenty of time available.

7    You want it -- let me get my 2020 calendar.

8            Okay.  What month are you --

9            MR. BAIN:  How much lead time do you like from

10   summary judgments to trial?

11           THE COURT:  90 days.

12           MR. BAIN:  90 days.  Okay.

13           Because we would like to -- we would like to propose

14   to you a pretrial schedule adjustment --

15           THE COURT:  Okay.  Just let me -- let me write it

16   down.

17           MR. LUNSETH:  Your Honor, I'm sorry.  Two weeks will

18   not work.

19           THE COURT:  It won't?

20           MR. LUNSETH:  It won't work.

21           THE COURT:  Okay.

22           MR. LUNSETH:  Bear in mind that a day of that is jury

23   selection, opening argument, and another day is closing

24   arguments, so that gives you eight -- possibly eight witness

25   days.  It just -- that -- it won't work.

1           THE COURT:  Have you --

2           MR. LUNSETH:  The case -- the case we just had was

3    the same size, scope, witness numbers as this case, and --

4           THE COURT:  Have you talked to your local counsel

5    about my jury selection process?

6           MR. LUNSETH:  No, but --

7           THE COURT:  We usually have a jury by lunchtime.

8           MR. LUNSETH:  That would be good.  We were going to

9    have our jury by lunchtime.

10           THE COURT:  This is my famous jury selection story.

11    I had an age discrimination case of a woman who was an intake

12    clerk at the food stamp program, and she claimed that she was

13    fired because she was 84 years old.

14           And the first mistake she made was having her son

15    represent her, who had never, ever tried a case.  He was a good

16    lawyer, but he was a transaction lawyer.

17           So getting close to trial, I get a motion to continue

18    the trial date because he wants to go to a CLE seminar to learn

19    how to select a jury, which I granted.

20           Comes time for trial.  We have about 24 potential

21    jurors, and I gave them an hour to ask questions after

22    submitting questions to me that I asked.  And he gets up, and

23    he's questioning and questioning and questioning, and this

24    is -- I was watching him intently.

25           He goes like this, and he says, "If you had a choice

1   between wearing a watch that had numbers and hands, an hour

2   hand and a minute hand, or one of those new kind of watches

3   that just has numbers, which one would you use?"  And I went

4   through 24 people.  They gave their answer.

5         First witness he puts on the stand is the woman who

6   sits at the desk next to his mother, and the first question he

7   says to her, after going through the identification, "How old

8   are you?"

9         And she says, "87."

10         Now, his mother had a 55 percent error rate on her

11   paperwork, and I think the Department of Labor statistics

12   allowed for, like, a 7 percent.  And that's why they claim they

13   fired the woman.

14         Well, after the case was over and the jury was out 30

15   seconds and found no liability, I sent them home, and I said to

16   him, "I was intrigued by that question about the watch.  Can

17   you tell me why you asked that question?  What were you looking

18   for?"

19         He said, "Well, you told me I could have an hour, and

20   I checked my watch to see how much longer I had, and all of a

21   sudden this thought popped into my mind about numbers and

22   hands, so I asked the question."

23         That was the last time I ever let a lawyer ask jury

24   questions, but --

25         MR. LUNSETH:  Well, we -- when we took depositions,

1  between defense counsel and our firm -- I don't have an exact

2  number, but I'll say that we deposed 15 total witnesses.

3  In addition to that, we're going to have a minimum of

4  five expert witnesses, so we're talking now --

5  THE COURT:  Yeah.

6  MR. LUNSETH:  Even if we cull out some of those

7  witnesses because we don't need them all --

8  THE COURT:  Okay.

9  MR. LUNSETH:  -- we're talking 10 to 15 witnesses,

10  and I just don't see it working.

11  THE COURT:  Okay.  Well, give me your proposed dates.

12  I'll set the thing, and then after you get back home and talk

13  around, see if you want to suggest any names of judges that I

14  can call and say, "Would you like to come to sunny Florida?"

15  MR. BAIN:  Right.

16  MR. LUNSETH:  Your Honor, counsel did get together,

17  and you issued a case management and scheduling order, third

18  amended or something like that.  And then we got the *Markman*

19  order, and we have several concerns, scheduling concerns.

20  One is the issuance of the *Markman* order triggers

21  things to be done.  Now they're to be done over the holidays,

22  so we have a working issue there with both law firms.

23  Two, my firm is merging --

24  THE COURT:  Just -- just --

25  MR. LUNSETH:  I have a sheet --

```
 1              THE COURT:  Have you got a proposed order where
 2   you --
 3              MR. LUNSETH:  I have a sheet counsel and I have
 4   agreed on.  May I --
 5              THE COURT:  Just give it to my courtroom deputy, and
 6   you will have an order tonight --
 7              MR. LUNSETH:  All right.
 8              THE COURT:  -- with those dates on it.
 9              I know --
10              MR. LUNSETH:  If you look on the other side,
11   there's --
12              THE COURT:  I know generally absolutely nothing about
13   cases other than what I've heard during some hearings.  You
14   guys know what -- and women know -- I'm not supposed to use
15   guys, my wife tells me, but everybody calls my family "you
16   guys," which are loaded with more women than men.
17              MR. BAIN:  Right.
18              THE COURT:  Okay.  Let me just see here what you
19   have.
20              Oh, so you have -- okay.  So after the expert
21   disclosure, okay, motions June 5th.  Okay.  So figure this.
22   July, August, September.
23              Now, you said October was the bad month for you?
24              MR. BAIN:  Right.  I could do many things.  I could
25   do a September trial or November on.
```

1      THE COURT:  Okay.

2      MR. BAIN:  Other than -- of all my other trials --

3      THE COURT:  It's okay.

4      MR. BAIN:  -- I've got a trial in May of '21 set.

5      THE COURT:  Okay.  Hang on.

6      MR. LUNSETH:  If we're going to -- if we're going to

7  do November, I'd rather have early November.  If you get

8  towards late November --

9      THE COURT:  Yes.

10      MR. LUNSETH:  -- then you've got Thanksgiving, and --

11      THE COURT:  Thanksgiving.

12      MR. LUNSETH:  -- that's just --

13      THE COURT:  No problem.

14      Okay.  My -- in 2020, I think November 2nd --

15      MR. BAIN:  Okay.

16      THE COURT:  -- is a trial term.  And if I get a

17  visiting judge or one of the local judges to agree, you'll be

18  by yourself.  If you have to stick with me, I have to give the

19  criminal cases the speedy trial problem, so they would come

20  ahead.

21      Can you do -- is September -- look at September 16th.

22      COURTROOM DEPUTY:  16th --

23      THE COURT:  Okay.

24      COURTROOM DEPUTY:  -- at 10 o'clock.

25      THE COURT:  10 o'clock?

1          COURTROOM DEPUTY:  Yes.

2          THE COURT:  Okay.  September 16th at 10 o'clock for

3     the pretrial conference.  Monday the 2nd of November for the

4     trial.

5          The *Daubert* motions and dispositive motions would be

6     June 5th.  The expert discovery closes on May 1st.  Disclosure

7     of rebuttal experts, March 27th.  Mediation conference, March

8     20th.  Expert report disclosure, 28th of February.  And

9     amendments of infringement and noninfringement and invalidity

10    contentions, January 31st.

11         So that should --

12         MR. LUNSETH:  I went through the calendar quickly,

13    and those are all Fridays.  I hope -- the real days, in other

14    words.

15         THE COURT:  You want me to check them?

16         MR. LUNSETH:  No.  Well, you can, but they don't land

17    on a weekend.  That's what I was trying to make sure of.

18         THE COURT:  That should take care of that.

19         So in all seriousness, if you want to talk with one

20    another to make a suggestion, if you know somebody that might

21    want to come to Florida in November --

22         MR. LUNSETH:  I think that would be nice, Your Honor.

23         My associate called to my attention we were supposed

24    to talk about motion in limine deadlines here too, and I --

25    counsel and I haven't talked about that.

1      THE COURT:  I think we had it in here.  The

2  motions -- oh, that was the *Daubert*.

3      You want to try and do that by the same -- no, no.

4  That would be too early.

5      How about by the last -- let me see what date that

6  turns out to be.  How about by the close of business on Friday,

7  the 28th of August?

8      MR. BAIN:  Okay.

9      MR. LUNSETH:  I think that's -- I'll say yes, but

10  isn't that before the summary judgment rulings would be out?

11      THE COURT:  Well, hopefully I can get them out.  If

12  they're filed on June 5th, they should be ripe for ruling

13  around June 20th.

14      MR. LUNSETH:  I think the briefing --

15      THE COURT:  June to July, July to August.

16      MR. LUNSETH:  The briefing is done on June 26.  The

17  response -- July 5th is the filing of the motion, and the

18  26th --

19      THE COURT:  No.  I have June 5th for *Daubert*,

20  dismissals, and summary judgment.

21      MR. LUNSETH:  That's the filing of the original

22  motion --

23      THE COURT:  Yes.

24      MR. LUNSETH:  -- and the response is 21 days later,

25  on the 26th of June.

1          THE COURT:  Right.  And I usually don't have replies.

2          MR. LUNSETH:  No replies, but --

3          THE COURT:  Yeah.  So it will give me June to July,

4    July to August.  It would be 60 days.  So hopefully I'm going

5    to try to get those done.

6          MR. LUNSETH:  Okay.

7          THE COURT:  If you want to make it the end of August,

8    it will be past the pretrial date.

9          MR. LUNSETH:  If we can get summary judgment orders

10   out by then, I'm fine with it.

11         THE COURT:  I'm going to try.

12         MR. BAIN:  Okay.

13         MR. LUNSETH:  Okay.

14         MR. BAIN:  Thank you, Judge.

15         THE COURT:  Okay.  What else do we need to discuss?

16         MR. LUNSETH:  Pretrial and trial.

17         MR. JOHNSON:  No, he --

18         THE COURT:  Yeah.  Those would be September 16th --

19         MR. LUNSETH:  Okay.

20         THE COURT:  -- and November 2nd.

21         MR. LUNSETH:  All right.

22         THE COURT:  Unless you want to -- do you want to move

23   the date up for the *Daubert* and dismissals?  I don't know if

24   you -- well, you don't have the discovery closed.  That might

25   not give you enough time, May 1st, or I could -- that's just

1  about a month.  That should do.  I don't see any way of moving

2  that up.

3          Okay.  What else?  Anything else that you'd like to

4  discuss?

5          Have you picked someone to be a mediator or --

6          MR. LUNSETH:  Yes.

7          MR. BAIN:  Yes.

8          THE COURT:  Oh, good.

9          MR. LUNSETH:  A guy over in Tampa who does -- as I

10  understand it, you have to have a mediator certified in this

11  district, and he's certified in this district.

12          THE COURT:  Who is it?

13          MR. LUNSETH:  I don't know.  I suggested him, but I

14  don't remember his name.

15          MR. BAIN:  Do you remember his name?

16          MR. LUNSETH:  James --

17          MR. BAIN:  James something, Your Honor.  He's

18  certified, and he also has experience with patent cases.

19          MR. LUNSETH:  Oh, Matulis, yes.  James Matulis, who

20  has done patent case mediations before, which was the reason I

21  thought he would be suitable.

22          THE COURT:  Okay.  What else?

23          MR. BAIN:  Nothing else from the defendant, Your

24  Honor.

25          THE COURT:  How about from the plaintiff?

1          MR. LUNSETH:  No, Your Honor.

2          THE COURT:  Okay.  And I'll get working to -- I'll

3   wait about maybe two -- is two weeks enough time to give you to

4   talk about this thing of trying to get another judge who you

5   might want?

6          MR. BAIN:  I would say give us two weeks to discuss

7   it, Your Honor.

8          THE COURT:  Okay.  Yeah, why don't you --

9          MR. BAIN:  We'll let you know whether --

10          THE COURT:  Well, the way --

11          MR. BAIN:  -- we have a recommendation or no

12   recommendation.

13          THE COURT:  Well, the way that it has to work is

14   first you've got to get your chief judge to approve it.  So he

15   usually sends out a notice to all the district judges, you

16   know, "Would you like to try this case?"

17          If the answer is no, it's got to go to the circuit

18   and then from the circuit to the chief justice.

19          So some judges call -- especially in this district,

20   there are a lot of snowbird judges that like to come down for

21   the winter.  Otherwise you leave it up to the Intercircuit

22   Assignment Committee, and they get people that you really don't

23   know anything about.  And sometimes you do run into problems, I

24   mean, horrible problems.

25          We had, maybe ten years ago, an intercircuit

1  assignment for someone to come here to do criminal cases, and

2  he was senile.  We had to take him off the bench the first day.

3          MR. LUNSETH:  The only thought I have on that, Your

4  Honor, if we are going to have a different judge, is we're in

5  the process -- we didn't cert him so -- or her, so it seems to

6  me motions in limine, which are what evidence is going in --

7          THE COURT:  That's something I would ask whoever is

8  going to do it whether -- some judges want the case ready for

9  trial, "I come down and whatever you did goes."  And some

10  judges say, "Well, leave the motions in limine for me."

11          MR. LUNSETH:  Okay.

12          THE COURT:  Because a lot of times, I mean, you're

13  going to get an order that says, "I'll take it under advisement

14  and carry it with the trial."

15          It's -- I don't know if you've ever sat up here, but

16  sometimes it's very, very difficult to understand the context

17  of the witness until you get rolling into the trial and see

18  what's actually going on.

19          So as much as you'd like to try to rule on those

20  ahead of time, it's very difficult in some circumstances.

21          MR. BAIN:  Judge, I had -- another idea occurred to

22  me, because you have a long history with this case and you've

23  obviously invested an incredible amount of time in the *Markman,*

24  so you're very familiar with the legal issues in this case, and

25  you said that you're willing to do a two-week trial.

 1          What about the idea of possibly bifurcating the

 2   liability from the damages?  Because I think --

 3          THE COURT:  Well, this is the concern that I have.

 4   Between the -- if you're going to do it back to back, it's

 5   still going to wind up, then, being four weeks.  If you're

 6   going to ask to split it, you run into the problem with the

 7   jurors, using the same jurors, when --

 8          MR. BAIN:  Okay.

 9          THE COURT:  -- you know, they disappear.

10          And you can instruct them.  We have -- as far as I

11   can tell, in Jacksonville -- I don't know about the other

12   divisions -- we really have never had any problem with jurors

13   violating their sequestration order about, you know, reading

14   things and doing things like that.

15          I know in the district we have.  We had a horrible

16   case many, many years ago in Orlando, when we first allowed

17   cell phones, of one lawyer leaving his cell phone on during a

18   trial connected to his office and witnesses waiting to be

19   called in his office listening to the whole trial.  And it was

20   not an easy thing to handle.

21          So that's really the only bad thing.  I say only bad

22   thing.  We once had an issue in Tampa in a cocaine case with

23   some of the jurors --

24          MR. LUNSETH:  Plaintiff would have a --

25          THE COURT:  -- using the evidence in the jury room.

1        MR. LUNSETH:  Plaintiff would be opposed to a

2    bifurcated trial.  It's the same language.

3        THE COURT:  Yeah.  It's going to take the same amount

4    of time --

5        MR. LUNSETH:  Yeah.

6        THE COURT:  -- so . . .

7        MR. LUNSETH:  Actually longer because do you more

8    opening and closing and picking.

9        THE COURT:  Well, no, there is a way to resolve that.

10   If there's no liability, it's over.  If there is liability and

11   you bring in another panel, you just tell them the only issue

12   for them to decide is the damages because the parties --

13       MR. BAIN:  That's what I was envisioning.

14       THE COURT:  -- because the parties have already

15   reached an understanding in the case.  You don't tell them it

16   was a jury verdict.  And you put on your evidence.  But -- so

17   if that's what you want to do, I'd be happy to do it, just

18   split it up.

19       No.  When you're hitting 80, to go four weeks or six

20   weeks, I mean, you're talking about a trial -- the last case I

21   tried before getting on the bench started the first Monday in

22   February and ended the 8th of August.

23       MR. BAIN:  Wow.

24       THE COURT:  And that poor district judge that tried

25   that case, his calendar was ruined for years.  Never could get

1    caught up.  And the other judges said, "It's your problem, not
2    mine."

3           So -- and we did.  We had two cases here.  I just saw
4    one of the attorneys this morning.  I hadn't seen him in 30
5    years.  The *Carlos Lehder* case, he was the biggest
6    narcoterrorist ever tried in this country about 1989.

7           That trial started and took almost six months.  Then
8    we had the Glenn Turner "Dare to be Great" trial back in 1974,
9    roughly.  Started the Monday -- no, the Tuesday after Labor
10   Day, and a mistrial was declared in the first week in June
11   because the jurors -- this is just an unbelievable thing.

12          These people sat together from September to June,
13   went back into the jury room, and there was a deputy.  We were
14   in the other building, and it wasn't kind of like a private
15   room.  It was just right off the corridor so they had a marshal
16   sit out there.  And he hears fighting going on in the jury
17   room.

18          Went to the judge, and the judge calls them back.
19   There was a white male and an African American female, and when
20   they went back into the jury room, the male took his chair,
21   pulled it over to a window, and looked out the window and
22   refused to sit and discuss the case with an African American
23   female.

24          And that -- they had to declare a mistrial in the
25   case.  There was just no way.  And they had run out of

1   alternates by then.

2        What's the famous lawyer from -- I can't think of his

3   name right now.  He was a criminal defense attorney.  You

4   probably read his books.  He was a defendant in the case, and

5   his defense was, "I was giving legal advice, and the judge

6   said, 'You can't get away with that defense if what you told

7   them to do was a crime.'"

8        He sat through the case until January and got a

9   directed verdict when the defendants took over.  So we've had

10  our fair share.

11       Somewhere -- I think it may have been in Ripley's

12  Believe It or Not, years ago, I read some -- you wouldn't

13  believe it, about a lawsuit in India over an estate that went

14  on for, like, 200 years.

15       MR. BAIN:  Oh, yeah.

16       THE COURT:  I don't think it was the same judge.

17  Although my famous Pollock and Weinstein story was the first

18  MDL case I had was back in the '90s.  I went to the MDL

19  Conference, and these two judges are -- I mean, the whole time

20  we were there, they're laughing and arguing with one another.

21       Jack Weinstein had the Agent Orange case, and this

22  was in the '90s.  And he entered a class action order and

23  appointed a former law clerk to represent an undisclosed class

24  of veterans who served in Vietnam who came down with Agent

25  Orange disease through the year 2040.

1        And Milton Pollock, who was in his '90s then, is

2    telling Jack Weinstein, "You know, the Lord doesn't care what

3    kind of order you entered.  When it's your time to go, you're

4    going to go, and he's not going to let you live until 2045 to

5    resolve this class action case."

6        And I think -- I saw an article.  I think Judge

7    Weinstein is maybe 97 now and still going strong --

8        MR. BAIN:  Yes.

9        THE COURT:  -- except for drug cases.  He said years

10    ago he wasn't trying any of the drug cases because of the

11    mandatory minimums, but -- so what else?  Can I handle

12    anything?

13        (Negative response.)

14        THE COURT:  Okay.  I appreciate you coming down.

15    Sorry we didn't have better weather.  And if you have an extra

16    day and want to spend from 1:30 to 5:00 this afternoon with --

17    seeing 200 lawyers come in and everybody try to say

18    something . . .

19        Should I let her say something so she could charge

20    more for speaking in court?

21        MR. LUNSETH:  She's more interesting than I am, Your

22    Honor.

23        THE COURT:  Okay.

24        MR. LUNSETH:  All right.

25        THE COURT:  I'll get your order out today.

1          MR. BAIN:  Thank you.

2          THE COURT:  And I'll wait at least two weeks before I

3     try to find somebody for next year.  Have to find somebody

4     that's not too old.

5          MR. LUNSETH:  I'm okay with that.

6          THE COURT:  Okay.  Thank you.

7          MR. LUNSETH:  These kids might -- these kids might

8     want a --

9          THE COURT:  The youngsters?

10         MR. LUNSETH:  Yeah.

11         MR. BAIN:  The 55-year-old youngsters.

12         MR. LUNSETH:  All right.  Thank you.

13         THE COURT:  Do you think -- do you think you're going

14    to collect Social Security?

15         MR. BAIN:  I don't know.  It won't be as big as it

16    was supposed to be, but --

17         THE COURT:  I've got a grandson who's getting a

18    doctorate in biomedical and chemical engineering at

19    Northwestern, and he is a -- I went to high school.  A year

20    behind me was Bernie Sanders.

21         And little people don't know this.  Bernie Sanders

22    was the second fastest miler in New York City in his junior

23    year in high school.  He ran a mile in 4 minutes and 32

24    seconds.

25         MR. BAIN:  Wow.

1    THE COURT:  My grandson is a big fan of his, and I

2    said, "Sam, you're living on $30,000 a year on your stipend

3    from the National Institutes of Health.  When you graduate and

4    think you're going to get one of those big jobs, if he's in the

5    White House, you'll be living on less than $30,000."

6         And, "Oh, you just got to give him a chance," so --

7    yep.  I remember -- I think, if my memory serves me correct,

8    the thing about the Social Security Trust Fund, whether it's in

9    a lockbox or there's actually bucks in there, in the 1960s they

10   started about actuarially it wouldn't work.

11        And when my mother started collecting Social

12   Security, her first check was more than she had contributed her

13   entire life.

14        MR. BAIN:  Wow.

15        THE COURT:  Of course, it was -- you know, I think it

16   started with, like, a quarter of a penny or something.  But I

17   always tell people back in my younger days the minimum wage was

18   75 cents an hour.  And it has gone up maybe ten times since

19   then, but . . .

20        You're from -- where are you from?

21        MR. LUNSETH:  Minneapolis.

22        THE COURT:  Minneapolis.

23        MR. BAIN:  I'm a Florida native.

24        THE COURT:  Florida native.

25        So I decided that I was going to try a cruise from

1   Montreal, and this one, instead of stopping and ending in New

2   York, went to Miami.  They were repositioning the ship.

3            MR. LUNSETH:  Yeah.

4            THE COURT:  And in New York we made the mistake -- it

5   was there on Veteran's Day, and my wife had read in the

6   newspaper that the Met -- the Museum of Modern Art in New York

7   had just been redone.  They spent, like, $850 million.  "Oh,

8   you've got to get tickets rather than go to the veterans

9   parade."

10           I said, "Okay."

11           And we got off the ship.  I'm looking for a taxi.  I

12  had to walk till I found one.  The taxi got four blocks in

13  bumper to bumper because of the parade, and the meter was

14  12.50.  I said, "I can walk faster, and it will be cheaper in

15  order to get there."

16           So we did.  We went to this museum, which I highly

17  recommend to people who love modern art, but if you're not

18  interested in seeing a snow shovel hanging from the ceiling,

19  which was as bad as the banana in Miami -- are you guys from

20  Miami?

21           MR. BAIN:  West Palm.

22           THE COURT:  West Palm.

23           Well, the guy that pulled the banana that had been

24  taped to the wall and ate it, and he claims that was art --

25           MR. BAIN:  Right.

1          THE COURT:  -- the eating of the banana, not just the

2    banana.

3          MR. BAIN:  Performance art.

4          MR. LUNSETH:  Just come visit my garage this weekend

5    if you want to see a snow shovel hanging from the ceiling.

6          THE COURT:  Well, you have -- you have the tunnels

7    that connect the buildings --

8          MR. LUNSETH:  Skyway.

9          THE COURT:  -- which -- yeah.  I knew a -- there was

10   a magistrate judge up there for about four years.  I think one

11   of the -- he was a part-timer in South Carolina.  He didn't get

12   the full-time position, so he went up to Minneapolis full-time.

13   This helped his pension.

14         And his wife bought him a beautiful wool topcoat

15   which hung in his closet for the four years he was there

16   because he used the Skyway --

17         MR. LUNSETH:  Skyway, yeah.

18         THE COURT:  -- to go to work every day, yeah.

19         MR. LUNSETH:  Noel?  Magistrate Judge Noel maybe

20   or --

21         THE COURT:  No.  His name -- I'll think of his name

22   in a minute.  He was Skip Swearingen.

23         MR. LUNSETH:  Oh, that's a while ago.

24         THE COURT:  Yes, a long -- he's retired now.  And --

25   but he was a character, a real -- he lived in Florence.

1    And I think in those days, when Senator Thurmond was

2    alive, he picked the magistrate judges and told the judges that

3    "You give him the job," and the bankruptcy judges, "You give

4    that person the job."

5    I once was in a hearing before the -- I guess it was

6    the Senate Judiciary Committee, and we were trying to get a pay

7    raise for magistrate judges, and Strom Thurmond refused to

8    cosponsor the bill.

9    And all of a sudden he comes walking into the hearing

10    late, and he says, "Mr. Chairman, I changed my mind and I want

11    to be a cosigner of the bill."

12    And we found out afterwards his nephew became a

13    magistrate judge in South Carolina, so that took care of that.

14    All right.  Have a good trip back.

15    MR. LUNSETH:  Thank you.

16    MR. BAIN:  Thank you.

17    THE COURT:  Are you guys driving or flying?

18    MR. BAIN:  I'm driving.

19    THE COURT:  Oh, all right.  Have lunch before you go.

20    MR. BAIN:  Yes, indeed.  Thank you, Judge.

21    THE COURT:  We'll be in recess till 1:30.

22    MR. JOHNSON:  Thank you, Your Honor.

23    MR. LUNSETH:  Thank you, Judge.

24    COURT SECURITY OFFICER:  All rise.

25    (The proceedings were concluded at 11:44 a.m.)

1                   CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4    UNITED STATES DISTRICT COURT )

5    MIDDLE DISTRICT OF FLORIDA    )

6

7              I hereby certify that the foregoing transcript is a

8    true and correct computer-aided transcription of my stenotype

9    notes taken at the time and place indicated therein.

10

11             DATED this 5th day of June, 2020.

12

13                              s/Shelli Kozachenko_____
                                Shelli Kozachenko, RPR, CRR, CRC
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25