# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

Aatrix Software, Inc.,

       Plaintiff,

v.

       Case No. 3:15-cv-00164-HES-MCR

       DISPOSITIVE MOTION

Green Shades Software, Inc.,

       Defendant.

_____/


# DEFENDANT GREENSHADES SOFTWARE INC.'S
# MOTION FOR SUMMARY JUDGMENT


# (REDACTED)

Defendant Green Shades Software, Inc. ("Greenshades"), by and through its undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves for summary judgment of invalidity and non-infringement of U.S. Patent Nos. 7,171,615 and 8,984,393 (the "'615 Patent" and the "'393 Patent," respectively; collectively, the "Asserted Patents").  As set for herein, Aatrix has failed to prove that any of the Greenshades accused products include a form file as construed by the Court in its Markman Order.  Further, the Asserted Patents are invalid under 35 U.S.C. § 101 because they are directed to non-statutory subject matter and are invalid under the on-sale bar of 35 U.S.C. § 102(b) because Plaintiff Aatrix Software, Inc. ("Aatrix") offered for sale and sold the inventions claimed in the Asserted Patents more than one year before the March 26, 2002 priority date.[1]

## I.   <u>THE ASSERTED PATENTS</u>

Aatrix is the assignee and owner of the two Asserted Patents, both of which are entitled "Method and Apparatus for Creating and Filing Forms."  Docs. 62-1, 62-2.  The '615 Patent was issued from U.S. Patent Application No. 10/108,055, which was filed on March 26, 2002. The '393 Patent issued from U.S. Patent Application No. 11/698,575, and is a continuation application that claims priority to the filing date of the '615 Patent.

Aatrix explains that the inventions of the Asserted Patents have four main components, which include (1) the Forms Designer; (2) the form file (created using the Forms Designer); (3) the data (AUF) file; and (4) the form viewer program.  *See* Doc 62 at ¶¶ 31, 32, 41, 42.

---

[1] The '615 Patent and the '393 Patent were filed prior to March 16, 2013; therefore, the Leahy-Smith America Invents Act ("AIA") amendments to 35 U.S.C. § 102 do not apply, see Pub. L. No. 112-29, § 3(n)(1), 125 Stat 284, 293 (2011). For this reason, all references to § 102 in this Motion are to the pre-AIA version.

## II.   <u>SUMMARY OF THE ARGUMENT</u>

As set forth in the Background of the Invention section of the patents, the precursors to the invention as claimed in the patents were developed throughout the 1990's.  62-1, col. 1, line 14 – col. 2, line 30.  Aatrix has emphasized purposes of the invention that were contemporary then and now largely obsolete—the replication of paper forms so that the electronic equivalent of the forms could be filed and reliably read by OCR or similar technology.  *See* SAC at ¶¶ 10-13.  Aatrix didn't file a patent application until 2002, then prosecuted the patent for nearly five years. 62-1. The '615 patent issued in January 2007.  *Id.*  Seven years later in 2014, Aatrix first accused Greenshades of infringement of the '615 patent—the only party ever sued under the patents.

This is an action that should never have been brought.  As the Court correctly found, the patents are directed to ineligible subject matter under *Alice* and 35 U.S.C. § 101.  The ensuing five years of litigation have further confirmed that Greenshades's conventional use of expensive, highly skilled software programmers to write code that is then compiled into the accused products completely distinguishes from the purported invention of using a form designer to create form files that do not include compiled source code written by programmers and avoiding the associated expense of these professionals.  Further, despite Aatrix's efforts to hide the existence of products covered by its broad claim construction, Greenshades has established through independent investigation that Aatrix sold at least as early as 2000—more than a year before it sought patent protection—a software product including the claimed form files and bundled with QuickBooks – a third party accounting end user application that enables to user to export the QuickBooks data to display and edit in forms, including IRS Form 941, generated using the form files.  Such product operates as an on-sale bar and renders the patents invalid under 35 U.S.C. § 102(b).

III.   **ARGUMENT**

A.     **AATRIX FAILS TO PROVE INFRINGEMENT**

1.     INTRODUCTION

The Court has ruled that the form file as required by each of the asserted patent claims cannot include compiled code written by programmers.  Yet, the files associated with each of the accused Greenshades products identified as "form files" by Aatrix's own expert witness on infringement all include source code written in programming languages—either C# or TypeScript—that are compiled into the files actually used in the operation of the Greenshades products.  The accused software therefore does not include a necessary element of all asserted claims.  Plaintiff's own expert testimony demonstrates this critical defect.  There is no genuine issue of material fact; summary judgment is required. Greenshades's conventional approach to software development by skilled programmers using third party software development applications such as Microsoft Visual Studios stands in stark contrast to the purported Aatrix invention of an Aatrix Forms Designer or AFD in which "forms could be developed completely independent of programmers" (Doc. 62-1, col. 1, lines 59-65) and the form files produced by the AFD without compiled code written by programmers.

2.     LEGAL STANDARD

The plaintiff bears the burden of proving infringement by a preponderance of the evidence. *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998).  The absence of a single limitation in the accused product is fatal. *See Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998); *Amgen Inc. v. F. Hoffman-LA Roche Ltd.*, 580 F.3d 1340, 1374 (Fed. Cir.

2009) ("If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law.")

### 3. CLAIM CONSTRUCTION OF "FORM FILE"

In its Markman Order, the Court already has ruled as a matter of law that "form file" as used in all the patent claims asserted by Aatrix is a "collection of digital information representing a form with an instruction to the jury that 'form file' does not include compiled source code written by a programmer." Doc. 158 at 39. As summarized in the table as **Exhibit 1**, each of the asserted independent claims—independent claims 1 and 22 of the '615 patent and independent claims 1, 13, and 17 of the '393 patent—require the "form file." All asserted dependent claims share these same claim requirements. 35 U.S.C. §112, fourth paragraph ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.")

As the Court correctly found in the Markman Order, the absence of compiled code in the form files was touted as a critical aspect of the patented invention. Doc. 158 at 28-30. ("Thus, the 'form file' when read in light of the entirety of the claim language, the prior art, and the preferred embodiment, does not include compiled code.")

All of the asserted claims further specify that the form file includes "calculations and rule conditions required to fill in the form" as well as model information with varying degrees of correspondence to the original paper form. **Exh. 1**.

### 4. NONE OF THE ACCUSED PRODUCTS HAVE THE CLAIMED FORM FILE

Against this legal claim construction and express patent claim language, the undisputed facts confirm that none of the accused Greenshades products have the required form files providing model, calculation and rule condition information without compiled code written by programmers.

These facts are established by Aatrix's own expert witness on infringement, Christopher Rucinski ("Mr. Rucinski").

Mr. Rucinski provided a report disclosing his opinions under Rule 26 earlier this year on March 6, 2020.  A copy of Mr. Rucinski's Report ("Rucinski") is attached as **Exhibit 3**.

According to Mr. Rucinski, Aatrix accuses three Greenshades products:  the Greenshades Tax Filing Center ("TFC"); the Greenshades Payroll Tax Service ("PTS") and the Greenshades Year End Forms/downloadmyforms.com product ("YEF").[2]  Exh. 3, Rucinski  at ¶ 39.  Because none of these Greenshades accused products include a form file creation program/form designer program as required by all the asserted claims, Rucinski combines the products with the generic tools that the Greenshades programmers use to write the product source code—namely Microsoft Visual Studio and Microsoft Visual Studio—to conclude that the Aatrix patent claims are met.

As Rucinski acknowledges, Microsoft Visual Studio is an application that assists programmers in writing source code and includes a text editor for a programmer to create and edit source code and a "debugger" to test and remove code errors, and is referred to as an Integrated Development Environment ("IDE.")  Exh. 3, Rucinski at ¶ 33.  The second generic tool, Microsoft Visual Studio Code, is described by Rucinski as a text editor similar to an IDE also used by programmers for the creation and editing of files in HTML, JavaScript, C# and other programming language files.  Exh. 3, Rucinski  at ¶ 36.

As noted by Rucinski, over the years, Greenshades has utilized different software frameworks in which its products are programmed and implemented.  As described by Rucinski,

---

[2] The proper exclusion of YEF as an accused product will be the subject of a motion in limine to be filed on or before February 24, 2020.  Since the commencement of this action in 2015 until earlier this year in January 2020, Aatrix has accused only two Greenshades products of infringement, the Tax Filing Center ("TFC") and the Payroll Tax Service ("PTS").  In its amended infringement contentions of January 2020, Aatrix belatedly asserts infringement against the third product Year End Forms ("YEF").

these frameworks include:  Microsoft Silverlight and Angular frameworks for the TFC and PTS products (Exh. 3, Rucinski  at ¶ 45) and ASP.NET and AngularJS frameworks for the YEF product (Exh. 3, Rucinski  at ¶ 74).

All frameworks as used in development of the Greenshades accused products require source code written in a programming language by programmers—including C# and Typescript—that must then be compiled to create the files actually used in operation of the products.

### a.    TFC and PTS Using Silverlight Framework

For the TFC and PTS products using the Silverlight framework, Mr. Rucinski identifies a .xap file as the form file of the asserted claims.[3]  Exh. 3, Rucinski  at ¶ 46.  As noted by Rucinski, this .xap file is created by using the .xaml and .xaml.cs files written by a programmer in Microsoft Visual Studio.  Exh. 3, Rucinski  at ¶ 47.  As Rucinski confirmed, files having a .cs extension are written in C# programming language by programmers.  **Exh. 4, Rucinski Dep.** 136:17–137:11; 148:14–150:17; and Exh. 3, Rucinski  at ¶ 30. Rucinski further confirms that "[t]o create the .xap file, Microsoft Visual Studios compiles the .xaml and .xaml.cs files…."  Exh. 3, Rucinski  at ¶ 30.

There is no genuine issue of material fact that the xaml.cs files cited by Mr. Rucinski are written in C# by programmers and compiled for execution in the final Greenshades TFC and PTC Silverlight products, and that the .xap file identified by Mr. Rucinski does not meet the form file requirement of the asserted claims as a matter of law.

---

[3] Contrary to the requirements of the claims that form files be operated on by form viewer programs, which thus require the file actually operated on to be identified as the claimed form file, Mr. Rucinski here only identifies the .xap file, which his own tutorial makes clear is only a container for unidentified files actually operated on.

b.      TFC and PTS Using Angular Framework

For the TFC and PTS products using the Angular framework, Mr. Rucinski asserts that an otherwise unidentified main.js file[4] is the form file of the asserted claims.  Exh. 3, Rucinski  at ¶ 55  As noted by Rucinski, this main.js file is created by using corresponding .html and .ts files.  *Id.* The .ts files are written by programmers using the TypeScript language.  Exh. 4, Rucinski Dep. 145:7–146:5.  To create the main.js file, the .ts files written by programmers in TypeScript must be "written out."  Exh. 3, Rucinski  at ¶ 55.  However, elsewhere, Rucinski has confirmed that "writing out" a file includes compilation of the underlying source code files.  Exh. 4, Rucinski Dep. 136:17–137:11; 148:14–150:17; Exh. 3, Rucinski  at ¶ 30.

Rucinski states that the programming language TypeScript is "transpiled" (a term he describes as "a portmanteau of 'translated' and 'compiled'") into JavaScript, which can be executed in a web browser.   Exh. 3, Rucinski  at ¶ 28.  During his deposition, Mr. Rucinski attempted to deny that TypeScript is compiled into JavaScript but noted it was "transpiled."  Exh. 4, Rucinski Dep. 141:6–144:2.  Mr. Rucinski further acknowledged that TypeScript is a Microsoft programming language and he would accept Microsoft's technical description of its own product as accurate.  *Id.*

In supporting his mention of TypeScript files being "transpiled," Mr. Rucinski relies on a single reference, a publication from Microsoft cited by Mr. Rucinski in his report at footnote 8. Exh. 3, Rucinski  at ¶ 28, fn. 8.  A copy of the cited document is attached as **Exhibit 5**.  In pertinent part, the Microsoft publication cited by Mr. Rucinski, which is titled "Compiling TypeScript," states:

---

[4] Mr. Rucinski does not name any specific main.js file, nor does he cite to any contents of any such file. A proof of infringement requires identifying the alleged infringing component and showing hoe it meets the claims.

> *Compiling TypeScript*
>
> *TypeScript is a typed superset of JavaScript that compiles to plain JavaScript.* (Exh. 5,"Compiling TypeScript")
> . . .
> *You will need to install the TypeScript compiler either globally or in your workspace to transpile TypeScript source code to JavaScript.* (ibid.)
> . . .
> *Typically the first step in any new TypeScript project is to add a tsconfig.json file. [This] defines the TypeScript project settings such as the compiler options and the files that should be included.* (ibid.)

There is no genuine issue of material fact that the .ts files cited by Mr. Rucinski are written in TypeScript by programmers and compiled for execution in the final Greenshades TFC and PTC Angular products and such files do not meet the form file requirement of the asserted claims as a matter of law.

c.     YEF Product using ASP.NET framework

For the accused YEF product using the ASP.NET framework, Mr. Rucinski mentions "ASP.NET forms files" without identifying such a file. Rather, he states that they "consist of at least two files that he describes as an .aspx file and "an .aspx.cs file that is referenced by the .aspx file, runs on a Greenshades server,[5] and contains instructions written in C# that define event-handling logic for the form." Exh. 2 Rucinski at ¶ 76.   As Rucinski confirmed, files having a .cs extension are written in C# programming language by programmers.  Exh. 4, Rucinski Dep. 136:17–137:11; 148:14–150:17; and Exh. 3, Rucinski  at ¶ 30. Further, Rucinski states that files written by programmers in C# are compiled. "Programs written in some programming languages, such as C#, are intended to be *compiled* before they can be executed. After a human programmer writes source code in a compiled programming language, the source code is compiled into

---

[5] As with the previously discussed products, Mr. Rucinski did not identify a form file actually operated on by a form viewer program.

executable machine code that can be executed directly by a computer." Exh. 3, Rucinski at ¶ 27 (emphasis in original).

There is no genuine issue of material fact that the aspx.cs files are written in C# by programmers and compiled for execution in the final Greenshades YEF products using the ASP.NET framework and such files do not meet the form file requirement of the asserted claims as a matter of law.

> d.      YEF Product using the AngularJS framework

For the YEF product using the AngularJS framework, Mr. Rucinski states:

> The AngularJS form files[6] use a combination of HTML, JavaScript, and **C#** to create an interactive web form that can be edited by a user. The AngularJS form files include .cshtml files, which contain both HTML that renders in the user's web browser and **C# instructions** that run on a Greenshades server. The AngularJS form files also include .js JavaScript files that run in the user's web browser and **.cs C# files** that run on a Greenshades server. (Exh. 3, Rucinski  at ¶ 81; emphasis supplied)

As Rucinski confirmed, files having a .cs extension are written in C# programming language by programmers.  Exh. 4, Rucinski Dep. 136:17–137:11; 148:14–150:17; and Exh. 3, Rucinski  at ¶ 30. Further, Rucinski states that files written by programmers in C# are compiled. "Programs written in some programming languages, such as C#, are intended to be *compiled* before they can be executed. After a human programmer writes source code in a compiled programming language, the source code is compiled into executable machine code that can be executed directly by a computer." Exh. 3, Rucinski  at ¶ 27 (emphasis in original).

---

[6] Mr. Rucinski does not identify any spy "AngularJS form file" as what the claims require to be operated on by the form viewer program.

There is no genuine issue of material fact that the .cs files cited by Mr. Rucinski are written in C# by programmers and compiled for execution in the final Greenshades YEF AngularJS products and the resulting AngularJS files do not meet the form file requirement of the asserted claims as a matter of law.

        e.        Aatrix Improperly Attempts to Re-litigate the Claim Construction Ruling through Rucinski.

All the files identified by Rucinski as the form files include at least one component written in C# or TypeScript programming language by programmers and then compiled into an executable file used in the operation of the final accused Greenshades products.   Faced with this dispositive reality, Aatrix attempts to relitigate the claim construction of form file by asserting through its expert Mr. Rucinski that:

> *It is my opinion that this intended instruction to the jury is incorrect and is inconsistent with the plain and ordinary meaning of the term "form file," as well as the intrinsic and extrinsic evidence regarding the '615 Patent and the '393 Patent.* (Exh. 3, Rucinski  at ¶ 27.)

The Court's claim construction is a question of law and Mr. Rucinski's after the fact opinion cannot be used as a vehicle to evade the court's legal ruling.  Mr. Rucinski was involved with the case since 2015.  Exh. 4, Rucinski Dep. 92:8–22.  Yet, Aatrix did not offer this opinion during the Markman proceedings in 2019.

Further, the basis of Mr. Rucinski's opinion is a disingenuous, false reading of the Court's construction.  Rucinski equates "compiled source code" with "executable machine code," and that machine code can be written directly by a programmer. Exh. 3, Rucinski  at ¶ 27. Later, Rucinski implies that this direct writing of machine code is what was meant by the Court's construction. Rather, the clear and reasonable understanding of the Court's construction means source code

written by a programmer and then compiled.  This latter, true understanding is made clear by the Court's analysis of the intrinsic record and Mr. Jensen's declaration.  Doc. 158 at 28-30.

In fact, while programmers can directly write executable machine code, in such a situation, there is no upstream source code, so what is written in that case is not "compiled source code." Programmers can either write source code which is then compiled to executable machine code, or they can write executable machine code directly, without the involvement of precursor source code and a compiler.  Rucinski conflates the two and attempts to attack the Court's correct claim construction on that basis.

Mr. Rucinski proffered two more incorrect theories concerning the Court's claim construction. These are proffered in the same form for each of the four accused product categories. The first of these theories is stated thusly for the Silverlight-based products:

> *Specifically, the .xap Silverlight application form file does not include compiled source code written by a programmer because it is a .xap file that includes digital information that is **compressed** and **does not include compiled code**. (Exh. 3, Rucinski  at ¶ 110; emphasis supplied)*

This statement is entirely incorrect and contradicted by Mr. Rucinski's earlier statement in his report:

> *To create the .xap file, Microsoft Visual Studio **compiles** the .xaml and .xaml.cs files, along with potentially other source code files, into one or more executable .dll files. These .dll files and any other .dll files containing libraries and resources required to run the Silverlight application then undergo **a compression transformation** as defined by the Deflate algorithm, and **the output of that compression transformation is the Silverlight .xap file**. (Exh. 3, Rucinski  at ¶ 30; emphasis supplied)*

The .xap file results from compiling source code written by programmers, followed by compression. Subsequent compression does not preclude compiling.

The second of these theories is stated thusly:

> *Secondly, compiled source code used to create the .xap Silverlight application form file is **written out by Microsoft Visual Studio** when converting the .xaml and .xaml.cs files to the .xap file, and the compiled source code is **therefore not written by a programmer**.* (Exh. 3, Rucinski  at ¶110; emphasis supplied)

As found frequently throughout his report as a circumlocution, Mr. Rucinski here uses the phrase "written out" to name the act of compiling the source code for the .xap file taught by Mr. Rucinski in the text cited above, but here then attempts to use that word replacement to fit the Court's construction. If "written out" and "written" are replaced in the above statement by "compiled," the statement then concludes with "compiled source code not compiled by a programmer." At the very least, the source code was written by programmers, then compiled, so is excluded by the Court's construction.  Thus, as a matter of law, there can be no infringement and summary judgment is warranted.

## B.     THE ASSERTED PATENTS ARE INVALID UNDER 35 USC § 101

Through smoke and mirrors, and ever-changing arguments as to the scope of the asserted patent claims, Plaintiff has staved off judgment day as to the eligibility of the asserted patent claims.  But the time for final judgment has arrived.  The asserted claims are ineligible for patent protection because they are directed to an abstract idea, and embody no inventive concept.  There are no genuine questions of material fact concerning this determination.   As such, summary judgment is appropriate and required.

### 1.     PROCEDURAL BACKGROUND

The patent eligibility question has lingered over Plaintiff's specious infringement allegations since it brought this suit in early 2015.  Defendant sought dismissal because the asserted

patent claims do not survive the Supreme Court's patent-eligibility framework.  *See* Defendant's Motion to Dismiss, Doc. 20.   Plaintiff argued in response that the Court needed a fuller "understanding of the nature of the Aatrix technologies," and that claim construction should occur before resolving Defendant's motion to dismiss.  *See* Plaintiff's Opposition to Motion to Dismiss, Doc. 25 at 20.  In resolving Defendant's dispositive motion, the Court held a hearing on October 21, 2015.  *See* Doc. 47.  Recognizing defeat was at hand, less than a week after this hearing, Plaintiff, seeking to manufacture a plausible factual basis to avoid dismissal, requested leave to file its Second Amended Complaint (the "SAC").  The SAC added allegations that purportedly bore on the patent-eligibility question.  Specifically, according to Plaintiff, the SAC at ¶¶ 105-115 pleaded plausible factual allegations that required survival of a dismissal motion.

The Court granted Defendant's dismissal motion, holding that the asserted patent claims were ineligible.  *See* Doc. 59.  The Court also determined leave to file a Second Amended Complaint was unnecessary, and denied Plaintiff's requested motion for leave.  *See* Doc. 67.  In granting Defendant's motion to dismiss, the Court correctly found that the asserted claims are directed to the abstract idea of "collecting, organizing, and performing calculations on data to fill out forms: a fundamental human activity that can be performed using a pen and paper."  Doc. 59 at 21.  The Court then turned to the second step of the *Alice* inquiry, and held that the claim elements, either alone or in combination, did not contain an inventive concept.  *Id.* at 22.  Accordingly, the asserted claims are directed to an abstract idea and constitute ineligible subject matter under 35 U.S.C. § 101.  *Id.* at 24.

Plaintiff appealed.   The Federal Circuit reversed and remanded, finding two areas prevented dismissal at the pleadings stage.  First, based on Plaintiff's arguments that claim construction was critical to the 101 analysis, the Federal Circuit believed dismissal was premature

without considering Plaintiff's claim construction arguments.  Second, the Federal Circuit believed Plaintiff should be given an opportunity to amend its complaint to plead elements Plaintiff argued bore on eligibility.  *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) ("The district court granted this Rule 12(b)(6) motion without claim construction. We have some doubt about the propriety of doing so in this case, but need not reach that issue because it did err when it denied leave to amend without claim construction and in the face of factual allegations, spelled out in the proposed second amended complaint, that, if accepted as true, establish that the claimed combination contains inventive components and improves the workings of the computer.").

Thus, the case was remanded for two purposes:  (1) construing the claims and analyzing if those constructions altered the patent eligibility analysis; and (2) determining if the asserted claims recited any inventive concept.  As shown below, the claim constructions adopted by the Court do not alter any phase of the patent eligibility analysis.  As to the second issue, there is no genuine issue of material fact concerning any of the purported improvements contained in the asserted claims.  Each of the purported improvements was well-understood, routine, and conventional ("WURC").  Plaintiff's "invention" did not improve the functioning of the computer systems. Instead, Plaintiff applied conventional computing techniques to its particular application, namely a computerized tax form program.  As a matter of law, summary judgment is appropriate and proper and must be granted, finally holding the asserted claims to be ineligible pursuant to 35 U.S.C. § 101.

    2.      THE ASSERTED PATENTS ARE INVALID UNDER 35 U.S.C. § 101

        a.      Patent Eligibility pursuant to 35 U.S.C. § 101

Limiting the subject matter of patent-eligible inventions, 35 U.S.C. § 101 states,

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  The Supreme Court has carved out exceptions to this patent eligibility framework, and excludes from the realm of patent protection laws of nature, natural phenomenon, and abstract ideas.  *See Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 189 L. Ed. 2d 296 (2014).

These exceptions are critical because they form "the basic tools of scientific and technological work."  *Id.* at 2354 (quoting *Molecular Pathology v. Myriad Genetics, Inc.*, 132 S.Ct. 2107, 2116 (2013)).  Permitting patents on these foundational building blocks would defeat the Constitutional purpose for patent protection, namely promoting the progress of science.  *See* U.S. Const., Art. I, § 8, cl. 8 (Congress "shall have Power … To promote the Progress of Science and Useful Arts"); see also *Mayo Collaborative Services. V. Prometheus Laboratories, Inc.*, 132 S.Ct. 1289, 1293 (2012) ("monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it").

> b.    The Asserted Patents Claim an Abstract Idea Implemented on Generic Components Using Conventional Techniques

To ensure patents do not wrongly burden future innovation, the Supreme Court has set forth a two-step framework for determining whether subject matter is patent-eligible under § 101. *Alice*, 573 U.S. at 217.  First, a court must decide whether the patent claims at issue are directed to an ineligible concept, such as an abstract idea.  *Id.*  If so, the court must continue to the second step and decide whether the claims add an "inventive concept," i.e., "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Id.*  "[C]laims defining a desirable information-based result and not limited to inventive means of achieving the result, fail under § 101." *Elec.*

*Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1351 (Fed. Cir. 2016).

       (1)     *Alice* Step One – The Claims are Directed to an Abstract Idea

To determine whether a claim is "directed to" an abstract idea under the first step of the *Alice* framework, courts look at the claim's "character as a whole" and determine its "focus." *Elec. Power*, 830 F.3d at 1353. "Courts deem claims directed to 'analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." *SuperCell Oy v. Gree, Inc.*, 2018 WL 1609584, at *5 (N.D. Cal. Apr. 3, 2018) (quoting *Elec. Power*, 830 F.3d at 1354).

The Court has previously held the asserted claims are directed to an abstract idea. *See* Order on Motion to Dismiss, Doc. 59 at 21.[7]  On appeal, the Federal Circuit did not disturb this holding. *See Aatrix v. Greenshades*, 882 F.3d 1121, 1126 (Fed. Cir. 2018).  Instead, the Federal Circuit determined that Plaintiff's SAC presented allegations that bore on the factual questions underpinning the *Alice* step two inquiry, namely whether the claims "contain an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id*. (quoting *Alice*, 134 S. Ct. at 2357).  *See also id.* at 1127 ("Aatrix's proposed second amended complaint supplies numerous allegations related to the inventive concepts present in the claimed form file technology.").

Pursuant to the law of the case doctrine, the question of whether the asserted claims are directed to an abstract idea under *Alice* step one is decided.  *See Alphamed, Inc. v. B. Braun Med., Inc.*, 367 F.3d 1280, 1285–86 (11th Cir. 2004) ("Under the law of the case doctrine, both district courts and appellate courts are generally bound by a prior appellate decision in the same case.").

---

[7] Claim 1 of the '615 Patent is representative of all asserted claims for analyzing the patent eligibility issue.  *See* Factual Citations Demonstration the Asserted Claims are Ineligible Pursuant to 35 U.S.C. § 101 ("Factual Citations Demonstration") at 9.

The Federal Circuit decision was clear that vacating and remand was warranted because, from a pleading perspective, Plaintiff's SAC pleaded sufficient facts to survive a dismissal motion relating to step two of the *Alice* inquiry, namely whether or not the asserted claims recite an inventive concept. *See, e.g.*, *Aatrix*, 882 F.3d at 1128 (the allegations in the SAC "if accepted as true, contradict the district court's conclusion that the claimed combination was conventional or routine.")

The Court previously found the claims directed to an abstract idea. That decision was not reversed by the Federal Circuit. As such, that decision is law of the case. The claims are directed to an abstract idea, and as shown below, they do not recite any inventive concept.

> (2)     *Alice* Step Two – The Asserted Claims Do Not Recite an Inventive Concept

Once a court has concluded that the claims are directed to an abstract idea, it must then consider "what else" is recited in the claims apart from that idea. *Alice*, 573 U.S. at 225-26. This second step requires the Court to determine whether the claims "contain[] an inventive concept sufficient to transform the claimed abstract idea into a patent eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotations and citation omitted). "To save a patent at step two, an inventive concept must be evident in the **claims**." *RecogniCorp LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326-27 (Fed. Cir. 2017) (emphasis added); *Accenture Global Servs. GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) (patent-ineligibility focuses on the scope of the claims, not the length of the specification). *See also Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016).

Claim limitations that implement an abstract idea using merely "generic computer components" or "well-understood, routine, conventional activities" are not inventive. *Alice*, 573 U.S. at 221-226. Nor are limitations that merely confine the claims to a "particular field of use or

technological environment." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015).

In order to find an inventive concept, courts have held there must be claim language explaining how to achieve results "outside of usual, conventional use" rather than simply claiming the results "devoid of any explanation." *Windy City Innovations, LLC v. Facebook, Inc.*, CAND-4-16-cv-01730 (N.D. Cal. September 24, 2019).

The Court previously determined that the claims did not recite any inventive concept. *See* Order on Motion to Dismiss, Doc. 59 at 24. That decision was correct. Plaintiff's SAC sought to avoid that necessary conclusion by pleading allegations of fact couched in terms of cases that survived dismissal under § 101.

Recognizing the deficiency of Plaintiff's SAC, Defendant filed a single counterclaim, seeking a declaration that the asserted claims are ineligible pursuant to 35 U.S.C. § 101. *See* Answer to SAC and Counterclaim, Doc. 87. Through the Counterclaim, Defendant explained that Plaintiff's claims simply used 9 conventional technologies. *See id*. at ¶¶ 35-43. In rejecting Plaintiff's attempt to dismiss the Counterclaim, the Court recognized the lack of inventive concept in Plaintiff's claims. *See* Order Denying Plaintiff's Motion to Dismiss Counterclaim, Doc. 116 at 12 (The various computer activities pleaded by Defendant "though broad and generic activities, taken as true, suggest that the claims lack an inventive concept…").

Defendant set out to show in discovery that these nine computer activities were WURC, and also set out to demonstrate that an additional nine computer activities arguably related to the asserted claims were also WURC. To that end, Dr. Rosenberg, Defendant's patent eligibility expert, provided a 259-page expert report, laying out in great detail how each of the underlying features of the claimed invention, as well as their combination, was WURC. *See* Expert Report of

Craig Rosenberg attached as **Exhibit 6 and Declaration of Craig Rosenberg, PhD attached as Exhibit 6A**.  Through that report, Dr. Rosenberg identified no less than 144 publications from across industry, academia, and government showing that the techniques used by Plaintiff were all WURC.  Dr. Rosenberg identified 17[8] different technological activities, each of which was WURC.  *See* Exh. 6, Rosenberg at §§ 7.1-18.[9]

In response to this mountain of evidence, Plaintiff offered the rebuttal report of Mr. Rosenblatt.  Mr. Rosenblatt did not individually refute the technological activities, and essentially conceded they were each WURC.  Rebuttal Expert Report of William Rosenblatt Regarding Validity, **Exhibit 7** *See* **Exhibit 8,** Factual Citations Demonstration the Asserted Claims are Ineligible Pursuant to 35 U.S.C. § 101 ("Factual Citations Demonstration") at 18-35.[10]  Nor did Mr. Rosenblatt challenge Dr. Rosenberg's methodology.  Rather, Mr. Rosenblatt explicitly endorsed Dr. Rosenberg's methodology of searching existing publications and products at the time to learn what was WURC.  *See* Exh. 8, Factual Citations Demonstration at 37-28.  Instead, Mr. Rosenblatt argued that the specific activities were not the precise language used in the claims, and

---

[8] Dr. Rosenberg relied on the Court's conclusion in the Order on Motion to Dismiss for identifying the first 9 activities, where 1 of those elements was duplicated (namely computer programs that merge files).  The remaining 9 activities Dr. Rosenberg identified through analysis of the asserted patents and Plaintiff's arguments as to the purported inventive concepts.  *See* Rosenberg Report at 22-23.

[9] These activities are: (1) saving data in a computer file; (2) saving form display rules and conditions in a computer file; (3) computer programs that merge files; (4) computer programs that perform calculations on data in data fields; (5) computer programs that allow a user to change data in fields of a form; (6) computer programs that merge files; (7) computer programs that generate a form from a scanner or digitally; (8) computer programs that display a form with data in fields; (9) computer programs that transmit and receive forms and data in various formats; (10) using form files to specify the look and the feel of forms; (11) reading data from two files with the first file containing the data and the second file specifying the format;  (12) using data files to populate forms; (13) importing and exporting data files; (14) using comma separated value files to transfer data; (15) using a TXF file to transfer data from QuickBooks to TurboTax; (16) computer programs that consist of independent, interchangeable modules; (17) computer programs that perform online updates by installing changes only; and (18) multi-layer forms. *See* Rosenberg Report at 35.

[10] References to the Factual Citations Demonstration take the form: Factual Citations Demonstration at <fact number>, thus Factual Citations Demonstration at 18 means Fact 18 in the Factual Citations Demonstration, attached hereto as **Exhibit 8**.

thus he believed looking at them was "immaterial."  But this form of rebuttal is simply a denial; and a denial without any underlying support.  Conclusory expert denials do not create genuine issues of material fact, and should be disregarded in resolving summary judgment motions.  *See Move, Inc. v. Real Estate All. Ltd.*, 721 Fed. App'x 950, 957 (Fed. Cir. 2018) (disregarding an expert's conclusory statements for lack of support, and granting summary judgment of patent ineligibility).   Indeed, Mr. Rosenblatt's denial departs from the essential requirements of a patent eligibility analysis, and confuses the analysis done under eligibility with the analysis done under novelty pursuant to 35 U.S.C. § 102.

Under *Alice* step two, the issue for analysis is whether the claims "merely require generic computer implementation."  *Alice*, 573 U.S. at 221.  And simply attempting to limit the use of the abstract idea to a particular technological environment fails to render claims eligible under *Alice* step two.  *Id*. at 222-223.

Each time the patent eligibility issue has been ripe, Plaintiff has argued that claim construction would be required to fully understand the scope of the asserted claims.  But now that the Court has construed the claims, it is clear that the Court was correct from the beginning:  the asserted claims are invalid under § 101.  Plaintiff argued that the "Form Designer," "form file," "data file," and "Form Viewer" limitations were critical to analyzing whether the claims were directed to an inventive concept.  *See, e.g.,* Plaintiff's Opposition to Motion to Dismiss, Doc. 25 at 5-6.  Because of this, Plaintiff contended claim construction was necessary to resolve the eligibility question.  But none of the constructions have implemented any of the grand ideas and arguments Plaintiff claimed would demonstrate some inventive concept.  The claims as construed are nothing more than the conventional application of conventional computer technology, used to

speed up the familiar idea of filling out tax forms by hand with information from a ledger using a pen and paper, and then filing those tax forms with the appropriate agency.

(a)      The "Data File" Limitation Is Not Inventive

In seeking to reverse dismissal, Plaintiff argued that the "data file" was an inventive concept because it "allow[s] data to be imported into the viewable electronic form from outside applications" and that prior solutions only allowed data to be extracted "from widely available databases with published database schemas, not the proprietary data structures of application software." SAC at ¶ 109. The Federal Circuit found this allegation, if true, to be important in resolving *Alice* step two. *See Aatrix*, 882 at 1127.

On remand, the Court adopted Plaintiff's proposed construction for "data file," which was simply: "A digital file compromising structured or tagged data for a reporting period." *See* Claim Construction Order, Doc. 158 at 39. Notably, this construction says nothing about extracting data from application software versus anything else. The construction does not address whether the extracted data should come from a database or an end user application. The construction for this purportedly critical claim term "data file" simply adopts a conventional definition for what a data file is. *See* Exh. 6, Rosenberg at 31. The Court has clarified that the phrase "for a reporting period" is not a limitation on the claim and merely "clarifies for the jury that the data file is a known or identified set or quantity, 'not a guess at what the value of the data might be…'" *See* Claim Construction Order, Doc. 158 at 15 (Citing Plaintiff's Claim Construction Brief, Doc. 110 at 14).

Plaintiff had argued at the Federal Circuit that a "data file" was a critical component in demonstrating an inventive concept. *See Aatrix*, 882 F.3d at 1129 ("Aatrix argues … that the claimed 'data file' imports data from third-party applications into a viewable electronic form without programming each form file to work with each third-party application…. The

21

specification describes the structure of the data file, including the 'forms index file' that 'provides the vendor application with information on the forms available to the program.'")  But Plaintiff did not pursue these narrow limitations of requiring a data file to have the particular structure disclosed in the specification (such as a forms index file, which provides the vendor application with information on the forms available to the applications).  Instead, Plaintiff argued for a conventional construction of what a data file is, namely "a digital file compromising structured or tagged data for a reporting period."[11]

Plaintiff's extensive representations to this court and the Federal Circuit regarding the importance of the "data file" limitation is entirely missing from the claim constructions.  Plaintiff's proposed generic constructions of the asserted claim term fail to provide any distinction between the alleged advantages of the "data file" and the admitted well-known, routine and conventional ways of storing data.  *See* Exh. 8, Factual Citations Demonstration at 17.  Plaintiff's patent claims are nothing more than the conventional application of conventional computer ideas to solve a conventional problem.

          (b)     The Components, Alone or in Combination, Are Not Inventive.

Plaintiff also argues that the inventive concept may still be found in the combination of claims terms, such as the form designer, form file, data file and form viewer, as separate "add-on software" components, as opposed to their previously known uses within monolithic source code.  As above, nothing in the Court's claim constructions imbue any of these concepts into the claims themselves.  The Court largely adopted Plaintiff's proposed constructions, which each simply add

---

[11] Plaintiff itself admits that such structured data was WURC.  *See Aatrix Software, Inc. v. Green Shades Software, Inc.,* CAFC-17-1452 [Doc. 19] (Fed. Cir.  May 1, 2017) at 18 n.2 ("[o]ne skilled in the art would know that there are many other ways of structuring data. It can, for example, be delimited by commas, semicolons, periods, spaces, bars, or put in a spreadsheet or database file. The asserted claim language does not claim any specific structure, it claims a 'data file' of which the tab-delimited structure is species.")

generic computer components, admitted to be WURC.  *See e.g.* Claim Construction Order Doc. 158 at 39-40.

Plaintiff argues that "[t]he combination of the four limitations 1(a)-(d) enable distributed and cross-platform computing and distribution of forms."  But Plaintiff did not invent cross-platform computing.  *See* Exh. 8, Factual Citations Demonstration at 33.  As above, Plaintiff's expert only argues that Plaintiff may have been the first to do this with electronic tax forms.  *See* Exh. 8, Factual Citations Demonstration at 33.  While the evidence shows Plaintiff's expert's denial to be incorrect, as a matter of law it misses the mark.  Applying conventional teachings to a new use is not a viable path to survive ineligibility under § 101.  *See Alice*, 573 U.S. at 222.

In considering the "form designer" limitation, Plaintiff argues a number of purported advantages over the prior art.  *See* Doc. 62, SAC at ¶¶ 33-39.  As above, Plaintiff argued on appeal that this limitation was critical, "[s]ince the form viewer 'knows' how to do the basic tasks of erecting a form, form files can be small, needing only to contain information for the particular form in a simple set of instructions such as a plain text file."  *Aatrix Software, Inc. v. Green Shades Software, Inc.,* CAFC-17-1452 [Doc. 11] (Fed. Cir.  Mar. 7, 2017) at 49.

Like above, Plaintiff only offered a generic claim construction for the "form file" limitations (e.g., "form file" as "a collection of digital information representing a form," "Form file creation program" as "a set of software tools that is suited for designing a form and creating a form file," etc.).  These constructions, adopted by the Court, fail to provide any distinction between the alleged advantages of "add-on software" and admitted well-known, routine, and conventional activities.  *See e.g.* Exh. 8, Factual Citations Demonstration at 19, 24-29.

Contrary to Plaintiff's arguments at the Federal Circuit, the claims, as construed by the Court, are nothing more than the use of conventional technology. They lack an inventive concept, and are due to be invalidated as directed to patent ineligible subject matter.

(c)     The Patent Filing Date is the Critical Date

In avoiding the substance of Defendant's detailed expert report, Plaintiff seeks to move the goal posts, and argues that Plaintiff's purported date of invention is the date that should be used in analyzing whether an activity was WURC under step two of the *Alice* framework. *See* Exh. 7, Rosenblatt Report at ¶¶ 7, 37, 41, 80. This approach fails for two reasons. First, antedating, or swearing to an earlier filing date, is only available in limited circumstances in connection with a novelty analysis. Second, even if Plaintiff were entitled to swear to an earlier date as concerns patent eligibility, Plaintiff has failed its burden.

(i)     The Patent Filing Date is the Relevant Date
for § 101 analysis

When pursuing a patent application, applicants are able to "swear-behind" a reference in order to prove to the USPTO that the prior art reference being asserted against the applicant should not be a basis to bar a patent grant. This right comes from Pre-AIA[12] 35 U.S.C. § 102(g), which provided that, in addressing novelty as a condition for patentability, a patent applicant can show that it was in possession of an invention before a prior art reference if she does the following:

> In determining priority of invention *under this subsection*, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

---

[12] On September 16, 2011, the America Invents Act was enacted, resulting in amendments to 35 U.S.C. § 102, and applying to patent applications filed on or after March 16, 2013. Based on their filing dates, the asserted patents are subjected to the earlier pre-AIA version of 35 U.S.C. § 102.

*Id.* (emphasis added). *See, e.g., Monsanto Co. v. Mycogen Plant Sci., Inc.,* 261 F.3d 1356, 1362 (Fed. Cir. 2001) (analyzing prior invention under § 102(g)).

Thus, by the express statutory language, this ability to "swear-behind" a reference is only applicable in the context of a novelty analysis under 35 U.S.C. § 102.  As the Federal Circuit and Supreme Court have repeatedly instructed, a patent *eligibility* analysis under § 101 is different from a patent*ability* analysis under §§ 102 and 103 (non-obviousness).  As a matter of express statutory construction, Plaintiff's attempt to "swear-behind" its patent filing date to analyze what was WURC some years earlier is fatally flawed.

Nor does permitting a patent owner to "swear-behind" its filing date make sense in the context of a patent eligibility analysis.  Using the invention at issue in *Alice* is instructive.  There, the claims related to a computerized scheme for mitigating settlement risk.  *Alice*, 573 U.S. at 212. By the time the patent was filed, intermediated settlement was conventional, and implementing such techniques on conventional computers was ineligible for patent protection.  If the plaintiff had been able to show it had "invented" these steps decades before the capabilities of computers had matured at the time the patent application was filed, they were still conventional steps at the time the applicant sought patent protection.  This is what precludes them from eligibility, because by the time the application was filed, the technology was conventional and permitted to be used by all for its conventional purposes.  Stated differently, if an inventor invented something, and sat on it for years and during that time the invention became WURC, the inventor in that situation has lost its ability to pursue patent protection because the solution has become conventional.

The Supreme Court in *Alice* and *Mayo* suggests the critical date of whether an activity is "previously known to the industry" and "previously engaged in by researchers in the field." *Mayo Collaborative Servs. v. Prometheus Labs., Inc*., 566 U.S. 66, 72 (2012); *Alice Corp. Pty. v. CLS*

*Bank Int'l*, 134 S. Ct. 2347, 2359 (2014).  These activities must be tied to the filing date, as that is the date that the patent applicant's activities are deemed publicly known.

The purpose of permitting an applicant to "swear-behind" a novelty reference under 35 U.S.C. § 102(g) was to show that the patent applicant was in possession of the applicant's specific invention prior to a particular reference and that the applicant had not abandoned, suppressed, or concealed her invention.  *See* Manual of Patent Examination Procedure § 2138 (attached as **Exhibit 9**).

The Federal Circuit has regularly tied the § 101 analysis to the filing date of the subject patent.  *See, e.g.*, *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1377 (Fed. Cir. 2016) ("The first claimed step … was indisputably well known, routine, and conventional in the field of molecular biology as of 1989, when the first precursor application to the '179 patent *was filed*.") (emphasis added); *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1349 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 241 (2020) ("As we explained above, the specification makes clear that transmitting information wirelessly was conventional *at the time the patent was filed* and could be performed with off-the-shelf technology.") (emphasis added); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1375 (Fed. Cir. 2015) (affirming district court's determination that claims were "well-understood, routine, or conventional activity in 1997, *when the application for the '540 patent was filed*.") (emphasis added); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) ("CET conceded at oral argument that the use of a scanner or other digitizing device to extract data from a document *was well-known at the time of filing*….") (emphasis added).

The proper date for analyzing whether the claims at issue were WURC is the filing date of the subject patent, namely March 26, 2002.

        (ii)     Plaintiff Has Failed Its Burden to Show an Earlier Priority Date

A patent owner claiming an earlier filing date from the filing date of the patent application bears the burden to prove by a preponderance of evidence that the invention was conceived and reduced to practice before the filing date of the patent application. *See Slip Track Sys., Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1262-63 (Fed. Cir. 2002).

An invention is "conceived" when the inventor has formed the idea of how to make and use every aspect of the claimed invention. *Singh v. Blake*, 222 F. 3d 1362, 1366-70 (Fed. Cir. 2000) ("A conception must encompass all limitations of the claimed invention"). A claimed invention is "reduced to practice" when it has been tested sufficiently to show that it will work for its intended purpose or when it is fully described in a filed patent application. *Cooper v. Goldfarb*, 154 F 3d. 1321, 1326-31 (Fed. Cir. 2000).

The plaintiff must prove reduction to practice of all limitations of the claimed invention. *See Correge v. Murphy*, 705 F.2d 1326, 1329 (Fed. Cir. 1983) ("The physical embodiment relied upon as an actual reduction to practice of the invention in interference must include every essential limitation of the count"). Furthermore, proof of reduction to practice cannot be solely based on inventory testimony alone. *See Cooper,* 154 F 3d. at 1326-31.

Notwithstanding the critical date for *Alice* step two is the patent filing date, Plaintiff has failed to establish an earlier invention date.  Plaintiff provided no testimony (expert or otherwise) tying any evidence to any asserted claim element.  At best, Plaintiff's evidence is its Rule 131 affidavits and associated source code dumps during prosecution.  But those affidavits are not tied to any issued claim language.  Indeed, Plaintiff was well-aware that its affidavits did not establish a date of invention in 1995, as even the Patent Examiner was not persuaded that conception occurred in 1995.  *See* SOF 39.  Further, those inventor affidavits are entitled to little, if any,

weight.[13]  Plaintiff offered no expert testimony in this litigation to tie those source code dumps to its asserted claims, an apparent recognition that they do not establish any purported earlier date of invention.

c.      The Asserted Claims Do Not Improve the Computer Itself

To escape ineligibility in the computing context, the Federal Circuit has required the invention itself to be directed to improvements in the functioning and operation of the computer itself.  *Aatrix*, 882 at 1127.  In those cases, the claims themselves are directed to a specific computing improvement which improves the computers themselves.  *See Visual Memory LLC v. NVIDIA Corp*, 867 F.3d 1253, 1258-59 (Fed. Cir. 2017) (claims directed to "a computer memory system"); *Enfish, LLC v. Microsoft Corp*, 822 F.3d 1327, 1336 (Fed. Cir. 2016) (claims directed to "a specific improvement to the way computers operate, embodied in the self-referential table."). Alternatively, if the solution involves generic computing components, but used in an unconventional way, the solution may survive § 101.  *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-02 (Fed. Cir. 2016) ("the claims enhancing limitation necessarily requires that these generic components operate in an unconventional manner to achieve an improvement in computer functionality.").

Plaintiff's SAC sought to avoid this conclusion by alleging that Plaintiff's "invention increased the efficiencies of computers processing tax forms in other ways."  SAC, Doc. 62 at ¶ 39.  But Plaintiff's allegations are starkly different than the cases cited above.  In those cases, the improvements themselves improved the computer systems so that future users of those computer systems could benefit from the improvements.  Plaintiff's allegations, on the other hand, simply

---

[13] Nor does Plaintiff's expert report concerning eligibility provide any further support, as Mr. Rosenblatt simply relied on Plaintiff's statement that it should be entitled to an earlier filing date.  *See* Rosenblatt Report at ¶ 80.

use well-understood, routine, and conventional techniques for building computing systems and argue that Plaintiff was purportedly the first one to do so in the electronic tax form space.

Putting aside that that is not true (as shown through the invalidity analysis elsewhere herein), that fundamentally misstates and misapplies the § 101 analysis.  Using a conventional technique to achieve a conventional result is precisely the type of activity that is ineligible for patent protection.  *See Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016) (to survive § 101, the claims must do more than "simply [use] generic computer concepts in a conventional way.").

For example, Plaintiff argues that an advantage of its patents is that prior art systems utilized a "monolithic software architecture."  *See* SAC at ¶ 19.  Through this architecture, all components of a computing product were coded into a single, monolithic, piece of software code.  *Id*.  This required many things be "hard coded," where any changes to the software or its use would require additional "coding" by software developers.  *Id*. at ¶ 20.  Thus, where tax forms were "hard coded" into the "monolithic" software, each time new tax forms were released, a developer would need to write additional code into the monolithic software.  *Id*. at ¶¶ 20, 27.  Thus, Plaintiff argues, moving from a monolithic architecture to an architecture using separate components was innovative.  *See id*. at ¶ 30 (One of the named inventors "had the insight to break from the monolithic architecture…").

Plaintiff's SAC thus alleges that Plaintiff invented the concept of redeveloping a monolithic piece of computing functionality using a component-based architecture.  Plaintiff's allegations fail as a matter of law for at least two reasons.  First, Plaintiff did not "invent" this improvement, as this precise activity was WURC.  Second, the asserted claims are not directed to this purported improvement.

Dr. Rosenberg, through his expert report and testimony, explained in great detail how each of Plaintiff's claimed improvements were WURC.  *See* Exh. 6, Rosenberg Expert Report at § 7.16. Concerning this concept of developing component-based applications instead of monolithic applications, Dr. Rosenberg explained that these concepts "were commonly known prior to the priority date of the '615 patent."  Exh. 8, Factual Citations Demonstration at 33.  Dr. Rosenberg then cites over 20 articles and publications dating as far back as the 1970s describing these techniques and the obvious benefits appurtenant thereto.  *Id*. These examples include improved maintainability for software developers, ease of management of large projects, ease of ability to prepare and distribute bug fixes and feature updates, and improved stability and performance.  *Id*.

Dr. Rosenberg devotes twenty-two pages of his expert report to explaining the conventionality of modular-based programming techniques and architectures.  *See* Exh. 6, Rosenberg Report at 178-200.  He explains the values of computer programs consisting of independent, interchangeable modules, and cites to numerous articles and publications touting the virtues of modular computing systems.  Defendant's proffered expert, Mr. Rosenblatt, provided two paragraphs of response.  *See* Exh. 7, Rosenblatt report at ¶¶ 393-394.   That response is defective, however, for at least two reasons.  First, it simply constitutes a denial.  While not challenging a single reference provided by Dr. Rosenberg, Defendant's expert simply responds that "[m]odular software architecture was an improvement on the state of the art in e-forms processing, which (as discussed above) was not WURC to a POSA."  Rosenblatt Report at 137. Mr. Rosenblatt cites no authority or references to support his purported conclusion and it could and should be disregarded.  *See Move, Inc.*, 721 Fed. App'x at 957.

Second, Mr. Rosenblatt attempts a sleight of hand, and seeks to recast Dr. Rosenberg's opinion as limited solely to "modular *programming*" instead of "modular architecture."  *See*

Rosenblatt Report at 136-137.  Respectfully, this sleight of hand is offered only to try to confuse the fact finder, and it is simply not true.  Dr. Rosenberg's opinion explains in detail, with reference to numerous publications, how modular *architecture* was WURC.  Indeed, the very first reference Dr. Rosenberg cites is titled "On the Criteria to be Used in Decomposing <u>Systems</u> into Modules." Rosenberg Report at 179 (emphasis added); *see also id.* at 182 (citing a paper titled "A General <u>Software Architecture</u> for Information Systems") (emphasis added).

Plaintiff claims its move from a monolithic architecture to a component architecture "increased the efficiencies of computers processing tax form."  SAC at ¶ 39.  This improvement to efficiency, according to Plaintiff, was because the component-based architecture required the computer to load less information into RAM resulting in less "thrashing" as the computer did not have to sub information in and out of RAM as regularly since the component-based computer program was smaller in size than the earlier monolithic program.  But as Defendant's own expert conceded, Plaintiff did not invent this improvement.  *See* Rosenblatt transcript at 171:17-172:6 ("Q. …have you expressed an opinion as to whether that activity [component-based software development] would be conventional to a person skilled in the art in 2002?  A.  … I haven't expressed such an opinion.").

Plaintiff simply used conventional technology (rewriting a monolithic piece of code into a component-based program) and obtained a conventional result (easier computer performance because the program was now smaller as it was written with a component architecture).  *See also* Rosenblatt transcript at 172:3-6 ("So I express an opinion that it was not conventional *with respect to eForms processing*.  But otherwise I haven't expressed such an opinion.") (emphasis added). But applying a conventional technique to a particular domain does not survive a § 101 challenge. *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015)

("An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet.").  *See also Bilski v. Kappos*, 561 U.S. 593, 612, 130 S. Ct. 3218, 3231, 177 L. Ed. 2d 792 (2010) ("limiting an abstract idea to one field of use or adding token postsolution components did not make the concept patentable.").

Nor do Plaintiff's claims provide any language whatsoever relating to modular software architecture, or Plaintiff's purported improvement thereof.  Merely reciting a system that uses multiple components provides "little more than … a generic technological environment to allow users to access information."  *Intellectual Ventures I LLC v. Erie Indem. Co.,* 850 F.3d 1315, 1330 (Fed. Cir. 2017)

Plaintiff did not invent any improvement to any computing technology itself.  At best, Plaintiff took WURC techniques used for decades and applied those techniques to the eForms processing field.  Applying conventional techniques to a field of use is simply using computer equipment in the manner in which it was designed. The asserted claims are directed to an abstract idea, and fail the first step of the *Alice* inquiry.

### C.    TOP PAY INVALIDITY

#### 1.    Introduction

The undisputed material facts show that Aatrix commercialized and sold the claimed inventions of the Asserted Patents more than one year before the March 26, 2002 filing date of the '615 Patent.[14]  In fact, the evidence clearly demonstrates that the Aatrix Top Pay version 10.0.6 ("Top Pay") product, which includes each and every element of the claimed inventions, was sold at least as early as May 11, 2000.

---

[14] The '393 Patent is a continuation of the '615 Patent and claims a March 26, 2002 priority date.

2.      Factual Background

a.      The Asserted Patents

Aatrix is the assignee and owner of the two Asserted Patents, both of which are entitled "Method and Apparatus for Creating and Filing Forms."  Docs. 62-1, 62-2.  The '615 Patent was issued from U.S. Patent Application No. 10/108,055, which was filed on March 26, 2002. The '393 Patent issued from U.S. Patent Application No. 11/698,575, and is a continuation application that claims priority to the filing date of the '615 Patent.

Aatrix explains that the inventions of the Asserted Patents have four main components, which include (1) the Forms Designer; (2) the form file (created using the Forms Designer); (3) the data (AUF) file; and (4) the form viewer program.  *See* Doc 62 at ¶¶ 31, 32, 41, 42.

b.      Overview of Top Pay

As set forth more fully below, Aatrix rebranded a version of its Payroll Series software from the late 1990's as Top Pay to be sold in a bundle with the popular third party accounting software QuickBooks for Mac beginning in 1999.  Significantly, Top Pay enabled the QuickBooks user to export the employee payroll data from QuickBooks to Top Pay where the data could be used to populate various forms, including the IRS Form 941 in a viewer program that displayed the form and enabled the user to review and edit the data and print out the form.

3.      Aatrix Failed to Disclose Its Top Pay Product

Aatrix failed to disclose during discovery the existence of its Top Pay product, which was bundled and sold together with Intuit's QuickBooks software during this period of alleged secrecy. In fact, Greenshades only discovered the Top Pay product through independent investigation. As set forth more fully herein, Aatrix's Top Pay software includes and anticipates the combination of

elements claimed in the Asserted Patents, and therefore renders them invalid under the "on-sale bar" recited in 35 U.S.C. § 102.

Notwithstanding the significance of Top Pay and its responsiveness to several discovery requests, Aatrix has failed to identify or produce any documentation related thereto. Greenshades's First Set of Interrogatories, Interrogatory No. 5 asked:

> **INTERROGATORY NO. 5.:** Indentify all versions of the Aatrix Forms Designer (as identified in the Patents-In-Suit) and Payroll Series software package (as identified in the Jensen declaration at Doc. 26) that existed prior to March 26, 2002.

In response, Aatrix never identified the Top Pay version of the Payroll Series. Plaintiff Aatrix Software Inc.'s Answers to Defendant's First Set of Interrogatories, attached to Notice of Filing Exhibits as **Exhibit 10**.

In addition, Greenshades served a Second Request for Production of Documents that specifically sought documentation pertaining to Top Pay, as follows:

> **DOCUMENT REQUEST NO. 45**: All documents relating to all versions of Aatrix Top Pay software released, sold, or offered for sale between May 1993 and March 26, 2001, including, but not limited to, source code, software development notes, software development guides, engineering and laboratory notebooks, log books, record books, memorandum, design reviews, progress reports, technical reports, drawings, schematics, specifications, diagrams, computer records, diaries, calendars, test results, product packaging, product manuals product packaging, product manuals or other files.

Aatrix raised numerous objections to this request and again argued that "as decades have passed, many of the documents that may have existed… and that are sought by this Request no longer exist and have likely been lost with the passage of time, especially as a result of significant flooding over a decade ago that rendered many of Aatrix's stored records unrecoverable."

Plaintiff Plaintiff Aatrix Responses to Defendant's Second Set of Requests for Production attached to Notice of Filing Exhibits as **Exhibit 11**.

Despite the alleged flood, the passage of time, and the purported degradation of magnetic media that Aatrix contends excused its non-production, Greenshades was able to independently obtain a copy of Top Pay and all of its associated documentation. As set forth more fully herein, Greenshades's expert, Mr. Leonard Laub, purchased a copy of Top Pay via Amazon and has successfully operated and tested Top Pay using an Apple Macintosh computer that was available circa 2000. Not surprisingly, Mr. Laub's analysis has revealed that Top Pay includes features and functionality that meet each and every element of the claims in the Asserted Patents, even with the application of Aatrix's proposed construction for disputed claim terms.

4.      MEMORANDUM OF LAW

      a.      THE ASSERTED PATENTS ARE INVALID UNDER 35 U.S.C. § 102(b)

"A person shall be entitled to a patent unless… the invention was… in public use or ***on sale*** in this country, more than one year prior to the date of the application for patent in the United States...." 35 U.S.C. §102(b) (2006 ed.) (emphasis added).[15] The underlying policies of the on-sale bar include "discouraging removal of inventions from the public domain which the public justifiably comes to believe are free available" as well as "prohibiting an extension of the period

---

[15] While the America Invents Act ("AIA") is not applicable here, it includes a similar provision in 35 U.S.C. §102(b) that allows an inventor up to one year after his own sale or public disclosure to file the patent. Therefore the one year "on sale" time bar is applicable under both the AIA and pre-AIA statute. Moreover, the Supreme Court recently held that because the new (AIA) § 102 retained the exact language "on sale" that the pre-AIA precedent remains applicable. *See Helssin Healthcare v. Teva Pharm.*, 139 S. Ct. 628, 633-34 (2019).

for exploiting the invention." *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 860 (Fed. Cir. 1985).

Whether an invention was on sale within the meaning of Section 102(b) is a question of law for this Court, based on any factual findings underlying such a conclusion. *Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 249 F.3d 1307, 1310 (Fed. Cir. 2001). Once a defendant has presented facts sufficient to establish a *prima facie* case that the invention was "on sale" under 35 U.S.C. § 102(b), the burden falls on the patent owner to present convincing evidence to the contrary. *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 498 (Fed. Cir. 1992), *cert. denied*, 508 U.S. 912 (1993) (affirming summary judgment based on a Section 102(b) violation while explaining that "[o]n summary judgment, once an alleged infringer has presented facts sufficient to establish a prima facie case of public use, it falls to the patent owner to come forward with some evidence to the contrary sufficient to raise a genuine issue of material fact."). Absent such a showing by the patent owner, a summary judgment of invalidity should be granted.

Under the two-part test prescribed by the Supreme Court, the on-sale bar of Section 102(b) applies to prevent patentability when an invention is: (1) the subject of a commercial sale or offer for sale before the critical date; and (2) ready for patenting before the critical date. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). "The ultimate determination that a product was placed on sale under [35 U.S.C. § 102(b) (1994)] is a question of law, based on underlying facts." *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000) (quoting *Ferag AG v. Quipp Inc.*, 45 F.3d 1562, 1566 (Fed. Cir. 1995)); *Minton v. National Ass'n of Securities Dealers, Inc.*, 336 F.3d 1373 (Fed. Cir. 2003).

Furthermore, a patent owner cannot avoid the consequence of the on-sale bar by keeping the patented method or machine secret while selling or offering for sale a product that is produced with the patented method or machine. *Metallizing Engr. Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516 (2nd Cir. 1946) (finding that a secret, commercial use of patented process over a year before the filing date constitutes an on-sale bar). As concisely stated by Judge Learned Hand, "it is a condition upon the inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy or legal monopoly." *Metallizing Engr. Co.*, 153 F.2d at 520. The Federal Circuit has adopted the *Metallizing* doctrine, stating that "*Metallizing* parallels the statutory scheme of 35 U.S.C. § 102(b), the intent of which is to preclude attempts by the inventor or his assignee to profit from commercial use of an invention for more than a year before an application for patent is filed." *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1147 (Fed. Cir. 1983); *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, (Fed Cir. 2002); *Quest Integrity USA, LLC v. Cokebusters USA Inc.*, 924 F.3d 1220, 1227–28 (Fed. Cir. 2019) (sales of products made from patented software methods bar patentability under § 102(b)).

### i.   AATRIX TOP PAY WAS SOLD BEFORE MARCH 26, 2001

Applying the two-part *Pfaff* test to the Asserted Patents, Aatrix cannot dispute that the Top Pay product was on sale more than one year prior to the filing date. ███████████████

██████████████████████

██████████████████████████████

████████████████████████████████████

█████████████████████████



In addition, Greenshades's expert, Mr. Laub, purchased Top Pay version 10.0.6 which includes a manual that is dated May 11, 2000 and a directory of files that are all dated May 15, 2000 or earlier.  **Exh. 13**, Declaration of Leonard Laub.  Thus, it is undisputed that Top Pay was sold and offered for sale more than one year before the filing date of March 26, 2002.

## ii.     AATRIX TOP PAY MEETS THE REQUIREMENTS OF THE ASSERTED CLAIMS

With respect to the second prong from *Pfaff*, Aatrix cannot dispute that the alleged inventions were ready for patenting prior to the critical date.  As set forth more fully below,  Aatrix has admitted that Top Pay utilizes the claimed form files that are created with the claimed form designer program.  Additionally, Top Pay makes use of a data file, as that term is construed by the Court, by providing explicit instructions for creating the data files in order to import data from a separate end user application, QuickBooks, to Top Pay.  Lastly, Top Pay includes a form viewer program that performs each of the functions recited in the claims.  Consequently, both prongs of the *Pfaff* test are satisfied and Court should find that the Asserted Patents are invalid under the "on-sale bar" provision of 35 U.S.C. § 102(b).

Attached as Exhibit 2  is a table presenting a Summary of Invalidity in view of Aatrix Top

Pay 10.0.6 showing the correspondence of Top Pay to the claim elements common to the asserted

patent claims.  Detailed correspondence of Top Pay to each of the specific claim elements of each

of the asserted claims are provided in the Expert Report of Leonard Laub Concerning Invalidity

("Laub Invalidity Report"), attached as **Exhibit 14**, at 57 *et seq*. and in Exhibits C (for the '615

patent) and D (for the '393 patent) to that report, attached as Exhibit 14C and Exhibit 14D

respectively.

> **i.   TOP PAY INCLUDES COMMERCIAL USE OF THE CLAIMED "FORM FILE CREATION PROGRAM"**

> > **a.   AATRIX ADMITS THAT IT USED THE CLAIMED FORM FILE CREATION PROGRAM FOR TOP PAY**

██████████████████████████████████████████████████████

██████████████████████████████████████████ Exh. 12, Deposition of Aatrix

Software, Inc. corporate representative Arthur Dale Jensen, 169:10 – 170:13, 171:20 – 172:9 and

**Exh. 15**, Jensen Deposition exhibit 7.   Mr. Jensen is also the first named inventor on the asserted

patents.  Dkt. 62-1, 62-2.

██████████████████████████████████████████████████████

████████████████████████████████████████ Exh. 12 Jensen, 171:20-24.

██████████████████████████████████████████████████████

████████████████████████████████████ *Id*. at 64:11-16.   Exhibit 2 to the Jensen

deposition is Plaintiff Aatrix Software Inc.'s Answers to Defendant's First Set of Interrogatories,

attached hereto as Exhibit 10█████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]                        While Aatrix may argue that the program used to create the form

files (i.e. AFD or RectFinder) is not included[16] in Top Pay, the form files that it creates are.  Aatrix

has therefore commercialized the form files creation program element of the claimed invention by

utilizing the form files in a product that was sold more than one year before the critical date.  Such

activity constitutes an on-sale bar under 35 U.S.C. § 102(b). *Metallizing Engr. Co.*, 153 F.2d 516.

### ii.    TOP PAY INCLUDES THE CLAIMED "FORM FILE"

[redacted]

[redacted]

[redacted]

---

[16] In addition, Aatrix Top Pay includes a "Check Designer" program that performs all of the functions of the claimed form file creation program as demonstrated for all asserted independent claims in the Expert Report of Leonard Laub Concerning Invalidity ("Laub Invalidity Report"), Exh. 13 at 69, 78, 92, 101-102, 108-109, Exhibit C to that Report, Exh. 14C at 35-42, 44-47, 124-126, 163-170 and Exhibit D to that Report, Exh. 14D at 26-28, 42-49, 124-126 140-147. 198-201, 211-218. In the event the case survives summary judgment and proceeds to trial, Greenshades reserves the right to present this additional basis for the form file creation program element at trial.

████████████████████████████████████████

████████████████████████████████████████ Exh. 12, Jensen, 169:10 –

170:13, 171:20 – 172:9 and Exh. 15, Jensen Deposition exhibit 7.

Further, Greenshades's expert Leonard Laub was able to confirm through operation of the

Top Pay, using the 941 form file as an example, modeling the original form, performing

calculations (e.g., "6 Taxable social security wages 6a 62375.00 12.4%|.124 6b 7734.50", "11

Total taxes (add lines 5 and 10)", and "15 Balance due (subtract line 14 from line 13)") and

carrying out rule conditions (e.g., in line 8: "Check here if wages are not subject to social security

and/or Medicare tax").  Exh. 14C1 Screenshot reproduced from Exh. 14C Laub Invalidity Report,

Exh. C, p. 34.

The proofs presented above for how the data files associated with Top Pay meet the

requirements of Claim 1(c) of the '615 Patent and also meet the similar, and generally broader,

requirements of the other asserted independent claims.   Exh. 14C, Laub Invalidity Report at 68-

69, 78, 92, 101, 108, Exh. 14C Laub Invalidity Report, Exh. C, at 15-42, 144-170, and Exh. 14D

Laub Invalidity Report, Exh. D, at 17-54, 115-152, 196-218.

### iii.    TOP PAY INCLUDES THE CLAIMED "DATA FILE"

The asserted claims variously recite a data file as a vehicle to import data from an end user

application to the form viewer for use in populating the form displayed by the form view. Dkt. 62-

1, '615 patent (claim 1) col. 20, lines 4-5; (claim 22) col. 21, lines 41-44; Dkt. 62-2,  '393 patent

(claim 1) col. 19, lines 43-45; (claim 13) col. 19, lines 43-45; (claim 17) col. 20, lines 57-59.

The Top Pay Manual specifies and directs the generation and importation of data files containing data from QuickBooks, which is unquestionably a user application. The documentation supplied with Top Pay instructs the user how to do this:

> You can import an employee information file (e.g., name, address, wages) any time after the program is installed using the Import Employees command in the File menu. This import file can be an Aatrix MacP&L file or **a tab-delimited text file**.

(**Exh. 14**, Aatrix Top Pay 10.0.6 Manual, p. 3-12)

Per the instructions supplied with Top Pay, a user opens QuickBooks Pro 4.0 for Mac and selects Reports, then Payroll Reports, then Summary by Employee to begin export of yearly pay history (Laub Invalidity report, Exh. C, p. 67; the entire sequence of producing the data files per the instructions supplied with Aatrix Top Pay 10.0.6 is shown in Laub Invalidity Report, Exh. C, pp. 64-75). See Exhibit14C2.

Following the steps in the instructions produces a tagged (rows are named) and structured (tab-delimited) file containing data for a reporting period (e.g., one calendar quarter as shown in Laub Invalidity Report, Exh. C., p. 75) and reproduced at Exhibit 14C3.

When Top Pay is later used to prepare a viewable form, that form can be seen to have been populated with the data from the data file. As shown in (Laub Invalidity Report, Exh. C, p. 85)(reproduced at Exhibit 14C4, 941 line 2) ("Total wages") matches QuickBooks "Total Gross Pay" and 941line 3 ("Total income tax withheld") matches QuickBooks "Taxes Withheld".

As noted above, the Court adopted Plaintiff's proposed construction for "data file," namely: "A digital file compromising structured or tagged data for a reporting period." *See* Claim Construction Order, [Dkt. 158] at 39. The Court has clarified that the phrase "for a reporting period" is not a limitation on the claim and merely "clarifies for the jury that the data file is a

known or identified set or quantity, 'not a guess at what the value of the data might be…'" *Id.* at 15 (Citing Plaintiff's Claim Construction Brief, [Dkt. 110] at 14).  Indeed, Plaintiff itself asserted to the Federal Circuit "The asserted claim language does not claim any specific structure, it claims a 'data file' of which the tab-delimited structure is species." See fn. 11 *supra.* Tab-delimited structure is the very species of data file used in Top Pay.

The proofs presented above for how the data files associated with Top Pay meet the requirements of Claim 1(c) of the '615 Patent also meet the similar, and generally broader, requirements of the other asserted independent claims.   Exh. 14, Laub Invalidity Report at 69-70, 78, 92, 102, 109, Exh. 14C Laub Invalidity Report, Exh. C, at 60-85,170-185, and Exh. 14D Laub Invalidity Report, Exh. D, at 54-69, 152-167, 218-238.

Top Pay's combination of this data file (in the form of a tab-delimited structure—asserted by Aatrix to be a species of the claimed data file) to export data from an end user application (in the form of QuickBooks) when combined with the admittedly pre-existing form files, viewer program and form file creation program meets the claims and constitutes an on-sale bar under 35 U.S.C. § 102(b).

### iv.    TOP PAY INCLUDES THE CLAIMED "FORM VIEWER PROGRAM"

The Court agreed with the Parties that no construction was needed for this term, as its meaning is evident from the plain language of the claims. Dkt. 158 at 40.

 Claim 1(d) of the '615 Patent requires a form viewer program and assigned certain functions to this program:

> (d) a form viewer program operating on the form file and the data file, to perform calculations, allow the user of the data processing system to review and change the data, and create viewable forms and reports.

Dkt. 62-1, col. 20, lines 6-9. Similarly, Claim 22 of the '615 patent and Claim 13 of the '393 patent recite view programs and associated functions.  Dkt. 62-1, col. 21, lines 45-51; Dkt. 62-2, col. 20, lines 32-38.[17]

As detailed in the Laub Invalidity Report, Top Pay comes with a form viewer program called "Reports" operating on a form file and a data file, to perform calculations, allow the user of the data processing system to review and change the data, and create viewable forms and reports.

A user of Top Pay can start the Reports form viewer program by clicking on the "Reports" tab. This brings up the main dialog for viewing and filling in a form, such as IRS Form 941, as shown in Laub Invalidity Report, Exh. C, p. 87) (reproduced as Exhibit 14C5)

Once the specifications for the form are entered, Reports generates the viewable form as a model of the original form filled out with all calculations and rule conditions met.

As shown in Laub Invalidity Report, Exh. C, p. 34 (reproduced as Exhibit #B2), the Top Pay form viewer uses the "941 Form" form file to perform calculations (e.g.,"6 Taxable social security wages . . . 6a 62375.00 > 12.4%|.124 = 6b 7734.50", "11 Total taxes (add lines 5 and 10)", and "15 Balance due (subtract line 14 from line 13)") and carries out rule conditions (e.g., in line 8: "Check here if wages are not subject to social security and/or Medicare tax").

The asserted claims require the form viewer program to operate on the form file and the data file to produce the viewable form.  To test this, the "941 Form" file was located in the "Government Forms *f*" folder, then temporarily removed from that folder. A subsequent attempt to run IRS Form

---

[17] Not all of the asserted independent claims recite a "form(s) viewer program." Claim 1 and claim 17 of the '393 only recite operational steps but do not attribute them to a form viewer. 62-2, col. 19, lines 42-50; col. 20, lines 57-63. Nevertheless, these recited functions are performed by the Reports program of Top Pay.

941 failed because "941 Form" no longer appeared in the list of available reports in the "Reports" form viewer program.

After restoring the "941 Form" form file to the "Government Forms *f*" folder, the form viewer program was again able to run IRS Form 941. Comparing the resulting viewable form and the data file showed the viewable form had been populated with data from the data file.

The entire sequence of this test is shown in Laub Invalidity Report, Exh. C, pp. 87- 94. The asserted claims require the form viewer to permit a user to review and changes the data in the form and to redo any affected calculations. The "Reports" program provided with Top Pay meets those requirements.

To test this, an IRS Form 941 was generated from data imported from QuickBooks Pro 4.0 for Mac. This 941 had no entry in line 4 ("Adjustment of withheld income tax for preceding quarters of calendar year"). A figure of $400.00 was then manually entered into line 4 on the user's presentation of the viewable form. The program then automatically and correctly recalculated line 5 ("Adjusted total of income tax withheld") from $204.16 to $604.16. Line 6c, which was zero when the form was initially generated, was then manually changed to $10,000.00. The program then automatically and correctly changed line 6d from zero to $1240.00.   Screenshots showing this entire sequence are in Laub Invalidity Report, Exh. C, pp. 97-100.

The proofs presented above for how the form viewer program supplied with Top Pay meets the requirements of Claim 1(d) of the '615 Patent and also meets the similar, and generally broader, requirements of the other asserted independent claims.  Detail support for correspondence with the remaining claims are present in Exh. 14, Laub Invalidity Report at 70, 79, 92-94, 102, 109, Exh.

14C Laub Invalidity Report, Exh. C, at 85-102, 185-202, and Exh. 14D Laub Invalidity Report, Exh. D, at 69-77, 167-183, 233-246.

These requirements are met by the form viewer program associated with Aatrix Top Pay 10.0.6.

## IV.  **CONCLUSION**

Plaintiff's proposed claim construction demonstrates that Plaintiff has misrepresented the scope of these terms throughout the proceedings before this court and the Federal Circuit to survive Defendant's motion to dismiss needlessly extending litigation with respect to the pa-tents at issue.

Despite arguing to this court and the Federal Circuit that the narrow construction of the terms in Plaintiff's asserted claims present inventive concepts, Plaintiff's proposed generic claim constructions make it clear that the Plaintiff's claims do not capture Plaintiff's purported improvements and do no explain how the abstract idea is achieved outside of well-known, routine and conventional uses.  The asserted claims do not present any inventive concept.  The Court should grant summary judgment and hold that the claims of the Asserted Patents are inva-lid as a matter of law under 35 U.S.C. § 101.

Dated:  December 30, 2020

/s/ *Joseph W. Bain*
Joseph W. Bain, Trial Counsel
Florida Bar No. 860360
Shutts & Bowen LLP
525 Okeechobee Blvd. Suite 1100
West Palm Beach, Florida 33401
jbain@shutts.com

H. Timothy Gillis, Trial Counsel
Florida Bar No. 0133876
Jeffrey S. York, Trial Counsel

Florida Bar No. 987069
Shutts & Bowen LLP
1022 Park St. Ste. 308
Jacksonville, Florida 32204
tgillis@shutts.com
jyork@shutts.com
(904) 899-9950

***Attorneys for Green Shades Software, Inc.***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on December 30, 2020, I electronically filed the foregoing with the Clerk of Court pursuant to the Administrative Procedures for Electronic Filing in Civil and Criminal Cases of this Court by using the CM/ECF System, which will send a notice of electronic filing to all counsel of record:

John B. Lunseth (Minn. #65341) Trial Counsel
Aaron M. Johnson (Minn. #034641X)
Mira Vats-Fournier (Minn. #0399692)
**Taft Stettinius & Hollister LLP**
80 South Eighth Street, Ste. 2200
Minneapolis, MN 55402-2157
612-977-8400
612-977-8659 (facsimile)
jlunseth@taftlaw.com
ajohnson@taftlaw.com
mvats-fournier@taftlaw.com

*Attorneys for Plaintiff Aatrix Software, Inc.*

/s/ *Joseph W. Bain*
Joseph W. Bain

SBDOCS 126957 6

48