1     IN THE UNITED STATES DISTRICT COURT
      MIDDLE DISTRICT OF FLORIDA
2      JACKSONVILLE DIVISION

3 AATRIX SOFTWARE INC.,    Jacksonville, Florida

4    Plaintiff,    Case No. 3:15-cv-164-HES-MCR

5   -vs-      July 28, 2021

6 GREEN SHADES SOFTWARE INC.,  1:29 p.m.

7    Defendant.    Courtroom 10C

8 _____

9     **TRANSCRIPT OF FINAL PRETRIAL CONFERENCE**
    BEFORE THE HONORABLE HARVEY E. SCHLESINGER
10     UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21 OFFICIAL COURT REPORTER:

22   Shelli Kozachenko, RPR, CRR, CRC
    221 N. Hogan Street, #185
23   Jacksonville, FL  32202
    Telephone:  (904) 301-6842
24
        (Proceedings reported by stenography;
25        transcript produced by computer.)

1                    A P P E A R A N C E S

2

COUNSEL FOR PLAINTIFF:
3

        **John Lunseth, Esquire**
4       **Aaron Johnson, Esquire**
        Taft Stettinius & Hollister LLP
5       80 South Eighth Street, Suite 2200
        Minneapolis, MN  55402
6

        **Joanne O'Connor, Esquire**
7       Jones, Foster, Johnston & Stubbs, PA
        505 South Flagler Drive, Suite 1100
8       West Palm Beach, FL  33402

9

COUNSEL FOR DEFENDANT:
10

        **Joseph Bain, Esquire**
11      Shutts & Bowen LLP
        525 Ockeechobee Boulevard, Suite 1100
12      West Palm Beach, FL  33401

13      **Jeffrey York, Esquire**
        **Jessica Morgan Martens, Esquire**
14      Shutts & Bowen LLP
        1022 Park Street, Suite 308
15      Jacksonville, FL  32204

16      **Woodrow Pollack, Esquire**
        Shutts & Bowen LLP
17      4301 West Boy Scout Boulevard, Suite 300
        Tampa, FL  33607
18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2   July 28, 2021                              1:29 p.m.
3                           -  -  -
4            COURT SECURITY OFFICER:  All rise.  United States
5   District Court in and for the Middle District of Florida is now
6   in session, the Honorable Harvey E. Schlesinger presiding.
7            Please be seated.
8            THE COURT:  Okay.  Call the next case.
9            COURTROOM DEPUTY:  Aatrix Software Inc. versus Green
10  Shades Software Inc., Case No. 3:15-cv-164-HES-MCR.
11           Counsel, please state your presence for the record.
12           MR. LUNSETH:  John Lunseth, Aaron Johnson, and Joanne
13  O'Connor, all for the plaintiff.
14           MR. BAIN:  Good afternoon, Your Honor.  Joseph Bain,
15  Jeffrey York, and Woody Pollack of Shutts & Bowen on behalf of
16  the defendant.  And also Morgan Martens.
17           THE COURT:  This case was set for a pretrial
18  conference, and I think that I should have had my law clerk
19  call you to make sure that you weren't in any rush to catch a
20  flight back.  If you were, I'll make some adjustments because I
21  have, in some of the pending motions, some questions I'd like
22  to go over with you, and I need to ask you some questions.
23           First of all, don't, right now, send out your
24  subpoenas for the 15th of September because I'm not sure we're
25  going to get this thing going then.
```

```
1            I noticed in your -- the joint pretrial statement
2    that you filed, one party had indicated the trial might take
3    four weeks; another one indicated two weeks.
4            And just out of curiosity, do you have your pretrial
5    statements with you?
6            MR. LUNSETH:  I wrote it, so yes.
7            MR. BAIN:  Yes.
8            THE COURT:  Look on page 10.  "Greenshades identifies
9    Steven Lunseth and Dale Jensen as persons whose
10   depositions . . ."
11           Is that a relative?  Is that a --
12           MR. LUNSETH:  Yes.
13           THE COURT:  Huh?
14           MR. LUNSETH:  Yes.
15           THE COURT:  What's the relationship?
16           MR. LUNSETH:  He's my brother, and --
17           THE COURT:  Wait, wait.  You can sit down.
18           MR. LUNSETH:  Okay.  He's my brother, and he's the
19   CEO of Aatrix.
20           THE COURT:  Should I ask the next question -- but
21   don't answer it -- which would be so you're handling this for
22   nothing for your brother?
23           Exhibit 4 and 6 to the -- and I've been through this
24   book with one exception, and it didn't matter.
25           My law clerk -- when we went to electronic filing, I
```

1    told the clerk, "You'd better double your Xerox order because

2    when judges get to be my age, they're not going to look at a

3    computer but we're going to want things printed out."

4            So you can see (indicating).

5            This is Defendant's exhibit list, which was 309-E.

6    I'm just going to flip through it so you can see.  It didn't

7    print out, so I really didn't go through it because I didn't

8    see the need to, but I looked at the last page.

9            So on Exhibit 4, which is the plaintiff's exhibit

10   list, and Exhibit 6 in my book, which was the defendant's

11   exhibit list, one reads 565, and one reads 515.

12           So I will tell you an ancient story.  Did I ever tell

13   you about the failure-to-file case that I tried about 40 years

14   ago with the Quickie Car Wash man?  Did I ever tell you that

15   story?

16           MR. BAIN:  No.

17           MR. LUNSETH:  No, Your Honor.

18           THE COURT:  Okay.  Well, failure to file, when you

19   make 600 bucks a year, you're required to file an income tax

20   statement.

21           Here's a debit salesman, insurance salesman, probably

22   making less than $85 a week, and he files the little IBM card

23   where everything goes in -- you probably don't even remember

24   this because you're so young, except one of the plaintiff's

25   attorneys who I won't mention.

1     It was just a little teeny card that you had the
2  address, contact information, signature.  And you put in what
3  the taxable income is and how much you either get back because
4  you paid or not, and he had done that.
5     He's reading a *Popular Mechanics* magazine and he sees
6  an ad from a company called Quickie Car Washes, and Quickie Car
7  Washes was you lay a concrete slab.  You pay to have an
8  aluminum wall, ceiling.  And you bring your car into the
9  Quickie Car Wash, and there's a jet spray wand.  You wash your
10  own car and dry it off in there, and you don't have to go to
11  the car wash.  So he becomes a Quickie Car Wash entrepreneur.
12     He had car washes in Florida, Alabama, and all of a
13  sudden his income is in the millions of dollars a year.  No
14  more tax returns.
15     This is his defense:  "Well, I figured that I was
16  putting money in the bank, and the IRS would just go to my bank
17  when I didn't file tax returns, find out how much I was making,
18  and send me a bill."
19     So the IRS uses a bank deposit method to prove his
20  income, and the jury is correctly instructed if you make $600 a
21  year, you have to go ahead and file a tax return.
22     The jury is out longer than the trial took, and I'm
23  worrying, "Oh, my gosh, a hung jury.  We're going to have to
24  try this case over again."
25     The jury comes back with a guilty verdict.  So

1    afterwards -- I knew the foreman of the jury.  Turned out to be

2    a member of my Rotary club.  And I asked him, I said, "What

3    were you people doing back there?"

4            He said, "Counting the bank deposits."

5            I said, "Counting the bank deposits?  I told you when

6    the man makes $600 a year or more, he's got to file a tax

7    return.  When you got to 600 in each of the calendar years, why

8    didn't you stop counting?"

9            "Oh, we wanted to find out how much a Quickie Car

10   Wash franchise owner really makes."  And they sat back there

11   for days counting all these deposit slips that the IRS put in.

12           So my question really is, do you really intend to put

13   a thousand exhibits in and think the jury's going to be able to

14   understand or not understand what in the world is going on in

15   the case?  And all -- and I'm asking you this for -- I guess I

16   should have told you.

17           We have a little unwritten policy that senior judges

18   don't have to try cases if they're going to take more than a

19   week.  So when I saw this one, two weeks or four weeks, I

20   figured, well, maybe if they tell me two weeks, I'll stick to

21   it.  If not, the chief judge said he'll try to get somebody

22   else to try it.

23           But in all reality, you really think that you're

24   going to have to submit a thousand exhibits to the jury to

25   understand the whole thing, or is there a way to pare it down

1   some?

2          I'll ask the plaintiff.

3          MR. LUNSETH:  Sure.

4          THE COURT:  And you don't have to get up.

5          MR. LUNSETH:  Okay.  I'm the person who said four

6   weeks, and here's the issue, Your Honor, and I've tried to

7   explain this to Mr. Bain also, and it seems to always get into

8   a question of the order of proof.

9          I'm not affecting the order of proof.  I'm not

10  suggesting there's any kind of a bifurcation of the trial.  The

11  plaintiff will put on their infringement and damages case.  The

12  defendant will then put on their defense to infringement.

13         But the defendant has the burden of proof on patent

14  invalidity.  We have no burden of proof.  So they'll put on

15  essentially a plaintiff's case on invalidity.

16         THE COURT:  And then you've got to go.

17         MR. LUNSETH:  We then have a rebuttal.

18         THE COURT:  Right.

19         MR. LUNSETH:  So essentially having a case like this

20  is a two-part case.  You've got plaintiff, defense, and then

21  plaintiff, defense.

22         And what I particularly am concerned about is the

23  clock running out on the plaintiff's right to rebut the

24  defendant's invalidity -- invalidity case towards the end of

25  the case.

1          THE COURT:  Okay.  So let me just --

2          MR. LUNSETH:  So that's --

3          THE COURT:  Let me just asking you this.  By saying

4    it, you really mean it may take four weeks.  It may not, but

5    you just don't want me to say, "Okay.  It's been four weeks,

6    and that's the end"?

7          MR. LUNSETH:  Yeah.

8          THE COURT:  Well, I have this in another case.

9          MR. LUNSETH:  Or three weeks and that's the end --

10          THE COURT:  Right.

11          MR. LUNSETH:  -- or, you know, whatever it happens to

12    be.

13          THE COURT:  I've got an -- a rerun of an MDL

14    antitrust case that I tried against the same defendants in the

15    1990s.  There's a potential for 41 million claimants in the

16    case, and I've got the same thing.  Plaintiffs, two weeks;

17    defendants, four weeks.

18          I had a hearing on it last week, and I can --

19          MR. LUNSETH:  What I can tell you from --

20          THE COURT:  I can understand the -- according to the

21    defendants, the plaintiffs against Vistakon are demanding $600

22    million in damages, and it was an issue of time.

23          I have never tried a timed case in my life.  If you

24    tell me it's going to take two weeks, you're not going to, on

25    the tenth day, have me say, "That's it.  You're still in your

1　case in chief.  You've run the clock out.  You can't do any

2　more."

3　　　　　I know some judges have, have said, "Plaintiff can

4　have four days; Defendant can have four, and that's it."  I

5　didn't do that.

6　　　　　So I -- you've answered the question.  I understand

7　what it is --

8　　　　　MR. LUNSETH:  Okay.

9　　　　　THE COURT:  -- as to why there may be a difference,

10　and maybe we can speed things up a little bit.

11　　　　　So let me ask you this.  There's also, which we can

12　go over if you want, in Defendant's response and objections to

13　plaintiff's witness list, there are some objections to people

14　being called.  I have been over -- and I have to get it.

15　　　　　There was an objection that I have already kind of

16　worked on about Mr. Rosenberg.  And I know there -- has one

17　been raised about -- I think the witness's name is Ms. Riley,

18　but that's not ripe yet because there was some additional time

19　that -- because of Judge Richardson's rulings that were talked

20　about.

21　　　　　I think there's four motions in limine that the

22　defendants -- I mean that the plaintiffs made and -- I mean the

23　defendants.  Two of them, I think, I've got down pretty pat.

24　　　　　Then there was a motion to amend the case management

25　and scheduling order that was filed by the plaintiffs.  And on

1   all of these, if we could -- if you want to go over some of

2   them, I think I have it down pretty pat from reading the

3   paperwork.

4            And I'm fairly certain -- take, like, Mr. Rosenberg.

5   On the motion in limine, if I remember correctly, isn't there

6   an issue with respect to if I grant some of his testimony

7   coming out or all of this testimony coming out -- whether that

8   might have some effect on the length?

9            How would my ruling on the motion with respect to --

10  if I only granted part of the motion in limine, how would he

11  testify as to the remaining issue if -- if we come to the

12  conclusion that his opinion, because it's based on an erroneous

13  assumption with respect to the Court's first order of

14  dismissal, still apply rather than the Court of Appeals saying

15  no?

16           If his analysis of the step one *Alice* issue is he

17  can't do what he did and that is say the Court has resolved the

18  *Alice* issue, can he testify as to the second *Alice* issue, or is

19  he foreclosed from testifying as to anything?

20           What's --

21           MR. BAIN:  Your Honor, he can.  We -- we have

22  maintained throughout that as a result --

23           THE COURT:  You can sit down.

24           MR. BAIN:  Okay.  We have maintained throughout that

25  as a result of the *Aatrix* and the *Berkheimer* decisions at the

1    Federal Circuit, one of which sent the case back to us, to this

2    Court, that the only question in the *Alice* analysis that became

3    a question of fact is the question as to whether, in step two,

4    the particular computer operations and technology at issue was

5    conventional at the time of the priority date.

6          Step one, whether the claim is abstract, remains a

7    question of law for the Court.  It is our position that the

8    Court, in its original analysis underlying the motion to

9    dismiss, got that right.

10         We have reflected in the various pending motion

11   papers that even if that is not law of the case and binding,

12   not to be revisited, we believe, when the Court does revisit

13   it, which it must as part of assessing, for example, Aatrix's

14   motion to dismiss under a 101 defense, the Court should

15   conclude that, under step one, that the claim remains abstract.

16         Mr. -- Dr. Rosenberg should not be at trial having to

17   speak to step one.  That is a question of law that the Court

18   should resolve.

19         And, you know, this is new territory because I think

20   we were all surprised that the Court of Appeals in *Aatrix v.*

21   *Green Shades* and in the companion case *Berkheimer* said, for the

22   first time, that there's this question of fact that prevents

23   the resolution of the 101 question by the Court in some

24   circumstances at the motion to dismiss or at the summary

25   judgment stage.

1    So we've taken a look to see what have courts -- what
2  have district courts done since then, and we have found that in
3  the Eastern District of Texas -- which, of course, is a very
4  popular forum for patent infringements -- two different judges
5  have tried the 101 defense.  And the only question that was
6  sent to the jury was this very specific conventionality
7  question that Dr. Rosenberg has spoke to.
8    I can give the Court the citations to those cases and
9  the jury instructions.
10   But the jury instruction to the jury doesn't ask them
11 to assess whether the claim has proven to be abstract -- excuse
12 me, that -- yeah, that the claim is directed to an abstract
13 construct.  It doesn't ask them to assess whether something
14 more has been done in step two of *Alice* to -- in the claim to
15 transform the abstract concept into something that's patent - -
16 patent eligible.
17   The only question specifically directed to the jury
18 was conventionality, and Dr. Rosenberg has given a very
19 thorough opinion on that, supported by substantial evidence.
20   And by the way, coming to the point of us having
21 500-plus exhibits, hundreds of them are the literature that he
22 has gathered to support his opinion that the various computer
23 operations present in the claim are conventional.  I don't
24 think it's Dr. Rosenberg's intention to go through each of
25 those references, but they need to be in the record to support

1    his opinion.

2           And I will just drop a footnote on that point, Judge.

3    The reason that he has to have such a voluminous collection of

4    literature at the time is because the Court of Appeals has said

5    that finding a single prior reference -- let's say, for

6    example, a data file storing data.  We think that that's a --

7    has probably always been a very conventional computer feature.

8           The Court of Appeals has said that in the context of

9    *Alice*, you can't prove the conventionality of that computer

10   feature or operation by finding a single patent that says it.

11   You have to demonstrate that it was well understood, routine,

12   and conventional.

13          And so what Dr. Rosenberg has done to address that

14   question is gather a collection of literature from different

15   as- -- different areas of the field, you know, from academia,

16   from industry, from government, to show that all of these

17   different participants in the field at the time collectively

18   understood that particular computer operation to be

19   conventional.

20          That is the only thing that he speaks to.  So if

21   he -- if you find that in -- somewhere in his report or in his

22   assessment of step one -- because it's our understanding that

23   Dr. Rosenberg's observations with respect to step one of *Alice,*

24   and any other aspects of step two other than conventionality,

25   was to simply say that he followed the Court's analysis, and he

1    found it to be correct.

2         Whether the Court revisits that analysis and finds

3    that it's abstract for other reasons, I don't think, prevents

4    Dr. Rosenberg from going forward with the jury on the one

5    specific question that he should be speaking to, which is the

6    factual question of conventionality and that alone.

7         So that is my answer, that, yes, if the Court finds

8    that there was some error in Rosenberg's assessment of step

9    one, it is of no consequence to his ability to testify to what

10   he is supposed to testify about, according to these Eastern

11   District models.

12        And secondly, that he -- he has demonstrated in his

13   report and the volume of literature that he's prepared to speak

14   to that factual question.

15        MR. LUNSETH:  There are two major issues in here.

16        The first one is we agree with the defendant that the

17   *Alice* step one question is a question of law.  However, the

18   Federal Circuit has been unequivocal that questions of law

19   involve issues of fact; in particular, in this instance, what's

20   the nature of the technology here?

21        In the analysis that was done in connection with the

22   motion to dismiss now five-plus years ago, the defendant argued

23   that the technology was a data recognition and imaging

24   technology.

25        Well, everyone in this case agrees that that was just

1    dead flat wrong, and there was therefore no basis for the

2    conclusion that the Court reached on step one of *Alice*.

3          But the bigger problem is that the Federal Circuit

4    vacated this Court's judgment at the time, and the vacation was

5    unequivocal.  They just said, "We vacate this judgment."

6          And there's a case directly on point in the Eleventh

7    Circuit where the Eleventh Cir- -- where a defendant -- a case

8    went to trial, and the defendant got a favorable ruling on --

9    on one factual issue.

10         There was a reversal.  The judgment was vacated.  The

11   case went back to the district court on remand, and the

12   defendant did not advance any new facts or argument on -- on

13   one particular issue.  Instead they said, "Well, the jury's

14   already decided in that case that the husband was guilty of

15   arson so that applies in this case."

16         And the appellate court said, "No.  We said

17   unequivocally this is vacated.  It is remanded.  All

18   proceedings start over from scratch."  And that is exactly what

19   the Federal Circuit did in this case.

20         The -- the analysis that was done for step one of

21   *Alice* was based on wrong assumptions.  It can't be reapplied

22   here.  But in any event, the defendant's argument, only

23   argument, the only thing they produce for this Court, is not

24   facts.  They say, "Your old order is still law of the case,"

25   and that's dead wrong under the *Sales versus State Farm* case.

1    So that analysis cannot be reapplied.

2           Now, the defendant could have advanced new facts, and

3    we could have done a new analysis, but they have advanced no

4    new facts.  All they advanced was Dr. Rosenberg's opinion that

5    he was going to rely on Your Honor's vacated decision on the

6    motion to dismiss, which is -- doesn't exist anymore.  The case

7    law on that is unequivocal.  It's -- it's gone.

8           They could have advanced new facts.  They failed to

9    advance new facts in discovery or anywhere else, and there's no

10   basis on which this Court can then go forward and conduct a

11   step one of *Alice* type analysis.

12          The second part of it though is this idea that

13   Dr. Rosenberg addressed step two.  What Dr. Rosenberg did --

14   and it's, again, unequivocal in his report -- is he said, "I

15   find 18 generic activities," period.

16          He didn't say anything about how the generic

17   activities applied to the patents.  In fact, ultimately he

18   admitted that nine of the generic activities don't apply to

19   the -- any claims of the patents.  They apply to allegations in

20   the second amended complaint.

21          As to the first group of nine, he said, "My basis for

22   believing that these generic activities apply to the patent is

23   the district court's order," where we made a motion to dismiss

24   the counterclaim because it was not sufficiently pled.

25          And there is no holding in that particular decision

1    that if those nine activities are found to exist, then the

2    patents are invalid.  Dr. Rosenberg failed to draw that

3    connection anywhere.  He proved 18 generic activities in there

4    without explaining a thing about what they have to do with the

5    patents.

6           And you'll see this in our briefs, but we asked him

7    that question at depositions.  We said, "Well, you didn't do

8    the analysis to explain to us or the jury or the Court how

9    these generic activities relate to the patents."

10          "Well, no.  Perhaps I didn't do that."

11          He didn't do it at all, and so that analysis is

12   completely invalid as to step two.  Dr. Rosenberg has not done

13   an analysis that could apply to step two under *Alice*.

14          So as to step one, the -- I'm sorry, but Your Honor's

15   prior judgment is gone.  It's out the door.  There's no basis

16   for reapplying step one.  That decision is not the law of the

17   case.  The Federal Circuit's decision is the law of the case.

18          And, sure, if they'd come forward with -- as the

19   party with the burden of proof, if they had come forward with

20   facts and analysis to prove a new step one analysis up, that

21   would have been a different situation, but they have not done

22   that.

23          They've fallen right into this *Sales versus State*

24   *Farm* case.  They've come forward with nothing, except to say,

25   "Well, your old decision applies," which is just wrong.  It's

1    just wrong.  And, frankly, honestly, the argument is

2    disrespectful of the Court of Appeals.

3             The Court of Appeals vacated the judgment and said,

4    "Remand.  Do this again.  Get the facts."  And I think Your

5    Honor has done a very good job of allowing the parties to bring

6    the facts forward.

7             But on this issue, the defendant has brought no facts

8    forward.  They have the burden of proof, so where are the facts

9    that support an *Alice* step one analysis?  They don't exist.

10            So there is no reason to go to *Alice* step two because

11   they have not supported *Alice* step one, not at all, and we

12   should just get this out of the case.

13            You know, for purposes of trial, we've got a report

14   from Dr. Rosenberg that supposedly cites 144 references

15   supporting these generic activities that exist in error and

16   aren't related to the claims of the patents, and it's going to

17   be an awful lot of trial time.

18            So why did we go through all of that exercise when

19   they have done nothing whatsoever to support step one of *Alice*?

20   There's nothing that Your Honor can rely on to conduct an

21   analysis and reach a conclusion on step one.  They simply

22   haven't done it, so at that point it's over.

23            Had they done it on remand, it would be a different

24   situation, but they did not come forward with those facts.

25            THE COURT:  Okay.  As an aside, I didn't get an

1  answer to the first thing that I posed about when is your -- I
2  assume you people all fly.
3          MR. LUNSETH:  Oh, our flight.
4          THE COURT:  Right.
5          MR. LUNSETH:  I believe it leaves at 6:47, so we
6  probably need to leave --
7          THE COURT:  So you're going to try to get out of here
8  tonight.
9          MR. LUNSETH:  -- about 4:30, I think.
10          Yeah.  But, Your Honor, we have refundable tickets,
11  so --
12          THE COURT:  Oh.
13          MR. LUNSETH:  -- I mean, we're here to --
14          THE COURT:  You buy the expensive kind.
15          MR. LUNSETH:  We don't have a hotel.  Maybe we can
16  come stay at -- stay at Joe's house or something.
17          MR. BAIN:  That would be a four-hour drive, Judge.
18          THE COURT:  That's what I was going to say.  Do you
19  have room in the car for them?
20          MR. BAIN:  Right.  My parents live in Orange Park.
21  We can put them up there.
22          THE COURT:  Oh, okay.
23          Well, let me ask this question.  If I have the
24  concept down right, one of the things is whether things existed
25  before 2002 and 1995, etc., etc.

1          That's the things that Mr. -- or Dr. Rosenberg -- I
2    apologize for not calling him doctor.
3          Those are the things that you intend to try to get in
4    from him; am I correct?
5          MR. BAIN:  Yes.  He's going to speak to the
6    conventionality of --
7          THE COURT:  So let me --
8          MR. BAIN:  -- the functions in 2002.
9          THE COURT:  -- ask you about the conventionality.  He
10   allegedly found it somewhere, okay?
11         Is the "somewhere" document one page or is the
12   "somewhere" document 50 pages?  I don't need an exact number.
13   I'm just trying to find out is it a short little thing, or it's
14   part of a big thing?
15         What I don't want to get involved in, or whoever's
16   going to try the case, is what I explained in the income tax
17   thing.  You -- if you send a book back to the jury room for
18   something that's on page 10, you're going to find one of the
19   jurors that's going to want to read from page 1 to 300 to see
20   the context where it is.
21         So what I'm trying to find out is, is there a way, if
22   it is voluminous paperwork, that you can somehow, amongst
23   yourselves, stipulate that the only thing we need to put in is
24   page 14 says so-and-so did this in two thousand -- I mean, in
25   1996, so we know --

1           MR. BAIN:  Correct.

2           THE COURT:  -- that existed before 2002?

3           MR. BAIN:  I mean, subject to a stipulation with

4    Plaintiffs, we're more than happy just to have excerpts.

5           THE COURT:  To try that.  Okay.

6           MR. BAIN:  It doesn't require ten pages of disclosure

7    in a particular book to make his point.  But, of course, under

8    the rules of evidence, the entire publication has to be

9    available to the plaintiff for cross-examination.

10          But if we can stipulate that this is the page we want

11   to cite, and then the plaintiff can cite any other pages from

12   the book as excerpts that they feel would support their

13   cross-examination, we'd be happy to do that.

14          And, again, Judge, we only go through this very

15   voluminous exercise because we just don't really know the

16   parameters yet of what -- what is the threshold for

17   conventionality beyond novelty, which, you know, with prior art

18   and a 102 invalidity, you can prove invalidation with a single

19   patent.

20          But the Federal Circuit has made clear -- in fact,

21   they made it clear during oral argument on this case.  Appeal

22   Judge Reyna asked me, when I was making the point that some of

23   the things are admittedly prior art in the background section

24   of the invention, and he said, "Well, that's -- that's

25   anticipation.  That doesn't necessarily mean it's

1   conventional."

2          So we don't really know where the line is between a

3   single reference showing that it was known versus so well known

4   that it's conventional.  So obviously we have our expert give a

5   large volume.

6          But we -- as a practical matter, for purposes of

7   proof, if we can be assured that we won't be, you know, held to

8   not have had sufficient evidence, we would be more than

9   happy -- in fact, Dr. Rosenberg, in his report, I think,

10  identifies the page and verse that supports it.

11         So we can do excerpts and work with Plaintiff to have

12  any counter-excerpts they feel they need to make the -- --

13         THE COURT:  Yeah.  Would Plaintiff be agreeable to

14  try and work something out like that?

15         MR. LUNSETH:  I don't think Your Honor appreciates

16  the volume.  There are 144 references, many of which are books.

17  And I think you're talking about weeks of work.

18         Yes, to distill it down, we could do that.  But doing

19  that in the four weeks that we have remaining for trial with

20  all the other trial preparation, that's an enormous amount of

21  work.

22         And I don't -- did you take -- do you remember

23  *Palsgraf* from law school?

24         THE COURT:  I remember that thing that blew up in the

25  train station.

1           MR. BAIN:  -- that fell on her head, I think.

2           MR. LUNSETH:  The issue in *Palsgraf* was you have to

3    have proximate cause.  Yes, you can have negligence --

4           THE COURT:  Wait a minute here.  Wait a minute

5    though.

6           I can write something for the restatement that may

7    make this case go away?

8           MR. LUNSETH:  Yes.

9           THE COURT:  That's how it was done, according to my

10   professor.

11          MR. BAIN:  Right.

12          THE COURT:  You write the statement and get them to

13   publish it, and then you say, "Aha.  That's my basis for using

14   this."

15          MR. LUNSETH:  But *Palsgraf*, by analogy, is the same

16   problem with Dr. Rosenberg's report.  So he establishes -- he

17   says generic activity, and he doesn't relate it to anything

18   anywhere.

19          THE COURT:  To the claims.

20          MR. LUNSETH:  He doesn't -- he doesn't relate it to

21   the claims.  He doesn't relate it to any specific allegations

22   in the pleadings.  He just says, "There are 18 generic

23   activities.  Therefore, my opinion is the patents are invalid."

24   That's the problem.

25          MR. BAIN:  We don't agree with that, Judge.

1           MR. LUNSETH:  It's just a --

2           THE COURT:  You wanted to reply to --

3           MR. BAIN:  I do.  So what I heard was --

4           THE COURT:  And you are driving, so . . .

5           MR. BAIN:  Yes, sir.

6           THE COURT:  Okay.

7           MR. BAIN:  At least to Orange Park.

8           THE COURT:  Well, I was going to say if you stay

9   late, you're putting your team up at your mother's.

10          MR. BAIN:  Yes.

11          THE COURT:  Okay.  Do you want to take a break and

12  call her and tell her that she ought to go to Publix and get

13  dinner ready?

14          MR. BAIN:  Well, she did ask me to come to dinner,

15  and I'll have to tell her more are coming.

16          Okay.  So I heard Aatrix's concern, beyond what

17  Dr. Rosenberg is prepared to testify at trial, is that --

18  before we even get there.  All we have done is relied on law of

19  the case to say basically the legal questions have already been

20  decided by the Court, and they cannot be revisited.

21          With respect to that, we have taken the position that

22  the Court's -- portions of the Court's analysis that was not

23  criticized by the Federal Circuit, we believe, was, at least

24  necessarily, by implication, not vacated.

25          But we also have made it a point in those very same

1   briefs that to the extent that it is not law of the case and

2   the Court does choose to revisit it, the Court should revisit

3   it and come to the same conclusion.  And the Court needs to do

4   that before trial anyway.

5           So it's really a form over substance argument to say

6   that our only position is that it's law of the case.  It's not.

7   It's more than that.  We -- it's -- the underlying substance of

8   your analysis was correct.  It was not criticized by the

9   Federal Circuit.  And the Court, I think, made that observation

10  when it denied their motion to dismiss our counterclaim.

11          The Court was exactly right in that order when he --

12  when the Court found the only two things that the Federal

13  Circuit said needed to be done on remand was to have claim

14  construction on any disputed terms, which the Court has done,

15  and to resolve the factual question which relates to what is

16  well understood, routine, and conventional to one skilled in

17  the art at the time of the priority.

18          There was no discussion in the Federal Circuit's

19  opinion, and we're not aware of any law, that says that there's

20  a fact question underlying a step one analysis.

21          Step one analysis is the Court looking at the claim.

22  The claim is the intrinsic record.  It's already established.

23  If you want to say that there's a fact underlying your

24  analysis, it's the facts of the claim in the intrinsic record,

25  which the Court had in the original analysis under the motion

1   to dismiss and has before it now in connection with the motion

2   for summary judgment.

3          So what the Court must do under step one of *Alice*

4   doesn't require any contribution from Dr. Rosenberg or from any

5   other expert.  It's for the Court to determine.  If the Court

6   concludes, based on an analysis of that claim, as it did

7   before, that it is abstract, then we go to step two.

8          Now, under step two, the criticism is that

9   Dr. Rosenberg, again, didn't do his job because he just simply

10  accepted the nine functions.

11         But, again, Dr. Rosenberg said, "Look, I understand

12  these are the nine functions that were pled by the defendant in

13  its counterclaim."  It was subject to challenge by the

14  plaintiff under a motion to dismiss.  That motion to dismiss

15  was denied by the Court.  And the Court specifically said that

16  those -- "If those nine functions are established to be

17  conventional, that can make out their cause of action for

18  invalidity under 101," and denied the motion for counterclaim.

19         So it's not that Dr. Rosenberg pulled those nine

20  functions out of thin air.  They had a basis in our

21  counterclaim, which was confirmed by the Court.

22         And it's also our position that the identification of

23  those functions within the -- within the claim are a question

24  of law for the Court.  But, nevertheless, Dr. Rosenberg looked

25  at what the Court said, said, "Yes, I see that those functions

1   are in the claim."

2          What Aatrix is doing is trying to put additional

3   burdens on Greenshades and on Dr. Rosenberg to say, "Okay.

4   Data -- saving data in a data file, that ties to this

5   particular element."  And I think some of them, it's just a

6   matter of common sense.

7          Let's take that example.  When Dr. Rosenberg is

8   assessing "data file," does he expressly say, "And this ties to

9   the data file element in Claim 1?"  I don't -- sitting here

10  right now, I don't know if I could cite you the paragraph where

11  he says that.  But even if he didn't, it's readily apparent,

12  these functions and what elements they tie to, and it's

13  ultimately a question of law for the Court.

14         I take, again, a page out of the two Eastern District

15  of Texas cases that actually went to a jury, and in both of

16  those, none of the jury instructions have anything to do with

17  step one or identification of the functions relative to the

18  claim in step two.  The only question put to the jury is

19  whether those functions, as identified, are conventional.

20         Dr. Rosenberg has done that.  He's done it

21  thoroughly.  And -- and we think that he should be allowed to

22  proceed to do that and that all the other aspects of it are for

23  the Court to decide as a matter of law.

24         We have -- and just to be clear, we're not simply

25  saying law of the case cannot be revisited.  We further say

1  your original analysis, your conclusion that they're abstract

2  and what the activities are that involve a computer in the

3  claims, which you did before, is correct.

4          And we urge the Court to -- if the Court feels that

5  it's not law of the case, we urge the Court to make those same

6  findings again now in the context of the motion for summary

7  judgment.

8          THE COURT:  Okay.  But if I conclude that he can't

9  make a step one analysis, does that get rid of the rest of his

10  testimony or not?

11          MR. BAIN:  I'm sorry.  What was --

12          THE COURT:  If my ruling is that I strike his step

13  one analysis so he's foreclosed from going in there because he

14  didn't cover it in his report, does that foreclose the rest of

15  his testimony --

16          MR. BAIN:  No.

17          THE COURT:  -- or you can use him for something else?

18          MR. BAIN:  I can use him for the step two

19  conventionality, just as they've done in the Eastern District

20  of Texas.

21          THE COURT:  Okay.

22          MR. BAIN:  In fact, I will go further.  We don't

23  intend to have Dr. Rosenberg speak to step one.

24          MR. LUNSETH:  Your Honor, there are several Federal

25  Circuit cases that say that if step -- unless there is a step

1    one analysis, there's no --

2         THE COURT:  You can't go into step two.

3         MR. BAIN:  But the step one analysis is for the Court

4    to do as a matter of law --

5         THE COURT:  I understand --

6         MR. BAIN:  -- not for Dr. Rosenberg.

7         THE COURT:  -- your argument.

8         Okay.  What is your -- each of your opinions on, if I

9    grant the motion with respect to Dr. Rosenberg, would that

10   affect any of the summary judgment motions that are currently

11   pending?

12        MR. LUNSETH:  If you grant the motion --

13        THE COURT:  If I grant the *Daubert* motion and

14   preclude him from testifying.

15        MR. LUNSETH:  Dr. Rosenberg?  Then there is no basis

16   for any of their *Alice* type stuff.  He's their witness on

17   *Alice*, and he's their entire basis for step two.

18        And as to step one, as we've said, he just said,

19   "Well, I agree with the Court, and that prior judgment still

20   applies."

21        If all that is stricken, there is no evidentiary

22   basis for a step two analysis.

23        THE COURT:  So you would conclude, then, that the --

24   it would affect the summary judgment motion.

25        MR. LUNSETH:  Yes.  Yes.

1          MR. BAIN:  He is our witness to establish

2  conventionality, Judge, so if you say that he's not eligible to

3  do that, then we would not be able to present conventionality.

4          THE COURT:  Okay.  I'm going to go through some of

5  those motions to give you an opportunity to bring up any other

6  issues that I looked at, but let me ask you this.

7          I know you had in your pretrial statement -- let me

8  just find it.

9          I have never seen the video that you're referring to,

10  but both of you agree that it should be shown to the jury.  I

11  think that's on page 15; am I correct?

12          MR. BAIN:  That's correct, Judge.  Can I add an

13  additional observation on this, which I think --

14          THE COURT:  Okay.

15          MR. BAIN:  -- both parties agree to?

16          Patent infringement and invalidity analysis is not a

17  typical thing that the jury's probably ever heard, and I think

18  we both have had experience where it's helpful for the jury to

19  get an overview of the patent process and also for the Court to

20  read some preliminary instructions saying basically, "This is a

21  patent case.  As you hear the evidence over the next -- next

22  weeks, you are going to be deciding whether there is

23  infringement.  This is -- I will tell you this again at the end

24  of trial, but to orient you, the test for infringement is this.

25          "There are also contentions of invalidity, and here's

1  a preliminary instruction so you understand what the test for

2  invalidity is," so that when the jury hears the two weeks plus

3  of evidence, they have a context of what they're looking for.

4  And so --

5          THE COURT:  What -- what does -- as I said, I have

6  never seen the video.

7          How long does it take?

8          MR. BAIN:  15 minutes, I think.  It's about 15

9  minutes.

10          THE COURT:  Oh, it's just a short one.

11          MR. BAIN:  Oh, yes.

12          THE COURT:  Okay.

13          MR. BAIN:  And it's professionally and neutrally

14  produced by some judicial conference.  I think a district judge

15  actually narrates it.

16          And it -- and I think both plaintiffs and defendants

17  benefit from the jury having some idea about the patent -- what

18  a patent is and what the patent process is and then followed up

19  by some --

20          THE COURT:  Okay.

21          MR. BAIN:  -- brief instructions on the tests for

22  infringement and invalidity.

23          THE COURT:  Now --

24          MR. LUNSETH:  I can say, Your Honor, that that

25  tape -- and my original is a VHS tape; that's how old that

1    thing is.  But it's played in virtually every patent

2    infringement case throughout the country.  It's routine.

3           MR. BAIN:  And I would add that I'm old enough that

4    my copy is also a VHS.

5           THE COURT:  You're the paralegal?

6           MS. O'CONNOR:  No.  Joanne O'Connor, Your Honor.

7           THE COURT:  Okay.  Go over there a minute --

8           MS. O'CONNOR:  Yeah.

9           THE COURT:  -- to the lectern.  Pull that door open

10   on the bottom.

11          No, no, no, no.

12          MS. O'CONNOR:  Oh, right here?

13          THE COURT:  Yes.

14          MS. O'CONNOR:  Okay.

15          THE COURT:  Is that a VHS thing in there?

16          MS. O'CONNOR:  I'm old enough to know what VHS is

17   too.  I think this is -- I think it's a DVD player.

18          THE COURT:  Oh, rather than a -- okay.

19          MS. O'CONNOR:  Yeah.

20          MR. LUNSETH:  I think you can download the current

21   version from the Federal Judicial Center online.

22          THE COURT:  Yes.

23          MR. LUNSETH:  You don't need --

24          THE COURT:  I'll make sure --

25          MR. LUNSETH:  You don't need media.

1          THE COURT:  Yes.

2          I had -- in the first antitrust case that I had

3    against the contact lens manufacturers, one of the -- during

4    one of the arguments right before lunch, one of the attorneys

5    got up and said something to the effect that "This is the

6    modern era where we use CDs rather than eight-track tapes."

7          When they came back from lunch, I had set up on my

8    bench my eight-track player and the two speakers and put in an

9    eight-track tape so they could hear what it sounded like.  The

10   lawyer wasn't too happy.

11         You have written on page 16, item No. 18, I gather,

12   XVIII -- and I preface this with the following statement.  I am

13   not a person who believes in wasting anybody's time, especially

14   the lawyers' who have a case before me.

15         You had indicated that it would not be fruitful to

16   discuss the resolution of this case until all the motions are

17   resolved, or at least some of the motions that you're waiting

18   on.

19         What is your opinion, once all of whatever motions

20   you think need to be resolved, as to whether there's any

21   possibility of talking amongst yourselves, talking with the aid

22   of somebody else, maybe Judge Richardson or another magistrate

23   judge that has nothing to do with the case, or would it be a

24   waste of time?

25         I ask that in the context -- I'm not interested in

1    numbers or anything like that.  Sometimes you know from -- I

2    assume you've already had some discussions; am I correct?

3              MR. LUNSETH:  Two.

4              THE COURT:  Okay.

5              MR. LUNSETH:  One with Judge Richardson and one with

6    Mr. Matulis.

7              THE COURT:  Okay.  You have an idea moneywise where

8    you are.

9              Is the gap so large that after the motion -- the

10   merits of the motions are ruled on, that it's not worth trying

11   to get together again, or do you think that it would be

12   helpful?

13             MR. LUNSETH:  I'd have to say there's not even a gap.

14   We've not received an offer in either -- all we've heard is,

15   "We're going to invalidate your patents.  Walk away," and

16   that's not going to happen.

17             So the answer is, no, there's no prospect of

18   settlement from our point of view.

19             THE COURT:  What about the defendant?

20             MR. BAIN:  Well, I'm not sure that that level of

21   detail was appropriate, but we think that the gap is too large,

22   Judge.

23             I think that the ruling that YEF is in the case and

24   that Dr. -- Mr. Gorowsky's going to be able to testify, as he

25   is, on all the issues makes them ask for this large-figure

1  demand that I just -- that creates a gap that's just not going

2  to be possible.

3          So I think it would be a waste of time in view of the

4  fact that YEF is in the case and Gorowsky's going to be able

5  to --

6          THE COURT:  Yeah, but what if they're not asking for

7  $14 million?

8          MR. BAIN:  I suspect it's probably going to go up

9  now.

10          THE COURT:  Yep.

11          MR. BAIN:  Yeah.  If their number was coming down,

12  obviously, but I just don't see that.

13          So I think -- in answer to your question, I think the

14  gap is too large, and it would be a waste of time.

15          THE COURT:  Okay.  Let me just go through this pile

16  of motions that I have to see if there's any other questions.

17          Okay.  I think that you answered all the questions

18  that I had about Dr. Rosenberg.

19          Have I entered the order this morning on the

20  Microsoft Dynamics thing?

21          LAW CLERK:  Yes.  I believe that was yesterday.

22          THE COURT:  Yesterday.

23          Did you people get it, the order that I had entered

24  on the defendant's motion in limine No. 2?

25          MR. BAIN:  Yes.

1        MR. LUNSETH:  Yes.

2        THE COURT:  Okay.  I'm now looking at docket entry

3   No. 286.  If you don't have it with you, that's the plaintiff's

4   motion in limine.  And I just have -- and you don't have to

5   respond if you don't want to.

6        MR. BAIN:  I don't have it on my list, Judge.  What

7   motion or document is that?

8        THE COURT:  No. 286.  It's the plaintiff's motion in

9   limine that was filed on the 31st of March.

10       Do you have that?

11       MR. LUNSETH:  I have it.

12       THE COURT:  Okay.  If you look on page 1 of 2 of the

13  motion, there's, I think, 12 things that the plaintiff wanted

14  to keep out.

15       And if you don't want to say anything, you don't need

16  to.  I'm just looking at -- like No. 10, evidence, testimony,

17  or argument concerning hypothetical designs that were never

18  implemented.

19       What are we really talking about, or Defendant

20  doesn't intend to introduce anything like that?

21       MR. BAIN:  I'm not sure.

22       MR. LUNSETH:  I know what that argument is.  Is that

23  the question?

24       Here's what -- here's what the facts are.  Ms. Riley,

25  their damage expert, in her report said that according to

1  Mr. Kane, who's one of the officers of Greenshades, he thinks

2  that he could redesign his software to avoid infringement for

3  some fairly low-cost numbers.

4       The issue is that whatever those redesigns are, they

5  have never been done; they have never been offered to customers

6  in the market; and, in fact, they haven't even told us what

7  they are or given us any designs.

8       And the case law is pretty clear you could apply a

9  design that was available in the market, but if something is

10  not available in the market, you can't apply that design --

11       THE COURT:  You talking about something that doesn't

12  currently exist.

13       MR. LUNSETH:  Yeah.

14       Now, there are cases that say that it doesn't have to

15  be something that you could go out and buy, but it has to be

16  something that everybody knows actually exists.  In this case

17  we don't even know what it is, but if it does exist, nobody's

18  ever offered it in the market.

19       So it's a pretty common tactic by defendants to say,

20  "Well, I think I could redesign this and get away from

21  infringement, and it would be cheap, and so your royalty

22  shouldn't be as high as it is."

23       But he's got no evidence.  He's given us nothing to

24  go on, design specifications or plans or -- something, you

25  know.  We don't have anything.

1     MR. BAIN:  We have given examples, and we've given

2 examples of things that actually exist -- have existed and do

3 exist.

4     One of the very significant things that's occurred in

5 this case after all this litigation is that the only -- putting

6 aside for a moment YEF, in the context of the historically

7 charged products, TFC and PTS, the only aspect of those two

8 products, which do many things, is a thing called the 94x

9 Editor.  That is the editor that enables you to bring up the

10 federal 940 and 941 tax forms populated with the information.

11     The Greenshades products at issue allow the customer

12 to process hundreds of other tax forms and tax filings for

13 states, none of which have been accused of infringement.

14     And the reason they haven't been accused of

15 infringement is it would be readily apparent to anyone who sees

16 it that the image that's brought up -- if you wanted -- if you

17 have an Alabama tax unemployment form to file -- or, in fact, I

18 think the one that Mr. Laub has in his report, and we have an

19 exhibit, is the Florida unemployment.

20     If you bring up the official paper form and you

21 compare it to the image that Greenshades displays on the screen

22 for its customers to make any changes to the values, you

23 will -- nobody could dispute that they are different, that

24 there's no correspondence in the way they look.

25     And as Your Honor ruled in the *Markman* order, there's

1    got to be some level of correspondence.  It doesn't have to be

2    identical; it doesn't have to be a replica; but it has to have

3    some level of correspondence.

4         And true to that correct claim construction, there's

5    been no accusation by Aatrix or its experts that any other form

6    processed by the Greenshades products besides 940 and 941 are

7    even candidates to be infringement by virtue of the look of the

8    form.

9         So I don't have the declaration here to confirm, but

10   if Mr. Kane is speaking to the fact that, "Okay.  Well, if we

11   have to avoid the look of a 940 or 941, we can modify those to

12   look just like the Florida and all the other 50 states," where

13   they don't look anything like the form from the government

14   agency, and they have not been accused of infringement.

15        So that's a non-infringing alternative design, and

16   Mr. Kane, who's got 20 years of experience of developing

17   software, managing programmers, making modifications to his

18   products, has the ability to give a professional estimate of

19   how much it would cost to make those changes.

20        I think there were other changes that he pointed out

21   he could make, but that is something that Mr. Kane can speak to

22   and should speak to, because that goes to -- that goes to one

23   of the *Georgia Pacific* factors with respect to the hypothetical

24   negotiation.

25        Could Greenshades have modified the accused

1    infringing product to a non-infringing form, and what would the

2    approximate costs of that be?  And that's part of the analysis

3    that Ms. Riley included.

4         So it wasn't a big mystery, and it wasn't something

5    hypothetical and in the future that Mr. Kane is just

6    speculating about.  It's based on real-world -- in the same

7    product real-world alternatives and the cost that it would take

8    to change that.

9         So that's -- so I don't think this is really an

10   accurate -- this motion in limine's really not framing the

11   issue accurately when it talks about hypothetical designs never

12   implemented.

13        Yes, the 940 and the 941 at issue have never been

14   modified because Greenshades believes, has believed, and

15   continues to believe it doesn't need to because there's other

16   aspects of the 94x Editor that make it non-infringing.

17        But for purposes of hypothetical negotiation, you're

18   supposed to assume that the product is infringing, and what

19   could you do to change it to avoid that infringement.  And one

20   of the easy changes is simply make the form that's displayed on

21   the screen not look anything like the government form.

22        THE COURT:  Anything else?

23        MR. LUNSETH:  Well, first, they have revised their

24   basic software, the Tax Filing Center and the Payroll Tax

25   Service, three times over the course of this litigation.  And

1    they have yet to take the 94x Editor out, which tells you what

2    customers want.  They want the 94x Editor.

3          All of what Mr. Bain just explained should have shown

4    up in their response to our motion.  It doesn't, because it

5    doesn't exist.  It's -- this is -- we're hearing this for the

6    first time.  "Here's the alternative design, and now we're

7    not" -- when I listen to Mr. Bain's explanation, there are

8    several ways that they think that they're non-infringing.

9          One is all those state forms don't appear on a

10   computer screen.  They only get printed out in hard copy.  They

11   never appear on screen.  That's part of the patent.  That's one

12   thing.

13         Another thing is, well, we could make what appears on

14   the screen not look like the form.  That's a completely

15   different thing.  So which one is it?  And where is the market

16   study that says customers will accept this if you do it?

17         Mr. Kane is just making it up.  It's an excuse

18   because we're down to the wire.  The case is going to get

19   tried.

20         We needed design specifications, and there needed to

21   be evidence that this -- these hypothetical designs would be

22   accepted by customers and could actually be implemented in

23   their software.

24         THE COURT:  And you've never been presented any of

25   that.

```
 1              MR. LUNSETH:  I've not received it, no.

 2              THE COURT:  Have you ever supplied that to him?

 3              MR. BAIN:  I'm not able to confirm that right this

 4    moment, Your Honor.  I -- if Ms. Riley is relying on Mr. Kane's

 5    evaluation -- it had to be based on something -- I don't have

 6    it --

 7              THE COURT:  Okay.

 8              MR. BAIN:  -- here to confirm that.

 9              THE COURT:  So I'm going to leave this one open, and

10    we'll come back to that.  If you could just maybe file a

11    response to that.

12              MR. BAIN:  Okay.

13              THE COURT:  Then the other one is No. 5:  All

14    evidence, testimony, and arguments regarding inequitable

15    conduct or any alleged delays in prosecution or information

16    withheld from the PTO.

17              MR. LUNSETH:  Inequitable conduct is an equitable

18    defense and it's a fraud-type defense that has to be pled with

19    particularity under Rule 9.

20              And the Federal Circuit has said several times that

21    inequitable conduct claims are a plague on the courts.  They're

22    a way of throwing bricks at the defendant -- I mean at the

23    plaintiff, the patentee.  And this has not ever been pled by

24    the defendants in this case.

25              For the first time, in the waves of motions that --
```

1   the summary judgment motion and the *Daubert* motions and the

2   motions in limine, we saw statements from the defendant such

3   as -- implying that the plaintiff took a very long time to

4   prosecute this patent, and it was the plaintiff's fault.

5           Also statements that Plaintiff failed to disclose a

6   product called Top Pay to the patent office, when, in fact, Top

7   Pay is one of our Payroll Series of products that shows up

8   right on the face of the patent.  That whole series was

9   disclosed to the patent office.

10          Unless they pled it, they cannot advance it.  But the

11  motion -- there are two parts to the motion.  One is they

12  can't -- they can't advance an inequitable conduct defense at

13  this point because they never pled it.

14          Part 2 is they can't put any of this evidence in

15  because they never disclosed any of it in discovery.  They only

16  started throwing bricks at the plaintiff's prosecution of the

17  patent and what was and what wasn't disclosed after discovery

18  was over, in the motion stage.

19          And when we saw that, Your Honor should be aware that

20  we decided we'd better go find a rebuttal witness.  So we

21  engaged the former deputy commissioner of the Patent Office,

22  who was at the Patent Office when the second of the two Aatrix

23  patents was actually issued.

24          And I can't tell you what he's going to testify to

25  because I don't know what the evidence is that they have up

1   their sleeve.  But if they have evidence, they needed to tell

2   us what it was in discovery, tell us what their arguments are.

3          It's far too late at this point, after

4   interrogatories are over and depositions are over and

5   infringement contentions and invalidity contentions are all

6   over, to start raising those arguments.

7          So that's the gist of the motion, no defense of

8   inequitable conduct, and they can't start throwing bricks at

9   the plaintiff about the prosecution of the patent or what was

10  or wasn't disclosed to the patent office.

11         You may remember that when we filed the second

12  amended complaint in whatever -- it was back in 2016, which is

13  five years ago now, we attached the entirety of the file

14  wrapper of the '393 patent, and I think we also attached the

15  file wrapper of the '615.  The file wrapper is the file

16  history, the whole file history, at the Patent Office.

17         They've had that for five years now.  And it's way

18  too late, after all the discovery is over, to start throwing

19  bricks.  So our request is that they be prevented from throwing

20  bricks at the plaintiff about the prosecution of the patent.

21         MR. BAIN:  Well, first of all, we don't -- I think

22  we've said this in the response to that motion in limine.  We

23  don't contend or try to -- trying to assert that there's an

24  inequitable conduct defense that we're going to present.

25         But I think we also said in the response papers that

1    the -- this is a counter, and it's proper counterevidence

2    really only if Plaintiff intends to present this mountain of

3    prosecution history and tell the story that they've alleged in

4    their second amended complaint that these -- look at all of the

5    patents and all the prior art that the examiners thoroughly

6    reviewed, and look at this gigantic prosecution history back

7    and forth, in essence trying to bias the jury into some type of

8    super presumption of validity.

9            We don't disagree that under the statute, a patent

10   has the presumption of validity.  We don't dispute that we have

11   the burden of proof to -- in asserting an invalidity defense,

12   such as Top Pay, to -- we have the burden, and it's a clear and

13   convincing standard.

14           Plaintiff should not be allowed to come in, introduce

15   the file histories of this, and try to tell the story that

16   because it's been through such -- what they would say is a

17   thorough examination of these hundreds of patents and all this

18   back-and-forth, it's bulletproof, and it's got a presumption of

19   validity, and you should keep that in mind as you assess this

20   evidence.

21           A very substantial counterpoint to that is in that

22   mountain of evidence and in that mountain of prior art that the

23   examiner considered, the one thing he did not consider was the

24   Top Pay product.  It is not accurate to say that the Top Pay

25   product was disclosed because the Aatrix Payroll Series was

1    disclosed.

2          There's a very significant difference between the Top

3    Pay that we found, Judge, and the Payroll Series.  The Payroll

4    Series was never bundled with a third-party accounting package.

5    In 1999 -- that's why Top Pay is so significant, as we set

6    forth in our summary judgment.

7          In 1999, as part of a Y2K solution, according to the

8    testimony of the plaintiff's witnesses, they partnered with

9    QuickBooks to provide the Top Pay product bundled with

10   QuickBooks.

11         You know the claim very well, Judge.  QuickBooks is

12   clearly a third-party end-user application.  We demonstrated --

13   Mr. Laub has demonstrated the data comes from QuickBooks over

14   to Top Pay, which has the form viewer in it which enables it to

15   populate the 941.

16         I think an examiner would find that to be very

17   significant.  But we're not presenting it for the purpose of

18   saying this was really inequitable conduct, and we're not doing

19   it for the purpose of throwing bricks.

20         But we are doing it for the appropriate counter- --

21   counterevidence to any kind of plaintiff contention that

22   they're entitled to some type of super presumption because

23   "Look at all this work that the examiners did."  And I have a

24   reason to believe that's the case because that's the story they

25   tell in their vari- -- you know, in their second amended

1    complaint.

2          Mr. Lunseth just pointed out they've attached the

3    file histories.  For what purpose?  You know, frankly, this

4    is -- you'll notice in the exhibits -- the exhibit list that we

5    object to the introduction of the file histories.

6          Frankly, the file histories don't really need to be

7    admitted in this case because traditionally file histories are

8    part of the intrinsic record that the Court considers for

9    purposes of the claim construction, which has already been

10   done.

11         There's no doctrine of equivalence in this case, so

12   the counterpart called file wrapper estoppel is not at play

13   here.  So there really is no reason -- and coming back to your

14   point about the jury, if you give them something big, they're

15   going to want to pore through it.

16         These file histories, these

17   multi-hundred-thousand-page file histories, really have no

18   relevance or purpose in this case in view of the issues that

19   remain.

20         So if there's going to be a limit on Plaintiff --

21   Plaintiff will obviously get the instruction to the jury that a

22   patent goes through the Patent Office examination and enjoys a

23   presumption of validity.  And if that's the end of it, there's

24   no need to point out, well, the patent office didn't consider

25   Top Pay.

1          But this is not throwing bricks.  This is just

2     appropriate counterevidence to what I anticipate Plaintiff's

3     going to do, which is to try to say, "They went through this

4     robust examination.  Look at this mountain of paper.  And,

5     therefore, it's presumed valid, and they have not overcome it."

6          MR. LUNSETH:  Top Pay is their argument for

7     anticipation and -- fine.  We disagree with them that Top

8     Pay -- that the -- the Payroll Series included Top Pay, and the

9     Payroll Series was disclosed to the Patent Office.

10         But what you're hearing, I think, is that they get to

11    make the argument that Top Pay was not provided to the Patent

12    Office, and therefore the jury should give Top Pay some special

13    treatment, and we need to be quiet and not rebut that, not

14    respond to that.

15         And the answer to that is no.  We get -- we have the

16    right to rebut.  So if they want to raise that argument, we

17    have a rebuttal witness, and we have the file histories.  And

18    the file histories contain literally thousands of prior art

19    hits that were looked at by the Patent Office.  Everything

20    they're arguing about with respect to Top Pay was considered by

21    the Patent Office.

22         So we have the right to rebut.  There's just no

23    question about it.

24         MR. BAIN:  Your Honor, in the absence of this new

25    surprise witness that they've identified as rebuttal --

1    Mr. Slifer, I think his name is.  In the absence of him, who --

2    I'm still trying to figure out who is going to be the sponsor.

3    Who is going to be the witness who's going to introduce the

4    file histories?

5            MR. LUNSETH:  We have the right to put in rebuttal,

6    and we're going to put in rebuttal.

7            THE COURT:  Okay.  Last one on this motion is No. 7,

8    if you want to comment.  If you don't wish to, that's fine.

9            That's on the bottom of page 1 and the top of page 2:

10   "Defendant and its witnesses be prohibited from testifying

11   about what Defendant actually did, as opposed to testifying

12   regarding the actual structures and capabilities of the accused

13   product in regard to infringement of the apparatus claims."

14           You want to be heard on that or not?

15           MR. LUNSETH:  Yes, Your Honor.

16           We can -- let's take an apparatus claim first.  One

17   thing the Court and the jury needs to understand is that an

18   apparatus claim is a set of structures of some kind.  It's a

19   thing described by what the components of the thing are.

20           It is not important for purposes of infringement

21   whether the defendant used all the components of the structure.

22   It's not important whether the defendant used it in a way that

23   might be described as infringing under the patent.

24           The only thing that's important for purposes of

25   infringement of an apparatus claim is whether all the

1    structures that are in the apparatus claim are present in the

2    accused device and the defendant then used the accused device.

3    That's it.

4            And so they want to put in, for example, evidence

5    that, "Well, we not only -- with our TFC software, we not only

6    have the advanced editor and we display it onscreen, 94x form,

7    but we have these other thousand forms, and we do this with it

8    and we do that with it."  And those issues are irrelevant to

9    the question of infringement of an apparatus claim.

10           And the same thing is true with respect to a method

11   claim.  All that you need to prove is that the steps that are

12   in the method were followed.

13           If other things were added or subtracted or if they

14   did something that they think distinguishes their method from

15   our method but it -- but they conducted all the steps in the

16   method, they have still infringed the method claim.  So that's

17   the case law.

18           What -- to distill this down to a fine point, you

19   have a jury instruction that says the form file cannot contain

20   compiled source code written by a programmer.

21           And in their process what they contend that they do

22   is have a programmer write some source code, which is then

23   compiled by a piece of software.  It's not compiled by the --

24   by that programmer.  And it's not -- and then it's -- that file

25   is used as a step in making the ultimate form file that goes --

1  that we say is the accused form file in the patent.

2          The form file that's -- we accuse that's in the

3  patent, in that particular instance, is called an XAP, or XAP,

4  file.  The XAP file contains no source code.  It doesn't

5  contain compiled code.

6          What it is is code that has been run through an

7  algorithm called the deflate algorithm.  It can only be decoded

8  by the deflate algorithm at the other end, so it's not compiled

9  source code written by a programmer.

10         What they want to do is step back upstream of the

11 creation of the actual XAP file and say, "Well, upstream we had

12 a programmer write some compiled source code."

13         That's an endless discussion because the form file

14 creation -- the master software that makes the form file, the

15 form file creation program, is a program that's made of

16 compiled source code.  It's compiled then into an executable.

17         So you could step upstream and you could say, "Look,

18 we used this compiled source code up here to make that XAP file

19 down there, and therefore the jury instruction applies, and we

20 don't infringe."

21         All that counts is what is in the XAP file, not what

22 was done upstream, not how they did it.  What counts is what's

23 in the XAP file.  Does that match the structural limitation of

24 the claim, or does it not match the structural limitation of

25 the claim?

1    So we'd like to have excluded all their discussion

2  about other stuff that they do or other steps that they take

3  before the actual structure that infringes the patent.  That's

4  what we're asking.

5    MR. BAIN:  I heard two things going on in the

6  clarification of their motion.  One is seeming to suggest that

7  we should not be allowed to tell the jury that the accused

8  products -- they have not said that the accused product is 94x.

9  They said the accused product is the PTS and the TFC.

10    But what we've learned through discovery is that it's

11  really only the 94x Editor subcomponent of these much larger

12  products.  And the fact that the much larger products do many

13  other things that are not -- that don't infringe and are not

14  accused of infringement is relevant, if for nothing else, to

15  damages, okay, and the jury's entitled to know that.

16    They're also entitled to know what the difference is

17  between why 94x, as I told you earlier, Judge, is even a

18  candidate for infringement because the image of the 941 that's

19  brought up on the screen looks like a 941, but in all the other

20  ones, it just simply doesn't.  And so it's not surprising that

21  they're not being accused.

22    So that's with respect to that first part.

23    The second part about upstream, the contention that

24  the XAP file is the form file, we simply disagree with it,

25  okay?  The form file must be the thing that's ultimately used

1    in the process with the four things.

2         With the data file -- it has to operate on the form

3    file and the data file, the form viewer does, to do the

4    functions that the form viewer does.  That is not the XAP file.

5    It's the things inside the XAP file.

6         As the record reveals, as we've explained, and as

7    Mr. Laub has explained, within, among other places, our motion

8    for summary judgment, the XAP file is like a ZIP file, okay?

9    When you take a stack of PDFs or a stack of Word documents and

10   you compress them into a ZIP file so that they can then be sent

11   via e-mail to a recipient who then unzips them or -- as he

12   says, you know, used to conflate/deconflate the thing -- what

13   you put into that file, that compressed file, doesn't

14   disappear.

15        So that compiled code created from the -- from the

16   source code doesn't all of a sudden become something else.  It

17   gets stored inside the ZIP file.  It gets migrated over to the

18   operating environment where, as needed -- and this is in the --

19   not only is this the opinion of Mr. Laub, but this is also the

20   opinion of Mr. Rucinski, citing to Microsoft literature, okay?

21        So it's the plaintiff's expert's own literature that

22   explains this process that this -- that these contents are

23   unpacked.  And these contents are executable files.  They

24   remain the compiled code that they were before the introduction

25   into the ZIP files.

1          So Plaintiff complains that we're improperly looking

2    upstream.  Well, my response is you're improperly not looking

3    downstream.  And downstream, in the actual operation of the

4    Greenshades product by the user, where the data file and the

5    form file -- what they accuse to be a form file are used by a

6    form viewer in the 94x, that's the proper place to look.

7          They're looking upstream at the XAP file and saying,

8    "Well, in the XAP file there's no evidence that there's any

9    compiled code."  It's simply incorrect.

10          So to the extent that they're looking to exclude our

11    ability to show the jury -- and this is completely consistent,

12    by the way, Your Honor, with the judge's claim -- with your

13    claim construction.  And it's not -- it's not the manner in

14    which it's done; it's the actual structural result.

15          The fact that a programmer writes in a source code

16    that a programmer writes and then that gets compiled can be

17    assessed as a matter of structure in the end result, which is

18    the object code that's actually an executable.

19          We presented evidence.  We will prove that, but the

20    jury has to understand how that's -- how that's created.  And

21    what they want to do is they want to have the jury look

22    myopically, without anything upstream or downstream, just at

23    the point that they want to select, which is the XAP file,

24    which is this mystery -- mysterious black box that they can put

25    any label they want on.

1           So it's not appropriate to exclude us from explaining

2     the whole process and the structural result of that process as

3     a counter to their -- what we believe to be an incorrect

4     identification.  When they point to the XAP file, that's simply

5     just the wrong file to look at.

6           And even if you look at the XAP file, it still does

7     not meet the claim because the contents of that XAP file

8     continue to include what was put into the XAP file, which is

9     compiled code written by a programmer.

10          THE COURT:  Okay.  Do you think, with respect to

11    No. 10 -- that's the one I left open -- evidence, testimony, or

12    argument concerning hypothetical designs that were never

13    implemented -- that if anybody wants to file anything

14    additional in writing, you -- can you do it by next Friday?

15          MR. BAIN:  Yes.

16          THE COURT:  Can you do that too, just simulta- -- if

17    you want to file something by next Friday?

18          MR. LUNSETH:  Yeah.  I don't think we have anything

19    to file.

20          THE COURT:  Okay.  That's fine.

21          MR. LUNSETH:  They apparently contend they do.

22          THE COURT:  Okay.  Let me just go through the rest of

23    this material.

24          MR. BAIN:  That would be August 6th, Judge?

25          THE COURT:  Yes.

1          MR. BAIN:  Okay.

2          THE COURT:  Okay.  I think that's all the questions

3     that I have.

4          Okay.  Hopefully -- I've got a criminal case

5     scheduled for next Monday.  I'll let you people know, with

6     respect to the September 15th date, if we run into a problem

7     with the prospective jury pool.

8          The last jurors that we picked, there was a specific

9     COVID questionnaire that we used.  We did not use that for the

10    August pool.  But based upon the CDC's pronouncement

11    yesterday -- and I had alerted the lawyers -- this morning I

12    had a hearing in the case -- that I'm going to require all

13    jurors and witnesses be masked except when they're testifying.

14         I don't think, with respect to the jurors, it's going

15    to be any big problem because we use hands to answer questions

16    and signal.  But the only part that they really have to talk

17    about is when we have a printed history form that has a series

18    of questions.  And I just tell them, "Just answer the

19    questions," and they go down, and I think I'll have the jurors

20    unmask.

21         If you want to take a look, we can have the courtroom

22    deputy take you upstairs, when we're finished, to the 12th

23    floor.  We've been picking juries in the larger courtroom on

24    the 13th floor and then trying the cases in two jury [verbatim]

25    rooms on the 12th floor that are back to back, one for the

 1   actual trial and one for the jurors for deliberations and

 2   eating.

 3          We've been entering a partial sequestration order so

 4   that the government can buy lunch for the jurors, and they can

 5   socially separate themselves in the courtroom rather than --

 6   the jury deliberation rooms here are rather small.

 7          And I've seen varying suggestions about whether

 8   people should stay 6 feet apart or 12 feet apart.  I don't have

 9   the latest statistics with me, but since you're not from

10   Jacksonville, I think the latest reading is maybe 47 percent of

11   the people in this area were vaccinated.

12          The division runs from Suwannee County down to

13   Flagler County, which is 13 counties in Northeast Florida.  And

14   statistically the COVID-positive rate -- and I express no

15   opinion about whether we test enough, don't test enough, test

16   too many -- but it has just skyrocketed in the last few weeks.

17          And I think that the last news story that I saw said

18   something to the effect to expect the rate to keep skyrocketing

19   for six weeks, which would take it to that September 15th date.

20          I'll keep you posted with respect to what Judge --

21   Chief Judge Corrigan says about the potential trial date,

22   whether he'll do it or get somebody else to come down and do

23   it.  But I understand the problem with the timing that I have

24   raised.

25          So is there -- is there anything else that anybody

1   wants to bring up?

2          MR. BAIN:  Yes, Your Honor.  In view of the COVID

3   protocols, the other thing we need to manage is the

4   confidentiality of certain technical and business information

5   of the parties.

6          One solution is if the COVID protocols are going to

7   be such that only the participants are going to be in the

8   courtroom and not anybody in the general public, then as long

9   as we have -- as long as we can ensure that everyone that's a

10  participant, including, you know, the representatives of the

11  opposing parties -- Mr. Kane, particularly, and Mr. Lunseth and

12  Mr. Jensen for Aatrix -- currently, under the protective order,

13  they're not allowed to see the confidential information of the

14  other side.

15         But for purposes of trial only, Greenshades is

16  prepared to make an exception because obviously you have the

17  competing interest that the party representative should be

18  allowed to attend their trial.

19         But what Greenshades is particularly concerned about

20  is that -- you know, so if, for example, you know, some of

21  their code is displayed or some of the way that they do their

22  technical operations or their financial statements in the

23  context of the damages, if that's the subject of testimony in a

24  publication on a monitor that all of us in the room and the

25  jury sees, Greenshades is comfortable with that, with the

1    provision that all these folks are under the -- you know, the

2    protective order, the confidentiality order.

3              What Greenshades is concerned about is they wouldn't

4    want members of the public or the press, for example, to be

5    able to have access to that information.

6              So I guess we want to come up with some type of --

7    the alternative, of course, is when that information is being

8    displayed, that people that are not subject to the protective

9    order would have to be removed from the courtroom, would be our

10   request.

11             So my question is, under the COVID protocols that you

12   just described, is that going to still allow for members of the

13   public to come in?

14             THE COURT:  Yeah.

15             MR. BAIN:  Okay.

16             THE COURT:  We're open for business.

17             MR. BAIN:  Okay.

18             THE COURT:  What we're contemplating doing in one of

19   the cases is the potential for having the court exhibit which a

20   jury sees filed afterwards under seal when it gets into the

21   electronic filing system.

22             For example, if there's -- the local rule tells you

23   about, like, removing Social Security numbers and things like

24   that, addresses.  But if it's an address on a form that you're

25   trying to identify the defendant as the person who actually

1    executed it, the home address may be relevant.

2          So we're going to have the parties actually have the

3    copy that they want the jury to see filed under seal and the

4    redacted copy the one that would be in the public record.

5          I haven't seen a reporter in this courtroom until two

6    weeks ago.  I had a sentencing in a criminal case involving

7    allegations of someone being involved in Chinese -- that drew a

8    lot of public attention, and -- as a matter of fact, it got

9    splattered all over the country.  But I haven't seen a reporter

10   anyplace else.

11         The local newspaper here was recently -- not recently

12   but in recent times sold to *USA Today*, and *USA Today*, I assume,

13   was responsible for cutting the newspaper's budget down to

14   zilch.

15         So years ago they had a reporter that covered federal

16   court every day and one in state court.  We haven't had one of

17   those in God knows how long, and eventually it just kind of

18   dried up.  And I didn't know the reporter was here.

19         What happened was we were going to discuss some

20   national security information, and the courtroom was just

21   packed.  And the lawyers assured me that everybody that they

22   could identify, with one exception, was either a government

23   employee or some intern that had already gotten a clearance.

24         And the one man who was sitting in the back, I asked

25   him who he was, and he identified himself as a newspaper

1   reporter.

2          But we'll -- if there is something really

3   confidential that the public shouldn't have, before you go to

4   introduce it, let me know.

5          MR. BAIN:  Okay.

6          THE COURT:  In the courtroom on the 12th floor, if

7   you want to go up and take a look at it -- and that's why we

8   basically are down to trying one case at a time -- we have

9   screening, plastic screening, so that the jury is -- each juror

10  is in a little cocoon.  And the witness has got a screen around

11  them in the front and on the side where the Court is.

12         And there's a system where there's -- instead of

13  having a sidebar where everybody would come up and discuss

14  legal matters -- can you hit that white noise button?

15         COURTROOM DEPUTY:  (Complies.)

16         THE COURT:  You put that on so the jurors can't hear

17  what's going on.

18         Well, what we've done is hook up a

19  microphone/earphone system.  So basically you can do the

20  sidebars from counsel table with that noise going on so the

21  jurors won't be able to hear any of the discussion, and we'll

22  have earphones on.

23         MR. LUNSETH:  Your Honor, I'm not quite following.

24  Is the jury -- are you saying that the jury's going to be up on

25  12, and we're going to be in this courtroom?

 1          THE COURT:  No, no, no.  We're going to be on the

 2    12th floor.

 3          MR. LUNSETH:  Oh.

 4          THE COURT:  It's two courtrooms back to back on the

 5    12th floor.  We'll pick the jury on the -- we're doing all of

 6    them on the 13th floor, and the way that we've got the peanut

 7    gallery set up, they've got marked spaces so that there's

 8    social distancing for the jurors.

 9          Once the jury's picked, we move down to the 12th

10    floor.  And there's a mirror of what you're in now right

11    through that door on the other side.  That's -- the court was

12    built with four jury rooms and courtrooms on the same floor.

13          But the jury room is over there, and if you have 14

14    jurors, they're crowded around a little table.  So to avoid

15    that contact, we've just set aside one complete courtroom this

16    size for the jurors to use for deliberations, for eating lunch,

17    and during their breaks.

18          The bathrooms, though, are in the jury room so they

19    have to work out some kind of system where they -- they don't

20    stand in the little vestibule waiting to get in.  How they're

21    doing it, whether they're taking numbers and getting on line --

22    it's just slowed things down tremendously.

23          And I just -- I can't tell you what the answer to the

24    situation is going to be because what happens on Wednesday may

25    not be what's going around on Thursday.

1           In my discussions with the lawyers this morning for

2   the trial next week, it involves voluminous documents to --

3   I've had to work a system out where the defendant, who has been

4   detained now since October of 2019, has a laptop and is getting

5   all the information and documents and discovery that his lawyer

6   has for him on flash drives to send to the institution.

7           The unfortunate situation is last week we've had a

8   terrible -- we keep inmates in three county jails, not in

9   Jacksonville but the Baker County, Bradford County, and Nassau

10  County, and COVID is just running rampant through.  In the

11  Nassau County Jail, we can't bring anybody.

12          We originally thought by the 2nd of August, we'd be

13  able to, because the 14-day quarantine would have run.  But

14  it's -- positive cases have grown, so we're now hoping maybe

15  for the 9th, but there are more correctional officers than

16  inmates that have contracted it.

17          The Baker County Jail is almost as bad.

18          The Bradford County Jail, where this defendant

19  happens to be housed, is on lock-down.  So this poor defense

20  attorney, who's trying to have contact with his client, can't

21  get into the jail.  The Bradford County Sheriff's Office did

22  accommodate them, to the extent that they can have extended --

23  I mean, up to four-hour telephone conversations, where usually

24  it's just a few minutes.

25          But now, because of the spread that's gone on,

1    depending upon who the lieutenant in charge is, he's having a

2    hard time.  Some of them say, "No, you can't do that anymore."

3    Wait on the phone for 15 minutes, and then someone says, "Okay.

4    We realize there has to be an exception in this case."  And --

5    but it's just getting logistically back to a nightmare.

6              And there was a period from, I guess, March of '19

7    [verbatim], probably, through June of '20 that we had nothing

8    but emergency hearings, first appearances in court and ran into

9    the problem of everybody would be masked.

10             Johnny gets arrested.  He gets his initial

11   appearance.  Johnny's mother comes down to be a witness at a

12   detention hearing.  And the day after the court rules, Johnny's

13   mother notifies the marshal, "I'm positive for COVID."  So

14   everybody that was in that courtroom's got to quarantine for 14

15   days, and you can only do so much from home.

16             I mean, I did everything, even videoconferencing or

17   telephonically, and the paperwork moved, but you do the best

18   you can.

19             I -- the Florida Bar every year asks -- have y'all

20   ever been to the Federal Judicial Round Table at the Florida

21   Bar meetings?

22             MS. O'CONNOR:  Yes.

23             THE COURT:  Okay.  Well, did you go this year?

24             MS. O'CONNOR:  I did, Your Honor.  I was a moderator

25   of one of the sessions.

1          THE COURT:  Well, let me tell you, Ms. Moderator, you
2    were the ones that were screwing up.
3          MS. O'CONNOR:  No.  No.
4          THE COURT:  We had 15 breakouts -- not you
5    personally.
6          We had 15 breakout sessions, and some of them had one
7    judge, two judge, or three judges.  And the moderators were
8    kind of controlling who was getting in to which breakout
9    session.
10          And all I kept hearing on the Zoom was, "I've tried
11    to get into 15, but they won't let me in.  Can you help me?"
12    And there was something technically wrong, and everybody was
13    listening to these conversations.
14          It reminded me -- I can't remember where it was.  It
15    was somewhere in Georgia where there was a county commission
16    meeting, and it was open to the public, and all of a sudden
17    somebody hooks porno into the website.
18          MR. BAIN:  Oh, no.
19          THE COURT:  It was just one nightmare after another.
20          And there was one; I can't remember where it was.  A
21    doctor -- a surgeon was supposed to be in court at
22    such-and-such a time by Zoom, and he's on Zoom.  He's in the
23    surgical wing actually performing surgery and talking to the
24    judge about his case.
25          MR. BAIN:  Wow.

1    THE COURT:  It's -- you know, you just run into those

2  technical glitches, so you do the best you can.

3    But one of the sessions that I was in -- and if you

4  want to know anybody that's concerned about the current health

5  situation, it's me.

6    Female lawyer, sole practitioner.  Daughter did not

7  get COVID, but she got a terrible case of pneumonia and was in

8  the hospital for two weeks.  And that child told her mother,

9  "You can't go to your office.  I don't want you in the office

10 building.  I don't want you in an elevator."

11   There were two other judges and myself, and the

12 answer to the question is, "You don't have to worry if you ask

13 for a continuance before me, because we're not going to make

14 you come down and have your daughter have problems because

15 she's concerned you're going to bring COVID home to her."

16 Three judges were agreeable to something.

17   But somebody raised the issue, "You know that there's

18 somebody somewhere" -- and it's probably an Article III

19 judge -- "who's going to say, 'I told you we're going to trial

20 on August 2nd, and I don't care what happens.  We're going to

21 trial.  Put your mask on and be down in the courthouse.'"

22   So you just don't know, but you don't have to worry.

23 Everybody here is gun shy, and I know of nobody that's going to

24 say, "Okay.  I'm going to expose you to the possibility of

25 catching COVID because I had a trial date and I'm not going to

1    change it."

2           It's -- although -- did I ever tell you the story

3    about the Michigan -- the Massachusetts lawyer that had a

4    criminal case down here and one in Massachusetts at the same

5    time?  Did I ever tell you that?

6           Well, we had a judge who had a criminal case.  Pro

7    hac vice lawyer comes down here from Massachusetts.  It turns

8    out, on the trial date, a judge in Massachusetts set a criminal

9    case the same day the federal judge had his trial.

10           Motion to continue in both cases.  Both judges deny

11    it.  I -- this is when I was a magistrate judge.  The lawyer

12    tells me this problem.  This is where I invented the word

13    nobody should have diarrhea syndrome because judges are not

14    understanding.

15           He brought to me an order from the judge in

16    Massachusetts that specifically said, "You are admitted in the

17    state of Massachusetts.  You're appearing in Florida pro hac

18    vice.  Don't show up in my courtroom for this trial, and I will

19    assure you you will be disbarred, and you'll never be able to

20    practice law anywhere in the country."

21           MR. BAIN:  Wow.

22           THE COURT:  The lawyer shows me this order.  I went

23    and talked to the district judge and said, "Obviously this

24    state judge is really on the warpath.  Put the case off."

25           And what he actually -- he actually finally continued

1    it.  But for a few weeks this lawyer didn't know what in the

2    world to do, you know.

3            MR. BAIN:  Well, Judge, that anecdote is appropriate

4    because I have to tell you one other thing, is that I was on a

5    trial calendar for a trademark case to begin this Monday,

6    August 2nd, in the Southern District in Fort Lauderdale.

7            And the judge on Friday, sua sponte, continued us to

8    his September 7th trial calendar.  So as it sits right now, if

9    we're going to go on September 13th, I've got the conflict.

10           THE COURT:  Between that and this case?  Well --

11           MR. BAIN:  So I guess -- but if this Court says -- I

12   mean, are we --

13           THE COURT:  I'm going to keep --

14           MR. BAIN:  If something doesn't prevent it, are we

15   going on the 13th here?  Because I can possibly get the

16   continuance from the other judge.

17           THE COURT:  I'm going to -- I'll keep you posted.  I

18   have to -- I talked to Judge -- Chief Judge Corrigan just for a

19   few minutes at lunch today, because he was in the middle of a

20   horrible sentencing in what every judge wants to avoid, and

21   that's having to try or sentence somebody in a kiddie porn

22   case.  And the sentencing just went on and on.

23           We had a noon meeting, and he didn't show up till

24   12:55, so I only had a few minutes to talk to him.  He said

25   he'll take care of it.

1          But he's going to either agree to do it himself.  I'm

2    going to tell him about the two- or four-week problem.  If he

3    can do it on the 15th, I'll let you know.  If he can't do it,

4    I'll let you know.  Just don't worry about it right now.

5    I'll --

6          MR. LUNSETH:  Your Honor, on that subject, since you

7    raised the issue in one of your orders a day or two ago, I

8    talked to the clients.  You should understand that both

9    companies here have their heaviest business season from

10   November 15 through roughly --

11         THE COURT:  For taxes.

12         MR. LUNSETH:  -- February 15, and it's intense.  They

13   need all hands on board.  It's like 80 percent of their

14   business, really, for both of them.

15         So a case that got started after October 15 would be

16   too late.

17         THE COURT:  Too late.  Okay.  I'll mention that to

18   Judge Corrigan.

19         MR. LUNSETH:  Yeah.

20         THE COURT:  Do y'all remember John Brown when he

21   was -- when we were part of the Fifth Circuit, or are you too

22   young?

23         He was the chief judge and came to every investiture

24   from Georgia to Texas.  And he had the same speech to every

25   judge, and that is, "Remember, you have been appointed and not

1    anointed."

2             So it isn't a matter of he's going to tell me, "Well,

3    I can do it November 15th."  If he can do it November 15th, he

4    can do it February 15th.  Don't worry about it.

5             Is that -- do you all agree that that's the time that

6    should be blocked off?

7             MR. LUNSETH:  It's got to be done by November 15 --

8             THE COURT:  Finished.

9             MR. LUNSETH:  -- or it goes to February.

10            THE COURT:  To February.

11            MR. LUNSETH:  It can't be --

12            THE COURT:  Okay.  I'll mention that to him.

13            MR. LUNSETH:  I would venture to guess that somewhere

14    around 30 or 40 percent of all the W-2s in the country are

15    handled by these two companies in that period of time, just

16    from what I know of Aatrix's volume.  So I don't know.  The IRS

17    would be --

18            THE COURT:  How come I don't get mine --

19            MR. LUNSETH:  -- upset at all of us.

20            THE COURT:  How come I don't get mine until March?

21            MR. LUNSETH:  Well, you've got to get the federal

22    courts to talk to Aatrix.

23            I have some questions.  I have some housekeeping

24    questions and then one or two --

25            THE COURT:  Yes.

1          MR. LUNSETH:  -- more substantive ones.

2          You want all exhibits premarked in accordance with

3     the exhibit list?

4          THE COURT:  Yes.  Yes.

5          MR. LUNSETH:  Okay.

6          THE COURT:  And I assume that you don't need more

7     than three challenges a side because that's -- there's only one

8     party on each side.

9          MR. LUNSETH:  Right.

10          We could mark them P1 through whatever and D1 through

11    whatever, if that works.

12          THE COURT:  Whatever -- the clerk can tell you what

13    tags to put on them.

14          MR. LUNSETH:  Okay.  We'll ask the clerk.

15          THE COURT:  Yes.

16          MR. LUNSETH:  Do you ask all the questions in voir

17    dire --

18          THE COURT:  Yes.

19          MR. LUNSETH:  -- or do you let the lawyers ask some?

20          THE COURT:  No.  I ask all the questions, but you

21    submit proposed questions.

22          MR. LUNSETH:  What are the --

23          THE COURT:  And I give you an opportunity, after I

24    finish -- and Judge Corrigan, I think, follows the same

25    thing -- to submit additional questions or, "I want juror No.

1    23, who answered this way, to please answer a follow-up

2    question."

3              MR. LUNSETH:  But we would address that to you --

4              THE COURT:  Yes.

5              MR. LUNSETH:  -- and you'd ask the question.

6              THE COURT:  Yes.

7              MR. LUNSETH:  What's the schedule?  How many hours a

8    day?  I mean, from when to when?

9              THE COURT:  Well, I usually do mine from 9:00 to

10   5:00, and the reason from 9:00 to 5:00 is the marshal has no

11   overtime money.  So when 5 o'clock comes, they've got to leave

12   the building, and we don't have anybody else to secure the

13   building.

14             So we usually do 9:00 to 5:00.

15             MR. LUNSETH:  Four days a week or five?

16             THE COURT:  Five days a week.

17             And what I normally do is take a 15-minute recess in

18   the morning, and then in the afternoon a 15-minute, and then a

19   five-minute for one, so . . .

20             With this caveat I tell everybody that's on the jury,

21   "My biological clock and your biological clock may not be the

22   same.  If you've got to go to the bathroom or something, raise

23   your hand."

24             50 years ago I was trying a case before Chief Judge

25   McRae in the building across the street, and all of a sudden a

1   man gets up and walks out of the jury box.  And the judge says,

2   "Wait a minute.  Where are you going?

3          And the man turned to him and said, "Unless you want

4   me to go in my pants, I'm going to the bathroom."

5          And I'm not a tea drinker, but I heard, at a very

6   young age on the bench, drink tea all during the trial to force

7   you to go, and then you won't make the jury suffer.

8          Same thing with the lawyers.  If you need a break,

9   you need a break, and if it's not a bathroom break but you need

10  to talk to somebody, raise your hand.

11         MR. LUNSETH:  The elderly, I have a lot of sympathy

12  for that.

13         Are we being recorded everywhere in the -- in the

14  courtroom?

15         THE COURT:  The court reporter is.

16         MR. LUNSETH:  Yes.  But, I mean, if we move over,

17  like, in front of the jury box or up at sidebar, we're being

18  recorded?

19         THE COURT:  Yeah.  They're running a tape recorder to

20  make the tape.  We don't record our proceedings.

21         MR. LUNSETH:  On a --

22         THE COURT:  The court reporter does.

23         MR. LUNSETH:  On a sort of related issue, a lot of

24  lawyers -- some federal courts allow it; some don't, but a lot

25  of lawyers like to stand in front of the jury box for opening

1   and closing.

2           THE COURT:  Yeah.

3           MR. LUNSETH:  It occurred to me that maybe with COVID

4   going on, we'd have some jurors that would be nervous about

5   that, so --

6           THE COURT:  That -- that -- we'll turn the lectern

7   sideways, and you do it from here.

8           MR. LUNSETH:  Stay at the lectern.

9           THE COURT:  Yeah.

10          MR. LUNSETH:  Got it.

11          THE COURT:  Yeah.  The local rule says, you know,

12  kind of do that.

13          Yeah.  I'm old.  I don't want to ask you your age,

14  but I can remember the days you'd make your argument by walking

15  up and down in front of the jury box.

16          MR. LUNSETH:  Yeah.

17          THE COURT:  Do you remember -- I can't even remember

18  his name now.  It was back in the 1970s.  It was a big scam

19  case.  He was a scam artist from Orlando.

20          And I remember he had a lawyer from Washington, D.C.

21  And this lawyer, in the middle of his closing argument, throws

22  his foot up on the jury box rail and said -- and he was wearing

23  cowboy boots, and he was referring to his client.

24          It was a company called Dare to be Great.  I wish I

25  could remember the guy's name.  And he said, "He's like me.  We

1    wear boots because we're common people."

2           He never appeared in a courtroom again.

3           MR. LUNSETH:  On the issue of scheduling, before I

4    forget it, we talked to -- we're both at the Omni.  We have

5    rooms and conference rooms scheduled at the Omni.

6           And I asked a woman at the Omni today what happens if

7    this gets moved.  And she said, "Well, we've got a -- I think

8    it's a Gator game on the weekend of the 29th and 30th."  And

9    she said, "We might have rooms for you, but Bain is going to

10   have to sleep in the alley."

11          THE COURT:  He's going to sleep at his mother's.

12          MR. LUNSETH:  My point, beside the joke, is there

13   might be some issues.  The sooner we know if there's going to

14   be a postponement --

15          THE COURT:  What I'm going to do when I walk out of

16   here is I'm going to talk to Judge Corrigan and find out.

17          If there's no possibility that he can try the case on

18   September 15th, I'm going to have my courtroom -- my law clerk

19   call you and let all of you know right away so you can take

20   care of the . . .

21          MR. LUNSETH:  And then as far as putting in exhibits

22   is concerned, in federal court, what I'm familiar with is we've

23   got them premarked.  They've got copies, so I don't have to

24   offer a copy to them.

25          We authenticate it with the witness.  We offer the

1  exhibit.  It shows up on your screen but not the jury's screen.

2  You make a ruling, and then the clerk --

3          THE COURT:  You mean on -- no.  I don't have it on my

4  screen either.  I've got to look at the piece of paper.

5          MR. LUNSETH:  Okay.  So you want -- well, you're

6  going to have a book --

7          THE COURT:  Yes.

8          MR. LUNSETH:  -- so you'll have it in front of you.

9          THE COURT:  If I have the book, or if you're going to

10 use the overhead projector, then I can see it here

11 (indicating).

12         MR. LUNSETH:  Right.

13         THE COURT:  Oh, it's not down.

14         You want to see the size of the screen?  We'll let it

15 come down.

16         MR. LUNSETH:  I think we have before.

17         THE COURT:  Okay.  Let it come down.

18         COURTROOM DEPUTY:  (Complies.)

19         THE COURT:  There you go.

20         And this will save you from having to produce a copy

21 for the jurors.

22         You get a nice big thing, and it's a little overhead,

23 so you can do it with the individual piece of paper.  Or if you

24 have someone that really is pretty proficient with a computer,

25 we -- the little part that comes out of the table in front of

1    you, you just plug your computer in there, and it will connect

2    to the system and automatically show up.

3              MR. LUNSETH:  And then the -- once the exhibit is

4    admitted --

5              THE COURT:  You give it to the clerk.

6              MR. LUNSETH:  -- then the clerk will hit the button

7    that lets the jury see it.

8              THE COURT:  The clerk will just take care of it.

9              MR. LUNSETH:  What can we keep in the courtroom?

10             THE COURT:  You can leave whatever you want in the

11   courtroom.  It will be closed at night.

12             There's two attorney conference rooms, one right

13   outside this first set of double doors, and there's another one

14   out in the hallway, attached.

15             MR. LUNSETH:  I was thinking about things like boxes

16   of documents and a whiteboard.

17             Can we just stack them back here against the bar?

18             THE COURT:  Yep.

19             MR. LUNSETH:  Okay.  Are there -- do you know if

20   there will be any jurors housed in the Omni?

21             THE COURT:  You know, we -- we have jurors that come

22   from as far away as Suwannee County, which can be a two-hour

23   ride.  So they -- they have the ability, if they want, to get

24   per diem and stay overnight.

25             I have never had a jury where they wanted to stay in

1    Jacksonville.

2         MR. LUNSETH:  Maybe can we ask the clerk that

3    question?  The issue for us is we'll have our hair down over

4    there.  We go to work in the boardroom.  The door might be

5    open, you know.  Jurors are going to see you.  So do you have

6    to be on stage when you're over at the hotel?

7         THE COURT:  Nope.  Nope.  We'll make sure -- if

8    there's anybody that is contemplating staying, we'll tell them

9    don't stay at the Omni.

10        Both of you are going to camp out over there?

11        MR. BAIN:  Yes.

12        MR. LUNSETH:  Yeah.

13        MR. BAIN:  And I'm not sure how Mr. Lunseth knows

14   that, but yes.

15        MR. LUNSETH:  We talked about preliminary

16   instructions.  I think the deadline for instructions is the 3rd

17   of September.

18        The question is, is that enough time for -- if we

19   submit preliminary instructions that are given to the jury at

20   the beginning of the case, is that enough time for you to

21   decide what --

22        THE COURT:  Yeah.

23        MR. LUNSETH:  Okay.  So --

24        THE COURT:  If you look online, because I -- he might

25   have them.  You can get the Eleventh Circuit pattern jury

1    instructions, and it's right in there.

2           It would probably be beneficial to -- when I was

3    trying cases, I -- the first thing I would always do is get the

4    jury instructions set, and that's what I knew I had to prove.

5           So I like to instruct a jury on what the essential

6    elements are for claims or counterclaims so they know at the

7    beginning --

8           MR. BAIN:  At the beginning?

9           THE COURT:  -- what to look at.

10          MR. BAIN:  At the beginning, Judge?

11          THE COURT:  At the beginning.

12          MR. BAIN:  At the beginning of the trial?

13          THE COURT:  The preliminary instructions.

14          MR. BAIN:  Good.

15          MR. LUNSETH:  I don't --

16          THE COURT:  And reinstruct them at the end.

17          MR. BAIN:  Right.

18          THE COURT:  And tell them at the beginning they're

19   going to be further instructed, you know, more fully at the

20   end.

21          I just try, you know, like, if you have a conspiracy

22   count, to tell them what the essential elements of conspiracy

23   are.

24          MR. LUNSETH:  I don't have a problem with the -- that

25   part.

1          There are no Eleventh Circuit pattern instructions

2    because they don't handle patent cases, so -- and the Federal

3    Circuit doesn't publish any.

4          But we'll submit them on the 3rd, if that --

5          THE COURT:  Sure.

6          MR. LUNSETH:  If that works for the Court.

7          THE COURT:  And if you can get together and come up

8    with two things at the beginning:  one is a joint statement of

9    the case to read at the beginning so the jurors know what each

10   side is going to try to do, and then the rest of the

11   instructions.  It makes it a lot easier if you can agree to

12   them, and you've had experience with other patent cases.

13         MR. LUNSETH:  Your pretrial order says that the

14   lawyers are supposed to submit demonstratives, such as charts

15   and graphs, that they intend to use in opening and closing.

16         And I think we've got an agreement to do that on the

17   27th and then the 3rd --

18         THE COURT:  Right.  I think you had, in your pretrial

19   thing, objections by the 3rd.

20         Yeah.  That's the whole purpose in getting it done

21   ahead of time.

22         MR. LUNSETH:  Right.

23         THE COURT:  There's nothing worse than a lawyer being

24   up there in closing argument, and the other side objecting,

25   "I've never seen it," and it distracts everything.

1          MR. BAIN:  Uh-huh.

2          THE COURT:  And you wouldn't be surprised to hear

3    that some lawyers do it on purpose to --

4          MR. LUNSETH:  So not to cut too fine a point, but

5    if -- if one or both of us were to use a PowerPoint --

6          THE COURT:  Same thing.

7          MR. LUNSETH:  Well, do you have to submit the whole

8    PowerPoint or just the charts?

9          THE COURT:  Well, whatever you're going to show the

10   jury --

11         MR. LUNSETH:  Well, the PowerPoint --

12         THE COURT:  -- let them get a look at it.

13         MR. LUNSETH:  A PowerPoint --

14         THE COURT:  You know, what if you make a PowerPoint

15   and have something in a PowerPoint that there was no evidence

16   on?  Then we've got to get into a haggle.

17         That's why I try to get everybody to exchange

18   whatever it is, to avoid that coming up.

19         MR. LUNSETH:  Sure.  I get that.

20         But a PowerPoint is -- you can think of it in two

21   pieces.  One, it's an outline of what the lawyer is going to

22   say in his opening statement, and it's just, you know, a dash

23   and a few words and then a dash and a few more words.

24         And the other part of it is I might --

25         THE COURT:  Yes.

1          MR. LUNSETH:  Someone might put up a chart or a graph
2     or -- those are two demonstratives.
3          So I'm wondering if the outline part of it, you know,
4     where we're just saying, "Here's what I'm talking about" --
5          THE COURT:  No.  I don't care about the opening.
6     It's the closing.  It's the closing that I'm concerned about.
7     In opening, he doesn't have to know ahead of time what you're
8     going to talk about.
9          MR. LUNSETH:  Okay.
10          THE COURT:  It's the closing part.
11          And if there is -- I mean, if you've got some kind of
12     a chart, let him see it because what if the chart -- nowhere is
13     the chart going to come into evidence?
14          MR. LUNSETH:  That would be my expectation, to do it
15     that way.
16          THE COURT:  Yeah.
17          MR. LUNSETH:  I just wanted to get it clear.
18          Does that make sense to you?
19          MR. BAIN:  So when would we disclose the closing
20     demonstratives to each other?
21          THE COURT:  Yeah.  Just before the trial so -- and in
22     time so if there are objections, that the Court can timely rule
23     on it.
24          Used to be that the people would file objections on
25     Friday, okay?  Well, if we're starting on Monday and you file

1   something on Friday, when do you think the judge is going to

2   look at it?

3          MR. LUNSETH:  Yeah.

4          There was a provision in the case management and

5   scheduling order, I think, or the pretrial order that said that

6   if a party wants -- if a party's going to use impeachment

7   documents, they should be submitted to the Court for ex parte

8   review.  And that's a new one to me.

9          Do we have to submit everything that we're going to

10  use for impeachment to you for ex parte review?  Is that it?

11         THE COURT:  Yep.

12         MR. LUNSETH:  Okay.  And then some more substantive

13  issues.

14         You ordered that we get the access keys in seven

15  working days, and that works out to August 6.  Currently we're

16  supposed to give the other side our demonstratives, which will

17  come from that software, on the 27th, so that's only three

18  weeks.

19         So our time has been cut.  We had -- we started this

20  with three months to go.

21         THE COURT:  Yeah.

22         MR. LUNSETH:  I don't know that we can make --

23         THE COURT:  Just tell me how much more time you need.

24         MR. LUNSETH:  Well, if we're going on the 15th, we'd

25  like another week at least.

```
 1              THE COURT:  No problem.

 2              MR. LUNSETH:  Okay.  And then we have -- with the

 3     defendant, we've worked out supplementation of damages so we

 4     have damage information from the expert reports up to May.

 5              But there's going to be that period from May to the

 6     time --

 7              THE COURT:  To the trial date?

 8              MR. LUNSETH:  -- of trial, and I'm just throwing out

 9     there that we should have a deadline to get that financial

10     information from them and then we generate the supplementation

11     back.

12              There's no -- other than the math, there's no

13     analysis in it.  It's just math.

14              Do you follow me?

15              MR. BAIN:  I thought we already produced the

16     supplementation to you.

17              MR. LUNSETH:  Up through May, but --

18              THE COURT:  He's talking about from May on.

19              MR. LUNSETH:  So we've got June, July.  Technically

20     we're supposed to prove damages as of the date of trial.

21              MR. BAIN:  Okay.

22              MR. YORK:  So what are you proposing?

23              MR. LUNSETH:  Maybe we can work this out among

24     ourselves and give you an order.

25              I think that's it.
```

1          That's my list.  Thank you.

2          THE COURT:  How about the other side?

3          MR. YORK:  The only thing I'd add, Your Honor, the

4     access order to the products was entered yesterday.  We have

5     the registration keys, so we're prepared to give them up.  We

6     have those.  We received those last night.

7          MR. LUNSETH:  Okay.

8          MR. YORK:  Just as -- for your information.

9          MR. BAIN:  I don't think there's anything else.

10          MR. LUNSETH:  Well, and we're both going to submit,

11     or jointly submit, an order, speaking of access, to get

12     everything in the courtroom, you know, technology and all that

13     stuff.

14          THE COURT:  You mean computers and your cell phones?

15     Oh, you're not a member of the Florida Bar.

16          MR. LUNSETH:  Well, we can get a cell phone through

17     the door, but when we walk in with -- I don't know what we're

18     going to have.  We just need an access order.  I think we'll

19     work that out and submit it to you.

20          THE COURT:  For computers and cell phones --

21          MR. BAIN:  Yes.

22          THE COURT:  -- and whatever else?

23          MR. LUNSETH:  Yeah.

24          THE COURT:  No problem.

25          MR. LUNSETH:  Can we --

1        THE COURT:  Just make sure you -- just make sure you
2   keep the phones so they're not recording.
3        MR. BAIN:  Okay.
4        THE COURT:  We, a few years ago, had a terrible
5   sequestration problem in another courthouse in our district,
6   where someone had the phone open, and the witness is sitting in
7   the lawyer's office listening to the trial.  It wasn't my case.
8        I only had that happen one time in a state death
9   habeas case where, it turned out, one of the petitioner's
10  lawyers from Colorado actually, in violation of the
11  sequestration order, went back to an office after the trial to
12  prep witnesses for the next day and recited almost verbatim
13  what every witness that day had to say to the witnesses for the
14  next day.
15       And I was tempted to throw the petition out, but I
16  went ahead and -- this was the last defendant to be executed by
17  electrocution in the state of Florida.
18       And when I tell people the interesting part about the
19  case was the man weighed almost 500 pounds.  He had put on a
20  tremendous amount of weight and then argued medically that the
21  electric chair can't handle him.
22       And we had to have a special chair brought into the
23  courtroom because he was so big he couldn't fit in a regular
24  chair.
25       MR. LUNSETH:  Just so Your Honor is aware, and I

1   think we said this in the pretrial statement, at least from

2   Aatrix's point of view, we intend to have live witnesses at

3   trial.  So we've told the defendant if they want to call one of

4   our people, tell us who it is; we'll get them here.

5           THE COURT:  Ahead of time?  Yeah.

6           And if you want a -- if I was trying the case -- the

7   lawyers have always agreed to take and explain to the jury what

8   we're doing.  If you were going to call one of the plaintiff's

9   witnesses in your case in chief, is just do it all at once and

10  explain to the jury why it's happening that way.

11          And I think that -- at least I know I was capable --

12  I hope every judge is capable -- of when it comes time for a

13  motion, not to consider that other evidence that would not have

14  come in, because you didn't get that far, in deciding whether

15  to enter a Rule 50 motion.  So we can do that.

16          I -- we've had -- you name it.  Logistically, we've

17  accommodated everybody we can:  doctors called out of turn

18  because they've got transplant problems on Wednesday and -- but

19  they're available on Tuesday, but the -- you were in the middle

20  of the other side's case.

21          Jurors -- let me tell you, I generally try to talk to

22  jurors after every case about their experience, and you'd be

23  surprised on how intelligent, even without college educations,

24  jurors are.

25          And after they get my little speech about how they're

1    carrying on a tradition that started with the Egyptians in

2    ancient days of the jury system, how intense they treat the

3    business.

4              I've had letters from people thanking me for telling

5    them about the history of the jury system because they never

6    had any idea how it came about, why we're using it, and --

7    especially in criminal cases where you're explaining, if you

8    were sitting over there as the defense counsel, what would you

9    want in the jury box.

10             The trial next week that we hope to get started

11   involves an active-duty naval officer.  Part of the charges are

12   allegations about lying on a security clearance form.

13             He's a native of China, and the defense attorney is

14   concerned about jurors' attitudes towards foreign born, towards

15   Chinese, towards the potential of hostility between China and

16   America, and now with what was tagged as the Chinese virus, do

17   they have any personal feelings about the Chinese.

18             I sentenced a co-defendant in the case two weeks ago,

19   and one of the documents that the defense attorney had

20   submitted was a declaration from a former assistant director of

21   the Federal Bureau of Prisons about foreigners are not allowed

22   into prison programs that they have for citizens, how fellow

23   inmates treat foreign prisoners.

24             And it turned out, in this particular case -- I

25   didn't know it until I got to sentencing -- this man had been

1  housed in the local county jail and was constantly not only

2  being harassed but being physically molested by fellow inmates

3  and, actually, according to his lawyer, was being threatened

4  with extortion and was paying off some inmates not to beat him

5  up.

6         So you try doing the best and, you know, getting a

7  fair and impartial group.

8         Anything else?  I've been looking at my notes over

9  here because I wrote 4:30 to make sure that --

10        MR. LUNSETH:  Thank you.

11        THE COURT:  -- you're gone.

12        MR. BAIN:  Would we have an opportunity to look at

13  that courtroom today, Your Honor?

14        THE COURT:  Yes.  I'm going to ask the courtroom

15  deputy if she'll take you upstairs.

16        MR. BAIN:  Thank you.

17        THE COURT:  And then you can take a look at that.

18        Anything else?

19        Years ago I tried a case in Tampa.  Unfortunately, it

20  lasted for seven months.  And Judge Krentzman used to let us go

21  at 3:30 on Friday.

22        And there was only one flight a day from -- this is

23  when National Airlines was still in business -- from Tampa to

24  Jacksonville, and it left at 4:30.

25        And I had an FBI agent with the engine running and

1    the siren on, and many a Friday I'd wave to the plane as it was

2    going down the runway and have to figure out how to get to

3    Orlando because the midnight flight from Orlando to

4    Jacksonville wasn't booked.

5         We finally convinced him to end a half hour early on

6    Friday, and we could make the flight.  There were a bunch of

7    lawyers from Jacksonville that had asked him that.

8         So don't miss your flight.  It's ten to, so she'll

9    take you upstairs.

10        You just want to see the one that we're going to try

11   the case in.

12        MR. BAIN:  Yes.

13        THE COURT:  Yeah, okay.  Good enough.

14        Have pleasant journeys back, and I'll talk to Judge

15   Corrigan and let you know -- and I'll try to get the orders out

16   on everything except that -- Riley is not -- is the one case

17   that I still need more time on than the others.

18        Okay.

19        COURT SECURITY OFFICER:  All rise.

20      (The proceedings were concluded at 3:51 p.m.)

21                              -  -  -

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4    UNITED STATES DISTRICT COURT )

5    MIDDLE DISTRICT OF FLORIDA    )

6

7           I hereby certify that the foregoing transcript is a

8    true and correct computer-aided transcription of my stenotype

9    notes taken at the time and place indicated therein.

10

11          DATED this 15th day of September, 2021.

12

13                              s/Shelli Kozachenko_____
                                Shelli Kozachenko, RPR, CRR, CRC
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25